**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| Alicia Holland, | Civil Action No. 9:20-cv-03479-DCN-MHC |
| Plaintiff, | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT JAMES BECKERT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Beaufort County and James Beckert, Individually and in his Official Capacity, | |
| Defendants. | |

Plaintiff, a former employee of Beaufort County, has filed suit against Beaufort County (asserting a violation of Title VII, a violation of 42 U.S.C. § 1983, negligence and assumption of a duty) and James Beckert (alleging outrage, assault, defamation and a violation of 42 U.S.C. § 1983) for damages sustained from being harassed, bullied, intimidated and defamed by James Beckert via the hostile work environment Beaufort County allowed to exist and thrive. James Beckert asserts he is entitled to summary judgment on all causes of action. Sufficient evidence exists to submit these claims to a jury, and as such, summary judgment must be denied. Plaintiff submits this Response in Opposition to Defendant James Beckert's Motion for Summary Judgment. ECF No.: 114.

## FACTS

I.      **Parties.**

        a.  **Alicia Holland ("Holland").**

Holland was the Chief Financial Officer for Beaufort County until she resigned on April 20, 2020 (last date worked: May 1, 2020). *See* Ex. 1 – Holland Resignation Documents. Holland was employed with Beaufort County for approximately ten (10) years prior to her resignation. In

April of 2010, Holland began working for Beaufort County as a financial analyst. ECF No.: 1-1 – Summons and Complaint. She was promoted to Controller in 2011 and again to CFO in 2013. *Id*. As CFO, Holland was responsible for the general ledger; consulting the County's financial documents and/or data provided by each department (Treasurer's Office, Auditor's Office, etc.) to calculate rates and analyze Beaufort County's revenue; calculating the County's millage rates from data provided by the Auditor, Treasurer and Accessor; and developing the County's budget. *Id*. Plaintiff resigned from Beaufort County after years of harassment, intimidation and bullying on behalf of Defendant Beckert, having received no assistance or protection from her employer.

### b. James Beckert ("Defendant Beckert").

Defendant Beckert was elected in 2014 as the Beaufort County Auditor. Contrary to Defendant Beckert's Motion for Summary Judgment (ECF No.: 114, p. 6 ¶ 3), he is *still* the Auditor (until the Auditor elect is sworn in on July 1, 2023).

During his tenure as Auditor, Defendant Beckert has exhibited outrageous and inappropriate conduct. For example, in 2018, he referred to the Beaufort County Republican Chairwoman by an antisemitic slur.[1] Defendant Beckert has harassed, bullied, intimidated and defamed several female employees and/or elected officials in Beaufort County government. ECF No.: 28, ¶ 5. After being sued by Holland and Maria Walls (companion case pending in Beaufort County Court of Common Pleas, Civil Action No.: 2020-CP-07-01635) and served with the EEOC charge/complaint, Beaufort County finally removed Defendant Beckert from his office in the Beaufort County Government Administration Building, relocating him to a remote office space away from female County employees and/or his victims; he is also not allowed to directly contact county employees.[2]

---

[1] *See* Ex. 2 - Hervochon Dep. 33:17 – 35:10.
[2]

### c. Beaufort County.

Beaufort County is a Council-Administrator form of government, with eleven (11) County Councilmembers and several elected officials, including the Treasurer and the Auditor.

The Court will remember a hearing on January 5, 2023 to address Holland's 30(b)(6) Notice to Beaufort County. In accordance with the Court's instructions, Holland presented Beaufort County with testimony from depositions already taken to eliminate duplicative testimony. Beaufort County could then adopt this testimony as its own – it did so. Ex. 3 - Beaufort County Adopts Testimony. Plaintiff's counsel has indicated the testimony adopted by Beaufort County as it is cited herein.

## II.    Defendant Beckert's Conduct Toward Holland.

During Holland's tenure at Beaufort County, she was subjected to severe and pervasive conduct on behalf of Defendant Beckert, e.g., Holland has been bullied, intimidated, harassed and defamed, as well as had her work product, intelligence and character called into question. *See* ECF No. 28 – Amended Complaint.

---

| | |
|---|---|
| Q: | Okay. So shortly after Maria Walls filed her lawsuit, it seems a policy was put in place to, one, remove Jim Beckert from the county admin building and, two, not allow him back in the building absent an escort. |
| A: | Uh-huh. |
| Q: | Do you remember that policy being put in place? |
| A: | I do. |
| Q: | Did you put that policy into place? |
| A: | No. Council did. |

… 

| | |
|---|---|
| Q: | What about the County's directive for Mr. Beckert and this building, what do you know about that? |
| A: | I know that Ashley Jacobs and the County Council and the County Attorney developed a policy that was in place when I took over as acting County Administrator that said that Mr. Beckert was going to be relocated to another building, and if he wanted to come into this building, and if he wanted to come into this building he would need an escort in order to be in this building. |
| Q: | And have you continued to carry out this policy? |
| A: | I have. |

Ex. 4 - Jacobs Dep. 71:9 – 71:19; Ex. 5 - Greenway Dep. 34:3 – 34:16.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists. Fed. R. Civ. P. 56(a). Defendant Beckert has the burden of establishing the nonexistence of a genuine dispute. *Id.* (requiring that "the movant shows that there is no genuine dispute as to any material fact"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). Under Fed. R. Civ. P. 56(c):

> A party asserting that a fact cannot be … genuinely disputed must support the assertion by:
>
> (A)     Citing to particular parts of materials in the record…; or
>
> (B)     Showing that the materials cited do not establish the … presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Defendant Beckert must identify those parts of the record that show facts are conclusively established. *Id*; *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. "Even after *Celotex*, it is never simply enough to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). "In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party ***is to be believed*** and all justifiable inferences must be drawn in the non-moving party's favor." *Allen v. Greenville Hotel Partners, Inc.*, 405 F. Supp. 2d 653, 656 (D.S.C. 2005) (emphasis added) (*citing Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). "The facts must be viewed in the light most favorable to the non-moving party so that any doubt as to the existence of a genuine issue of material fact will be resolved in favor of denying the motion." *Fitts v. Witkowski*, 920 F. Supp. 679, 681 (D.S.C. 1996).

## LEGAL ANALYSIS AND ARGUMENT

First and foremost, Defendant Beckert's Motion is written as if it is a Motion to Dismiss. Defendant Beckert consistently states that Holland "has not plead" sufficient facts, etc. For a summary judgment motion, the entire record is in play, not just the pleadings. For that reason alone, Defendant Beckert's Motion fails to meet its burden for summary judgment.

In his Motion, Defendant Beckert asserts several arguments, including: (1) Defendant Beckert is immune from suit under the South Carolina Tort Claims Act; (2) there are insufficient facts to support a constitutional violation; (3) Defendant Beckert is entitled to Qualified Immunity; (4) Holland cannot meet her burden of proof for her outrage claim; (5) Holland cannot meet her burden of proof for her assault claim; and (6) Holland cannot meet her burden of proof for her defamation claim. Holland contests each argument and offers evidence sufficient to survive summary judgment.

### I.    Holland's Claims Are Not Barred by the South Carolina Tort Claims Act ("SCTCA").

Defendant Beckert asserts that Holland's claims against him (Negligence, Outrage and Assault) are barred under the SCTCA. As discussed in detail below, neither the Outrage nor the Assault causes of action require a SCTCA analysis (Holland is dropping the assault cause of action and her outrage cause of action is against Defendant Beckert in his *individual capacity*), which leaves Holland's Defamation subject to a SCTCA analysis.

#### a.    Holland's Defamation Claim is Not Barred by the SCTCA.

The SCTCA is the exclusive and sole remedy for any tort committed by an employee of a government entity while acting within the scope of the employee's official duty. S.C. Code Ann. § 15-78-200. The SCTCA provides that the State, its agencies, political subdivisions, and other governmental entities are "liable for their torts in the same manner and to the same extent as a private individual under like circumstances," subject to certain limitations and exceptions provided

in the SCTCA. S.C. Code Ann. § 15-78-40. "*The governmental entity asserting the Act as an affirmative defense bears the burden of establishing a limitation upon liability or an exception to the waiver of immunity*." *Hawkins v. City of Greenville*, 358 S.C. 280, 292, 594 S.E.2d 557, 563 (Ct. App. 2004) (emphasis added); *see also Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014) ("[S]overeign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating.").

"[I]f it is [proven] that the employee's conduct was not within the scope of his official duties *or* that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude," no immunity under the SCTCA is granted. S.C. Code Ann. § 15-78-70(b) (emphasis added). Holland concedes that Defendant Beckert's conduct at the time he made the defamatory statements was outside the scope of his official duties, even if it was within the scope of his employment. Further, the evidence clearly demonstrates that his statements were made with actual malice. Therefore, while Defendant Beckert is immune from liability in his official capacity as Auditor, there is also conduct alleged within the Complaint that falls outside of his official duties as Auditor and the umbrella of the SCTCA such that he is individually liable for this conduct.

### b. Defendant Beckert is Individually Liable for Conduct That Was Not Within the Scope of His Official Duties.[3]

Defendant Beckert relies on Holland's *Complaint*[4] to assert his notion – "[h]er Complaint is a compendium of disagreements between her and the Auditor regarding her work product, which directly or indirectly intersected with his role as the Auditor. She cannot claim he was outside his official duty because she did not plead or allege his actions stemmed from anything outside his scope of duty." ECF No. 114, p. 9 ¶ 1. This excerpt from Holland's Amended Complaint is the

---

[3] According to the SCTCA, "scope of official duty" means (1) acting in and about the official business of a governmental entity and (2) performing official duties. S.C. Code Ann. § 15-78-30(i).

[4] Defendant Beckert's argument (citing solely to a complaint) is only appropriate in a Motion to Dismiss.

only evidence offered by Defendant Beckert in his crusade for SCTCA immunity. Undoubtedly, by solely relying on the allegations in the pleadings, and failing to point to any evidence (or lack thereof) in the record, he does not meet his burden of proof; therefore, the Court should deny Defendant Beckert's Motion for Summary Judgment on the issue of sovereign immunity based on this point alone. The evidence and supporting case law at minimum create a genuine dispute as to whether he was acting within his official capacity that must be resolved by a jury.

Defendant Beckert's argument can be summarized as follows: All of the conduct described within the Complaint was engaged in by Beckert pursuant to his role as Auditor as it related to Holland's work product, thus, Beckert was wholly operating within the scope of his official duties and all of his actions should be granted immunity because Holland cannot prove that Beckert acted with actual malice. However, while Beckert will be immune from liability in his official capacity as Auditor for acts he committed with actual malice while operating within the scope of his official duties, he will not enjoy such immunity as an individual defendant for statements he made with actual malice within his individual capacity. S.C. Code Ann. § 15-78-70(b).

Whether an employee of a governmental entity is acting within the scope of his official duties or within the scope of his employment is a question of fact that must be resolved by the jury. *Steinke v. S.C. Dep't of Lab., Licensing and Regul.*, 336 S.C. 373, 393-98, 520 S.E.2d 142, 152-55 (1999) (finding that exceptions to SCTCA are issues that are properly charged to the jury). The term "scope of official duties" is narrower than the term "scope of employment." *See Frazier v. Badger*, 361 S.C. 94, 102, 603 S.E.2d 587, 591 (2004). Therefore, an employee's "official duties" do not include all conduct that an employee might engage in while working. *Loadholt v. S.C. State Budget and Control Bd., Div. of Gen. Serv., Ins. Reserve Fund*, 339 S.C. 165, 171, 528 S.E.2d 670, 674 (Ct. App. 2000). In order for conduct to be within the scope of official duties, it must at

minimum seek to advance or further the business of the government employee's office. *Doe v. S.C. State Budget and Control Bd.,* 329 S.C. 214, 220, 494 S.E.2d 469, 473 (Ct. App. 1997).

The testimony in this case demonstrates that Defendant Beckert at minimum acted in reckless disregard of whether the information he provided to County Council and other government employees/officials was true. *See* Section VI.c *infra*. This information caused considerable confusion amongst county officials and appears to have been advanced for solely personal reasons. *See* Sections II.a, II.b *infra*. Acts that are undertaken by an employee for personal and not professional reasons are not only outside the scope of official duties but are also outside the scope of employment. *See Doe v. Beaufort Jasper Acad. for Career Excellence*, App. Case No. 2018-000641, 2021 WL 118300, at *3 (Ct. App. Jan. 13, 2021).

Testimony from an employee in the auditor's office at the time the statements were made indicates that Defendant Beckert was acting outside the scope of his official duties at the time he made the statements:

Q.    Do you think his perception was correct?

A.    I don't know. I could tell you that there is a policy out there to follow, and I can tell you that the auditor has nothing to do with the millage except in that his input wasn't warranted. He has nothing to do with the millage. The millage is decided by the finance committee, and county council certifies the millage after the finance committee. There's nothing – Mr. Beckert doesn't have as – any saying in what those millages are.

Q.    But he would try to assert himself into those –

A.    Correct.

Q.    - issues?

A.    He tried to assert his numbers stating the fact that Alicia Holland's or somebody else's numbers were incorrect.

Ex. 12 – David Cadd Dep. 112:3-19. Since the evidence leads to a reasonable inference that Defendant Beckert's conduct was clearly motivated for personal reasons, and his statements were

made with at least a reckless disregard for their truth, it should be left to the jury to determine whether some of Beckert's conduct fell outside the scope of his official duties such that he could be individually liable for any statements that were made with actual malice.

## II.     A Constitutional Violation Cause of Action is Established by the Record.

"To [establish] a claim under [section] 1983, a plaintiff must [prove] the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *see Filarsky v. Delia*, ―――U.S. ――――, 132 S.Ct. 1657, 1661–62 (2012); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  The Equal Protection Clause directs governments that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985) (*quoting Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382 (1982)).

The Fourth Circuit has explained that "the equal protection clause confers on a public employee a federal constitutional right to be free from gender discrimination" and that "sexual harassment has long been recognized to be a type of gender discrimination." *Beardsley v. Webb*, 30 F.3d 524, 530–31 (4th Cir. 1994) (citations omitted).  "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Wilson v. United States*, 332 F.R.D. 505 (D.C. W.Va. 2019) (*quoting Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)).  A plaintiff "must first demonstrate that [she] has been treated differently from others with whom [she] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

Distinctions on the basis of sex or gender are subject to heightened scrutiny under an equal protection analysis. *See Knussman v. Md.*, 272 F.3d 625, 635 (4th Cir. 2001). Thus, this Court has recognized that the Equal Protection Clause confers on public employees "a right to be free from gender discrimination that is not substantially related to important governmental objectives." *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *see Davis v. Passman*, 442 U.S. 228, 234–235, 99 S.Ct. 2264 (1979). Intentional sex discrimination and sexual harassment against public employees by persons acting under color of state law violate the Equal Protection Clause and are actionable under Section 1983. *Beardsley*, 30 F.3d at 529; *J.E.B. v. Ala.*, 511 U.S. 127, 130–131, 114 S.Ct. 1419 (1994) ("[i]ntentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where ... the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women.").

### a. Defendant Beckert's Conduct was Based on Holland's Sex.

Contrary to Defendant Beckert's assertion, there is ***plenty*** of evidence that the discrimination was based on sex –

> Q:     Did – in your observations, did Mr. Beckert have – seem to have issues with women in authority?
>
> A:     I would have to say yes because the ones that were in authority were the ones he had problems with.

Ex. 12 - Cadd Dep. 49:21 – 50:1.

> Q:     Can you tell me specifically what Title VII rights you are alleging to have been violated?
>
> A:     Discrimination based on my gender.
>
> Q:     All right. And how was that manifested?
>
> A:     I believe that females are Jim Beckert's target.
>
> Q:     All right. Anything else?
>
> A:     The county failed to protect us, the females, that were Jim Beckert's target.

Q:    Okay.  And is that the – can you explain the – you know, can you explain that more fully to me?

A:    Jim singled out females in an attempt to intimidate and harass and bully them.  He did not treat males that way.

…

A:    I got to a point, specifically with Jim Beckert, to where I felt like I could not verbally communicate with him because of how hostile he was towards me.

Ex. 11 - Holland Dep. 134:10 – 135:1; 62:25 – 63:3.

Q:    Would you define "the Jim Beckert problem"?  Because we've been all – we've been saying that throughout these depositions –

A:    Uh-huh.

Q:    – as if everybody knows what that means –

A:    Uh-huh.

Q:    – but would you define it for me?

A:    Sure.  I define – and I don't – I don't think I've ever had anyone else define it, but the way I define it is his incompetence as the auditor and his disruptive behavior in terms of questioning everyone[5] and changing things without authority and, you know, refusing to do what the council asked him to do and just ***harassing people, specifically, you know, a group of women who were in positions of authority***.[6]
                                                  …

Q:    Tell me about those conversations and when they occurred.

A:    I don't remember when they occurred, but I do remember that, you know, we just – I just said, you know, "We've got a problem here.  We – Jim doesn't make sense.  You know, the things that he asks us to do or that he complains about and what he wants done, none of this makes sense to us.  He's not rational.  I don't think he knows what he's doing.  ***He's very***

---

[5] Defendant Beckert contends that he was difficult to both males and females.  This is incorrect.  Defendant Beckert may have questioned males, but he habitually harassed, bullied and intimated females.
[6] Ashley Jacobs relayed her concerns of Defendant Beckert's treatment of women to multiple councilmembers, including Paul Sommerville –
    Q:    Okay.  Well I was going to ask you about Ashley Jacobs.  So did Ashley Jacobs ever relay comp – complaints about Jim Beckert's harassment of County employees.
    A:    Yes.
Ex. 8 - Sommerville Dep. 18:20 – 18:24.

> ***problematic for all of the female employees.*** It's just something, you know, that's got to change.
>
> …
>
> A:    …Alicia and I talked frequently about Jim, and, you know, we – the way that we talked about it, we always talk about it as a team. You know, how are "we?" We always talked about how we are going to handle Jim. I didn't want her to ever feel like she was alone in dealing with him, you know, and – and Maria too. You know, all three of us. And with Ebony. You know we all – and Tonya Crosby. We all talked together and supported each other, and, I mean, I certainly did everything I – I could think to do to protect her.

Ex. 4 - Jacobs Dep.: 189:15 – 190:5; 126:24 – 127:10; 142:7 – 142:18 (emphasis added). Standing alone, Ashley Jacobs's testimony is enough evidence to show there is a genuine dispute of a material fact.

The Court will note in the last excerpt from Ashley Jacobs's Deposition, she referenced several other females –

<u>Maria Walls</u>

Q:    Just talk about his behavior toward – starting with regard to Maria Walls. Did she relay that to you?

A:    Yes, several times.

Q:    And when she relayed it, it was something that she didn't like?

A:    Yeah. That – you know, that was – my interpretation of what Maria expressed to me in those moments about Mr. Beckert looking in her window, she was clearly upset, she was clearly worried about physical harm. I would try to counsel her visiting and – and making sure that she related those incidents to the proper authorities, that being the sheriff. I told her I would introduce a video camera to record those events. And, yeah, she was visibly upset. She – it troubled her.

…

Q:    Okay. Do you concur with Ms. Bensch's assessment that his interactions, and if its referring to Mrs. Walls, rose to the level of harassment?

A:    Yes.

Ex. 6 – Kubic Dep. 19:15 – 20:6; 51:10 – 51:14 (this testimony has been adopted by Beaufort

County in lieu of 30(b)(6) testimony).

<u>Ebony Sanders</u>

Q:     What about an example of how be might bully you?

A:     He's bullied me personally in my office, face-to-face, as well as in verbal – as in written communication that we have received. So we've had those instances as well.

Q:     Can you be more specific about what – what that would look like when he would bully you?

A:     Yes.  Accusations of things that are not true…

Ex. 9 – Sanders Dep. 10:5 – 10:15 (this testimony has been adopted by Beaufort County in

lieu of 30(b)(6) testimony).

Q:     Okay.  What about Ebony Sanders, did you ever become aware of him being inappropriate or harassing Ms. Sanders?

A:     Yes.  She notified me immediately when that started.

Q:     So within your first week or two, Ms. Sanders had come to you and expressed concern?

A:     No.  So Ebony wasn't – she wasn't promoted to the assessor position, and I can't remember when it was, but it wasn't when I first got there.  It was some months after – after I arrived.  May have been the fall.  But she was – and I can't remember.  I don't remember when it started, but as soon as it started, she let me know.

Ex. 4 – Jacobs Dep. 21:7 – 21:21.

<u>Ashley Jacobs</u>

Q:     Okay.  Did – did he ever attempt to intimidate or harass you?

A:     Yes.

Q:     All right.  Can you tell me about those instances?

A:     So Jim frequently wanted to meet with me, and when we would meet, he was just -- he would talk and talk and talk about whatever he thought was wrong and needed to be changed and differently, and he was just -- he was

just -- he was very creepy in the meetings. I don't -- I don't know any other word to describe it. He was just very -- I felt very uncomfortable in his presence. He is quite a bit taller than I am, and he would -- he'd, like, stand over me if we met in the conference room. Sometimes he would have his phone out, and Maria and Alicia have told me that he has secretly recorded them previously, and so I was very concerned about that. And I asked him a couple of sometimes, you know, "Jim, are you recorded me?" And he would say, "No, of course not." But I was really uncomfortable because he always seemed to have his phone, you know, like, poised. It just seemed odd, and so after a while, I told him I -- he couldn't bring his phone into meetings with me. But sometimes he would come up to me in the parking lot and kind of -- kind of stand over me and say things. He -- he liked to -- he liked to convey to me that he knew information, that he had insider information, so that he was privy to information that the council members knew. And he -- there were -- there were several times when we were having meetings and – with council, and he would burst into the room, and he wasn't on the agenda, but council would let him speak, and then he would just kind of go on and on about how -- how everything that we were doing was wrong, and he was right. And there was one other incident where he -- he sent a letter. I believe he sent it to -- to a set of -- there was a general set of -- or a specific set of taxpayers. He sent a message to them and told them that Maria and I needed to be investigated by the FBI. But overall his demeanor was just very hostile. He was -- he was not pleasant to be around. I felt very uncomfortable around him.

Ex. 4 – Jacobs Dep. 26:19 – 28:17.

<u>Tonya Crosby</u>

Q:   Okay.  And what about Tonya Crosby, are you aware of any issues between Mr. Beckert and Tonya Crosby?

A:   Yes. So Tonya was the -- the chief financial officer for the school district, and she would -- when she was giving a presentation about to council about the school district's budget and their millage, he would -- he would come up afterwards, and he would criticize what she had presented and say that it wasn't accurate and that the school district was spending too much money. They were going to be -- overspend by millions. They were wasting money.

Q:   Was that an ongoing issue?

A:   Yeah….

Ex. 4 – Jacobs Dep. 24:8 – 24:22.

<u>Monica Spells</u>

14

Q:    Did Monica Spells ever tell you that Beckert stared at her in the hall and made her feel uncomfortable?

A:    Yes.

Ex. 6 – Kubic Dep. 21:12 – 21:15 (this testimony has been adopted by Beaufort County in lieu of 30(b)(6) testimony). Defendant Beckert undoubtedly has an issue with women. Defense counsel insensitively attempts to equate "difficult" and "negative" interactions between Defendant Beckert and a few males with the chronic attacks, harassment, intimidation, etc. that the females in Beaufort County government had to endure.

The testimony and/or evidence referenced above provides enough evidence of a genuine issue of material fact to render summary judgment inappropriate. However, if the court is not persuaded, Holland only needs to provide enough evidence to support an inference of discrimination, and Holland has done so. In *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097 (2000) and its predecessor, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742 (1993), the Supreme Court had occasion to consider what showing a plaintiff had to make regarding pretext and, specifically, whether a plaintiff could satisfy his or her burden by merely rebutting the defendant's explanation for the action. In doing so, the Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." This Court has applied the *Reeves* formulation and has explained that it operates based on "the strength of the prima facie evidence in creating an inference of discrimination, and 'the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.'" *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 (4th Cir. 2002) (quoting *Reeves*, 530 U.S. at 147, 120 S.Ct. at 2097). A prima facie case coupled with probative evidence "that the employer's explanation is false," would counsel against granting the employer summary judgment unless the employer presented strong

evidence from which "no reasonable fact finder could conclude" that there was discrimination. *Reeves*, 530 U.S. at 148-149. "Under *Reeves*, a plaintiff may prevail by only showing that the employer's proffered reason for its action was pretextual because such a showing 'is simply one form of circumstantial evidence that is probative of intentional discrimination.'" *Crosland v. Caldero*, 232 F.3d 887 (4th Cir. 2000).

There is sufficient evidence to support Defendants' discrimination was based on Holland's sex; therefore, the Court should deny Defendant Beckert's Motion for Summary Judgment.

### b. Defendant Beckert's Conduct was Intentional.

Defendant Beckert erroneously asserts Holland has no evidence to support he acted intentionally. There is sufficient testimony and/or evidence to support he did possess the requisite intent. For example, David Cadd (former Deputy Auditor) explained why Defendant Beckert harassed Maria Walls (the plaintiff in the companion state court case) and Holland:

Q:    Did he ever tell you why he would take their photographs?

A:    I – he – with Maria, he goes, when he approached Maria, he goes, I could tell Maria was feeling uncomfortable.

Q:    And tell me about that. Did – did he seem to get joy out of –

A:    He did. He – ***he got joy*** because he felt like the county would support Maria more than him in his requests or his work. So he would – he would go outside while she was talking on the phone because he knew it would make her feel uncomfortable he said, and – and he would come in and laugh…

Ex. 12 – Cadd Dep. 39:18 – 40:13 (emphasis added). Not only did Defendant Beckert intentionally make women feel uncomfortable, but he also intentionally skewed Holland's numbers/work so he could continue to attack, bully and defame her.

Q:    Yeah. Would he skew the numbers that he presented to county council?

A:    He would give them the numbers that he thought was correct. That's all I can probably say about that. I know the – asking of the skewing by – by writing things off easier than we did before, he asked, and I said no. We weren't going to do that because of equity. It wasn't going to be right, but

16

> his goal was – he said his goal was to ensure that the numbers that the county had were going to be wrong.

> Q:    So he wanted the numbers that the county council provided were provided to be wrong, correct?

> A:    Correct.

Ex. 12 - Cadd Dep. 110:17 – 111:5.  Clearly Defendant Beckert intended to attack, harass, bully, intimidate and defame women in Beaufort County government; in fact, Defendant Beckert got joy out of it.  *See* Ex. 12 – Cadd Dep. 39:18 – 40:13.

Throughout Defendant Beckert's Motion, he asserts he could not possibly have possessed the requisite intent because he is "autistic."  His expert (a social worker not a medical doctor) claims that Defendant Beckert cannot be held accountable for his actions based on his alleged autism, i.e., diminished capacity.  *See* Ex. 7 - Boucher Dep. 58:9 – 58:22; 67:3 – 67:22.  However, South Carolina and the Fourth Circuit do not support that stance.[7]  And, neither does the doctor that diagnosed Defendant Beckert with autism, as he **recanted** his original diagnosis in his deposition –

> Q:    And of the four categories or criteria that we just went over, in order to reach a diagnosis of autism, at least two of those four to be present?

> A:    Yes.

> Q:    And we have no symptoms or behaviors that meet any of those four categories, correct?

> A:    Correct.

---

[7] "The diminished capacity defense is not recognized in South Carolina." *State v. Santiago*, 370 S.C. 153, 161-63, 634 S.E.2d 23, 28 (Ct. App. 2006) (*citing Gill v. State*, 346 S.C. 209, 220, 552 S.E.2d 26, 32 (2001).  The defendant in *Santiago* was prevented from offering expert testimony regarding whether the defendant's Asperger's disorder (which is a subset of autism) prevented him from "having the requisite state to commit murder nor the ability to provide a voluntary confession." *Id.* at 161-62, 634 S.E.2d at 28.  "Essentially, defense counsel argued that [the defendant] was culpable of a lesser offence because of his diminished capacity." *Id.*  Relying on Gill, the court held the exclusion of such evidence was proper because the defendant's diminished capacity is not a recognized defense. *Id.*  Unfortunately, the issue of the defendant's voluntariness of statements was not properly preserved for appeal and was ultimately found to be harmless error, meaning the court did not analyze how the defendant's diagnosis affected his mental state or the voluntariness of his statements.  *Id.* at 163-65, 634 S.E.2d at 153.

…

> Q:     And you're certainly not going to come into court and tell a jury that Mr. Beckert's – based on what you know now that Mr. Beckert's behavior as set forth in these lawsuits is caused by autism or any other psychiatric?
>
> A:     I can't make that statement today, no.

Ex. 9 - Walters Dep. 50:7 – 50:14; 63:2 – 63:7.  To provide some context to the Court, Defendant Beckert failed to disclose pertinent information to Dr. Walters when he spent ***one hour*** with Dr. Walters to receive an autism diagnosis.[8]

Defendant Beckert's own expert, Toni Boucher, testified that she can't determine Defendant Beckert's intent –

> Q:     I guess I'm just struggling to figure out how – how you can interpret one behavior and tie it to autism when it seems like regardless of whether he meant to or didn't mean to, it's classified as autistic.  How do you differentiate, you know, this behavior from just being an a**hole?
>
> A:     Yeah.  And it's a great question.  I don't know for sure in this case what was happening.  I don't know if he was being an a**hole or I don't know if he had some other, you know, thing going on in his head that came across differently because I haven't – I didn't have the conversation with him to dig deeper and see if that's the case.  So I don't know in this case…

---

[8] Beckert failed to disclose the following information:

- He's a politician (Walters Dep. 19:16 – 19:18);
- He gives public speeches and speaks regularly at events (*Id.* at 20:3 – 20:10);
- He has helped other politicians with their campaigns (*Id.* at 20:11 – 20:14);
- He has appeared on the news/interviewing with a reporter (*Id.* at 20:15 – 20:19);
- His memberships with social clubs (*Id.* at 59:6 – 59:22);
- His military service (*Id.* at 60:14 – 60:17);
- His alleged dyslexia (*Id.* at 58:14 – 58:16);
- His prior public racial slurs (*Id.* at 58:17 – 58:21);
- He maintains social relationships (*Id.* at 22:7 – 22:11); and
- He is the subject of several lawsuits (*Id.* at 32:20 – 32:22).

Dr. Walters did not attain any of Defendant Beckert's prior medical records nor did he reach out to Defendant Beckert's friends or family to confirm Defendant Beckert's account of issues and personal history.

Ex. 7 - Boucher Dep. 78:11 – 79:2. Because Defendant Beckert lacks an autism diagnosis, the testimony of Toni Boucher relating to and relying on that diagnosis should be struck and not considered for the purpose of Defendant Beckert's Motion.

Assuming arguendo that Defendant Beckert does in fact have autism, such diagnosis does not warrant granting Defendant Beckert's Motion for Summary Judgment. Neither South Carolina nor the Fourth Circuit have considered a case where an autistic defendant has claimed that he cannot have the requisite intent to intentional infliction of emotion distress.[9] However, precedence in other areas of law make it clear that this issue would be for a jury to determine, not one for summary judgment.[10]

---

[9] It appears no appellate court in the country has considered whether a defendant with autism lacks the requisite intent to intentionally inflict emotional distress.

[10] As a fundamental principle, "intent is a question of fact and is ordinarily for jury determination." *State v. Lee-Griggs*, 374 S.C. 388, 403, 649 S.E.2d 41, 49 (Ct. App. 2007) (*citing State v. Tuckness*, 257 S.C. 295, 299, 185 S.E.2d 607, 607 (1971). Intent can rarely be proven by direct evidence, so it "may be shown by acts and conduct from which a jury may naturally and reasonably infer intent." *Id.* (citations omitted) (internal quotations omitted). In the context of an outrage claim, "when evidence is in conflict and susceptible of more than one reasonable inference, it is the province of the jury to make a factual determination." *Ford v. Hutson*, 276 S.C. 157, 166, 276 S.E.2d 776, 780 (1981) (holding that the trial judge did err in submitting the issue to the jury on whether the defendant's conduct in defectively constructing the plaintiff's home met the elements of intentional infliction of emotional distress).

While not directly on point, the court in *Ford* opined that the parties' business relationship was a "significant factor to be considered." *Id.* However, while such a relationship "may justify one's conduct and make that conduct excusable or at least less culpable, … *it is at most a factor to be considered and weighed by the jury*." *Id.* (emphasis added). The court then held that the "evidence is susceptible of the inference that the conduct complained of herein was not a mere complaint by a dissatisfied homeowner but was instead a continuing pattern of highly questionable conduct over a period of almost two years." *Id.*

While the court in *Ford* discussed outrage in the context of a business relationship, this Court should find that the issue raised by Defendant Beckert is analogous. Like the business relationship considered in *Ford*, this Court should consider Defendant Beckert's autism "diagnosis" as "a significant factor to be considered **and weighed by the jury**" to excuse Defendant Beckert's behavior by eliminating the requisite intent required to support Holland's outrage claim. *Id.* (emphasis added). Like Defendant Beckert's conduct, the conduct in *Ford* was susceptible to the inference that it was a "continuing pattern of highly questionable conduct over a period of two years." *Id.* There has been testimony that Defendant Beckert possessed the requisite intent, was aware his conduct made Holland uncomfortable and enjoyed that he was making her uncomfortable. *See* Ex. 12 - Cadd Dep. 39:18 – 40:13.

Further, in the context of negligence, specifically proximate cause, the court in *Madison ex rel. Bryant v. Babcock Center, Inc.*, 371 S.C. 123, 146-48, 638 S.E.2d 650, 662-63 (2006), held the question of whether an autistic child's conduct was voluntary and intentional was for the jury. The court held the circuit court erroneously granted summary judgment for the defendant in reliance on S.C. Code Ann. § 44-26-90 (2002), "which provides that unless a client has been adjudicated incompetent, she must not be denied the right to, among other things, execute instruments, enter into contractual relationships, and exercise rights of citizenship in the same manner as a non-disabled person." *Id.* at 148, 638 S.E.2d at 663. The court in Madison found that the autistic plaintiff's "competence and ability to handle her own affairs, or lack thereof, is a factual issue … which must be resolved by the jury." *Id.*

Defendant Beckert's argument on intent is improperly brought for summary judgment – intent is a question of fact to be determined by the jury.[11]  Not only is there, through David Cadd's testimony, specific evidence of intent, but defense counsel's attestation to Defendant Beckert's intent is insufficient.  The parties have been unable to depose Defendant Beckert on this issue, as his attorneys contend he cannot meaningfully participate in a deposition due to an alleged traumatic brain injury.  The only evidence in the record is that Defendant Beckert took joy out of tormenting women in Beaufort County government, i.e., intent.  At a minimum, there is a genuine dispute as to a material fact; therefore, summary judgment is inappropriate.

### III.    Defendant Beckert is Not Entitled to Qualified Immunity.

Defendant Beckert contends that he is entitled to Qualified Immunity in his individual capacity, but he is not.  When moving for summary judgement on an affirmative defense, such as Qualified Immunity, a defendant must clearly establish all elements of that defense; only then does the burden shift to the plaintiff to "come forward with specific facts showing that there is a genuine issue for trial."  *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).  Holland has shown that Defendant Beckert violated Holland's constitutional rights, however, Defendant Beckert has failed to prove the elements necessary for his affirmative defense.

Qualified Immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982); *see Reichle v. Howards*, -- US --, 132 S.Ct. 2088, 2093 (2012); *Brandon v. Holt*, 469 U.S. 464, 472-73, 105 S.Ct.

---

[11] In light of how South Carolina and the Fourth Circuit have interpreted the effects of autism in the criminal context, this Court should either (1) allow the jury to determine if Defendant Beckert's alleged autism affected the voluntariness, intentionality or awareness of his conduct; or (2) outright deny Defendant Beckert from presenting any evidence to the jury regarding his "diagnosis."  Regardless, summary judgment is inappropriate.

873 (1985). Qualified immunity protects government officials from "bad guesses in grey areas" and ensures that they are liable only "for transgressing bright lines." *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (quotation omitted); *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

"Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, -- U.S. --, 132 S.Ct. 1235, 1245 (2012) (quotations and alterations omitted. An official should prevail in asserting "qualified immunity if a reasonable [official] possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991); *see Messerschmidt*, 132 S.Ct. at 1248.

To determine in Defendant Beckert is entitled to Qualified Immunity, the court must first decide "whether a constitutional right would have been violated on the facts alleged" and secondly "whether the right was clearly established at the time such that it would have been clear to an objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (*citing Saucier v. Katz*, 533 U.S. 194, 200 (2001), *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002)).

In the present case, Defendant Beckert's conduct clearly violated Holland's constitutional rights to remain free of gender discrimination and sexual harassment. His conduct towards Holland and other females in Beaufort County government exceeded the bounds of reasonableness. Not only is Equal Protection a known concept, in place long before the subject incidents, but Defendant Beckert's conduct violated the polices of the Beaufort County Handbook that he adopted and agreed to be bound by. Put simply, the law and workplace rules were put in place, easily understood, and adopted by Defendant Beckert before his discrimination and/or sexual

harassment of Holland began. As for the reasonableness standard, the highest-ranking County employee, Ashley Jacobs, contemporaneously recognized Defendant Beckert's behavior as harassing and discriminatory against women. *See* Ex. 4 – Jacobs Dep. 189:15 – 190:5. There were no "bad guesses" or "gray areas," Defendant Beckert was constantly and intentionally "transgressing bright lines"[12] to ensure Holland existed in a hostile work environment, riddled with harassment, discrimination and intimidation; therefore, he is not entitled to Qualified Immunity.

## IV.    Holland Presents Sufficient Evidence of Outrage.[13]

Contrary to Defendant Beckert's assertion, there is sufficient evidence to support Holland's outrage claim. Again, Defendant Beckert's Motion for Summary Judgment cites to Holland's Amended Complaint instead of the entire record; his reliance on just the Amended Complaint allegations is better suited for a Motion to Dismiss, not a Motion for Summary Judgment.

"To recover under an intentional infliction of emotional distress theory, a plaintiff must establish (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so 'extreme and outrageous' so as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community;' (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was 'severe' such that 'no reasonable man could expect to endure it.'" *Bass v. S.C. Dep't of Soc. Servs.*, 403 S.C. 184, 742 S.E.2d 667, 672 (Ct. App. 2013) (*citing Argoe v. Three Rivers Behavioral Health, LLC*, 392 S.C. 462, 710 S.E.2d 67, 74 (2011)).

---

[12] *Waterman*, *supra*.
[13] Defendant Beckert erroneously asserts that Holland's outrage claim is barred as Outrage is barred from the SCTCA. However, Holland has asserted this cause of action against Defendant Beckert in his ***individual capacity*** and not in his official capacity as Auditor of Beaufort County. The SCTCA only applies to him in his official capacity not in his individual capacity. Therefore, Defendant Beckert's argument as to the SCTCA is irrelevant.

As an employer, Defendant Beckert adopted the Beaufort County Personnel Handbook, which details the importance of a safe work environment, built on mutual trust and confidence. Instead of abiding by the policies he adopted as his own, Defendant Beckert intentionally created a hostile, combative and anxiety-inducing work environment for Holland and other females in Beaufort County government.

Defendant Beckert asserts his ***recanted*** autism diagnosis in an attempt to evade the intent element. Please *see* Section II(b) for analysis on Defendant Beckert's intent. As to Defendant Beckert's conduct and the environment he created was so extreme and outrageous, so as to exceed all possible bounds of decency. While each separate instance may not be considered extreme or outrageous, in their totality, no reasonable person could expect to endure the endless, chronic harassment, bullying, intimidation and gaslighting. The mental and emotional toll on Defendant Beckert's victims renders them unable to effectively perform their jobs and function in their work environment (as well as their personal life), by his own design.

Defendant Beckert's actions caused Holland emotional distress as well as physical injuries. Her counselor testified Defendant Beckert inflicted stress and trauma on Holland –

> Q:      …Is it fair that to say that –
>
> Q:      -- you know, that her therapy with you was because of the fact that Jim Beckert inflicted stress and trauma upon her?
>
> A:      Yes, ma'am.
>
> Q:      Do you recall Alicia Holland talking to you about her sleep issues due to the stress in thinking about Jim Beckert?
>
> A:      Sleep?
>
> Q:      Yes.
>
> A:      Yes. She often said that it affected her sleep very negatively. I think she may have been on a sleep medication. I'm not sure. I'm not sure. I know she complained about that a lot.

> Q:     …is it your understanding that it wasn't necessarily the job duties of the chief financial officer that had Ms. Holland so stressed out, it was essentially her interacting with Mr. Beckert at her job?
>
> A:     Yes, ma'am.  I feel like she has done this type of work for a long time.

Ex. 21 – Hance Dep. 54:18 – 55:19.  It is also important to note that Holland was CFO prior to Defendant Beckert being elected, and during that time, she performed her job duties without excessive stress.  Defendant Beckert's actions caused Holland so much stress that she presented to several medical providers with panic attack and heart-attack like symptoms; this was a recurring issue.  *See* Ex. 11 – Holland Dep.  When asked if the job itself caused her stress, she replied "[t]he job itself is a challenge but not to the point of that kind of stress" and "…in all of the positions I've held, you're working up against deadlines, and there's natural stress.  To me, I thrive off of challenges.  But when Beckert came on board, it became unbearable."  Ex. 11 – Holland Dep. 206:11 – 206:12; 216:1 – 216:11.  Defendant Beckert's actions took such a toll on Holland that she was ordered medical leave for July and August of 2019.  *See* Ex. 11 – Holland Dep. 200:17 – 201:2.

The distress Defendant Beckert caused Holland was so severe that she chose to resign for her mental, emotional and physical well-being, rather than continue to suffer damage to her overall health.  *See* Ex. 22 – Holland Statement.

The evidence presented herein shows a genuine issue of material fact; therefore, summary judgment is not appropriate.

## V.     Holland Withdrawals Her Assault Cause of Action.

## VI.     Holland[14] Presents Sufficient Evidence for Her Defamation Claim.

An action for defamation touches on both constitutional and common law principles. To state a claim for defamation, the plaintiff must prove: (1) a false and defamatory statement was made; (2)

---

[14] Holland concedes that she is considered a Public Official.

the unprivileged publication of the statement was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement regardless of special harm or the publication of the statement caused special harm. *Fountain v. First Reliance Bank*, 398 S.C. 434, 441, 730 S.E.2d 305, 309 (2012). How the plaintiff satisfies the fourth element of defamation depends on whether the defamatory statement is "actionable *per se*," which turns on the type of act or characteristic that makes up the substance of the purportedly defamatory statement.[15] *See Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 629 S.E.2d 653, 664-65 (2006).[16] When the claim involves a public official, constitutional protections apply to the action and necessitate that to show fault, the plaintiff must prove the statement was made with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 84 S.Ct. 710, 726 (1964).

### a. Defendant Beckert Made False and Defamatory Statements.[17]

The evidence demonstrates that Defendant Beckert made the following statements as set forth in Holland's Complaint:

- February 22, 2018 – Beckert wrote a letter to Mauldin & Jenkins (the County's external financial auditors), falsely accusing Holland of violating South Carolina law. While the letter references Beaufort County Treasurer, Maria Walls, the actions Beckert is referring to were taken by Holland (as CFO, Holland was responsible for signing the Comprehensive Annual Financial Reports). Beckert's letter accuses Holland's Comprehensive Annual Financial Report of containing material misrepresentations. These false accusations forced Alicia to defend herself and her work. Ex. 14 – 02.22.2018 Letter to Mauldin & Jenkins.

---

[15] The common law presumption that a plaintiff has suffered general damage has only been abolished in South Carolina in cases involving an issue of public controversy or concern and publications by a media defendant. *See Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 629 S.E.2d 653, 664-65 (2006); *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 512 n.8, 506 S.E.2d 497, 503 n.8 (1998). A presumed damages award does not violate the First Amendment rights of the publisher of the false statement when the statement is made with actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50, 94 S. Ct. 2997, 3011-12, 41 L. Ed. 2d 789 (1974).

[16] South Caroline Supreme Court precedent plainly states that where the defendant's defamatory statement is "actionable *per se*," "the defendant is presumed to have acted with 'common law malice' and the plaintiff is presumed to have suffered general damages." *Fountain*, 730 S.E.2d at 309 (*quoting Erickson*, 639 S.E.2d at 664).

[17] Holland is not attempting to collect for instances outside of the statute of limitations. Holland included these instances in her Amended Complaint to show the history of conduct necessary for a hostile work environment claim.

- February 22, 2018[18] – Beckert wrote a letter to Cherry, Bekaert & Holland, LLP (the County's previous external auditors) falsely accusing Holland of violating state law. While the letter references Beaufort County Treasurer, Maria Walls, the actions Beckert refers to were taken by Holland (as CFO, Holland was responsible for the County's General Ledger). What Beckert fails to understand is that the County does not recognize tax payments on the General Ledger until the tax bill is actually paid. Ex. 15 – 02.22.2018 Letter to Cherry, Bekaert & Holland, LLP.

- May of 2019 – Beckert took it upon himself, without proficiency in tax or mathematics, to calculate the value of a mil and forward his calculations to the County's Public Service Districts. Naturally, his calculations were incorrect, contradicting Holland's. Beckert orchestrated a mass state of confusion throughout the County's taxing districts in order to force Holland to justify and/or defend her calculations.

  o On May 6, 2019, Beckert presented information regarding Fiscal Year 2019 Reassessment Data and Rollback Millage Values at the Finance Committee Workshop. The information presented contained Holland's spreadsheets, however, Beckert accused Holland of not taking depreciation into account. Holland relies on the data provided by the Treasurer while the Auditor and Accessor calculate millage values. Therefore, IF the data failed to take depreciation into account, that would have been Beckert's mistake. Beckert's presentation caused confusion amongst the County's Finance Committee. Holland was forced to defend her work via letter to Beaufort County Councilmembers and Beaufort County School Board. Ex. 17 – Defendant Beckert's Presentation.

  o As a result of Beckert's presentation to the Finance Committee on May 6, 2019, the County spent $10,000.00 of taxpayer's money for an auditing firm to conduct a review of Holland's records and ensure the proper processes were being followed. The decision to spend the taxpayers' money to appease Beckert was made after then-County Administrator, Ashley Jacobs, admitted that she and Holland were unable to confirm the validity of Beckert's accusations. Ex. 19 – 05.21.2019 Email RE Forensic Audit.

  o On May 15, 2019, Beckert's presentation also forced Holland to defend herself in a meeting with Beckert, then-County Administrator, Ashley Jacobs, and Councilman, Chris Hervochon. Hervochon, friend of Beckert's, not only quested Holland's work, but took it upon himself to research Beckert's issues. Hervochon shared his unfounded concerns and research with Councilman, Joseph Passiment. Because of Beckert's false accusations and misinformation, Holland was forced to respond to Hervochon's fabricated concerns. Ex. 18 – Holland Letter Defending Herself.

---

[18] When discussing Defendant Beckert's defamatory statements, Beaufort County Attorney, Tom Keaveny, categorized his statements as "defamatory *per se*." Ex. 16 – Email Between Keavney and Holland.

The following testimony illustrates the defamatory attacks made by Defendant Beckert –

A:      …like, with Alicia Holland, he was sending out an e-mail telling – telling Ashley at the time that she didn't know how to do her job – not Ashley, but Alicia…And he's also done the same thing numerous times going out to county council not only by Alicia Holland but going out to the county council about the treasurer in the same situation. It's not doing her job. Doing her job incorrectly.  I know he's reached out numerous times to Mr. Keavney about certain laws and stuff, and says, hey, so and so is violating this law.  You need to fix it.  You need to stop it. Situations like that.

Q:      Was that the way Mr. Beckert operated throughout your tenure there where he would accuse people of not doing their jobs and/or violating state laws?

A:      Correct.  Yes.  On numerous times….

                                        …

Q:      How about Alicia Holland?  Did – did Mr. Beckert also have issues with Alicia Holland?

A:      Right.  Yes.  Like I stated earlier, he – he continuously said she didn't know how to – to figure out the millage – the annual millage correctly, and she was using wrong numbers.  That's what he would tell us.

                                        …

Q:      Did you ever hear Mr. Beckert say anything derogatory about Alicia Holland?

A:      On numerous occasions, like I said, he had me read his e-mails where – the one I read is where he came out and said, you know, Ms. Holland doesn't know how to do her job.  She's doing the millage – she's calculating the millage incorrectly.  I don't know where she's getting her information….

Ex. 12 - Cadd Dep. 33:24 – 36:23; 41:2 – 41:8; 47:10 – 49:19.

A:      Mr. Beckert constantly challenged my work.

                                        …

A:      He would try to accost me in the parking lot as I walked across the parking lot.  If we were in meetings together, in-person meetings together, he would stand in the doorway and block me from leaving the room to try to force me to talk to him.  He would get up at county council meetings at public comment and say things, incorrect things.

Q:      Such as?

A:     That there was fraud and illegal activity going on and that my work was incorrect….He would also do that at finance committee meetings.

…

A:     Going back to the general obligation bond documents, the comprehensive annual financial report, he constantly asked questions about the information in those.  And of course, it was his responsibility to provide certain information within those documents.  And he was constantly accusing that things were incorrect, things were misstated…

…

A:     They were personal attacks.

Q:     In what way?

A:     He was constantly accusing me of providing incorrect information or telling me he had different data than I had.  It was a constant that I was in the wrong.

Q:     And I understand that from the standpoint of what you're explaining, but to me it looks like it all comes back to your roles in performing your jobs.  He accused you of being wrong, and you're saying he was wrong in his calculations.

A:     I don't know.  I don't know what he was – with calculations.

Q:     Okay.  But that was the subject matter, usually, were issues relative to financial documents of the county.  Or can you give an example of when it was not.

A:     Yes.  And some of those financial documents did not involve him at all.

Ex. 11 - Holland Dep. 81:23 – 81:24; 85:23 – 86:10; 96:12 – 97:7; 107:17 – 108:11.  Despite Holland's work eventually being proven correct, County Council members and Defendant Beckert continued to question her work.  *See Id.* at 86:23 – 87:3.  In fact, Councilman Mike Covert (one of the three stooges)[19] responded to Defendant Beckert's false accusations against Holland with "Houston, there is a problem."  Ex. 5 – Email Dated 10.26.2019 – "Houston, there is a problem".

---

[19] Further, Beaufort County Councilman, Paul Sommerville, acknowledges that "the three stooges" (referring to three councilmembers – Brian Flewelling, Chris Hervochon and Mike Covert) defend Defendant Beckert's behavior –

### b. The Unprivileged Publication Was Made to a Third Party.

The publication of a defamatory matter is its communication, intentionally or by negligent act, to a third party. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 506 S.E.2d 497 (1998). Defendant primarily defends this element by stating that his statements were qualifiedly privileged. To the extent that it could be construed that a statement to a fellow employee does not constitute a publication to a third party, South Carolina law provides that if a publication within the workplace exceeds the scope of the qualified privilege, or is made with actual malice, that such co-employees will constitute third persons for the purposes of publication. *See Bell v. Bank of Abbeville*, 208 S.C. 490, 495, 38 S.E.2d 641, 643 (1946). Since Defendant primarily relies upon his privilege arguments as to this element, Holland refers the Court to her arguments contained herein regarding the inapplicability of qualified privilege to the facts of this case.

### c. There is Clear and Convincing Evidence that Defendant Beckert Acted With Actual Malice.

---

"Well, see that's one of the problems about trying to spread word about it, anytime you try to say something negative, you've got the three stooges coming out there going, no, he's the greatest thing in the world, the problem is whoever said something negative about Beckert is the problem."
Ex. 13 - Transcript of Audio Call Between Maria Walls and Paul Sommerville. This was confirmed by former County Administrator, Ashley Jacobs:

> A:    …There were three members who -- of council who were very close to Jim, who were friends with him…
>
> …
>
> Q:    Which three members do you think were really close to Mr. Beckert?
> A:    Mike Covert, Brian Flewelling and Chris Hervochon.
>
> …
>
> Q:    Do you remember which council member spoke with you and –
> A:    Uh-huh.
> Q:    -- would present Jim's agreements to you?
> A:    Yes.  It was Mike Covert, Brian Flewelling and Chris Hervochon.  They all said, you know, "Jim says." "Jim says this is wrong." So…
> Q:    And was Chris a CPA?
> A:    He is.
> Q:    Did you ever ask him if he checked behind Beckert's calculations?
> A:    Well, we talked quite a bit about Jim's accusations, and I told him.  I said, "Chris, this doesn't make sense to me."  And he said, "Well," he said, "I don't know that it makes sense to me either, but I – you know, Jim says that it's – it's – it's incorrect, so I trust his judgment."

Ex. 4 - Jacobs Dep.: 37:23 – 38:9; 57:20 – 58:13.

There is clear and convincing evidence in the record demonstrating that Defendant Beckert knew that information he provided to County Council concerning Holland was not true, yet he did it anyways. The actual malice standard as articulated by the Supreme Court of the United States provides that a defendant may also act with actual malice when he has reasons to doubt the truth of his assertions.

The actual malice standard introduced in *New York Times v. Sullivan* requires that the plaintiff provide evidence that the defendant published the defamatory material (1) with the knowledge it was false or (2) with reckless disregard as to whether it was false. *Anderson v. The Augusta Chronicle*, 365 S.C. 589, 595, 619 S.E.2d 428, 431 (2005) (citing *New York Times*, 376 U.S. at 279-80, 84 S.Ct. at 726). Courts should use a subjective standard to test whether the defendant had a good faith belief in the truth of his statements. *Peeler v. Spartan Radiocasting, Inc.*, 324 S.C. 261, 266, 478 S.E.2d 282, 284 (1997). The plaintiff must present evidence that the defendant had a high degree of awareness of probable falsity. *Elder v. Gaffney Ledger*, 341 S.C. 108, 114, 533 S.E.2d 899, 902 (2000).

To establish "actual malice" as an element for a defamation action by a public official, there must be sufficient evidence to conclude either the defendant made the statements with a high degree of awareness of probable falsity, or that the defendant in fact entertained serious doubts as to the truth of his publication.  *George v. Fabri*, 345 S.C. 440, 548 S.E.2d 868 (2001).

In the alternative, a defendant may act with reckless disregard for the truth when there are obvious reasons to doubt the veracity of his information. *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326 (1968). Any direct or indirect evidence indicating the defendant's state of mind is admissible to prove actual malice. *Anderson*, 365 S.C. at 596, 619 S.E.2d at 432. A plaintiff may present competent circumstantial evidence of bad faith to establish actual malice

despite a defendant's contention that the publication was made "with a belief the statements were true." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326.

Actual malice is governed by a subjective standard which tests the defendant's good faith belief in the truth of her statements. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1323. There must be sufficient evidence to conclude either that the defendant made the statements with a "high degree of awareness of ... probable falsity," *Garrison v. L.A.*, 379 U.S. 64, 74, 85 S.Ct. 209 (1964) or that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323.

David Cadd, who was deputy auditor at the time of the incidents giving rise to this lawsuit, provided the following testimony concerning Defendant Beckert's statements that were made to County Council concerning Holland's fitness for her job as CFO:

A.    -he said his goal was to ensure that the numbers that the county had were going to be wrong.

Q.    So he wanted the numbers that the county council provided were provided to be wrong, correct?

A.    Correct.

Ex. 12 – Cadd Dep. 110:25-111:5. Cadd's testimony concerning Defendant Beckert's statements to Council, the finance committee, and other public officials and employees clearly and convincingly demonstrates that not only was Defendant making statements that impugned Holland's professional reputation with reckless disregard to their truth or falsity, he almost certainly knew that what he was saying was false. This constitutes sufficient evidence to satisfy the constitutional actual malice standard and dictates that the Court should deny Defendant's Motion for Summary Judgment.

**d.      Since the Statements of Defendant Beckert Are Actionable *per se*, Holland Does Not Have to Prove General Damages and They Are Presumed.**

Although the defamatory statements at issue in this case were made concerning a public official, the United States Supreme Court has found that where a plaintiff can prove actual malice, presumed damages are not inherently unconstitutional, and it is up to the states to determine whether presumed damages are available within their own defamation jurisprudence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50, 94 S. Ct. 2997, 3011-12, 41 L. Ed. 2d 789 (1974). The common law presumption that a plaintiff has suffered general damage has only been abolished in South Carolina in cases involving an issue of public controversy or concern and publications by a media defendant. *See Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 629 S.E.2d 653, 664-65 (2006); *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 512 n.8, 506 S.E.2d 497, 503 n.8 (1998). Here, the defamatory statements have not been made by a media defendant. Therefore, Holland is entitled to a presumption of general damages if the defamatory statements at issue are actionable *per se* under South Carolina law.

All libel is actionable *per se*. *Holtzschetier v. Thomson Newspapers, Inc.*, 332 S.C. at 511, 506 S.E.2d at 502. Slander is actionable *per se* if it implies or asserts that the plaintiff is unfit in her profession or business. *Id.* The above-described emails and communications clearly impugn Holland's ability to perform her job, accuse her of violating the law and improperly managing her office, and if false are defamatory. Under the common-law and constitutional law, Holland is entitled to a presumption of general damages since the statements were written and accuse her of unfitness in her profession.

**VII.      Defendant Beckert's Communications Were Not Privileged.**

Defendant Beckert published written and oral statements about Holland that were defamatory and false.  In order to invoke a qualified privilege, the party making a communication must demonstrate that it was made in good faith on any subject matter in which the communicator

has an interest, or in reference to which he has a duty, and is made to a person having a corresponding interest of duty. S.C. Jur. § 54 (2006). "The elements of a qualified communication are 'good faith, an interest to be upheld, a statement limited in its scope to that purpose, a proper occasion, and publication in a proper manner and to proper parties only.'" *Id.* Despite defense counsel's…

Moreover, even if this court finds the statements were privileged, the "plaintiff may recover if [s]he shows that the [defamation] was actuated by malice." *Lesesne v. Willingham*, 83 F.Supp. 918, 922 (1949). "A qualified privilege does not prevent liability for defamation where the statement is made with actual malice." *Eubanks v. Smith*, 292 S.C. 57, 354 S.E.2d 898 (1987). Since this is a constitutional defamation action involving a public official, Holland is required to prove actual malice in order to prove defamation. Thus, the qualified privilege defense is superfluous, for it rises and falls on the same evidence that is required for Holland to prevail in this action. As demonstrated above, there is clear and convincing evidence upon which a jury could reasonably conclude that Beckert had serious doubts about the truth of his statements, or that he was at minimum acting in reckless disregard of the truth when he informed County Council and other officials that Holland was not adequately performing her job. Therefore, Beckert exceeded any qualified privilege that he may have had, and his Motion for Summary Judgment must be denied.

## CONCLUSION

Based on the foregoing, this case is riddled with genuine issues of material facts, therefore, Defendant Beckert's Motion for Summary Judgment (ECF No.: 114) should be denied.

Respectfully submitted,

PARKER LAW GROUP, LLP

BY: s/*Chelci S. Avant*
Ronnie L. Crosby (Fed ID: 6311)

rcrosby@parkerlawgroupsc.com
Chelci S. Avant (Fed ID: 13177)
cavant@parkerlawgroupsc.com
101 Mulberry Street East
Post Office Box 487
Hampton, SC 29924
803.903.1781

**ATTORNEYS FOR PLAINTIFF**

June 2, 2023
Hampton, South Carolina