Ex. 2
Chris Hervochon Deposition

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

## JOHN HERVOCHON

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC 29465
843-849-0133
Spectrumaaa@gmail.com

JOHN HERVOCHON – 9/27/2021

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

ALICIA HOLLAND,          :
                         :
                         :
    Plaintiff,           :
                         :  CASE NO.
    vs.                  :
                         :  9:20-cv-03479-DCN-MHC
BEAUFORT COUNTY and JAMES :
BECKERT, Individually and :
in his Official Capacity, :
                         :
    Defendants.          :

VIDEOTAPED DEPOSITION OF CHRISTOPHER JOHN HERVOCHON

DATE TAKEN:     Monday, September 27, 2021
TIME BEGAN:     1:35 PM
TIME ENDED:     4:15 PM
LOCATION:       Holiday Inn & Suites
                2225 Boundary Street
                Beaufort, South Carolina
REPORTED BY:    Marie H. Bruegger, RPR, CRR

## Page 2

```
 1   APPEARANCES:
 2     REPRESENTING THE PLAINTIFF:
 3       PETERS, MURDAUGH, PARKER, ELTZROTH &
         DETRICK, PA
 4       BY: RONNIE L. CROSBY
         BY: CHELCI S. AVANT
 5       101 East Mulberry Street
         Hampton, South Carolina 29924
 6       (803)943-2111
         rcrosby@pmped.com
 7       cavant@pmped.com
 8     REPRESENTING THE DEFENDANT BEAUFORT COUNTY AND
       THE DEPONENT:
 9
       BUYCK & SANDERS, LLC
10       BY: HUGH W. BUYCK
         305 Wingo Way
11       Mt. Pleasant, SC 29464
         (843)377-1400
12       hwb@buyckfirm.com
13     REPRESENTING THE DEFENDANT JAMES BECKERT:
14       ANDERSON, REYNOLDS & STEPHENS, LLC
         BY: JONATHAN J. ANDERSON
15       37-1/2 Broad Street
         Charleston, SC 29401
16       (843)723-0185
         janderson@arslawsc.com
17
       ALSO PRESENT:
18
         Doug White, Legal Videographer
19
         Thomas John Keaveny, II
20
                    - - -
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2                          PAGE
 3   EXAMINATION
 4     By Mr. Crosby...............................5
 5     By Mr. Anderson............................74
 6     By Mr. Buyck...............................85
 7     By Mr. Crosby..............................98
 8     By Mr. Anderson...........................100
 9   Certificate of Reporter.....................103
10
11          INDEX OF EXHIBITS
12   DEPOSITION                   PAGE
13   Exhibit 27  10/22/19 Email to Hervochon from
14     Caporale.....................9
15   Exhibit 28  Email Chain Ending in a 6/22/20
16     Email to Beckert from Hervochon....12
17   Exhibit 29  6/27/19 Text Messages.............13
18   Exhibit 30  9/18/19 Email to Hervochon from
19     Beckert...........................14
20   Exhibit 31  Email Chain Ending in a 9/18/19
21     Email to Cox from Beckert.........15
22   Exhibit 32  Text Messages....................19
23   Exhibit 33  8/30/19 Email to Hervochon from
24     Beckert...........................25
25   Exhibit 34  6/5/18 Text Message...............32
```

## Page 4

```
 1                          PAGE
 2   Exhibit 35  Email Chain Ending in a 5/22/18
 3               Email to Hervochon from Caporale...34
 4   Exhibit 36  5/21/18 Text Messages.............36
 5   Exhibit 37  Text Messages.....................37
 6   Exhibit 38  1/22/18 Text Messages.............40
 7   Exhibit 39  Text Messages.....................43
 8   Exhibit 40  9/12/18 Text Messages.............44
 9   Exhibit 41  Let Her Work Campaign.............49
10   Exhibit 42  Email Chain Ending in a 1/26/18
11               Email to Hervochon from Caporale...55
12   Exhibit 43  Text Messages.....................59
13   Exhibit 44  Email Chain Ending in a 3/2/18
14               Email to Hervochon from Caporale...62
15   Exhibit 45  Email Chain Ending in a 3/6/18
16               Email to Hervochon from Caporale...64
17   Exhibit 46  Email Chain Ending in a 10/24/19
18               Email to Hervochon from Caporale...66
19                    - - -
20
21
22
23
24
25
```

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON - 9/27/2021

## Page 5

1    THE VIDEOGRAPHER: The date today is
2  September 27th, 2021, and the time is 1:35.
3  This is the video deposition of Chris
4  Hervochon --
5    THE WITNESS: Hervochon.
6    THE VIDEOGRAPHER: -- Hervochon in the
7  matter of Alicia Holland versus Beaufort
8  County, et al., being heard in the United
9  States District Court for the District of
10  South Carolina, Beaufort Division, Case Number
11  9:20-cv-03479-DCN-MHC. This deposition is
12  being held at the Holiday Inn located at 2225
13  Boundary Street, Beaufort, South Carolina.
14    Will counsel please identify yourselves
15  for the record.
16    MR. CROSBY: I'm Ronnie Crosby, and I
17  represent Ms. Holland.
18    MR. BUYCK: Hugh Buyck, and I'm here on
19  behalf of Beaufort County and Mr. Hervochon.
20    MR. ANDERSON: Jon Anderson on behalf of
21  Jim Beckert.
22    CHRISTOPHER JOHN HERVOCHON
23  being first duly sworn, testified as follows:
24    EXAMINATION
25  BY MR. CROSBY:

## Page 6

1    Q  Mr. Hervochon, would you give us your
2  full name?
3    A  Full name is Christopher John Hervochon.
4    Q  And where do you live?
5    A  I live at 5 Royal Pointe Drive, Hilton
6  Head Island, South Carolina, 29926.
7    Q  Tell me a little bit about your -- what
8  do you do for a living?
9    A  I'm an accountant.
10    Q  And tell me about your business.
11    A  Can you clarify the question?
12    Q  Well, just the size of your business and
13  just sort of the scope of your client who you
14  generally try to serve.
15    A  Sure. So it's myself, two full-time
16  employees at the moment, two contractors at the
17  moment. We generally serve marketing and creative
18  agencies in a virtual CFO capacity. We also have a
19  small tax practice that services businesses and
20  individuals as well.
21    Q  Tell me about the CFO services. How does
22  that work?
23    A  It's a month-to-month subscription-type
24  service where we generally do all of the
25  accounting. We'll generally do the tax returns as

## Page 7

1  well. But for the most part, what we're focusing
2  on is providing financial strategy for our clients,
3  anything from cash flow management, expense
4  management, how to grow revenue, revenue models,
5  those sorts of things, consulting type.
6    Q  What sorts of businesses do you provide
7  that for?
8    A  So our biggest segment is marketing and
9  creative agencies. We've got another segment --
10  that's probably about 70 percent, plus or minus, of
11  our business. There's probably another 20, 25
12  percent which is in the trades -- HVAC companies,
13  construction companies, those sorts -- and then
14  5 percent what I call pet projects, so things that
15  are just generally interesting, friends and family
16  that have businesses that just kind of need help,
17  those sorts of things.
18    Q  Are you currently a member of Beaufort
19  County Council?
20    A  I am.
21    Q  When were you elected?
22    A  2018.
23    Q  I guess you run next year?
24    A  Yes, sir.
25    Q  And what area is your district is in?

## Page 8

1    A  District 8, which is generally the north
2  side of 278 from Belfair to Hilton Head Plantation,
3  and then a little bit on the south side of 278
4  around the area of Hilton Head National, generally.
5    Q  Everything's on the island?
6    A  No. Geographically, I think our biggest
7  area is on this side of -- on this side of the
8  bridge.
9    Q  Oh, yeah. I had a brain mess there. I
10  forgot where Belfair is.
11    Tell me about your relationship with Jim
12  Beckert.
13    A  Jim is the elected auditor and an elected
14  councilman.
15    Q  Do you have any business dealings or any
16  type of outside of that relationship with Jim
17  Beckert?
18    A  No, no.
19    Q  Is that -- did you know Jim Beckert
20  personally before being elected to council?
21    A  I met Jim at probably a Republican Party
22  event, either a county party or the Bluffton Party,
23  and that would have been probably late 2018, so
24  maybe just before or just after I got elected. I
25  don't recall.

JOHN HERVOCHON – 9/27/2021

Page 9

1    MR. CROSBY: You said the next one would
2    be 27?
3         (Exhibit 27, 10/22/19 Email to
4    Hervochon from Caporale, was marked for
5    identification.)
6    BY MR. CROSBY:
7    Q   If you'd just take the one with the
8    yellow sticker and then pass the other two to
9    Mr. Buyck.
10        Who is Rick -- is it Caporale?
11   A   Caporale.
12   Q   Caporale.
13   A   He was my predecessor on county council.
14   Q   You took his place?
15   A   Yes, sir.
16   Q   This is an email from Mr. Caporale to you
17   attaching a piece that he had written for who he
18   refers to there as the Duke of Dyslexia. That's
19   Mr. Beckert?
20   A   Presumably.
21   Q   Is that something that you -- the manner
22   in which you refer to Mr. Beckert?
23   A   No, sir.
24   Q   And here he's indicating to you that this
25   is a press release that he wrote for Mr. Beckert.

Page 10

1    Why would he -- why is he forwarding that to you?
2    A   I don't recall specifically.
3    Q   Do you have an understanding of why
4    Mr. Caporale would be drafting a press release for
5    Mr. Beckert?
6    A   No, I don't. I know that Rick and Jim
7    had some sort of relationship when Rick was on
8    counsel, but beyond that, I don't know why he would
9    do that.
10   Q   Did you have a conversation with
11   Mr. Caporale about the press release that was -- he
12   had drafted?
13   A   I don't recall.
14   Q   You are familiar with the I guess
15   controversy or discussion surrounding the contents
16   of the press release?
17   A   Correct.
18   Q   Is that the matter that ended up with the
19   independent auditing firm coming in and looking
20   into the matter?
21   A   Can you specify the question?
22   Q   Do you recall in some of these financial
23   discussions an issue that arose between Mr. Beckert
24   and Alicia Holland regarding some of the
25   calculations?

Page 11

1    A   Which calculations are you referring to?
2    Q   Well, I'm referring to the ones that are
3    in this memo.
4    A   And can you repeat the question, please?
5    Q   Do you recall when this controversy
6    arose?
7    A   I do. This is in reference to the
8    rollback millage, if I'm not mistaken.
9    Q   Do you know what kind of relationship
10   Mr. Caporale and Mr. Beckert had such that he would
11   be writing public press releases?
12   A   No, I do not.
13   Q   Did you question that at the time?
14   A   His relationship?
15   Q   Yeah, and why he would be drafting a
16   press release.
17   A   I don't recall.
18   Q   And you developed a relationship with
19   Mr. Beckert whereby you would help him draft
20   documents, correct?
21   A   I don't recall ever helping draft
22   documents. I recall asking for information to be
23   presented a little bit more clearly, but as far as
24   drafting, no.
25   Q   Do you recall helping him edit some of

Page 12

1    his emails?
2    A   Edit emails?
3    Q   Yes, some of the information that he was
4    sending out.
5    A   I don't recall that, no.
6         (Exhibit 28, Email Chain Ending in a
7    6/22/20 Email to Beckert from Hervochon,
8    was marked for identification.)
9    BY MR. CROSBY:
10   Q   And here's where Mr. Beckert was to
11   present to the Beaufort County School District, and
12   he sent you a draft of his presentation, asked for
13   your input?
14   A   Uh-huh, yes, sir.
15   Q   Do you remember that?
16   A   Not specifically, no, sir.
17   Q   Why would Mr. Beckert be requesting your
18   input into his presentation?
19   A   I had told him several times that he
20   needed to present information to public bodies more
21   clearly, and I'm presuming that this was the
22   genesis of one of those conversations.
23   Q   Did you ever review the final draft of
24   this presentation?
25   A   I don't recall.

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON - 9/27/2021

Page 13

1          (Exhibit 29, 6/27/19 Text Messages,
2      was marked for identification.)
3  BY MR. CROSBY:
4      Q   This is a screenshot of a text exchange
5  between you and Mr. Beckert?
6      A   Yes, sir.
7      Q   And at the bottom he says: Just sent you
8  a draft email for the audit firm.  For your eyes
9  only.  Until we talk.
10         Do you recall getting an email from
11  Mr. Beckert containing information that he was
12  sending to the auditing firm that had been hired by
13  the county?
14     A   Not specifically.
15     Q   Why would you be involved in reviewing
16  what he was sending to the auditing firm?
17     A   I don't recall specifically.
18     Q   When Mr. Beckert presented the
19  information that is in Exhibit Number 27, that
20  press release, did you have any meetings with him
21  to sit down and determine whether or not the
22  information was accurate before he released it?
23     A   I don't recall specifically on this
24  particular issue.
25     Q   You did question Ms. Holland about that,

Page 14

1  did you not?
2      A   I believe I did.
3      Q   Did you ever question Mr. Beckert to
4  determine, you being a CPA, whether his numbers
5  made more sense or her numbers?
6      A   Absolutely.  I questioned him on
7  everything he ever presented to me.
8          (Exhibit 30, 9/18/19 Email to
9      Hervochon from Beckert, was marked for
10     identification.)
11  BY MR. CROSBY:
12     Q   I'll pass to you what's marked as
13  Exhibit 30.  This -- I'll give you a second.
14         Exhibit Number 30 is an email to you from
15  Jim Beckert providing you a draft of an email that
16  was going to be sent out to council?
17     A   I'm sorry.  Is that a question?
18     Q   Yes.
19     A   Can you restate the question?
20     Q   What is Exhibit 30?
21     A   It is an email to somebody named Bonnie
22  and that he forwarded to me, "he" being Jim
23  Beckert.
24     Q   Do you know why he forwarded it to you?
25     A   I do not for certain.

Page 15

1      Q   Did he ask you to review this email
2  before it was sent out?
3      A   I don't recall.
4      Q   Who is Bonnie?
5      A   I don't know.
6          (Exhibit 31, Email Chain Ending in a
7      9/18/19 Email to Cox from Beckert, was
8      marked for identification.)
9  BY MR. CROSBY:
10     Q   Let's look at Exhibit 31.  Exhibit 31 is
11  a copy of what appears to be the same email that
12  went out to somebody -- actually somebody named
13  Bonnie L. Cox, a CPA.  Who is Bonnie Cox?
14     A   Bonnie Cox appears to work for Cherry
15  Bekaert.
16     Q   Say that again.
17     A   Bonnie Cox appears to work for Cherry
18  Bekaert, or at least did at the time.
19     Q   And who is Cherry Bekaert?
20     A   Cherry Bekaert is a local or regional
21  accounting firm.
22     Q   And do they work for the county?
23     A   My understanding is that they do work for
24  the county on occasion, or have done work on
25  occasion.

Page 16

1      Q   And this Exhibit 31 went out at 11:05 AM
2  on September 18th, 2019, yes?
3      A   Yes, sir.
4      Q   And Exhibit Number 30 was sent to you at
5  10:08 AM on the same date, correct?
6      A   Yes, sir.
7      Q   Why was Mr. Beckert sending this to you
8  in advance of it going out to council and Ms. Cox?
9      A   I don't know, sir.
10     Q   Did you have a conversation with
11  Mr. Beckert about this prior to it being sent out
12  to council?
13     A   I don't recall.
14     Q   Did you -- he ask for your approval on
15  the wording?
16     A   Not to my knowledge, not that I recall.
17     Q   Did you go over the numbers that were
18  contained in Exhibit 31 before this was sent out?
19     A   I'm sorry.  You said the numbers in
20  Exhibit 31 or the numbers in --
21     Q   Well, in 30 or 31, did you go over the
22  numbers with Mr. Beckert prior to this being sent
23  out?
24     A   I don't recall.  That would have been in
25  the middle of the workday.

4  (Pages 13 to 16)

JOHN HERVOCHON - 9/27/2021

Page 17

1    Q  Did you make any of the edits to this
2  document on Mr. Beckert's behalf?
3    A  Not that I can recall.
4    Q  I'm just curious to why he'd be sending
5  it to you before it went out.
6    A  Is that a question?
7    Q  Yes. I mean, I'm curious. Do you know
8  why -- have any idea why he'd be sending it to you?
9    A  We had talked about the particular issue
10  a number of times.
11    Q  But you were going to get a copy of it
12  before -- because you were copied on Exhibit 31,
13  correct?
14    A  Presumably.
15    Q  Yes. And I'm trying to gain an
16  understanding as to why Mr. Beckert, an hour before
17  this document was sent out to full council, would
18  run it by you.
19    A  I can't speak for Mr. Beckert.
20    Q  Well, did you do anything with it when he
21  sent it to you?
22    A  I don't recall. It's entirely possible
23  that I didn't even see it until I got the second
24  iteration of it.
25    Q  Well, somebody made some changes. The

Page 18

1  paragraphs were changed. The formatting was
2  changed somewhat there. Did you help him do that?
3    A  I don't recall. If I did, the exhibit
4  would be in your possession because I provided
5  everything that I sent to him.
6    Q  Well, do you know if Exhibit 31 is a
7  version that you -- a version that you edited?
8    A  I don't know that I did edit it.
9    Q  Did you have some understanding with
10  Mr. Beckert with regard to these issues that --
11  where you needed to approve what he was sending out
12  before he sent it out?
13    A  No, absolutely not.
14    Q  Do you know whether the numbers that are
15  contained in Exhibit 31, as stated by Mr. Beckert,
16  were indeed accurate?
17    A  I don't recall at the time.
18    Q  Do you recall today whether you and
19  Mr. Beckert have any kind of relationship such that
20  he runs certain issues by you?
21    A  Currently?
22    Q  Yes.
23    A  I haven't talked to Mr. Beckert in
24  probably a year and a half.
25    Q  Have you ever had any relationship or

Page 19

1  agreement with Mr. Beckert whereby you were -- he
2  was running certain issues by you before he went
3  public with him?
4    A  Agreement, no.
5    Q  Understanding?
6    A  Understanding, I would say no. I don't
7  think that appropriately characterizes the
8  relationship that we had.
9    Q  What was the relationship whereby he
10  would send you emails in advance?
11    A  He would raise issues to me and ask me
12  what my opinion was in my role as vice chairman at
13  the time of the finance committee and given my
14  background in finance.
15    Q  Would you do anything to verify his
16  numbers, since he was sending it -- running it by
17  you?
18    A  Occasionally, but most of the numbers
19  that he was pulling I did not have access to on a
20  daily basis.
21       (Exhibit 32, Text Messages, were
22       marked for identification.)
23    MR. BUYCK: Ronnie, I notice that the
24  text messages that you've got here do not bear
25  a Bates stamp or anything. Do you know where

Page 20

1  these came from?
2    MR. CROSBY: Well, that's stuff y'all
3  produced. I don't know.
4    MR. BUYCK: Okay. This came from --
5    MR. CROSBY: I wouldn't have had access
6  to it anywhere else. Chelci will be here
7  tomorrow. She probably can do better with
8  that than I can.
9  BY MR. CROSBY:
10    Q  And this is -- Exhibit Number 32 is an
11  exchange between you and Mr. Beckert?
12    A  Uh-huh, yes, sir.
13    Q  And he's commenting, it sounds like, on
14  some of his election -- or some -- I don't know if
15  it's election or not, on some -- well, tell me,
16  what was this conversation about?
17    A  This was about the campaign at the time
18  because we both got elected the same cycle.
19    Q  So you would -- this would answer a
20  question earlier. You would have known
21  Mr. Beckert, then, before you got elected?
22    A  It was right -- it was right in that time
23  frame, correct.
24    Q  Did y'all help each other with your
25  campaigns?

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON - 9/27/2021

Page 21

1     A   What's your definition of "help"?
2     Q   As broad as you want to -- as your
3  understanding of it would be.
4     A   So we talked about social media strategy,
5  which is what this is discussing.  We talked about
6  sign placement, as I recall.  Apart from that, I
7  don't recall any specifics.
8     Q   It looks like you're giving him advice
9  here about -- who is George?  Is that his opponent?
10    A   Correct.
11    Q   And you're giving him advice about
12  looking into Instagram?
13    A   Yes, sir.
14    Q   Were you any kind of retained consultant
15  for Mr. Beckert in his campaign?
16    A   No, sir.
17    Q   How is it that the two of y'all -- you
18  came to be giving him advice about social media
19  strategies and sign placeage and that type of
20  thing?
21    A   He reached out prior to the election, and
22  we met at least once I think prior to the election
23  and just formed a relationship based on that.
24    Q   When he reached out to you, what was
25  the -- what was the -- led to that, to him reaching

Page 22

1  out to you?
2     A   It was something to the effect of, "I'm
3  the auditor.  You're clearly going to have an
4  involvement in the finance committee.  You know,
5  it's a good idea that we know each other."
6     Q   You would have an involvement if you got
7  elected?
8     A   Correct, correct.  He was presuming that
9  I was going to get elected.  I was not quite there
10  yet, but that was the presumption.
11    Q   I assume you had opposition?
12    A   I did.
13    Q   Had Mr. Corvall --
14    A   Caporale.
15    Q   Caporale.  Had he -- was he just stepping
16  down?
17    A   Correct.
18    Q   Did he work for you on your campaign?
19    A   Mr. Caporale?
20    Q   Yeah, Mr. Caporale.
21    A   He was very supportive, for sure.
22    Q   Did he and you and Mr. Beckert ever meet
23  together?
24    A   Not to my recollection.
25    Q   Do you know if you still have a draft of

Page 23

1  the presentation that was referred to in
2  Exhibit 28?
3     A   It is likely still in my email.
4     Q   By this time, you were on the county
5  email.  This is beaufortcounty.gov, correct, your
6  email address?
7     A   Yes, sir.
8     Q   Do you recall whether or not you deleted
9  that presentation?
10    A   I do not, no.
11    Q   Have you deleted any emails that were
12  sent to you on -- over your county email address?
13    A   Any emails?  Can you clarify that,
14  please?
15    Q   Well, I mean -- let me -- well, I'll just
16  ask it broad.  Have you deleted any emails,
17  permanently deleted any emails, off of your
18  government email address?
19    A   Occasionally I get phishing-type emails.
20  I know that I've deleted those, because I've been
21  instructed to do so, but generally, I don't delete
22  emails, whether personal, private, county,
23  business.  I'm a notorious hoarder, electronic
24  hoarder, as it were.
25       MR. BUYCK:  Is that what you call us?

Page 24

1       THE WITNESS:  Yeah, I do.
2  BY MR. CROSBY:
3     Q   And one thing in this Exhibit 28, the
4  last thing -- piece of advice you give him is that
5  you remove anything that could be construed as a
6  personal attack on Ms. Crosby, and I assume that's
7  Tonya Crosby?
8     A   Yes, sir.
9     Q   What would he have had in there that made
10  you give him that piece of advice?
11    A   I don't recall specifically.
12    Q   I mean, he had some conflict with
13  Ms. Crosby that you became aware of?
14    A   Can you define "conflict"?
15    Q   Well, he was critical of Ms. Crosby.
16    A   Generally speaking, I think that's
17  accurate.
18    Q   Just like he was critical of Alicia
19  Holland?
20       MR. ANDERSON:  Objection.
21       THE WITNESS:  Generally speaking, I would
22  say that's probably accurate.
23  BY MR. CROSBY:
24    Q   That last one was 32?
25    A   Yes, sir.

6  (Pages 21 to 24)

JOHN HERVOCHON – 9/27/2021

Page 25

1    Q   Do you know whether Mr. Beckert had
2  dyslexia?
3    A   I do not know that, no.
4        (Exhibit 33, 8/30/19 Email to
5        Hervochon from Becker, was marked for
6        identification.)
7  BY MR. CROSBY:
8    Q   I'll give you Exhibit 33.
9    MR. BUYCK:  Take your time and read
10  through all of these.  We're in no hurry.
11    THE WITNESS:  Okay.
12  BY MR. CROSBY:
13    Q   That's 33, correct?
14    A   Yes, sir.
15    Q   So Exhibit 33 is a draft email that was
16  sent to you by Mr. Beckert?
17    A   Yes, sir.
18    Q   And its subject line is:  Audit issues in
19  draft form, correct?
20    A   Yes, sir.
21    Q   And we looked at Exhibit 29 earlier.
22    A   Okay.
23    Q   And Exhibit 29 was that text, and there
24  at the bottom, it says that -- Mr. Beckert tells
25  you he just sent you a draft email for the audit

Page 26

1  firm, for your eyes only until we talk, correct?
2    A   Yes, sir.
3    Q   And that's dated August 30th, 2019, at
4  3:46 PM?
5    A   Yes, sir.
6    Q   And Exhibit 33 is dated August 30th,
7  2019, at 3:44 PM, correct?
8    A   Yes, sir.
9    Q   So two minutes later -- he sends you the
10  email at 3:44, and then two minutes later, he sends
11  you a text letting you know that he sent it?
12    A   Yes, sir.
13    Q   And so if we look back at Exhibit 30,
14  which is dated September 18th, to you and the --
15  there's been a number of changes to the draft,
16  correct?
17    A   Yes, sir.
18    Q   And then I think Exhibit Number 31 that
19  we looked at it a minute ago that was actually sent
20  had some more changes, but it was sent the same
21  day, September 18th?
22    A   Yes, sir.
23    Q   So what input did you have between
24  August 30th, 2019, and September 18th, 2019, in
25  drafting the email to Bonnie Cox at Cherry Bekaert?

Page 27

1    A   I don't recall specifically.
2    Q   You would have had involvement.  That's
3  why he was sending it to you, correct?
4    A   I don't recall specifically.
5    Q   But your responses, if any -- let me ask
6  you this:  If you did any edits, then they would
7  be -- still be within your email if you made edits
8  and sent it back to Mr. Beckert?
9    A   If it was by electronic means, then yes.
10    Q   Do you know if you had telephone
11  conversations with Mr. Beckert whereby you went
12  over proposed changes either in substance or
13  stylistic changes?
14    A   So Exhibit 29 would lead me to believe
15  that we either had a phone conversation or possibly
16  lunch, maybe.
17    Q   Do you ever recall having -- I mean, this
18  was a pretty big issue at the time, wasn't it?
19    A   Yes, sir.
20    Q   Your predecessor had drafted a press
21  release for him, correct, that we already looked
22  at?
23    A   Uh-huh, yes, sir.
24    Q   And now you were the contact person for
25  Mr. Beckert, or at least he's reaching out to you,

Page 28

1  to help him provide this information to this audit
2  firm that the county -- this firm that the county
3  had hired to do this audit, correct?
4    A   I'm sorry.  Can you repeat the question?
5    Q   Mr. Beckert was reaching out to you,
6  sending you the drafts of what he intended to send
7  to the firm that was hired to do the audit by the
8  county?
9    A   Yes, sir.
10    Q   And what I'm just trying to gain an
11  understanding of is what's your role in that?  I
12  mean, he sent it to you for a purpose, correct?
13    A   Presumably.
14    Q   No one else is on this email other than
15  you?
16    A   I don't know who else he sent that to.
17    Q   Well, I'm talking about on these email
18  messages, correct?
19    A   Correct, uh-huh.
20    Q   Did you have lunch with Mr. Beckert and
21  discuss the verbiage of these exhibits?
22    A   I had lunch with Mr. Beckert probably
23  five or six times.  I don't recall if we discussed
24  these specific exhibits over lunch or if it was a
25  phone call or if we discussed them at all.

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON – 9/27/2021

Page 29

1    Q  It would lead one to believe that if he
2  sent you this Exhibit 33 on August 30th and then
3  again right before he sent it out that you would
4  have had some discussions in there so that you
5  could see what was final -- the final was before it
6  went out?
7        MR. BUYCK:  Note my objection.
8        THE WITNESS:  Possibly.
9  BY MR. CROSBY:
10    Q  I mean, that's why he was sending it to
11  you, wasn't it, to get your input, and you were
12  providing input?
13    A  Possibly on this particular issue.
14    Q  Did you help Alicia Holland provide
15  information to the auditing firm?
16    A  I don't recall Alicia ever asking for my
17  input or help on any of those issues.
18    Q  And you questioned Alicia Holland pretty
19  thoroughly about her numbers, did you not?
20    A  Yes, sir.
21    Q  Did you ever do that publicly whereby you
22  questioned Jim Beckert about his numbers?
23    A  When he presented at council, I'm sure
24  that I asked questions.  What those were, I can't
25  recall.

Page 30

1    Q  Well, that's all on video, isn't it?
2    A  Yes, sir, yeah.  They would all be --
3    Q  I hadn't seen where you questioned him.
4  That's why I was asking do you ever recall
5  questioning him at these public meetings?
6    A  I don't recall.
7    Q  And what was the ultimate outcome of this
8  after the audit about whose numbers turned out to
9  be right?
10    A  In my opinion?
11    Q  Yeah.
12    A  In my opinion, it was not determined.
13  The audit determined that the calculation, the
14  process was correct.  However, the answer of
15  whether or not the numbers were correct and the
16  result of the rollback millage was correct was not
17  determined, and I asked that question specifically
18  to Cherry Bekaert.
19    Q  And they didn't make that determination?
20    A  They said that they were not provided
21  with the data to do so, again, in my opinion.
22    Q  As far as -- as far as the methodology
23  that Ms. Holland was using, that proved out to be
24  the correct way to do it?
25    A  The calculation methodology is I believe

Page 31

1  what they spoke to at that meeting.
2    Q  Did you have any particular file whereby
3  you kept -- would have kept these types of
4  documents, your communications with Mr. Beckert
5  about ongoing issues that he was raising with the
6  county finances?
7    A  I'm sorry.  Can you --
8    Q  Did you have any type of file, whether it
9  be paper or electronic, whereby you stored
10  documents pertaining to the financial issues that
11  Mr. Beckert was raising?
12    A  If I did, it would be on my county
13  laptop.
14    Q  Were you encouraging Mr. Beckert to make
15  these assertions?
16    A  I don't think "encouraging" would be the
17  correct terminology.
18    Q  What would be?
19    A  I'm sorry.  The question was making
20  assertions?
21    Q  Yeah.
22    A  Whether I was encouraging him to make
23  assertions?  No.
24    Q  Was what's contained in Exhibit 31, that
25  is, the email that was sent out to Bonnie Cox and

Page 32

1  counsel, were you responsible for this final draft?
2    A  That responsibility would have been Jim.
3    Q  Well, I'm talking about for the content
4  and format of this final draft.
5    A  Not that I recall.
6    Q  I mean, it changed within that hour after
7  he sent it to you at a little bit after 10:00 and
8  when he actually sent it out at 11:05.
9        MR. BUYCK:  Note my objection.
10  BY MR. CROSBY:
11    Q  I mean, you can just look at it and see
12  the format changed, correct?
13    A  There's more spaces in here, for sure,
14  and the beginning paragraph is different, but I
15  don't believe that I was responsible for those
16  edits.
17    Q  The first two -- first two versions had a
18  different opening paragraph, correct?
19    A  You're speaking specifically to
20  Exhibit 33 and 30 versus Exhibit 31?
21    Q  Yes.
22    A  Correct.
23        (Exhibit 34, 6/5/18 Text Message,
24        was marked for identification.)
25  BY MR. CROSBY:

8  (Pages 29 to 32)

JOHN HERVOCHON – 9/27/2021

Page 33

1  Q  Who is the Rick that's in your contacts?
2  RC, Rick, who is that?
3  A  That's Rick Caporale.
4  Q  And you're commenting there on a post
5  that he apparently did for Jim Beckert, a question
6  on some comment?
7  A  Yes. I believe it was Facebook.
8  Q  And was it a part of the political
9  campaign?
10  A  If I'm recalling correctly, it was part
11  of the political campaign, correct.
12  Q  Do you recall what the subject of the
13  post was?
14  A  Specifically, no, I don't.
15  Q  Was he saying good things about Jim
16  Beckert?
17  A  Generally at the time, Jim was being
18  attacked by the Republican Party. I believe it was
19  right around that time frame.
20  Q  Why was he being attacked by the
21  Republican Party?
22  A  There was an accusation that he was
23  anti-Semite by somebody in the -- or some group or
24  person inside of the Republican Party during the
25  campaign.

Page 34

1  Q  That was the Republican chairman,
2  chairlady?
3  A  I believe that was one of them, yes.
4  Q  Was there another one?
5  A  Not to my recollection. I don't know who
6  specifically was in charge of that campaign.
7  Q  What was her name?
8  A  The chairwoman of the GOP at the time?
9  Q  Yes.
10  A  That was Sherri Zedd.
11    (Exhibit 35, Email Chain Ending in a
12    5/22/18 Email to Hervochon from Caporale,
13    was marked for identification.)
14  BY MR. CROSBY:
15  Q  Look at Exhibit 35.
16  A  Okay.
17  Q  That's an email to you dated May 22nd,
18  2018, from Mr. Rick Caporale?
19  A  I'm sorry. You said May 22nd, 2018?
20  Q  Yes.
21  A  Correct.
22  Q  And he's forwarding you something from
23  Sherri Zedd?
24  A  Correct.
25  Q  And it has the slur that was attributed

Page 35

1  to Mr. Beckert there?
2  A  Are you referring to the highlighted text
3  at the top here?
4  Q  Yeah, where it says: A/k/a Arbeit G.
5  Zedd.
6  A  Correct.
7  Q  And that's what he was accused of as
8  making an anti-Semitic slur to -- toward the chair
9  of the Republican Party, Ms. Zedd?
10  A  Correct.
11  Q  Do you know where that -- Mr. Caporale
12  received this attachment?
13  A  I do not.
14  Q  Did you discuss it with him?
15  A  I don't recall.
16  Q  Did you ever talk to Mr. Beckert about
17  his use of what was termed to be an anti-Semitic
18  slur?
19  A  I probably did. I just don't recall the
20  specifics of it.
21  Q  And that was something that was referred
22  to as Jewgate?
23  A  I don't recall that specifically.
24  Q  You don't recall you and your Republican
25  counterparts referring to that as Jewgate?

Page 36

1  A  I do not recall referring to it that way,
2  no.
3    (Exhibit 36, 5/21/18 Text Messages,
4    were marked for identification.)
5  BY MR. CROSBY:
6  Q  Looks like this is a text exchange, looks
7  like, following the election where Mr. Beckert
8  actually won?
9  A  I don't think so, because I think these
10  are from May 21. If I'm not mistaken, the primary
11  would have been in June.
12  Q  Okay. Yeah, yeah.
13  A  Yeah. This would have been preprimary,
14  if I'm not mistaken.
15  Q  And they say there: Did Nielsen -- and
16  that's -- who is that?
17  A  That would be Barbara Nielsen.
18  Q  And what's her position?
19  A  At the time, she was maybe like a VP or
20  vice chair of the Republican Club, I believe.
21  Q  And she's one of the ones that made some
22  noise about the slur?
23  A  I don't know that to be true.
24  Q  Is she one -- is she the one that
25  recruited someone -- the primary opposition?

9 (Pages 33 to 36)

JOHN HERVOCHON - 9/27/2021

Page 37

1    A   I don't know that to be true either.
2    It'd be secondhand. I don't know that firsthand.
3         (Exhibit 37, Text Messages, were
4    marked for identification.)
5    THE WITNESS: Okay.
6    BY MR. CROSBY:
7    Q   Who are the people on this exchange?
8    A   That is Joe Iaco, Paul Runko, and Sarah
9    Kimball and myself.
10   Q   And who is Joe Iaco?
11   A   Joe Iaco, I-A-C-O, at that time I believe
12   would have been the immediate past president of the
13   Greater Bluffton Republican Club, and at that time
14   I believe Sarah would have been the president, and
15   Paul would have been secretary, I believe, and I
16   was the treasurer.
17   Q   You're the blue up there, and you're
18   talking about Ms. Moss, who was running against
19   him? Who was it that ran against Beckert?
20   A   George Wright.
21   Q   In that race?
22   A   Correct.
23   Q   Who are you referring to that she's more
24   qualified?
25   A   I believe I was referring to Laura

Page 38

1    Sterling at the time.
2    Q   Who is that?
3    A   She is -- she ran for I think the
4    congressional seat maybe in twenty -- might have
5    been 2016. She ran for -- what's the date of this?
6    This would have been -- it's tough to say. She ran
7    for District -- she ran in the primary for District
8    Number 9 as a Republican for the council seat. She
9    didn't win. And I believe that this was in
10   reference to her potentially running for auditor.
11   She -- to answer the question I think you asked,
12   she's a local accountant in Bluffton. I assume
13   that's not a CPA that would qualify.
14   Q   And then help me one more time, Iaco?
15   A   Iaco.
16   Q   Iaco. He writes that people will line up
17   to vote against him. In a three-way race between
18   Moss, Beckert, and a broken washing machine, I
19   think the washer never finishes worse than second.
20   And here gets to my point when I asked you just
21   now. There's discussion there about Nielsen
22   getting -- exploring primary opposition?
23   A   I'm sorry. Can you repeat the question?
24   Q   This circles back around to my question
25   earlier where I asked you did Barbara Nielsen seek

Page 39

1    out primary opposition against Mr. Beckert.
2    A   I believe that's correct, but again,
3    that's -- that would be secondhand.
4    Q   Well, you were on -- you were the
5    secretary of the Republican Party. Would you
6    not --
7    A   Different Republican Parties. So the
8    Greater Bluffton Republican Club is one entity.
9    The Beaufort County Republican Party, that's
10   another entity.
11   Q   You were in a subset of that. But in
12   your role there, did you learn one way or the other
13   whether someone in the party actually sought out
14   primary opposition?
15   A   Secondhand, and this would be it.
16   Q   And going back to Exhibit 36, who all are
17   the people that are on this thread?
18   A   Joe Iaco, so that's the JI. MR is Mike
19   Raymond.
20   Q   Who is he?
21   A   Mike Raymond was involved in the Greater
22   Bluffton Republican Party. His wife was the
23   treasurer that preceded me. He's good friends with
24   Joe Iaco, and he is on the fire board. Is or was
25   on the fire board.

Page 40

1    The other JI is Joanie Iaco. That's the
2    wife of Joe. The SK is Sarah Kimball, the PR is
3    Paul Runko. And the -- at the top, the blue
4    circle, that's too small for me to make out.
5    Presumably, that would be me, though, but it
6    doesn't look like -- it doesn't look like my photo.
7    Q   And y'all go on to make some
8    Jewish-related jokes here?
9    MR. BUYCK: Note my objection.
10   THE WITNESS: Which exhibit are you
11   referring to?
12   BY MR. CROSBY:
13   Q   36.
14   A   That would be Joe Iaco.
15   Q   That would be Joe that says: Something's
16   not kosher?
17   A   Correct.
18   Q   And then Paul Runko, the end of it, says:
19   Jim might have blown the election, you guys, Hebrew
20   it?
21   A   I'm sorry. I missed the second page.
22   Correct.
23        (Exhibit 38, 1/22/18 Text Message,
24        was marked for identification.)
25   BY MR. CROSBY:

10   (Pages 37 to 40)

JOHN HERVOCHON - 9/27/2021

Page 41

1      Q   Exhibit 38, another text that you were
2   on?
3      A   One page, correct?
4      Q   It's just one page.
5      A   Okay.
6      Q   What are they referring to that Sarah is
7   saying that she couldn't be there and that you've
8   got -- what was that referencing?
9      A   January 22nd of 2018.  That may have been
10   a campaign announcement.
11      Q   Oh, as far as you announcing your
12   candidacy?
13      A   Correct, I believe anyway.  It certainly
14   would be the correct time frame.
15      Q   And it looks like that particular group
16   didn't text again until after the primary,
17   June 13th?
18      A   Correct.
19      Q   And as it turns out, the prior emails
20   about Mr. Beckert not being able to beat a washing
21   machine, he ends up winning the election?
22      A   As it turns out.
23      Q   And was that true that Zedd and Nielsen's
24   influence was finished in the party?
25      A   I don't think so.

Page 42

1      Q   Then at the end, Iaco -- gosh, I don't
2   know why --
3      A   Iaco.
4      Q   Iaco.  I can't remember.  He -- there's a
5   reference to Jewgate?
6      A   Correct.
7      Q   Is he anti-Semitic?
8      A   Not to my knowledge.
9      Q   You take these comments in these texts as
10   just good humor?
11      A   Good humor?  Possibly an attempt at
12   humor.  It's not necessarily my humor.
13      Q   I didn't see where you made any of those
14   comments.
15      A   Correct.
16      Q   It's not the kind of thing that you want
17   your constituents seeing?
18      A   No, absolutely not.
19      Q   Coming after all the controversy about
20   the slur from Mr. Beckert, probably would have been
21   better not to have those types of comments in
22   conversation?
23      A   Yeah.
24      MR. ANDERSON:  Objection.
25      MR. BUYCK:  Note my objection.

Page 43

1           (Exhibit 39, Text Messages, were
2        marked for identification.)
3   BY MR. CROSBY:
4      Q   Is this following the meeting that was
5   had where this text exchange after -- where
6   Mr. Beckert got up and addressed -- I forget if it
7   was the Republican Party or the Bluffton group.  Do
8   you know what I'm talking about, where he got up
9   and said that he was dyslexic, that's why he --
10      A   I don't remember that specifically.  I
11   know that he addressed the Greater Bluffton
12   Republican Club at some point about these issues.
13   I was not there, as I recall.  I watched it on
14   Facebook.
15      Q   Yeah.  I've got a video of it, but I was
16   just trying to context it, if this conversation was
17   related to -- timing-wise to that.
18      A   I don't recall as there's no date on it.
19      Q   In here Joe writes that Beckert is an odd
20   duck and that he might be incompetent?
21      A   That appears to be Joe Iaco.
22      Q   Do you agree with his assessment there?
23      A   Which assessment are you referring to?
24      Q   Well, let me break it down, that
25   Beckert's an odd duck.

Page 44

1      A   I don't know that I necessarily agree or
2   disagree with that, and I don't know that I
3   necessarily agree or disagree with him being
4   incompetent.
5      Q   You won't go either way with either one
6   of them?
7      A   No, I will not.
8      Q   You've had time to observe Mr. Beckert in
9   office.  You wouldn't say that he's a competent
10   Beaufort County auditor?
11      MR. ANDERSON:  Objection.
12      THE WITNESS:  I don't know that I've got
13   any sort of benchmark.  He's the only auditor
14   that I've been a counterpart to.  I think he
15   raises some good points at times.  I think he
16   doesn't raise some good point at others.  I
17   think, like I noted earlier, his communication
18   of financial information, and I told him this,
19   is lacking.  But apart from that, I wouldn't
20   go any further.
21           (Exhibit 40, 9/12/18 Text Messages,
22        were marked for identification.)
23   BY MR. CROSBY:
24      Q   I'll give you Exhibit 40.
25      A   Okay.

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON - 9/27/2021

Page 45

1    Q   Who is this exchange between?
2    A   It's Mare Baracco.
3    Q   Say that again.
4    A   Mare Baracco, M-A-R-E, Baracco is
5    B-A-R-A-C-C-O.
6    Q   And who is she?
7    A   An acquaintance.
8    Q   And I don't have a date on this.  Would
9    this have been after Maria filed a lawsuit?
10   A   The first one I'm not sure.  The second
11   one is Saturday, September 12th, so I'm presuming
12   that would have been 2020, 2020.  And I'm not
13   entirely sure about the timing of lawsuits.
14   Q   And she's -- well, she's talking about a
15   problem that Ashley Jacobs had, like Kubic before
16   her, had no control over Beckert.  And then this --
17   she goes on to talk about why the four attorneys
18   with the county were unable to figure out how to
19   handle the alleged problem of Beckert.  What do you
20   understand the alleged problem with Beckert to be?
21   A   Can you ask the question a different way?
22   Q   This problem that she references, what do
23   you understand the problem that she was talking
24   about with Beckert?
25   MR. BUYCK:  Note my objection.  You can

Page 46

1    answer.
2    THE WITNESS:  My understanding would be
3    the relationship with Ashley, Maria, Alicia,
4    the lady in the assessor's office whose name
5    escapes me at the moment.
6    BY MR. CROSBY:
7    Q   Ebony Sanders?
8    A   Thank you, yes, Ebony Sanders, or some
9    combination of the above.
10   Q   And she then says that she's not taking
11   sides, but she thinks it's some collusion to get
12   rid of Ashley.  Did you agree with her assessment,
13   that whatever this conversation is, that there was
14   some effort to get rid of Ashley Jacobs?
15   MR. BUYCK:  Note my objection.
16   THE WITNESS:  I certainly believe there's
17   an effort to get rid of Ashley, for sure.
18   BY MR. CROSBY:
19   Q   Did you want to -- were you in agreement
20   with Ashley being asked to resign?
21   A   I was not.
22   Q   Tell me about that.
23   A   Can you be more specific?
24   Q   I'd just like to understand what was
25   going on, what your position was with regard to

Page 47

1    Ashley Jacobs.
2    A   My position was, well, first and
3    foremost, we should have given her her review,
4    which we never actually did, so if there were
5    performance issues that needed to be corrected.
6    And certainly some of the councilmembers made some
7    good points.  I had some of my own.  She should
8    have been presented with what those were and had a
9    discussion about it.  My personal opinion as an
10   employer is that you have conversations with people
11   before you fire them and put them on some sort of
12   action plan.  So there's that piece of it.
13   The other piece of it is we've had just a
14   long string of county employees and county
15   administrators, and that going through one more
16   without making an effort to at least right the
17   ship, so to speak, was probably not a good look for
18   the county.
19   Q   What was the general nature of why some
20   people wanted her to leave?
21   A   It would be pure speculation.
22   Q   Well, y'all talked about it.  I mean, you
23   said, obviously, there was a discussion.
24   A   What some of the other councilmembers
25   noted was that she was rather controlling, and that

Page 48

1    didn't necessarily sit well.  There was a lack of
2    interaction with the staff after she came on board,
3    and I think that that didn't sit well with some
4    councilmembers.
5    Q   Were you involved in the campaign that
6    was sort of styled as "Let Ashley Jacobs Work"?
7    A   What's your definition of "involved"?
8    Q   Well, let's take it from a broad sense.
9    I'll break it down.  Did you help put that campaign
10   together?
11   A   Put it together, no.
12   Q   The last one was?
13   A   40.
14   Q   Who put that together, the campaign?
15   A   My understanding is that was a person by
16   the name of Heather Bragg and possibly some other
17   individuals as well.
18   Q   Did any individuals in your office aid in
19   putting that together?
20   A   Meaning my business?
21   Q   Yes.
22   A   No.
23   Q   Did your wife aid in putting that
24   campaign together?
25   A   No.

12  (Pages 45 to 48)

JOHN HERVOCHON – 9/27/2021

Page 49

1          (Exhibit 41, Let Her Work Campaign,
2     was marked for identification.)
3  BY MR. CROSBY:
4     Q   Just to be clear, I'll pass you a copy
5  for the record. I believe your wife's named
6  Michael Hervochon?
7     A   That is her.
8     Q   And she signed on to the campaign?
9     A   She did.
10     Q   Do you agree with the statement in the
11  campaign that Beaufort County Council lacks the
12  integrity the citizens deserve?
13     A   I think in some respects, it's probably
14  true.
15     Q   And that they engage in reckless and
16  unethical behavior has gone unchecked for too
17  long?
18     A   Sorry. Can you ask the question a
19  different way?
20     Q   Do you agree with the statement that the
21  council, instead, that their reckless and unethical
22  behavior has gone unchecked for too long, that
23  there's reckless and unethical behavior on council?
24     A   I think to some extent, that's probably
25  true.

Page 50

1     Q   Can you give me an example of it?
2     A   It's a political organization. I mean,
3  it's politics.
4     Q   And it says on Page 3 that: By not
5  taking action against Beckert, that council is
6  simultaneously costing taxpayers money with
7  inevitable lawsuits and sending a message that the
8  women in our community don't matter.
9     A   I'm sorry. Did you say you were on
10  Page 2?
11     Q   Page 3. I'm sorry.
12     A   Page 3.
13     Q   Top paragraph.
14     A   Okay. I'm sorry. Your question again?
15     Q   I mean, do you agree that the council
16  should have taken an action on Beckert sooner and
17  that failure to do so was costing the taxpayers
18  money?
19     A   I do not.
20     Q   Do you agree that within Beaufort County
21  employment that there was an unsafe working
22  environment for women?
23     A   I have not observed that directly, no.
24     Q   Have you ever observed Jim Beckert act
25  unprofessionally or improperly toward any female

Page 51

1  employees?
2     A   No.
3     Q   Or toward Maria Walls?
4     A   No.
5     Q   But you were aware that there were
6  allegations that Maria Walls was being harassed by
7  Jim Beckert?
8          MR. ANDERSON: Object to the form.
9          THE WITNESS: I'm aware of the
10  allegations.
11  BY MR. CROSBY:
12     Q   And you were aware that Alicia Holland
13  had made allegations that she was being harassed by
14  Jim Beckert?
15          MR. ANDERSON: Same objection.
16          MR. BUYCK: Note my objection.
17          THE WITNESS: I'm sorry. What was the
18  question again?
19  BY MR. CROSBY:
20     Q   Were you aware that Alicia Holland had
21  complained that she was being harassed by Jim
22  Beckert?
23          MR. BUYCK: Same objection.
24          THE WITNESS: I was aware that they
25  disagreed generally on a number of issues.

Page 52

1  BY MR. CROSBY:
2     Q   You weren't aware that she was
3  complaining that she was being intimidated and
4  harassed?
5     A   Harassed, no.
6     Q   Did you agree with -- do you agree with
7  the statement on Page 3 that certain councilmembers
8  have encouraged and behind the scenes have
9  contributed to a false narrative in the -- in
10  motion that Jacobs is the culprit behind the toxic
11  work environment that they had created?
12          MR. BUYCK: Same objection.
13          THE WITNESS: I'm sorry. Can you point
14  me to --
15  BY MR. CROSBY:
16     Q   Second-to-the-bottom paragraph.
17     A   I think I probably agree with it to some
18  extent.
19     Q   Is that how you felt at the time when she
20  was being pushed out?
21          MR. BUYCK: Same objection.
22          THE WITNESS: Generally, yes.
23  BY MR. CROSBY:
24     Q   On Page 2, there's a paragraph there,
25  fourth from the bottom, that talks about

13  (Pages 49 to 52)

JOHN HERVOCHON - 9/27/2021

Page 53

1  questionable and lucrative contracts that benefit
2  certain vendors. Do you know what that's
3  referencing?
4      A  I do not.
5      Q  Do you have any friends or family that
6  have contracts with the county?
7      A  Not to my knowledge, not to my knowledge,
8  no.
9      Q  On Page 15 of 17, do you know who Ben
10  Banks is?
11      A  I do not.
12      Q  Do you know who Terri Epps is?
13      A  I do not.
14      Q  Do you know whether they're related to
15  any of your employees or married to them?
16      A  Terri Epps may be related to a former
17  employee of mine.
18      Q  Did you encourage your employees to sign
19  the Ashley Jacobs --
20      A  No.
21      Q  -- Let Her Work campaign?
22      A  No. We generally don't talk about
23  politics in the work environment.
24      Q  Did you and your wife discuss her support
25  of Ashley Jacobs?

Page 54

1      A  She probably said something to the effect
2  of, "I'm going to sign this petition," and I
3  probably said something to the effect of, "Please
4  don't do that." I generally like her to stay out
5  of it.
6      Q  You did become aware that she had signed
7  it?
8      A  Yeah, sure did.
9      Q  Do you know any other people who signed
10  it?
11      A  Do you want me to go one by one?
12      Q  No. Did you encourage anybody to sign
13  it?
14      A  Not to my recollection, certainly not my
15  wife.
16      MR. CROSBY:  You know what, why don't we
17  take a quick break. I see that Chelci walked
18  in. We'll just take a break and let you
19  change that.
20      THE VIDEOGRAPHER:  Off the record at
21  2:54.
22      (A recess transpired.)
23      THE VIDEOGRAPHER:  This is Media Number 2
24  in the deposition of Chris Hervochon. We're
25  on the record at 3:08.

Page 55

1      (Exhibit 42, Email Chain Ending in a
2      1/26/18 Email to Hervochon from Caporale,
3      was marked for identification.)
4  BY MR. CROSBY:
5      Q  What is Exhibit 42?
6      A  Exhibit 42 is an email chain between
7  myself and Rick Caporale.
8      Q  And he's forwarding you what he refers to
9  as Beckert's letter?
10      A  I'm presuming it's a letter to the
11  editor.
12      Q  And what was that letter in reference to?
13      A  I don't recall.
14      Q  And you say he makes some very
15  interesting points. As we sit here, you don't have
16  any?
17      A  I don't recall, sir.
18      Q  We'd have to get whatever the attachment
19  was off of your computer?
20      A  Correct.
21      MR. CROSBY:  How about make a note for
22  that.
23  BY MR. CROSBY:
24      Q  And it looks like from the very
25  beginning, this is right when you took office, and

Page 56

1  we know that you were --
2      A  No, sir. This is --
3      Q  Oh, this is when you were --
4      A  This is right after I -- this would be
5  right after I announced my campaign, yeah.
6      Q  Right. I'm sorry. I was getting a year
7  ahead.
8      That Mr. Caporale was already -- did you
9  know -- did he ever talk to you about his
10  relationship with Mr. Beckert and sort of
11  behind-the-scenes stuff?
12      A  At this point?
13      Q  Yeah.
14      A  I don't recall. At this point I probably
15  would have known Rick for maybe three, four months,
16  maybe.
17      Q  Do you know why he was sending you this
18  letter from Beckert?
19      A  I don't recall. He used to send me all
20  sorts of stuff to try to get me up to speed as his
21  assumed predecessor. Or successor, I'm sorry.
22      Q  And, of course, this would have been on
23  your Gmail account because you didn't have a
24  Beaufort County account at that time?
25      A  Correct.

14  (Pages 53 to 56)

JOHN HERVOCHON – 9/27/2021

Page 57

1    Q   Let's see.  But he sent it from his
2  Beaufort County account, so –
3        MR. ANDERSON:  Ronnie, I'm going to
4  object to the fact that Beckert's letter I
5  don't believe is actually represented on this.
6        MR. CROSBY:  I know.  He says: Here's
7  Beckert's letter.
8        MR. ANDERSON:  No, no, I understand that,
9  but I think we've got an attachment at the
10 bottom that is not represented in the rest of
11 this email.
12       MR. CROSBY:  This is how it was produced
13 to us, so –
14       MR. ANDERSON:  Neither here nor there.
15 I'm just putting the objection on the record.
16 BY MR. CROSBY:
17    Q   And then the last communication in this
18 chain between you and Mr. Caporale, he says: I'm
19 sure he'd love to hear from you – and "he"
20 presumably being Jim Beckert – and talk to you,
21 but I'm not sure you should get in that deep at
22 this point.  Beckert is a tad different.
23       Did you reach out to Mr. Beckert at this
24 time?
25    A   Not to my recollection, no.

Page 58

1    Q   When do you think it would have been
2  between there and the primary that you and
3  Mr. Beckert would have started communicating and
4  you helping him with his campaign?
5    A   At the earliest, probably May or June of
6  that year, of '18, I would think.
7    Q   Over time, did you – do you know Skip
8  Hoagland?
9    A   I do.
10    Q   Who is he?
11    A   Skip Hoagland is – I believe he's still
12 a constituent of mine.  At the time he lived in
13 Windmill Harbour, so he was a constituent.  He
14 frequents the – or frequented at that time the
15 Greater Bluffton Republican Club meetings.  That's
16 where I met him.  He frequently comes to council
17 and gives public comment.
18    Q   Is he a friend of yours?
19    A   He's a – I would consider him to be a
20 political acquaintance.
21    Q   Do you know whether he and Mr. Beckert
22 have any relationship?
23    A   I don't know.
24    Q   Do you know what he meant, "he" being
25 Mr. Caporale, when he was saying that Beckert is a

Page 59

1  tad different?
2    A   I presume he just meant a little bit
3  different.
4    Q   Would that have been your observation?
5    A   As I think I said before, I don't know
6  that I can confirm either way.
7        (Exhibit 43, Text Messages, were
8        marked for identification.)
9        THE WITNESS:  Okay.
10 BY MR. CROSBY:
11    Q   And you're on this text exchange?
12    A   Again, I believe that the colored circle
13 on the left is me, although I don't recognize that
14 icon, but if I produced this, then I must have,
15 so –
16    Q   And this is referencing, I assume, the
17 lawsuit that was filed by Maria Walls?
18    A   I believe that's accurate.
19    Q   And a link from the Island Packet story
20 was passed around?
21    A   I believe that's accurate as well.
22    Q   And Mike Raymond says that: Beckert may
23 be a snake, but Walls knows he's not a county
24 employee, and it goes on.
25       Do you agree with his characterization of

Page 60

1  Jim Beckert?
2        MR. ANDERSON:  Objection.
3        MR. BUYCK:  Note my objection.
4        THE WITNESS:  I don't – I don't agree
5  that he's a snake, no.
6  BY MR. CROSBY:
7    Q   Did you agree with the characterization
8  that Maria Walls was sounding like a high schooler
9  whining about a bully?
10    A   I did not form any sort of opinion on
11 that lawsuit.
12    Q   In your interactions with Maria Walls and
13 seeing her work, do you believe that she's
14 competent to be treasurer?
15    A   I do.
16    Q   Have you found any faults with her work
17 in service to the county?
18    A   With her work?
19    Q   Yes.
20    A   No, not to my recollection.
21    Q   What about Alicia Holland?  You didn't
22 get a complete answer to the – one of the
23 questions you had about that audit, but outside of
24 that issue, did you find her to be capable as the
25 CFO of Beaufort County?

JOHN HERVOCHON - 9/27/2021

Page 61

1    A  I did not perform any performance reviews
2  for her, and she wasn't my employee, so I don't
3  know that I can answer that.
4    Q  You received her work product as a
5  councilmember?
6    A  In some instances, yes.
7    Q  Did you find the work product that she
8  put out for the county to be -- did you have any
9  faults with it?
10   A  In some instances, yes.
11   Q  And tell me what you recall about that.
12   A  I would -- well, first and foremost, I
13  would point to the internal audit that was just
14  completed a month ago and the items that were
15  raised there.  There was an issue with DSN
16  consumers being classified as contractors as
17  opposed to employees, which I asked questions
18  about.  At the time, it felt like we were taking
19  financial advantage of disabled people, and I found
20  that to be objectionable, quite objectionable.
21      We never received -- and this is
22  something Joe Passiment and I talked about quite
23  frequently.  We never received any sort of
24  reporting around cash or the financial performance
25  of accounting.  We were told it wasn't possible to

Page 62

1  get that.  We've since started to get that.  That
2  was also referenced in the internal audit as well.
3      The last meeting that she presented to us
4  was the budget book with a budget during the course
5  of -- that would have been the 2021 fiscal year,
6  2021 fiscal year budget.  That was the first year
7  that we were getting a budget book.  I asked
8  specifically what numbers are these good through,
9  so when did you close the books through these --
10  for these actual columns that were in the
11  presentation, and the answer that I got was
12  questionable at best.  The answer that I got from
13  the acting CFO subsequent to that was a little bit
14  clearer, that the numbers were kind of all over the
15  place.
16      But those are just the instances off the
17  top of my head, apart from the rollback millage
18  calculation issues that were raised.
19      (Exhibit 44, Email Chain Ending in a
20      3/2/18 Email to Hervochon from Caporale,
21      was marked for identification.)
22      THE WITNESS:  Sir, this should be 44.
23  BY MR. CROSBY:
24   Q  Exhibit 44 is where Mr. Caporale has
25  forwarded you an email from Jim Beckert to

Page 63

1  councilmembers and other Beaufort County employees
2  accusing Ms. Walls of being neglectful and that she
3  was evading the performance of her duties?
4    A  Uh-huh.
5      MR. ANDERSON:  Objection.
6  BY MR. CROSBY:
7    Q  That's a yes?
8      MR. BUYCK:  Same objection.
9      THE WITNESS:  Yes.
10  BY MR. CROSBY:
11   Q  And so this was before you were elected?
12   A  Correct.
13   Q  Did you know Maria Walls at this time,
14  March of 2019, other than that she was the
15  treasurer?  I'm talking about on any kind of
16  personal level.
17   A  No.
18   Q  When did you first get to know Maria?
19   A  I wouldn't say that I even really know
20  her on a personal level, at least certainly not
21  that well.
22   Q  You don't have a lot of one-on-one
23  interaction with her?
24   A  Hardly at all.
25   Q  But at least what was happening before

Page 64

1  you even got elected is a pretty crappy picture of
2  her that's being painted, if this was true what's
3  in here?
4    A  I think that's fair.
5    Q  You didn't get any emails from
6  Mr. Caporale saying anything good about Ms. Walls,
7  did you?
8    A  If I did, they would have been produced.
9    Q  Do you know if he had a beef with Maria
10  Walls?  Did he ever express that to you, that he
11  thought she was not competent or not doing a good
12  job?
13   A  Not to my recollection.
14   Q  Would have been all -- whatever you were
15  receiving was stuff that Jim Beckert was putting
16  out that may have been passed on to you because you
17  were presumed --
18   A  That's my recollection.
19   Q  -- new councilmember?
20   A  Correct.  That's my recollection.
21   Q  Was your election close?
22   A  Mine?  No, sir.
23   Q  I guess he had his horse picked right.
24      (Exhibit 45, Email Chain Ending in a
25      3/6/18 Email to Hervochon from Caporale,

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON - 9/27/2021

Page 65

1        was marked for identification.)
2            THE WITNESS: Okay.
3    BY MR. CROSBY:
4        Q   And this is another email forwarded to
5    you by Mr. Caporale regarding the issues between
6    Mr. Beckert and Ms. Walls?
7        A   That's correct.
8        Q   Do you know whether he had an uncle that
9    could get everybody killed?  That's just some more
10   humor?
11       A   I think that Mr. Caporale has an
12   off-color sense of humor at times.  I don't believe
13   he has an actual Uncle Louie.
14       Q   And this is, again, before you were
15   elected?  He was --
16       A   That's correct.
17       Q   And he was telling Mr. Beckert that he
18   was going to try to get the county to do some type
19   of resolution, I guess to get a request from the
20   Department of Revenue?
21       A   That is my read of it.
22       Q   I wonder why he would ask Mr. Beckert to
23   treat it as confidential.  It's a governmental
24   email.
25       A   That's a question for Mr. Caporale.

Page 66

1            (Exhibit 46, Email Chain Ending in a
2    10/24/19 Email to Hervochon from
3    Caporale, was marked for identification.)
4    BY MR. CROSBY:
5        Q   So this is an October 24th forwarding --
6    an email that was forwarded to you on October 24th
7    of 2019 from Mr. Caporale?
8        A   Yes, sir.
9        Q   And where he said that Jim Beckert
10   admitted to his calculations on the overtaxation
11   issue were in error?
12       A   He -- the email says he acknowledged a
13   sizable mistake.
14       Q   You were already elected at this point,
15   right?
16       A   Yes, sir.  I was already in office.
17       Q   And he said he spoke to Jim at length a
18   little while ago, and he acknowledged a sizable
19   mistake.  Why is Mr. Caporale still involved in
20   that and sending you information about Mr. Beckert?
21       A   I can't be certain of that.
22       Q   Have you had conversations with him about
23   that with regard to Mr. Beckert?  It just seems
24   like y'all have got a lot going on with regard to
25   Jim Beckert.

Page 67

1        A   Is that -- I'm sorry.  Can you clarify
2    the question?
3        Q   Well, I mean, I'm looking at all these
4    emails and this connection between you and
5    Mr. Beckert and Mr. Caporale, and you're telling me
6    you don't really know why he's forwarding you this
7    or what his involvement is, but, you know, is it
8    true that you don't have any idea why he'd be
9    sending these even after he's not in office and
10   you're the elected councilmember?
11       A   I don't know the extent of Mr. Caporale's
12   and Mr. Beckert's relationship.  I mean, Rick was
13   on counsel for a dozen years, so certainly I think
14   the entirety of Jim Beckert's term.  I know that he
15   has a relationship with Jim Beckert.  As I stated
16   before, I'm his successor on council.  I've got a
17   relationship with Rick.  So to the extent that he
18   still has a relationship with Jim Beckert, I would
19   presume that's why he would forward me this
20   information.
21       Q   Do you know if he forwarded that to the
22   other councilmembers?
23       A   I don't know.
24       Q   And then below, there's another
25   conversation between the two of you.  He writes:

Page 68

1    So, as you suggested, if he's going to be brought
2    back into the fold, it's going to take some effort
3    and reeducation.  What's the reference there?
4        A   I don't recall the context.
5        Q   Just read the whole thing and see.
6        A   From a timeline perspective, I don't
7    recall what was going on at the time, but the
8    comment was probably something to the effect of
9    Jim's a little bit outcast at this point, and if he
10   wants to reinvolve himself and be a productive
11   member of the finance structure of the county, that
12   would be what I would be referring to as far as
13   back into the fold.
14       Q   Did you ever participate in any attempt
15   to reeducate Mr. Beckert so that he could be
16   brought back into the fold?
17       A   I'm not entirely sure what "reeducate"
18   means in that context.
19       Q   Well, it says: So as you suggested.
20       A   Like I said, I'm not entirely positive
21   what "reeducate" means in that particular context.
22       Q   Well, do you recall the specifics of what
23   it would take to get Mr. Beckert back into the
24   fold?
25       A   Can you ask that in a different way?

JOHN HERVOCHON – 9/27/2021

Page 69

1    Q   Do you recall any specifics of the
2  conversation with Mr. Caporale about what it would
3  take to to, quote-unquote, bring Mr. Beckert back into
4  the fold?
5    A   Very broadly speaking, it seemed to me,
6  in my assessment at that time generally, was that
7  there was a communication issue between all the
8  parties involved.
9    Q   Well, what would Mr. Beckert need to be
10  reeducated in?
11    A   I don't know.  As I said, I don't know
12  what "reeducate" means in that specific context.
13    Q   Did you feel like he would need some help
14  in understanding the finances if he was going to
15  continue to be in that role?
16    A   Finances, no.
17    Q   What would he need help in?
18    A   As I said, I think that there has been a
19  long-standing communication issue between all
20  parties involved from a finance perspective.
21    Q   But you're specifically referring to Jim
22  Beckert here, or he is?
23    A   Correct.
24    Q   And a conversation that the two of you
25  had?

Page 70

1    A   Correct.
2    Q   Even after you were elected, you were
3  continuing to have conversations with Mr. Caporale?
4    A   I still have conversations with
5  Mr. Caporale to this day.
6    Q   And at this point in time, the
7  conversation -- subject of the conversation was how
8  to bring Jim Beckert back into the fold?
9        MR. BUYCK:  Note my objection.  You can
10  answer the best you can.
11        THE WITNESS:  I don't have a different
12  answer, sir.
13  BY MR. CROSBY:
14    Q   Was there anything ever done towards that
15  end?
16    A   I had proposed with Joe Passiment that we
17  start to have monthly lunches, which I presume
18  you're going to ask me about at some point here in
19  the near future, but apart -- and I told Jim on
20  numerous occasions that, "You need to communicate
21  your financial information differently and better,"
22  but apart from that, that's the extent of it.
23    Q   That would have been sometime after this,
24  wouldn't it, that you proposed the lunches?
25    A   I think shortly thereafter.

Page 71

1    Q   Actually, I was mistaken.  You proposed
2  that before.
3    A   Did I?
4    Q   Yeah.
5    A   Okay.
6    Q   And that was a lunch with Alicia Holland
7  and --
8    A   It was myself, Joe, Ashley, and Alicia,
9  and Jim, obviously.
10    Q   That never took place?
11    A   We had lunch one time with Jim and
12  Ashley.  If I'm not mistaken, Joe was out of the
13  country.  And that was the one and only time we did
14  something like that.
15    Q   Did you ever gain an understanding as to
16  why Alicia did not agree to that?
17    A   She sent me an email that was rather
18  lengthy that cited some health issues, and that was
19  pretty much the end of it.  She wouldn't feel
20  comfortable, or something to that effect.
21    Q   Being around Jim Beckert?
22    A   Uh-huh.
23    Q   Did you ever talk to Jim about that, that
24  why would a county employee feel uncomfortable
25  being around him?

Page 72

1    A   Not that I recall.
2    Q   Did you find that to be concerning at
3  all, that you had a county employee or chief
4  financial officer that didn't feel comfortable
5  being around the county auditor?
6    A   The email that I got back from Alicia was
7  nonspecific enough that I thought it was just a
8  little bit odd.  I sort of dismissed it.
9    Q   Did you ever talk to Ashley about that?
10    A   About?
11    Q   About that issue about any concern that
12  you had as why Ashley -- I mean why Alicia would
13  not meet --
14    A   I'm sure that I did.  I don't recall
15  specifics, though.
16    Q   You said you hadn't talked to Jim Beckert
17  in a while?
18    A   Yes, sir.
19    Q   I think, if I recall, you said a year and
20  a half, maybe?
21    A   Plus or minus.
22    Q   Is that talk and/or email?
23    A   I know he's emailed me, for sure, in
24  that -- in that period since -- I get emails from
25  him all the time.  Last I recall talking to him was

18  (Pages 69 to 72)

JOHN HERVOCHON – 9/27/2021

## Page 73

1  I think January of '20, but I think we had a
2  conversation at some point subsequent to that. I
3  don't recall what it was about.
4      Q   What precipitated the change there?
5      A   Just the, for lack of a better term,
6  turmoil around Jim and his relationship with the
7  county and council and the various folks employed
8  there. It just seemed like it was not a good
9  situation, and I wanted to remove myself from that
10  as much as possible.
11      Q   Did Jim ever try to reach out to you
12  about his office being moved?
13      A   I don't recall.
14      Q   Was that a decision, a directive from
15  county council or from a decision made by Ashley
16  Jacobs?
17      A   My recollection of it is that we met in
18  executive session. Ashley said, "This is within my
19  purview, and this is what I'm going to do," and it
20  was done.
21      Q   So in emails where she says that she was
22  directed by county council, there was never a vote
23  to do that?
24      A   No. We can't vote in executive session.
25      Q   I guess you could bless that or not bless

## Page 74

1  it in executive session, but you couldn't take a
2  formal vote on it?
3      A   I think that's fair.
4      Q   Were you in favor of moving his office?
5      A   Yeah. I would say I tended toward yes,
6  just doing something to maybe physically remove the
7  problems that were happening.
8      Q   To your knowledge, has that helped the
9  situation?
10      A   I don't know that I can say one way or
11  the other whether it's helped.
12      Q   I'm going to look back through these.
13  I'm going to pass you to Mr. Anderson.
14              EXAMINATION
15  BY MR. ANDERSON:
16      Q   Good afternoon, Councilman. My name is
17  Jon Anderson. I represent Jim Beckert in this
18  litigation.
19          I just have a couple of follow-up
20  questions to some of these that you've -- these
21  questions you've received.
22          Do you mind going to Exhibit 27, if you
23  have that in front of you. This was -- this news
24  release was put out October 18th, 2019, that's
25  attached. Is this before or after you were

## Page 75

1  elected?
2      A   After.
3      Q   After.
4      A   Uh-huh.
5      Q   Do you have an opinion as to the factual
6  veracity of this news release?
7      A   As I sit here at the moment, I don't know
8  that I've got an opinion as to the factual veracity
9  of it.
10      Q   Did you -- did you read this news
11  release?
12      A   I'm sure that I read it at the time. I
13  know that I read it earlier.
14      Q   Would you like to take a minute and think
15  about it?
16      A   Yeah, if you would.
17      Q   Yeah, sure.
18      A   Okay. If I'm not mistaken, in that
19  budget year, we had an overage, so directionally,
20  this would be correct if that was the case.
21      Q   Okay. So you would say that the citizens
22  were overtaxed by more than $23 million?
23      A   I don't know about the 23 million, but
24  directionally, I would say that this is correct.
25      Q   When you use the word "directionally," do

## Page 76

1  you mean just in the aggregate that taxpayers were
2  overtaxed?
3      A   Higher or lower, correct.
4      Q   Mr. Caporale wrote a phrase that Ronnie
5  stated earlier, the Duke of Dyslexia. Do you know
6  if other people commented on Mr. Beckert's let's
7  just say shortcomings in written communication?
8  Have you ever heard anybody comment on his
9  shortcomings in written communication?
10      A   Can you -- can you ask the question a
11  different way?
12      Q   Sure. This comment right here, the Duke
13  of Dyslexia, right, that's a comment on his
14  shortcomings for written communication, in my mind,
15  right? That's in -- that's poking a little fun at
16  Mr. Beckert for his typos, his run-on sentences,
17  bad use of punctuation. Do you ever hear anybody
18  else -- I don't need names. I'm just curious if
19  you've, in the aggregate, heard other people
20  comment on his inability to write or anything of
21  that sort?
22      A   Not to my recollection.
23      Q   Okay. Have you noticed it?
24      A   Yes, sir.
25      Q   Okay. Do you think it's reasonable for

JOHN HERVOCHON - 9/27/2021

**Page 77**

1 somebody to give drafts to someone else who might
2 be a better written communicator if you're trying
3 to get your point across to a larger audience?
4 A Yes.
5 Q Okay. Thank you.
6 I'd like to move to Exhibit 33, which was
7 an email from Mr. Beckert to you, audit issues in
8 draft form?
9 A Okay.
10 Q Am I correct, are you a CPA?
11 A Yes, sir.
12 Q And do you have a certification in South
13 Carolina?
14 A Yes, sir.
15 Q Do you know how to calculate the value of
16 a mill?
17 A Offhand, no.
18 Q Okay. It's not a trick question. I'm
19 just curious if you do, if you can speak with any
20 authority on the things that Mr. Beckert talks
21 about.
22 A Offhand, no, I can't calculate the value
23 of a mill.
24 Q Okay. Is that one of those things like
25 if I gave you 24 hours and enough data, you could

**Page 78**

1 probably figure it out?
2 A I'm reasonably confident that that's the
3 case.
4 Q Okay. All right. So would you be able
5 to speak to Mr. Beckert's analysis of the creation
6 of a mill that he puts forth in this email? Do you
7 think you could speak to that with any kind of
8 expertise?
9 A Can you clarify the question?
10 Q Yeah. If you were to read through this
11 draft that he sent you, do you think that you could
12 speak authoritatively as a CPA as to whether or not
13 his criticisms are valid?
14 A If given enough time and data?
15 Q Just the criticisms that are levied right
16 here. I mean, I don't -- I don't need to know
17 whether or not it should be 12.7 versus 12.9 or
18 something like that. I just need --
19 A If given enough time to walk through it
20 and do a considered analysis, I'm sure that I'd be
21 able to speak to it.
22 Q Okay. How much time would you need?
23 Could you just kind of look at some of these right
24 now --
25 A No.

**Page 79**

1 Q -- over the next ten minutes and say
2 that's a valid criticism or that's not a valid
3 criticism?
4 A No, definitely not.
5 Q Okay. So if I gave you 24 hours? Gave
6 you 48 hours? I'm just curious as to how in-depth
7 this process is.
8 A Right, probably at least several days, I
9 would say, of dedicated time.
10 Q Okay. So you cannot --
11 A And that is just a guess.
12 Q -- speak to whether or not this is --
13 A Offhand, no, sir.
14 Q Okay. Thank you. Then I won't ask the
15 next six questions.
16 I think the next -- I'll jump over to --
17 you said you recently just finished an audit, an
18 internal audit. I believe you said you got the
19 results about a month ago. Is that correct?
20 A Approximately.
21 Q Approximately a month ago. Do you, as a
22 city councilman -- county councilman, my
23 apologies -- believe that that internal audit was
24 necessary?
25 A Absolutely.

**Page 80**

1 Q Okay. And why did you believe that that
2 was necessary?
3 A Philosophically speaking, I think that
4 any organization of any size, certainly one that is
5 a steward of taxpayer funds, should have an
6 internal audit function, and I've argued for the
7 same since -- just about since I got on council.
8 One of the debates that we had was
9 whether or not that function should be internal or
10 external, and we ultimately agree that it should be
11 in what I'd call an outsourced internal audit, so
12 that's where we landed, and then one of the other
13 debates we had was what areas we should focus that
14 audit on.
15 Q So what -- explain to a dullard like me
16 what an outsourced internal audit means.
17 A Okay. So in an internal audit, you've
18 got a group of people who may or may not be
19 accountants who are internal employees of the
20 organization. They would be as independent as
21 possible, and then they would go and look at
22 processes/procedures/calculations/functions to make
23 sure that they're operating as intended.
24 Now, absent having a group of people who
25 are dedicated employees of that organization,

20 (Pages 77 to 80)

JOHN HERVOCHON - 9/27/2021

Page 81

1   basically, what we decided to do is outsource that
2   to in this case a CPA firm that would be able to
3   fill that role.
4       Q   How does that differ from an external
5   audit?
6       A   That's a great question.  So an
7   external -- so an external audit, what their
8   objective is is to provide reasonable assurance as
9   to the accuracy and presentation of financial
10  statements, whereas, an internal audit can look at
11  just the day-to-day operations of whatever it is
12  that they're looking at:  Operations, accuracy,
13  efficiency, best practices, things like that.
14  They're not forming an opinion on financial
15  statements as presented, they're presenting
16  findings and recommendations based on what it is
17  that they're observing and looking at.
18      Q   Is it akin to financial housekeeping, an
19  internal audit?
20      A   I think that -- I think that's fair.
21      Q   I don't want to put words in your mouth.
22  I just want to --
23      A   Yeah.  I think it's -- I think it's fair,
24  and that's a fairly accurate layman's portrayal of
25  it.

Page 82

1       Q   Okay.  I'll take that.  I'm a fairly
2   average layman, so --
3           Did I already direct you to Exhibit 42?
4   Because if not, I'd like to.
5       A   No, you did not.
6       Q   And that, again, is the email string that
7   ends with -- or the top begins with Mr. Caporale
8   saying:  I'm sure he'd love to hear from and talk
9   to you?
10      A   Yes, sir.
11      Q   And this is -- is this prior, before
12  becoming a councilman for you?
13      A   Yes, sir.
14      Q   Mr. Crosby asked you a question.  He said
15  what do you believe that Rick Caporale was
16  referencing when he states, "JB is a bit
17  different," and you answered in a bit of an
18  axiomatic way by saying something along the lines
19  of, "I assume he meant that he's just a little
20  different."  Can you please clarify?  Because you
21  just kind of restated it in the form of an answer.
22      A   I don't know that I've got a better
23  answer than that.
24      Q   Different from what?
25      A   Average person.

Page 83

1       Q   Okay.  So he's different from the average
2   person.  Do you agree with that?
3       A   I don't know that I've ever formed an
4   opinion one way or the other.
5       Q   You've worked with Mr. Beckert, right?
6       A   Not day to day, no.
7       Q   But you have worked with Mr. Beckert.  Is
8   that correct?
9       A   Sure.
10      Q   Have you spent time, more than an hour,
11  with him before?
12      A   Yes, sir.
13      Q   You haven't drawn any opinions about him
14  at all?
15      A   I don't think that's accurate, no.
16      Q   Okay.  So help me make it more accurate.
17      A   I mean, generally, I've just found him to
18  be fairly well researched, you know, as I stated
19  before, not the best communicator of financial
20  information.  Beyond that, I don't know that I've
21  got any sort of opinion.
22      Q   Okay.  The next exhibit is Exhibit 43.
23  It's a text exchange.
24      A   Yes, sir.
25      Q   And I'm going to ask this fully knowing

Page 84

1   that you may not know the answer, but does Mike
2   Raymond know Jim Beckert?  Do you know?
3       A   I don't know the answer to that.
4       Q   Okay.  That's fair.
5           Given what you know about her performance
6   at the county, would you hire Alicia Holland to
7   work for your firm?
8       A   No.
9       Q   I know you were sent a bunch of emails
10  about like this is Maria, and this is Jim, and you
11  were sent a bunch of emails.  It looks like
12  Mr. Caporale was doing a good job of really trying
13  to give you a baseline or -- I don't know his
14  baseline to enter you into the seat.  Did you form
15  any personal or professional opinions about any of
16  these people prior to meeting them?
17      A   I think the accurate way to portray it
18  would be forming just a skepticism of the situation
19  that I was walking into.
20      Q   A skepticism of --
21      A   Just how things operate.
22      Q   -- which situation that you were walking
23  into?
24      A   As a councilman.
25      Q   Okay.  So just a skepticism of all

21  (Pages 81 to 84)

JOHN HERVOCHON - 9/27/2021

Page 85

1    employees or all elected officials or --
2        A    Elected officials, certainly, because it
3    means a political position. Politics are politics.
4    But just a skepticism of exactly how, for lack a
5    better term, I guess hunky-dory things were.
6        Q    Okay. So maybe not -- just not -- I'll
7    withdraw that.
8            MR. ANDERSON: Mr. Buyck?
9            MR. BUYCK: Sure. I'm going to move
10   around just a second so the video will be a
11   little better.
12           EXAMINATION
13   BY MR. BUYCK:
14       Q    And I've got a few for you,
15   Mr. Hervochon, to put things into perspective I
16   think a little bit.
17           And the first place I want to start is
18   your relationship with Mr. Caporale. And he had
19   your exact same seat on Beaufort County before you,
20   correct?
21       A    Yes, sir.
22       Q    He knows your constituents?
23       A    Yes, sir.
24       Q    He held that role for 12 years, you said?
25       A    Yes, sir. I believe that's correct.

Page 86

1        Q    Do you think, in you coming onto council
2    from the perspective that you brought, that it was
3    important to have institutional knowledge about
4    what's going on within the county and within your
5    district?
6        A    A hundred percent.
7        Q    And have you tried to maintain that
8    institutional knowledge?
9        A    Yes, sir. I still --
10       Q    Or to garner as much institutional
11   knowledge as possible?
12       A    Yes, sir. I talk to Rick still on a
13   regular basis.
14       Q    But you still, as you were answering the
15   questions a minute ago, have some skepticism when
16   coming into the county in your role as a
17   councilmember, correct?
18       A    Correct.
19       Q    Do you take everything that Mr. Caporale
20   says and attribute it to yourself, or do you let
21   his words stand on their own?
22           MR. CROSBY: Object to the form.
23           THE WITNESS: Yeah. Can you --
24   BY MR. BUYCK:
25       Q    Yeah. We're trying --

Page 87

1        A    Can you ask that a different way?
2        Q    We've gone through a number of exhibits.
3    I think the documents speak for themselves, and you
4    were asked a number of questions about what
5    Mr. Caporale said. Do you adopt all his positions
6    in his emails as your own, or do you let his
7    statements stand on their own?
8        A    I don't think I adopt anything as fully
9    as my own -- or I should rephrase that. I think
10   that I ask a lot of questions, and I form my own
11   thoughts, generally speaking.
12       Q    Right. And just like these other
13   inflammatory emails in which, quote, Jewgate, end
14   quote, and other issues were brought forth, that
15   wasn't you speaking, was it?
16       A    No.
17       Q    That was an attempt, through exhibits, to
18   impute you as being part of some sort of Jewgate.
19   Is that -- is that accurate or truthful --
20           MR. CROSBY: Object to --
21   BY MR. BUYCK:
22       Q    -- in how you look at things?
23           MR. CROSBY: Object to the form.
24           THE WITNESS: I certainly don't agree
25   with the content of those texts, no.

Page 88

1    BY MR. BUYCK:
2        Q    So your words speak for themselves in
3    that regard?
4        A    Yes, sir, always.
5        Q    And do you think it was appropriate to
6    try to utilize that method in this political
7    campaign to raise a -- to raise a political issue
8    against Mr. Beckert or anyone in the manner that it
9    was done?
10       A    Can you clarify your question?
11       Q    Sure.
12       A    Is it in relation to the matter at hand
13   or in relation to the political campaign?
14       Q    In relation to a political campaign. I
15   mean, politics is dirty business, isn't it?
16       A    Yes, sir.
17       Q    You've found that out, haven't you?
18       A    Pretty quick.
19       Q    And these folks raise a lot of issues in
20   politics, and they'll probably even bring some more
21   text messages which you freely provided here even
22   before you were elected, correct?
23       A    That's correct.
24       Q    So you have provided, without any
25   hesitation, all emails that you had which in any

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON - 9/27/2021

Page 89

1  way are reflective of communications concerning
2  Mr. Beckert, correct?
3      A  That's correct.
4      Q  And you haven't adopted those as their
5  own.  They have to stand on their own, correct?
6      A  Can you ask that a different way?
7      Q  Sure.  You haven't adopted what everyone
8  else says?
9      A  No.
10     Q  Those communications must stand on their
11 own, correct?
12     A  Correct.
13     Q  Just as Mr. Caporale referring to a
14 fellow named Skip Hoagland as a Somali pirate, did
15 you know that Mr. Crosby's law firm had a lawsuit
16 against Mr. Hoagland at or around that period of
17 time?
18     A  I did not know that.
19     Q  In regards to the back into the fold
20 comments, do you hold yourself out as having fiscal
21 responsibility and accountability to your
22 constituents?
23     A  Absolutely.
24     Q  Is that one of the premier issues that
25 you've raised through your campaign?

Page 90

1      A  Absolutely.
2      Q  Is that something that you have tried to
3  utilize to the best of your ability to make a
4  determination of for the citizens of this county,
5  as to whether there is fiscal responsibility and
6  accountability?
7      A  Absolutely.
8      Q  There have been some votes even to have a
9  forensic audit of events here in Beaufort County,
10 correct?
11     A  I believe that's correct.
12     Q  Okay.  Well, you've talked about the
13 internal audit, and you mentioned something to me
14 before about SALY.  What is SALY from an accounting
15 perspective?
16     A  SALY is an acronym for "same as last
17 year."
18     Q  And in regards to same as last year, did
19 you have some concerns regarding the budgets of
20 Beaufort County and the millages as well as the tax
21 revenues that were brought into the county?
22     A  I believe you're referring to the
23 rollback millage calculation.
24     Q  Okay.  What is the back millage
25 calculation?

Page 91

1      A  Rollback.
2      Q  A rollback millage calculation.
3      A  Right.  So, basically, every five years,
4  there's a reset of the millage to accommodate for
5  the reassessment of property.  So in theory, when
6  you reassess property, you should end up with the
7  same tax revenue as you had yesterday.
8      Q  Correct.
9      A  That's probably the best layman's example
10 I can give.
11     Q  And what has happened in that regards
12 here in Beaufort County?
13     A  So what ended up happening, which is the
14 genesis of a lot of that content in the emails, was
15 the school district in particular saw a large
16 shortfall in revenue whatever year that was, I
17 believe it was 2019, and so that started to raise
18 questions about how it was calculated and what was
19 driving that.
20     Q  And this rollback millage, what does that
21 reference?  What are you rolling back?
22     A  I'm sorry?
23     Q  Sure.  You mentioned rollback millage, it
24 had to do with rollback millage.  Explain to me
25 what rollback millage involves.

Page 92

1      A  So at a -- a super-high level example
2  would be if you've got a property appraised at $100
3  today, when you go and reassess the property, it's
4  worth 110, then you would reset the millage value
5  so that you're not necessarily collecting any more
6  or less revenue than what you had yesterday.
7      Q  So maintaining the county's revenue, but
8  not at the expense of appreciation to the property
9  owner.
10     A  Right.
11     Q  But what was happening, based upon your
12 assessment of the changes?
13     A  My understanding of that process was that
14 it should be revenue neutral.  What it was not was
15 revenue neutral, and so I was questioning what
16 scenarios would create that type of a situation.
17        I questioned DOR in a public meeting.
18 It's on video.  And what the representative from
19 DOR said was something along the lines of
20 depreciation, I believe he cited, a recession, or
21 reduced growth in the county.  None of those
22 situations that he cited in that meeting -- there
23 may have been others.  None of the ones that he
24 cited in that meeting were in existence in Beaufort
25 County at that time, so I found it rather curious

23  (Pages 89 to 92)

JOHN HERVOCHON - 9/27/2021

## Page 93

1  that we would see such a shortfall to the school
2  district.
3      Q   Do you think you owe a duty of due
4  diligence to your constituents when considering the
5  financial aspects of the county?
6      A   Absolutely.
7      Q   And we talked a little bit about this
8  meeting that you tried to establish between
9  Mr. Holland -- I mean Mr. Beckert, Ms. Walls, as
10 well as Alicia Holland?
11     A   Not Ms. Walls.
12     Q   Okay. Not Ms. Walls.
13     A   Correct.
14     Q   But between Mr. Beckert and Ms. Holland,
15 correct?
16     A   No, sir. It was Beckert, Holland,
17 Ashley --
18     Q   Jacobs?
19     A   -- Joe Passiment, who was the chairman of
20 the finance committee at that time, and myself.
21     Q   And what was your role at the time?
22     A   Vice chairman.
23     Q   So you were part of the finance committee
24 of the county, correct?
25     A   Correct.

## Page 94

1      Q   And so as a member of the finance
2  committee, do you think you have an even higher
3  degree of due diligence to assess the financial
4  status of the county?
5      A   Yes, sir.
6      Q   And having that role, did you still have
7  some questions about the calculations?
8      A   Yes, sir.
9      Q   And did the entire county council vote
10 for this auditing of the budget and what was going
11 on?
12     A   I believe a majority voted for it,
13 because I believe it was a vote. I don't believe
14 it was in the purview of the administrator at the
15 time to do it unilaterally.
16     Q   Now, Exhibit 46, which I think was the
17 last exhibit, it says he: Spoke to Jim at length a
18 little while ago, and he acknowledged a sizable
19 mistake with regard to his calculations of the
20 county's overtaxation.
21         So were you equally critical of
22 Mr. Beckert's calculations as well as those coming
23 from Ms. Holland?
24     A   The email that you're referencing is from
25 Rick in reference to Mr. Beckert. When Mr. Beckert

## Page 95

1  originally presented -- or raised the issue to me
2  and presented his calculations, I questioned him
3  for quite some time over lunch.
4      Q   Okay. And then it goes on to say: He
5  says he and Alicia worked it out quite amicably.
6          At that point in time in October of 2019,
7  had Alicia Holland told you that Mr. Beckert was
8  harassing her from a workplace scenario?
9      A   Not to my recollection.
10     Q   Now, in regards to Exhibit 41 with these
11 issues of Ms. Jacobs, who actually resigned from
12 Beaufort County, is that correct --
13     A   That's correct.
14     Q   -- and these 396 concerned citizens and
15 growing, this was after the lawsuits were filed by
16 this plaintiff counsel on behalf of Ms. Holland and
17 Ms. Walls, was it not?
18     A   I'm just trying to place the timeline in
19 my head. I think -- I think it probably was.
20     Q   And whether or not the allegations that
21 have been set forth in their complaints with all
22 the photographs and whatnot are true or whether or
23 not they were accurate had yet to be determined by
24 a judge or a jury, were you aware of that, even to
25 this day?

## Page 96

1      A   I'm sorry. Can you restate the question?
2      Q   Are you aware that the allegations that
3  they've set forth in those lawsuits have yet to be
4  proven by a judge or a jury?
5      A   I'm aware.
6      Q   And so whether or not your wife and
7  others who had signed this document actually have
8  knowledge of these assertions on this statement, do
9  you know?
10     A   Well, certainly my wife has some
11 knowledge, given her role as the spouse of a county
12 councilman.
13     Q   But do you agree with all the assertions
14 in this document?
15     A   Would you like me to read through them
16 all?
17     Q   You can -- if you feel like you need to.
18 I'm not asking you to piecemeal it. I'm just
19 asking in general, do you agree with all the
20 assertions in the document?
21         MR. CROSBY: Object to the form.
22         THE WITNESS: I'm going to go ahead and
23     say, I mean, probably not, probably not.
24     There's a lot of assertions.
25 BY MR. BUYCK:

JOHN HERVOCHON — 9/27/2021

Page 97

1    Q   There are a lot of assertions by the
2  folks in this lawsuit.  Did you know that Alicia
3  Holland has asserted that she's going to go after
4  your CPA license?
5    A   I was not aware of that.
6    Q   Have you done anything in regards to your
7  due diligence in performing your role as a
8  councilmember that you think reflects
9  inappropriately towards your licensure as a CPA in
10  the state of South Carolina?
11    A   I don't think so, sir.  I'm fairly
12  careful about that.
13    Q   Did you do anything to personally attack
14  Ms. Holland or Ms. Walls in your role as a county
15  councilman?
16    A   Not to my knowledge.
17    Q   Did you join any clique of councilmembers
18  who had an agenda to go after Ms. Holland,
19  Ms. Walls, or others who had any financial
20  responsibilities within the county?
21    A   To my knowledge, no such clique exists.
22    Q   Did you have some sort of conspiracy with
23  other councilmembers to personally attack
24  Ms. Holland or Ms. Walls in any way?
25    A   No.

Page 98

1    Q   Did you have — same with Ashley Jacobs.
2    A   No.
3    Q   Were you ever made aware of a formal
4  written complaint prior to the filing of this
5  lawsuit by Ms. Holland as to her work conditions?
6    A   No.
7    Q   In regards to Ms. Walls, were you ever
8  made aware, prior to the filing of these lawsuits,
9  of a formal written complaint by her as to
10  harassment by Mr. Beckert or anyone else within the
11  county council?
12    A   Not that I recall.
13    Q   Okay.  Thank you very much for your time.
14        EXAMINATION
15  BY MR. CROSBY:
16    Q   What other than the information about the
17  Beckert and Walls situation did Councilman
18  Caporale, did he forward you?
19    A   I'm sorry.  What was the question again?
20    Q   You were asked a question about getting
21  caught in the open, getting institutional
22  knowledge.  If I go looking for emails where you
23  were being forwarded information by Caporale, what
24  other topics am I going to find emails on where
25  he's informing you, getting you up to speed?

Page 99

1    A   Sure.  It's whatever was going on on
2  council at the time.
3    Q   So there's going to be other ones that --
4    A   It's going to be fairly broad.
5    Q   That he was forwarding to you?
6    A   Uh-huh.
7    Q   You were asked about not adopting what
8  was in those text messages that we looked at about
9  the -- that could be termed anti-Semitic.  Did you
10  ever correct any of those people?
11    A   I did not want to get into a back and
12  forth over any sort of electronic means.
13    Q   And in fact, you actually complimented --
14  on Exhibit 36, when Joe says:  Something's just not
15  kosher, and you replied back:  You win the pun of
16  the day, sir, you don't disagree with that, do you,
17  that that's what you wrote on Exhibit 36?
18    A   That's what the text message says, yes.
19    Q   If someone like me who's just reading it
20  from a distance read that, it could be seen as you
21  agreeing with some of that.
22        MR. BUYCK:  Note my objection.
23  BY MR. CROSBY:
24    Q   Do you agree with that?
25        MR. BUYCK:  Same objection.

Page 100

1  BY MR. CROSBY:
2    Q   I'm not saying you did, but it could be
3  read that way.  Do you agree with that?
4        MR. BUYCK:  Same objection.
5        THE WITNESS:  I have no comment, sir.
6  BY MR. CROSBY:
7    Q   Do you agree with it or not?
8    A   Do I agree with what?
9    Q   What I just said, that that could be
10  interpreted as you agreeing.
11    A   I agree with what the text message says
12  and your reading of the text message.  I don't
13  agree with the content.
14    Q   I don't have any other questions.
15        MR. ANDERSON:  I've got two or three
16  follow-ups.
17        EXAMINATION
18  BY MR. ANDERSON:
19    Q   Plaintiff's interrogatories said that you
20  were going to be here to testify as to your
21  friendship with Mr. Beckert.  Do you have a
22  friendship with Mr. Beckert?
23    A   No, sir.
24    Q   Do you think that it's inappropriate for
25  a government -- for an elected official to question

Spectrum Court Reporting and Legal Video
843.849.0133

JOHN HERVOCHON – 9/27/2021

Page 101

```
 1    the work product of a government employee?
 2       A   No, sir.  I think it's our job.
 3       Q   And do you believe that Jim Beckert is
 4    trying to -- was attempting to work for the good of
 5    the citizens of Beaufort County?
 6       A   Yes, sir.
 7       Q   No further questions.
 8          MR. BUYCK:  Okay.  We're done.
 9          THE VIDEOGRAPHER:  This deposition is
10    concluded at 4:15.
11             (The deposition was concluded at
12          4:15 PM.)
13                --- ---
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 102

```
 1              SIGNATURE OF DEPONENT
 2
 3          I, the undersigned, CHRISTOPHER JOHN
 4    HERVOCHON, do hereby certify that I have read the
 5    foregoing deposition transcript and find it to be a
 6    true and accurate transcription of my testimony,
 7    with the following corrections, if any:
 8
 9    PAGE    LINE    CHANGE
10    ____    ____    _____
11    ____    ____    _____
12    ____    ____    _____
13    ____    ____    _____
14    ____    ____    _____
15    ____    ____    _____
16    ____    ____    _____
17    ____    ____    _____
18    ____    ____    _____
19    ____    ____    _____
20    ____    ____    _____
21    ____    ____    _____
22    ____    ____    _____
23    ____    ____    _____
24
25    _____    _____
      CHRISTOPHER JOHN HERVOCHON      DATE
```

Page 103

```
 1          CERTIFICATE OF REPORTER
 2
 3    STATE OF SOUTH CAROLINA )
 4    COUNTY OF CHARLESTON   )
 5          I, Marie H. Bruegger, the officer before
 6    whom the foregoing deposition was taken, do hereby
 7    certify that the witness whose testimony appears in
 8    the foregoing deposition was duly sworn by me; that
 9    the testimony of said witness was taken by me to
10    the best of my ability and thereafter reduced to
11    typewriting under my direction; that I am neither
12    counsel for, related to, nor employed by any of the
13    parties to the action in which this deposition was
14    taken; and further, that I am not a relative or
15    employee of any attorney or counsel employed by the
16    parties thereto, nor financially or otherwise
17    interested in the outcome of the action.
18
19
20    _____Date_____
21    Marie H. Bruegger, RPR, CRR
22    Notary Public in and for the County of
23    Charleston, State of South Carolina
24
25    My commission expires March 23, 2031
```

Spectrum Court Reporting and Legal Video
843.849.0133