Ex. 3
Beaufort County Adopts Testimony:
Topic 19: Each Action Taken by the County in Response
to Allegations Concerning Beckert's Conduct, Including
the Specific Action Taken, the Date Each Action was
Taken and the Identity of the Person(s) Involved in Each
Action



Deposition of:

**Robert Bechtold**

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com  |
www.veritext.com

Robert Bechtold
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 10

1 that falls under my charge also had a complaint.
2  Q.  And who was that?
3  A.  That was our -- I'm sorry, I don't know
4 why I'm drawing a blank right now.  If I could just
5 have a second.  That was our assessor.
6  Q.  Ebony Sanders?
7  A.  Ebony Sanders.
8  Q.  What did you learn about Ebony Sanders'
9 issues with Jim Beckert?
10  A.  That she filed -- again, I'm really not
11 certain, other than that she filed a complaint
12 against it -- against him.  I don't know how it was
13 done or other than -- I believe -- I'm really not
14 certain.  I read it in something and before, and
15 this would have been after, you know, I was
16 directed to help move the office and everything.  I
17 don't remember if it was the paper or if it was --
18 but I didn't know prior to that.
19  Q.  Did you have any involvement in
20 investigating the complaint filed by Ebony Sanders?
21  A.  No.
22  Q.  Did you ever attend any meetings or
23 accompany Ashley Jacobs to any meetings between her
24 and Jim Beckert?
25  A.  No.  I don't -- no, I don't believe I

Page 11

1 have ever been in the same room.  I don't -- I
2 don't think so, no.
3  Q.  At some point in time you were involved
4 in moving the -- the auditor -- the auditor's
5 office?
6  A.  I was.
7  Q.  Tell me about that.
8  A.  I -- Ashley, I believe it was verbally
9 or otherwise, she asked me to find a place for him
10 outside of the main administrative building and I
11 don't know if it was my decision or hers
12 ultimately, but I found a place down there at
13 records management.  And I went over to see
14 Mr. Beckert and let him know that we found an
15 alternate location for him.  And he -- he had
16 requested that if it were done, if he could have it
17 done outside of normal operational hours.  And I
18 said sure.  And then I had a crew come over and
19 help move all of the stuff down to the records
20 management building to the ultimate location.
21  Q.  When was that?
22  A.  I don't know the date.
23  Q.  It was sometime before Ashley Jacobs
24 left the County's employment, obviously?
25  A.  Yes.

Page 12

1  Q.  Do you recall what month it was in?
2  A.  I believe it was in the Fall.  I mean,
3 really, I believe it was sometime in the Fall.
4  Q.  When you met with Ash-- I mean, with
5 Jim Beckert about moving his office, tell me about
6 any conversations you had with him, other than him
7 asking you to do it outside of operational hours.
8  A.  I mean, it -- it was insignificant, so
9 I mean, nothing specific.  That was the only
10 request that he made that -- that stuck out to me
11 because I had gone over there to coordinate that
12 with him and so...
13  Q.  And did he ask you why he was being
14 asked to move?
15  A.  I have -- I mean, I have no idea.  This
16 is a, again, 46 departments in my daily activities,
17 I don't know that it's possible for me to retain
18 that, so I don't specifically know.
19  Q.  Did he seem to object to having to move
20 offices?
21  A.  He did.  In fact, I mean, ultimately,
22 he did.  So, I don't remember.  I mean, again, I
23 don't know really the context of the conversation.
24 I was there to execute something, you know, a
25 directive and so I went, communicated what I needed

Page 13

1 to communicate to him, let him know where it was
2 going to be.  He requested that I do it after
3 hours, so I facilitated that.
4  Q.  And that's -- that's all I'm asking.
5 You only know what you know.
6  A.  Right.
7  Q.  And I don't know it until you answer
8 the question.
9  A.  Uh-huh.
10  Q.  So don't, you know, feel offended by
11 me.
12  A.  Oh, I'm not at all.  I'm trying to
13 recollect things that I can't and that's
14 frustrating.
15  Q.  Some people have good memories and some
16 people don't.
17     You -- what you're telling me is that
18 when you went to move him, Mr. Beckert did not put
19 up any type of opposition, his only request was to
20 do it after hours?
21  A.  Yeah, I mean, that was his request.
22  Q.  And he complied with the move?
23  A.  He did.
24  Q.  Now, sometime later I believe you
25 were -- became a point of contact for Mr. Beckert?

4 (Pages 10 - 13)

Robert Bechtold                                              April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 14

1    A. I did.
2    Q. Tell me about that.
3    A. Mr. Greenway and I had a discussion
4    about him -- I mean, I got an additional directive
5    and that directive was to aid Mr. Beckert by being
6    a -- being the throughput for communications to the
7    staff, if that makes sense.
8    Q. You became the -- conduit for any
9    communications with --
10   A. Yes.
11   Q. -- the County employees?
12   A. Yes.
13   Q. Because Mr. Greenway had told you that
14   he didn't want Mr. Beckert to have any direct
15   contact with the County employees?
16   MR. ANDERSON: Object to the form.
17   You can still answer.
18   BY MR. CROSBY:
19   Q. Correct?
20   A. Yes.
21   Q. So whatever contact, would that have
22   been after David Cadd left the County's employment?
23   A. Yes.
24   Q. And at some point in time you became
25   involved in allow -- escorting Mr. Beckert into,

Page 15

1    back into the building where his office formerly
2    was?
3    A. Yes.
4    Q. Tell me about that.
5    A. There was some communication to
6    Mr. Beckert and a request that he provided a
7    24-hour notice when he needed to come up there and
8    so I had coordinated that with Mr. Beckert. And so
9    he would call me, sometimes on the weekend,
10   sometimes on a Monday to kind of give me a general
11   idea of what his plans were for the week. And then
12   when he arrived at the building, he would contact
13   me via phone or text and he would walk around the
14   front of the building, I would move through the
15   building and let him in the door adjacent to the
16   auditor's office.
17   Q. And who gave the authority for
18   Mr. Beckert to have access to the building?
19   A. Who gave the authority?
20   Q. Correct.
21   A. I'm not certain if that was Ash- -- it
22   was the same standing as I understood it from
23   before. So I don't know, but the notice to come up
24   there, I don't know where that came from, but I
25   mean, ultimately, I wasn't surprised by it so I

Page 16

1    don't know if it was Ashley or Eric when he
2    arrived. I just knew that the frequency was
3    greater because he had relieved Mr. Cadd. So...
4    Q. Prior to Mr. Cadd being relieved, did
5    you escort Mr. Beckert into building during that
6    time?
7    A. No.
8    Q. So this started sometime in 2021?
9    A. Yes.
10   Q. And what I'm trying to get at is, was
11   it your understanding that between Ms. Jacobs and
12   council the decision had been made to move
13   Mr. Beckert's office?
14   A. Yes.
15   Q. Do you know who made the decision to
16   allow Mr. Beckert to be able to return to the
17   auditor's office off of Ribaut Road?
18   A. Do I know who specifically, no, I
19   don't.
20   Q. Did you have any conversations with
21   anyone about any change in the policy of having
22   Mr. Beckert refrain from entering that building?
23   A. No. I mean, again, I think that the --
24   I'm uncertain of where it started, but I know that
25   it was reaffirmed sometime later because it was

Page 17

1    shifted -- whoever, their responsibility was
2    shifted to me, so that's when I got the ground
3    rules and ground work of what that looked like.
4    Q. Of what looked like?
5    A. Of -- of me having to escort him into
6    the building and, I mean, that.
7    Q. Well, I guess that's what I'm trying to
8    get at. Did you have any discussions with
9    Mr. Greenway that there had been some change in
10   policy whereby Mr. Beckert, after Mr. Cadd's
11   departure, could now return to the building?
12   A. I'm sure I had discussions. I mean,
13   nothing remarkable. It was the same standing, as I
14   understood it, the same standing notice and he
15   needed to be escorted into the building. I knew of
16   that prior to and so the discussions were about, I
17   mean, the frequency was all.
18   Q. Well, prior to Mr. Cadd's leaving, you
19   told me that he wasn't entering the building?
20   A. No, I wasn't responsible for that. I'm
21   not certain who was. But I know that after
22   Mr. Cadd's departure that was the task that I'd
23   received.
24   Q. Do you know whether Mr. Beckert was
25   entering the building prior to Mr. Cadd's

5 (Pages 14 - 17)

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

```
1              UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF SOUTH CAROLINA
2                  BEAUFORT DIVISION

3

4

5   ALICIA HOLLAND,

6       Plaintiff,

7

8

9
    vs.                          CASE NUMBER
10                        9:20-cv-03479-DCN-MHC

11

12

13
    BEAUFORT COUNTY and JAMES BECKERT,
14  Individually, and in his Official Capacity,

15      Defendants.

16  --------------------------/

17            The videotaped deposition of ERIC

18  GREENWAY, a witness in the above-entitled cause,

19  taken pursuant to Notice and agreement, before

20  Ceil Weser, Certified Court Reporter and Notary

21  Public, before Robert Claxton, videographer, at

22  the Offices of Beaufort County Administration

23  Building, 100 Ribaut Road, Suite 170, Beaufort,

24  South Carolina, on the 12th day of April, 2022,

25  commencing at or about the hour of 8:14 a.m.
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100          www.coastalcourt.com

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

34–37

### Page 34

1       MR.  BUYCK:  No.
2    BY MS. AVANT:
3       Q   What about the County's directive for
4    Mr. Beckert and this building, what do you know
5    about that?
6       A   I know that Ashley Jacobs and the
7    County Council and the County Attorney developed
8    a policy that was in place when I took over as
9    acting County Administrator that said that
10   Mr. Beckert was going to be relocated to another
11   building, and if he wanted to come into this
12   building he would need an escort in order to be
13   in this building.
14      Q   And have you continued to carry out
15   that policy?
16      A   I have.
17      Q   Tell me about that, have you run into
18   any issues?
19      A   What do you mean issues?
20      Q   Have you are run into any issues
21   enforcing this policy?
22      A   I am not sure what you mean by that.
23      Q   Well, I can't know what issues to
24   describe to you unless you tell me if you have
25   had any?

### Page 35

1       MR.  BUYCK:  Note my objection.
2       THE WITNESS:  Well, I can -- yeah.
3       MR.  BUYCK:  Let us take about a
4    two-minute break if we could, please.
5    Let us go off the record.
6       (Whereupon, a short break was
7    taken.)
8    BY MS. AVANT:
9       Q   So I was asking you if you had any
10   issues enforcing this policy with Mr. Beckert?
11   Have you had any issues?
12      A   And I was asking you what what you mean
13   by that?
14      Q   Has he attempted to enter the building
15   without an escort?
16      A   Not to my knowledge.
17      Q   I am going to show you Exhibit 12.
18      MR.  BUYCK:  Thank you.
19   BY MS. AVANT:
20      Q   This is an Email you sent January of
21   '21.
22      A   Okay.
23      Q   Take a minute to read through this.
24      A   I sent it, because it says Ashley
25   Jacobs?

### Page 36

1       Q   That is at the bottom.  At the top it
2    says from Eric Greenway.
3       A   Oh, okay.  I was looking at the
4    highlighted part here.
5       Okay.
6       Q   You read through your paragraph?
7       A   Uh-huh.
8       Q   It sounds like that he tried to enter
9    the building past office hours without an
10   escort?
11      A   Yeah, you are right.
12      Q   Do you recall this?
13      A   I do.
14      Q   Do you recall having to send this
15   Email?
16      A   I do.
17      Q   Has there been any other issues you
18   have been made aware of with Mr. Beckert not
19   following the policy put in by Council?
20      A   To my knowledge he has not violated
21   anything.  I mean I have sent a lot of Email
22   dealing with a lot of situations every day.  So
23   I do recall him -- I came by and saw his car in
24   the parking lot on a Saturday, and I inquired to
25   the County Attorney as to what action I should

### Page 37

1    take, and I was told I should send this Email by
2    the County Attorney letting him know he should
3    not come into the building without an escort.
4       MR.  BUYCK:  Take your time and
5    read through the entire exhibit,
6    because she has given you more than
7    just one Email there.
8       THE WITNESS:  Okay.
9       Okay.
10   BY MS. AVANT:
11      Q   You read the whole thing?
12      A   Yes.
13      Q   So I wanted to ask you about a couple
14   of things in here.
15      A   Okay.
16      Q   Back up to your Email.  You said before
17   anything is highlighted.  About three-fourths of
18   the way down of that big paragraph that says:
19   "With support of Council members."  And feel
20   free to read the whole sentence to get some
21   context.
22      A   Okay.
23      Q   What specific Council members were in
24   support of this policy or was it Council as a
25   whole?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100                                    www.coastalcourt.com

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

38–41

Page 38

1    A    So it was my recollection that Kurt
2    Taylor, the County Attorney told me that Miss
3    Jacobs established that policy in support of the
4    Council, so I would take that to mean a majority
5    of Council.
6        Q    Thanks.  That helps clarify that.
7        A    I don't know if it is all of them or --
8    but I would take it to mean a significant number
9    of them were concerned about him being in the
10   building based on the allegations or the
11   situation or his behavior, and that they asked
12   for him to -- they asked Miss Jacobs to take
13   steps to remove him from this building.
14       Q    Are you aware of any County Council
15   members that opposed this policy?
16       A    I would not have been involved in any
17   of those discussions because I would have been
18   Planning Director at that time, and I would not
19   have been involved in that.  So I don't know how
20   the policy was developed or came about.
21       Q    And you haven't been made aware since
22   you have became County Administrator of any
23   opposing Council members?
24       A    Not more than what I just told you from
25   based on what anything that was told to me about

Page 39

1    this policy was shared with me from with Kurt
2    Taylor, County Attorney.
3        Q    And that kind of goes back to one of my
4    previous questions when I asked if you were
5    briefed on anything, the County Attorney Kurt
6    Taylor briefed you on this policy?
7        A    Yeah, so let me put that in context.
8        Q    Uh-huh.
9        A    Whenever I took over as acting County
10   Administrator this policy was in place.  I think
11   an issue came up regarding this policy and
12   whether or not I was going to continue to
13   enforce it.
14            So I reached out to Kurt Taylor, and
15   after talking to Kurt about that I decided that
16   I would continue to enforce the policy as
17   established by Miss Jacobs.
18       Q    And what issue came up that led you to
19   question yourself, like do I still enforce this?
20   Do I not?
21            Do you remember what brought that one?
22       A    No, I don't recall what that was -- why
23   that would have up.
24            I seem to recall that Beckert asked me
25   about the policy and whether or not he would be

Page 40

1    able to have access back into the building or
2    about the escort situation for him in the
3    building.
4        Q    And correct me if I am wrong, I am not
5    trying to put words in your mouth, was it
6    something along the lines of okay, now that
7    Ashley is not here anymore, are you still
8    keeping this up, or do you know how he
9    approached you?
10       A    I don't recall that, no.
11            It was not -- it was at that particular
12   point in time Mr. Beckert had indicated to me
13   that when I became acting County Administrator
14   that it was very likely that, you know, my
15   relationship with him would change from being
16   just a cordial talk in the hall type of
17   situation to -- I got the sense that he was
18   sending me the message that he was going to be
19   somewhat aggressive with me as the acting County
20   Administrator.
21       Q    That is what you took from his
22   conversation?
23       A    Yes.
24       Q    Is there something about it that made
25   you take that away from it?  Was he aggressive

Page 41

1    when he spoke to you about it or was it just --
2        A    No, just because of what he said.  He
3    said something along the lines now that you are
4    acting County Administrator I still have to do
5    the things that I have to do as Auditor; and you
6    know, there will probably be some things that we
7    have issues regarding.  Something along that
8    lines that made me made me draw the conclusion
9    that he was going to be somewhat aggressive with
10   his style and approach toward me at times and
11   that has proven to be true.
12       Q    Okay.  You were able to predict that
13   one, huh?
14       A    Yes.
15            It is not hard to predict.
16       Q    So since you continue to enforce this
17   policy, and based on your testimony a minute ago
18   this was the only issue of him coming up on a
19   Saturday that you can remember off the top of
20   your head?
21       A    So when you say -- and again that is
22   why I am asking you about the issues?
23       Q    I will try to clarify.
24       A    What do you want to know?
25            So if it is about him coming into the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100                    www.coastalcourt.com

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY
42–45

**Page 42**

1  building and accessing the building, yes, that
2  was a pain, okay?  He would call when he was in
3  the parking lot or before he got in the parking
4  lot and say hey, I am in the parking lot.  Can
5  you send my escort to get me.  Well, at that
6  particular point in time my 42-year experienced
7  executive assistant would go to the door to let
8  him in and escort him to his office.  Well, he
9  wouldn't even be in the parking lot and she
10  would have to stand there and stand there and
11  stand there to wait on him to show up.
12       He would get in his office.  He would
13  be in there for 10 or 15 minutes, and then he
14  would call back to my office and say oh, I have
15  to go to the restroom, can somebody come and
16  escort me to the restroom?  So she would go and
17  escort him to the restroom, and he would go in
18  the restroom and he would stay in there for a
19  long time.  And she would come back to the
20  office, and then he would go back to his office;
21  and he would call me and say hey, I was in the
22  restroom, I left the restroom, my escort wasn't
23  there.  Nobody was there to escort me back to my
24  office, blah, blah, blah.
25       One day he called me like at 5:05 on a

**Page 43**

1  Friday afternoon, I was on my way to Charleston.
2  And he said hey, I am in my office and nobody
3  here on the administration side is here to let
4  me out of the office, what would you like for me
5  to do?  Crawl out the window of my office?  And
6  I said no, you do not need to crawl out your
7  window of your office.  There is a door right by
8  your office there.  I would suggest you walk out
9  the door of your office, turn right and go down
10  the hall and go out the door that faces Ribaut
11  Road.
12       So he was very aggravating during that
13  time about that policy, and the enforcement of
14  that policy.  And again as I stated earlier he
15  was unnecessarily consuming County resources.
16  So at that particular point in time I asked Mr.
17  Bechtold to be his escort, and that is when I
18  instructed Jim as you saw in this Email that he
19  would need to go through Bechtold, and he would
20  need to give us some notice as to when he needed
21  to be in the building.  He couldn't just call
22  and say hey, I am five minutes away, blah, blah,
23  blah.
24       I don't know this to be fact, but I
25  even heard that one time we went to let him in

**Page 44**

1  the door and he was hiding behind the columns
2  out front, and we didn't see him.  And then he
3  called me back immediately saying he has been
4  waiting at the door for a while.  I don't know
5  if that is factual or not, but having dealt with
6  him during that time, I can very easily see him
7  doing something like that.
8       Because it was a pain and eventually I
9  stopped him accessing this building totally even
10  with an escort, because it became so cumbersome
11  and consumed so many resources.  Even
12  Mr. Bechtold told him he would not be allowed
13  back into this building even with an escort, and
14  to my knowledge he has not been back since.
15  **Q    How long has that been?**
16  A    Mr. Bechtold was still here, so it is
17  several months.
18  **Q    And you just said to your knowledge he**
19  **hasn't been back since.  So your policy has been**
20  **effective?**
21  A    As far as I know.
22       MR. JOHN ANDERSON:  Objection.
23       THE WITNESS:  I mean has he been
24  in other County buildings.  Yeah, with
25  me in a meeting so.

**Page 45**

1  BY MS. AVANT:
2  **Q    But as far as your policy that he is**
3  **not to be in building to your knowledge it has**
4  **been effective?**
5  A    That is correct.  Nobody has told me
6  that he has been in the building since I did
7  that.  So if he has been here, I don't know
8  about it.  That I recall.
9       MR. BUYCK:  Let me ask you one
10  question?  Whenever you guys do the
11  objections, am I supposed to quit
12  talking?
13       MR.  BUYCK:  You are supposed to
14  answer unless we tell you, yes.
15       THE WITNESS:  Okay.  So you all
16  will tell me don't answer that?
17       MR.  BUYCK:  Yes.
18       Otherwise we are making a note on
19  the record for a judge.
20       When you get exhibits make sure
21  you look through everything and take
22  your time.
23  BY MS. AVANT:
24  **Q    Yeah, you are welcome to read this**
25  **whole thing; but I can tell you what pages I**





Deposition of:

**Gary T. Kubic**

*April 7, 2021*

In the Matter of:

**Holland, Aliciav. Beaufort County et al**

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic                                         April 7, 2021
Holland, Aliciav. Beaufort County et al

---

Page 10

1  use basically written documents, letters, and those
2  kinds of things to document my position or document
3  a next step as to how we were to proceed, whether
4  it be budget or employee management or contracts.
5          That's my perspective. And what I
6  found out in terms of staff, generally speaking, my
7  staff did not want to associate with Mr. Beckert.
8  And it got to a point where I had to, based on some
9  of the things that my staff was telling me -- you
10 know, the building was divided into two halves
11 where I had to separate and lock the doorway that
12 would allow entry from his side of the office into
13 my corridor. And that was done primarily because
14 of complaints from the female staff on my side.
15         Q.  And those were staff that work under --
16 under you?
17         A.  Monica Spells, Cheryl Harris, Sue
18 Rainey, members of the HR team primarily.
19         Q.  And what was the nature of the
20 complaints that your staff was relaying to you?
21         A.  They felt uncomfortable having to be
22 with Mr. Beckert. I think they used the word
23 creepy. And so I figured it would be better just
24 to separate the staff and limit the association to
25 those moments when we had to have discussions on a

---

Page 11

1  particular item that involved Mr. Beckert's
2  department and myself. And so we basically kept it
3  on a very -- as professional as we can with noted
4  separation.
5          Q.  And you -- as the highest ranking
6  county employee, you had to have some interaction
7  with -- with the auditor?
8          A.  That's correct.
9          Q.  And you're telling me is that
10 because of the complaints that you were receiving
11 about -- from your staff about Mr. Beckert's
12 conduct toward them that you took a step of
13 blocking off or cordoning off your employees so
14 that they didn't have access to him?
15         A.  Yes.
16         Q.  How far into Mr. Beckert's term as
17 auditor did this occur?
18         A.  Well, it wasn't right away, and I had
19 been out of the business -- been away from the
20 county for a while. So you're giving me a memory
21 teaser. I'd say three to six months as -- as the
22 initial start. There are documents that show when
23 I stopped having my monthly meetings.
24         These various actions were generated at
25 different times. They did not all occur at once.

---

Page 12

1  And so I did certain steps periodically based on
2  what was brought to me and how I thought I could
3  best resolve them.
4          Q.  Was the nature of the complaints that
5  you were getting such that Mr. -- that what
6  Mr. Beckert's conduct would be deemed
7  unprofessional toward these female employees?
8          A.  Granted that I wasn't present during
9  those moments, but relying upon what my staff told
10 me, my answer would be: Yes, they are -- they --
11 it wasn't a professional discussion.
12         And one of the things that evolved from
13 it was we put hallway cameras in the hallways
14 initially for security purposes to protect the
15 auditor's office because it was an office that
16 invited general public in. Also, security right
17 next door for the treasurer's office where the
18 collection of money would -- would go.
19         And I had access as county
20 administrator because I am in charge of all campus
21 buildings. I had the ability to monitor the
22 cameras in my office at all sites. And I then
23 decided to limit the monitoring of the associated
24 cameras, and I think I restricted one or two in the
25 hallway from Mr. Beckert because I thought that it

---

Page 13

1  was not necessary for him to see hallway activity.
2          And I got some information from staff
3  members that he would appear in the hallway, and
4  they just thought it was kind of ironic, so I
5  restricted that as well.
6          Q.  Would the information you were getting
7  from staff with regard to his use of the cameras,
8  was it such that they believed that he was using
9  the cameras to determine when they would enter the
10 hallway and step out and interact with them?
11         A.  Yes.
12         Q.  Did they complain that his interactions
13 made them feel uncomfortable?
14         A.  Yes.
15         Q.  Did they complain to you that his
16 interactions made them feel threatened?
17         A.  Being threatened in terms of a physical
18 threat, I'm not as certain. Being threatened sort
19 of in an emotional feeling of just generally being
20 uncomfortable, with that qualification, I would say
21 yes. But I'm -- I'm not certain that it rose to a
22 point of physically being threatened.
23         Q.  Well, we're going to talk to each one
24 of them, and we'll -- we'll get their take on that.
25 But obviously you're taking action because of

---

4 (Pages 10 - 13)

Gary T. Kubic

April 7, 2021

Holland, Aliciav. Beaufort County et al

Page 14

1 Mr. Beckert's actions and what your staff related
2 to you?
3      A.  Yes.
4      Q.  And you as their supervisor and the --
5 in your role as county administrator, you had an
6 obligation to provide a nonhostile, comfortable
7 workplace for your staff --
8          MR. J. ANDERSON:  Object to the form.
9          THE WITNESS:  That's correct.
10 BY MR. CROSBY:
11      Q.  -- correct?
12          I mean, it's important to -- for their
13 productivity and for their -- their well-being to
14 be free from any type of discomfort caused by
15 others in the workplace, correct?
16          MR. J. ANDERSON:  Object to the form.
17          THE WITNESS:  Yes.
18 BY MR. CROSBY:
19      Q.  Did any of the employees at your
20 staff -- let's keep with them right now -- did any
21 of the staff relate to you that Mr. Beckert would
22 from time to time just stare at them?
23      A.  Starting with myself, yes, stare from
24 the sidewalk through my window.  I used to get to
25 work early.  I caught him several times just

Page 15

1 looking through the window standing there.  It was
2 kind of odd.  I even had mentioned it to the
3 sheriff a few times and others.
4          Maria Walls had indicated to me that
5 she felt that Mr. Beckert was staring at her
6 through her office window.  As a result of that, I
7 think I told her to advise the sheriff as well, to
8 notify him that she felt uncomfortable.  And then I
9 also authorized security cameras at that corner to
10 have the ability to video those occurrences, and
11 also for general security of the building itself.
12          I think it -- you know, I'm -- I'm
13 going back.  I hope I get -- Monica Spells, I
14 think, told me a few times that Mr. Beckert
15 demanded access through a card swipe to our side of
16 the building, and I told her that -- you could
17 program the various access points for those cards.
18 And as a result of talking with her, I told her not
19 to program access for Mr. Beckert on -- on that
20 doorway that accessed my office space, that area,
21 that corridor.
22      Q.  Where is your office -- I think the
23 treasurer's office is on the first floor of the
24 county building?
25      A.  Yes.

Page 16

1      Q.  Get my directions, maybe the
2 treasurer's office would be on the south end?
3      A.  Well, I don't have a compass, and I
4 couldn't tell you --
5      Q.  Where --
6      A.  -- which way the sun rose on the
7 buildings.  But basically it's a rectangle building
8 which is divided in half, two corridors.  The front
9 corridor facing Ribaut Road had the treasurer and
10 the auditor, I think a mailroom, planning on that
11 side.  And on the other side was the clerk of
12 council, myself, some of my staff members for --
13 for Monica Spells, Beaufort County channel, and at
14 the end was the HR division.
15          So that was parallel -- there were
16 parallel corridors.  And in between was a central
17 reception area at one time where the general public
18 could come in and access the offices, and that door
19 I restricted coming into my area.  You could buzz
20 and have somebody come in and -- if it was a
21 taxpayer or another official, we would let them
22 through the doorway.
23      Q.  Let's go back to you -- your
24 interaction with Mr. Beckert and his staring in
25 your window.  How many times did that occur?

Page 17

1      A.  Well, I didn't count them, but if
2 you're talking about -- you know, I don't know.  I
3 never really took a count.  It was almost at least
4 once or twice a week.  It would depend on when he
5 arrived at work, and generally I'd get there about
6 7:00, 7:30.  He'd get there early as well.  He
7 parked right across from my window.  And I never
8 really took a count, but it was more than one, and
9 it could be, you know, 20, 30.  I -- I'm not sure.
10      Q.  And he would -- you didn't -- did he
11 ever have a conversation about why it was that he
12 would stand outside your window?
13      A.  No.  I really never talked to him about
14 it.
15      Q.  Did -- it sounds like you got to the
16 point where you were just limiting your interaction
17 with him in professional business settings?
18      A.  You know, looking through my window and
19 being a county administrator, I was going to use a
20 BS kind of language, but quite frankly I had more
21 important things to consider in my duties than to
22 worry about a person and why that person would be
23 staring or looking at me through my window.  I just
24 thought it was unusual, and I treated it that way.
25 You know, I just -- I moved on in my daily

5 (Pages 14 - 17)

Gary T. Kubic
Holland, Alicia v. Beaufort County et al

April 7, 2021

Page 18

1  activities.
2      Q.  Just -- just to be clear, was -- were
3  there other people who would routinely come to your
4  window and just stare at you?
5      A.  Well, I like to think that I was a
6  popular kind of guy and fairly good-looking, but I
7  lost all my hair, and then that kind of eliminated
8  that possibility pretty much.
9          No, I don't mean to be frivolous.  I
10  know this is an important matter.  But no.  No.
11          And what made it unique from normal
12  traffic on the sidewalk by the public or other
13  elected officials or staff, those occurrences
14  occurred when it was early in the morning with only
15  a few people in the building at that time.  It was
16  at the beginning of the day, and that's what I
17  thought was interesting.
18      Q.  Did you ever get the sense that he was
19  doing it to intimidate you?
20      A.  I don't know.  I -- I have no idea what
21  he was thinking about.  And quite frankly, my
22  personality, I wouldn't have thought that he was
23  doing it to intimidate -- at least I wasn't
24  intimidated by it, per se, because I figured I'm a
25  big boy, and that's kind of incidental.  So not

Page 19

1  knowing his motives, I really don't know.
2          I guess it was probably to maybe create
3  a signal that he was present.  But I did -- I did
4  go to the sheriff because, you know, at various
5  times I've been required to wear bulletproof vests
6  and different kinds of things on campus in Beaufort
7  County because of threats, and so just to get on
8  record -- and I didn't do it in writing; I just
9  mentioned it to the sheriff -- this is occurring in
10  the morning.  And he said, well, you know, do
11  you -- do you want to continue or do you want to do
12  anything for him?
13          I said, no, I just want you to know.
14  And that was the extent of it.
15      Q.  Just talk about his behavior toward --
16  staring with regard to Maria Walls.  Did she relay
17  that to you?
18      A.  Yes, several times.
19      Q.  And when she relayed it, it was
20  something that she didn't like?
21      A.  Yeah.  That -- you know, that was -- my
22  interpretation of what Maria expressed to me in
23  those moments about Mr. Beckert looking in her
24  window, she was clearly upset, she was clearly
25  worried about physical harm.  I would try to

Page 20

1  counsel her on visiting and -- and making sure that
2  she related those incidents to the proper
3  authorities, that being the sheriff.  I told her I
4  would introduce a video camera to record those
5  events.  And, yeah, she was visibly upset.  She --
6  it troubled her.
7      Q.  And so while the cameras may have had a
8  secondary function of providing -- serving as
9  security, the -- the -- the initial intent was
10  because of Mr. Beckert's coming and staring
11  at Maria -- through Maria Walls's window?
12      MR. J. ANDERSON:  Object to the form of
13  the question.
14      THE WITNESS:  I would say that's true.
15  I would also say that the camera is in plain view,
16  and the idea was that, you know, generally if you
17  walked in that area and you looked up or you knew
18  that the cameras were rolling as security that it
19  would maybe serve as a deterrent, which was the
20  ultimate intent, to stop that action from
21  happening.
22  BY MR. CROSBY:
23      Q.  Did you ever learn of him staring at
24  any other employees or any employees other than
25  yourself of the county?

Page 21

1      A.  The only other -- no.  The only other
2  employee that mentioned some occurrences outside
3  the building or along the building was Tony
4  Criscitiello, the planning director.  But, again,
5  Tony didn't think too much of it, but he did
6  mention it to me that he thought Mr. Beckert was --
7  was interested in the planning division.
8          I think maybe at that time Mr. Beckert
9  wanted to get a couple of tables or whatever, but
10  you'd have to check with Tony.  But I think Tony
11  did mention it to me once or twice.
12      Q.  Did Monica Spells ever tell you that
13  Beckert stared at her in the hall and made her feel
14  uncomfortable?
15      A.  Yes.
16      Q.  How about Melissa Beere -- Beere?
17      A.  Who?
18      MR. KEAVENY:  Beere.  Melissa Beere.
19      MR. CROSBY:  Beere.
20      THE WITNESS:  Where does she work at?
21      MR. KEAVENY:  HR.
22  BY MR. CROSBY:
23      Q.  I think she worked in --
24      A.  Oh, Melissa.  No, I don't think I had a
25  conversation with Melissa about that.

6 (Pages 18 - 21)

9:20-cv-03479-DCN-MHC    Date Filed 06/02/23    Entry Number 121-3    Page 13 of 200

Gary T. Kubic                                           April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 22

1    Q.  Who --
2    A.  I can't remember.
3    Q.  Who are the staff members that --
4  that -- that you're referring to that worked
5  under -- under you that -- directly there?
6    A.  Cheryl Harris, which was my executive
7  assistant.
8    Q.  Cheryl?
9    A.  Cheryl Harris, Monica Spells, there
10  were two black females who came into my office who
11  were auditor employees who wanted me to do
12  something about what they thought was harassment by
13  Mr. Beckert; and I advised them that Mr. Beckert
14  was a separate elected official, and that they had
15  the opportunity to go down to the general bulletin
16  board and look up the EEOC.  And if they needed
17  assistance in terms of how to contact the EEOC
18  about their complaints, they could go into my staff
19  HR, and they would provide numbers and forms, if
20  that was necessary, for them to complete.
21       I don't remember their names.  I
22  know -- I think they both were dismissed or fired.
23    Q.  Did Ebony Sanders ever relay any
24  complaints to you about Mr. Beckert?
25    A.  Not directly.  I think her

Page 23

1  complaints -- I think Monica may have mentioned
2  that Ebony was also concerned.  But I don't -- I
3  don't remember Ebony ever coming in directly and
4  having that type of conversation with me.
5    Q.  By putting up the cameras on the
6  outside of the county building, it was an attempt
7  by you to deter Beckert's conduct to -- to keep him
8  from looking through Maria Walls's window in
9  essence?
10       MR. J. ANDERSON:  Object to the form.
11       THE WITNESS:  That was one of my
12  intents.  That was one of my hopes.  Yes.
13  BY MR. CROSBY:
14    Q.  Much as dividing off and preventing
15  Mr. Beckert from coming into your side of the
16  building was to protect your employees?
17    A.  Yes.
18       MR. J. ANDERSON:  Same objection.
19  BY MR. CROSBY:
20    Q.  Did you ever address directly with
21  Mr. Beckert his conduct toward the employees or
22  Ms. Walls?
23    A.  Indirectly I told Mr. Beckert several
24  times that he was elected and replaced Sharon
25  Burris who was literally a tragedy as an elected

Page 24

1  official in my opinion for a lot of reasons, and
2  that the opportunity that he had was to use wisdom
3  in talking to others who had more experience about
4  budget, about office management, about hiring
5  practices, about statutory interpretation, to aid
6  him in developing a level of expertise to better
7  operate his office.  He rejected all those.
8       I think he took offense, quite frankly,
9  that I was a nonelected official trying to advise
10  him as an elected official as to how to operate
11  within the confines of governmental procedures.
12    Q.  Did you have -- ever have any
13  conversations with Alicia Holland about any
14  concerns she had about Mr. Beckert's conduct toward
15  her?
16    A.  My recollection on that topic would be
17  that I think Alicia talked to me about some of the
18  differences of opinion regarding budgetary
19  management and systems management.  I think we had
20  disputes with the auditor's office on who had the
21  responsibility of protracting and entering into
22  contracts for services or product.
23       I remember I had to explain to
24  Mr. Beckert that there's a statute that allows
25  council to establish the purchasing unit and

Page 25

1  policy.  And that as the controlling entity,
2  council creates that policy.  And then, you know,
3  there is buy-in from a lot of the elected
4  officials.
5       At times, Mr. Beckert felt that he had
6  sole authority on who he could contract with, what
7  services would be provided.  And I think those
8  discussions evolved with Alicia's because the
9  purchasing department was part of her chain of
10  command.
11    Q.  And would Mr. Beckert accuse her of
12  violating policies and laws with regard to what she
13  was doing?
14    A.  Yes.  He would -- I don't want to say
15  this -- but Mr. Beckert basically had disagreements
16  along those lines with almost everybody outside the
17  auditor's office.
18    Q.  And his accusations with regard to
19  Alicia Holland's conduct, his accusations about her
20  violating laws or policies were not true?
21       MR. J. ANDERSON:  Object to the form.
22       MR. BUYCK:  Same objection.
23       THE WITNESS:  What upset -- they
24  weren't true.  And what upset me is that Alicia
25  worked for me, and her conduct, as far as I was

Gary T. Kubic                                       April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 38

1  Mr. Beckert.

2      Q.  Would his aggressiveness, would you
3  describe it as abusive toward individuals at times?

4          MR. J. ANDERSON:  Object to the form.

5          THE WITNESS:  Yes.

6  BY MR. CROSBY:

7      Q.  And I take it what you did by locking
8  the doors, at least with regard to your staff and
9  his access to them, was an attempt to protect them
10  from what one would describe as a hostile
11  environment?

12          MR. J. ANDERSON:  Object to form.

13          THE WITNESS:  I would say generally the
14  answer is yes.  The idea of separation, obviously,
15  is to keep each side away from each other.  And so
16  my intent was to limit, because you cannot be
17  exclusive.

18          In the working conditions and product
19  that we were required to produce for the taxpayer,
20  you have occasions where people doing their
21  functions have to interact with others.

22          So physically putting a lock on the
23  door was one method.  The second method would be to
24  try to include or avoid one-on-one situations so
25  that you'd have more people in the meetings, and

Page 39

1  the idea or intent of that was to soften and
2  hopefully modify behavior patterns of individuals
3  because they were in a group setting rather than a
4  one-on-one setting.

5  BY MR. CROSBY:

6      Q.  Wouldn't an ordinary functioning of
7  county government with regard to the auditor and
8  treasurer, would there typically just be free
9  access between, for example, the auditor and
10  someone on your staff so that they could -- if they
11  needed something they could reach directly out to
12  them?

13          MR. J. ANDERSON:  Object to the form.

14          THE WITNESS:  Well, the purpose first
15  and foremost of every elected official in every
16  unit of government is to provide whatever their
17  level of duty and responsibility is to serve the
18  needs of the taxpayer.

19          Whether you like an individual or you
20  don't like an individual, in my world, my
21  authority, is not relevant.  I can dislike an
22  employee but not confront them, verbally abuse
23  them.  As long as their work product is 100 percent
24  and sufficient, I never thought I would have to
25  like or dislike anyone.  I want to see the results

Page 40

1  of their efforts.

2          Given those facts, Mr. Beckert gave
3  several people the impression during meetings
4  and -- and -- that he was just confrontational.  I
5  mean, they were always nervous.  And that's why I
6  tried to increase my presence at committee meetings
7  if I knew he was going to be there or meetings that
8  involved Alicia or Maria, I tried to be there.

9          The auditor's office and the
10  treasurer's office is hand in glove.  They cannot
11  work independently and produce a product that
12  satisfies the needs of the taxpayer.  They -- and
13  that's why in my opinion, and I'm going well beyond
14  in my response, is I don't think you need in this
15  day and age of technology two separately elected
16  officials, auditor and treasurer, to generate a tax
17  bill, whether it's personal property or real
18  property.  But that's -- that's for another
19  election or referendum.

20  BY MR. CROSBY:

21      Q.  In what -- in what you've -- in your
22  response three and your prior responses, because of
23  Mr. Beckert's aggressiveness toward individuals
24  working for the county and in it, he -- you created
25  a system where you served as a conduit and/or, I

Page 41

1  guess, attending more meetings sort of as a
2  protector?

3          MR. BUYCK:  Note my objection.

4  BY MR. CROSBY:

5      Q.  -- for your employees --

6          MR. J. ANDERSON:  Object to the form.

7  BY MR. CROSBY:

8      Q.  I mean, the reason you did that was an
9  attempt to protect your employees from
10  Mr. Beckert's --

11      A.  There --

12      Q.  -- aggressive and abusive behaviors --

13      A.  There were two reasons.

14          MR. BUYCK:  Same objection.

15          MR. J. ANDERSON:  Same objection.

16          THE WITNESS:  There were two reasons:
17  One, the primary focus to produce a product that
18  would satisfy the needs of the taxpayer.  Two, it
19  was to make sure that those present in the meeting,
20  elected or not elected, understood that we are all
21  together to get that done, that the objective of
22  the meeting was to produce product.  And, three, to
23  your point, indirectly to protect or to give
24  comfort from my presence to employees who felt
25  that -- uncomfortable with Mr. Beckert, that they

11 (Pages 38 - 41)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 42

1 didn't have to feel that way, that I was there to
2 help all involved, even Mr. Beckert.
3 BY MR. CROSBY:
4     Q.  Employees feeling uncomfortable or
5 nervous in the presence of Mr. Beckert, when
6 they're feeling like that, that interferes with
7 number one, isn't it, and that's producing the
8 product for the public?
9     MR. J. ANDERSON:  Object to the form.
10     THE WITNESS:  I've been a -- I was an
11 administrator for 43 years.  People who can't focus
12 on the mission at hand 100 percent won't produce a
13 product that is 100 percent.
14     So, if you have gaps in the process,
15 whether it be individuals or IT software or
16 whatever, you try to find ways to fill the gaps so
17 that the product is the best it can be.
18     And in this case, those two units, the
19 auditor and treasurer, I cannot express how
20 critical that function was.  And -- and we
21 facilitated -- you know, when you reach a point
22 where you can't produce a tax bill properly, I
23 decided that we would produce a written protocol
24 that the treasurer and the auditor would follow.
25     The protocol was created.  It was

Page 43

1 submitted for review to Mr. Beckert, to Maria
2 Walls, to county council for comment.  Came back
3 in, we refined the product, went back to county
4 and said:  Here's how we're going to produce the
5 tax bill if we follow step one to step two to step
6 three to step four.
7     I don't know if they use that still
8 today or not, but it was an attempt to make sure
9 that everything was able to be completed on a
10 timely basis for the tax bills to go out.
11     MR. CROSBY:  Pass that around.
12     (PLF. EXHIBIT 7, E-mail Chain with the
13 Top Line E-mail from Cynthia Bensch Dated 9/22/16,
14 was marked for identification.)
15     MR. CROSBY:  This is Exhibit Number 7.
16     MR. BUYCK:  You got a Bates number?
17     MR. J. ANDERSON:  No.
18     MR. BUYCK:  Cynthia Bensch.
19     MR. J. ANDERSON:  Ronnie, would you
20 read off the date of the two in the front?
21     MR. CROSBY:  The -- top of it is
22 an -- is an e-mail forwarded September 22nd, 2016,
23 from Cynthia Bensch to Maria Walls.
24     MR. J. ANDERSON:  Thank you.
25     MR. BUYCK:  Chelsi, do you happen to

Page 44

1 know the Bates number of what that would be or how
2 it was identified in your discovery?  It might help
3 me without a copy.
4     MS. AVANT:  I think the e-mail would
5 begin with Bates number 000283.
6     MR. BUYCK:  Okay.  Thank you.  And that
7 was -- is that the Walls?
8     MS. AVANT:  That's in the Walls case.
9     MR. BUYCK:  Okay.
10     MS. AVANT:  And for some reason, that's
11 not -- that's what -- it's on my screen, but if
12 that's not right, let me know.
13     MR. BUYCK:  That's fine.  I'm just
14 trying to pull it up.
15     THE WITNESS:  DOR.  I forgot about
16 this.
17     MR. CROSBY:  Mr. Kubic, while you look
18 at that, let me take a quick break off the record
19 and give you a minute to look that over.  I'm going
20 to --
21     THE VIDEOGRAPHER:  We are going off
22 record.  The time is 2:11 p.m.
23     (A recess transpired.)
24     THE VIDEOGRAPHER:  We are back on
25 record.  The time is 2:21 p.m.

Page 45

1 BY MR. CROSBY:
2     Q.  Before we went off, Mr. Kubic, I passed
3 to you Exhibit 7.  Did you have an opportunity to
4 look that over?
5     A.  Yes.
6     Q.  And this is an e-mail exchange between
7 you and someone named Cynthia Bensch?
8     A.  Councilman Bensch.
9     Q.  She was on council at the time?
10     A.  Yes.
11     Q.  And what -- what was the -- the general
12 nature of what these communications related to?
13     A.  Generally speaking, this is
14 communications that were generated as a result of
15 trying to develop a road map -- a written road map
16 of duties and responsibilities that involved the
17 auditor's office and the treasurer's office, county
18 administration so that each of the areas of
19 responsibility, as this memorandum had indicated,
20 these various steps would be followed, and we would
21 ultimately lead to the generation of a tax bill and
22 the collection of a tax bill.
23     Q.  Was that the beginning efforts of
24 creating that protocol that you were referring to
25 earlier?

12 (Pages 42 - 45)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 54

1 his obsession with control and authority has to
2 obviously affect office morale and performance in
3 many departments, and says: I know you're very
4 concerned.
5        Was she correct that you were concerned
6 about Mr. Beckert's affect on the morale and
7 performance of the various county departments that
8 were under your control?
9    A.  Yes.
10   Q.  And that goes back to what you talked
11 about earlier?
12   A.  It goes back to Monica Spells, several
13 of my staff members, Dave Thomas in purchasing,
14 Alicia, Maria Walls. You know, it -- it -- it's
15 without question that Mr. Beckert was a disruptive
16 force generally.
17   Q.  The -- did Maria Walls relay to you
18 other concerns she had with Mr. Beckert's behavior
19 toward her other than the staring through her
20 window?
21   A.  Yes. Maria on several occasions told
22 me that she was afraid. She also shared with me a
23 notebook of various things that Mr. Beckert was
24 doing in terms of affecting her department, tape
25 recording her. And she gave me a copy of that

Page 55

1 notebook I think with the hope that I would be able
2 to somehow correct the situation. The problem for
3 me was I was the county administrator, and I have
4 11 bosses, and besides going to the department of
5 revenue and county council, there is not much else
6 I could possibly do. I couldn't dismiss him or get
7 him out of office. He was an elected official.
8    Q.  Did you go to council with the -- those
9 concerns that -- about Ms. Walls's that she had
10 expressed to you?
11   A.  Yes. The procedure that I employ with
12 council, because there are 11, is that I first
13 advise, which I did, my concerns to county chairman
14 and the vice chair, and I think it was at the time
15 Paul Sommerville and Jerry Stewart. As a matter of
16 fact, the protocol -- written protocol on how to
17 get a tax bill was an example of that concern. I
18 think I addressed in several of the meetings,
19 particularly I think finance, that we were having
20 difficulties with the auditor in general.
21        And I think there were times where the
22 auditor and treasurer in those meetings were
23 present, and they both spoke to it, and it was
24 clear from their comments that -- that it was very
25 difficult for them to cooperate with each other.

Page 56

1    Q.  Did -- after you carried the concerns
2 Ms. Walls raised to council, were there ever any
3 solutions proposed by council on how to alleviate
4 these concerns that she had raised to you?
5    A.  It was my impression that council felt
6 that having them both present at their committee
7 meetings or allowing each of them separately or
8 collectively to address council from the podium
9 about their concerns on a matter in dispute, which
10 they permitted.
11        I do believe that I advised
12 Mr. Sommerville and Mr. Stewart of my concerns
13 regarding the inability of both parties to resolve
14 their differences so that there could be a
15 collective positive outcome in the responsibilities
16 of each at the department, because what's unique
17 about these two departments is they're independent,
18 but their product is -- is a combination of --
19 of -- of both efforts.
20        And then the third component is the IT,
21 which is the software processing to actually create
22 the tax rolls which then go towards the final
23 product in printing the bills.
24        So, yeah, they were aware, and I think
25 the heightened awareness of it was the tax bills.

Page 57

1 I mean, there were disputes on language, there were
2 disputes on timeliness. And I wasn't the only one
3 that called the department of revenue. Mr. Beckert
4 called them countless times trying to get them to
5 see his way.
6    Q.  And what you learned from your
7 conversations with the department of revenue was
8 that Mr. Beckert's interpretation of the laws was
9 inaccurate?
10   A.  Yes. And I think a few times with the
11 extensions -- you know, they were -- they were
12 granting us extensions to push the date to produce
13 the bills back a month or so. But they were keenly
14 aware of Mr. Beckert.
15   Q.  And when you were talking -- mentioned
16 earlier about Ms. Walls's concerns for her safety,
17 you were talking about her physical safety?
18   A.  Yes.
19        MR. J. ANDERSON: Object to the form.
20 BY MR. CROSBY:
21   Q.  And she expressed that to you?
22   A.  Yes. More than one occasion.
23   Q.  Was council aware that you had locked
24 Mr. Beckert out of your end of the building?
25   A.  I'm not sure. I'm certain that

15 (Pages 54 - 57)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 58

1 Mr. Beckert let them know.
2    Q.   Did he ever express his displeasure to
3 you?
4    A.   Oh, yeah.
5    Q.   That was certainly within your
6 authority to take that action, I assume?
7    A.   Yes.  I think there is a -- I'm not
8 sure if there is a statute or there is a policy.
9 Maybe it's a council policy.  But county
10 administrators are responsible for the -- all
11 buildings of the county, includes maintenance.  The
12 only caveat would be overall security, which I
13 coordinated with the sheriff's office.
14    Q.   Have you got Exhibit Number 1?  Can you
15 pass him a copy there?
16    A.   Give me three minutes so I can read
17 this document.
18    Q.   Just take a second.  You probably
19 helped write it, so...
20  . A.   I'm familiar with it.
21    Q.   And that's the county handbook that was
22 adopted -- that version looks like August of 2016?
23    A.   Yes.  Resolution 2016/11.
24    Q.   And I believe that in addition to
25 county employees, that the employees of the

Page 59

1 auditor's and treasurer's office signed off on that
2 document?
3    A.   I believe all elected officials of the
4 county signed off on this document.
5    Q.   Including council members?
6    A.   Well, council doesn't hire employees.
7 I'm not sure if they did.  But all the other
8 elected divisions, including I think the
9 magistrates, the courts, any other unit that had
10 separately had the capability by statute to hire
11 their own employees.
12    Q.   And what was it --
13    A.   All the hiring of employees for county
14 council was done through me.  That's why I don't --
15 I don't know if county --
16    Q.   What's the rationale on -- on having
17 the other elected officials and their employees
18 sign off and adopt this policy?
19    A.   The recommendation and -- came from our
20 outside counsel, I believe, was Attorney Edwards.
21 The idea of having a personnel handbook was so that
22 the employee and the employer, whether it would be
23 county administration, auditor, or treasurer, that
24 the expectations and actions of each party would be
25 defined in writing, and that the uniform standard

Page 60

1 would be created by having all elected officials
2 consent to the rules and regulations of a personnel
3 handbook, which then offered a level of expertise
4 for HR in terms of consistent management or
5 application for vacation, sick leave, whatever the
6 provision or idea would be.
7    Q.   Was the adoption by the elected offices
8 of this -- of Exhibit 1, the manual, a part of
9 the -- I guess the bargain with the county for --
10 to receive HR services and that type of thing?
11    A.   Yeah.  There was a -- sort of a mutual
12 understanding that the HR department was under the
13 control of the county administrator; however, to
14 assist in advertising a position or to assist in
15 management or to assist in producing documents on
16 behalf of the employee W-2, the actual paychecks,
17 how to do electronic deposit, all those things were
18 a result of a mutual understanding of how to
19 process.
20       It didn't necessarily mean that I could
21 tell any elected official who to hire.  That was up
22 to them.  But the process of how to manage and what
23 was expected of both sides, that was the purpose of
24 the handbook:  Consistency.
25    Q.   And consistency on that side, and then

Page 61

1 there was a centralized -- the elected offices got
2 the benefit of using the county's HR services like
3 you say for W-2s and --
4    A.   Right.  Producing a paycheck.
5       MR. J. ANDERSON:  Object to the form.
6       MR. BUYCK:  Note my objection, too.
7       THE WITNESS:  What was your question
8 again?
9 BY MR. CROSBY:
10    Q.   There was two sides to it.  You had
11 consistency and policy over here, but also the
12 benefit to the elected offices would be consistency
13 and the provision of the HR services?
14    A.   Yeah.  There are certain requirements
15 that are involved when you hire an employee.  One
16 is simply recordkeeping, timekeeping,
17 hospitalization, how to produce a paycheck.  All of
18 those things were products of the HR department
19 under my administration as county administrator.
20 So the idea was instead of having all the elected
21 officials having their own HR department, their own
22 check writing, their own hospitalization, for
23 purposes of efficiency and movement, it -- it was
24 under the HR.
25       This, also, handbook was not just for

16 (Pages 58 - 61)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 62

1  elected officials, it's also for the new hires to
2  understand what their responsibilities are to the
3  taxpayer of Beaufort County.
4      Q.  Right.  This is the exact same handbook
5  that your staff would sign?
6      A.  Yes.
7      Q.  And it sets forth the expectations with
8  regard to the -- how you expect county employees
9  and those that sign off on this to act in the
10  workplace?  It has --
11          MR. J. ANDERSON:  Objection.
12          MR. BUYCK:  Note my objection.
13  BY MR. CROSBY:
14      Q.  -- certain -- certain forbidden --
15  or behaviors that are set forth in this?
16          MR. BUYCK:  Same objection.
17          MR. J. ANDERSON:  Me too.
18          THE WITNESS:  It -- it's a -- it's a
19  personnel handbook that offers the elected official
20  the hiring authority and the employee hired by the
21  hiring authority to know in writing what the
22  expectations would be for each side.  And so for
23  clarity, and also I think to protect the county
24  overall from random or haphazard claims by
25  employees against the county, if they did not

Page 63

1  follow the handbook, then they have no real
2  position to argue.
3  BY MR. CROSBY:
4      Q.  And --
5      A.  So, if they violated procedure, we had
6  the ability to process them through the conditions
7  and the grievance procedures defined in this book.
8      Q.  And one of the purposes of the -- some
9  of the language in the handbook is to provide a
10  good working environment by prohibiting such things
11  as sexual harassment?
12      A.  Yes.
13      Q.  That's something that was strictly
14  forbidden by the county?
15      A.  Appropriate behavior.
16      Q.  If we look at Page 6 at Paragraph 1.3,
17  it has an anti-harassment policy set forth there.
18      A.  Page 6, 1.3, yes.
19      Q.  And in the second sentence, it says:
20  In addition to county endeavors to provide a
21  working environment in which employees are free
22  from discomfort or pressure resulting from jokes,
23  ridicule, slurs, gossip, threats, bullying,
24  harassment whether relating to such distinctions or
25  simply resulting from a lack of consideration for a

Page 64

1  fellow human being.
2      And then it says:  The county does not
3  tolerate harassment of any kind and strictly
4  forbids retaliation against anyone who has reported
5  harassment in good faith.
6      A.  Yes.  That's what it says.
7      Q.  And basically it's -- what we've talked
8  about earlier, your efforts that we've talked about
9  to protect your staff and your employees from some
10  of Mr. Beckert's conduct were in effort to provide
11  the working anti -- harassment-free environment to
12  your employees?
13      A.  That's correct.  That's just sound --
14  sound management.
15      Q.  Because what -- what Mr. Beckert's
16  conduct, as you observed, would -- rose to the
17  level of what one would describe as harassment
18  within this definition?
19          MR. J. ANDERSON:  Objection.
20          THE WITNESS:  Are you asking me whether
21  or not Mr. Beckert violated this provision as
22  written in the employee handbook?
23  BY MR. CROSBY:
24      Q.  That's another way of saying it.
25      A.  I would have to say I agree with that

Page 65

1  assessment.
2      Q.  And what you did to the best of your
3  ability was try to protect the county's employees
4  from that type of environment?
5      A.  Yes.
6      Q.  And you actually tried to -- in some
7  respects to -- help protect Maria Walls from
8  that conduct by putting up the cameras and taking
9  the concerns to county council?
10      A.  Yes.
11          MR. J. ANDERSON:  Objection.
12  BY MR. CROSBY:
13      Q.  Go over to page -- let me -- let me ask
14  something before this.  There is always this issue
15  about Jim Beckert that seems to permeate, and that
16  is that no one could do anything about him because
17  he was an elected official.  That was -- and you
18  and I have talked about that, that you didn't have
19  statutory authority to control an elected official,
20  correct?
21      A.  Yes.
22      Q.  The office of the auditor and the
23  treasurer are in county-owned property?
24      A.  Beg your pardon?
25      Q.  The offices of both the treasurer and

17 (Pages 62 - 65)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 66

1 the auditor are located in county-owned property?
2    A.   Yes.
3        Q.   And I take it the county provides a
4 budget for their offices?
5    A.   County council does the appropriation
6 for each of the units.
7        Q.   Was there ever any discussion while you
8 were employed with the county about separating the
9 offices or moving Jim Beckert's office to another
10 location?
11    A.   Well, we had discussions because we
12 were locating satellite offices and had satellite
13 offices for both the auditor, treasurer, and other
14 functions on Hilton Head.  We remodeled one stop
15 for the Bluffton South of the Broad office.  But I
16 did not engage -- I did not suggest moving
17 Mr. Beckert out of his main office as a result
18 of -- of these matters.
19        Q.   Page 8, Paragraph 1.6.
20    A.   Page 8.  Okay.  What paragraph?
21    Q.   1.6.
22    A.   All right.
23        Q.   And this -- point you to that second
24 sentence there where it says:  Non-employees may be
25 reported to appropriate law enforcement, which you

Page 67

1 did that, and I believe Mr. -- Ms. Walls may have
2 done that over time.  And it says that that and/or
3 barred from the premises.
4        Do you have -- and what you're telling
5 me is that never was a discussion between you and
6 council to your recollection as to whether
7 Mr. Beckert could be moved and barred from the
8 premises over in Ribaut Road?
9    A.   Well, two things:  One, this particular
10 paragraph I would question as to whether it applies
11 to an elected official or not.  And in that sense,
12 to answer your question directly, I did not have
13 any discussions regarding removal of Mr. Beckert
14 from any of his offices to someplace else as a
15 result of these discussions we're having here.
16        Q.   Well, it has two categories of people,
17 either employees or non-employees?
18    A.   Right.
19        Q.   And Mr. Beckert, what you told me, is
20 not an employee?
21        MR. J. ANDERSON:  Objection.
22        THE WITNESS:  In my interpretation,
23 Mr. Beckert is an elected official and not an
24 employee in the sense that he's required to work a
25 40-hour week, that he's required to accrue vacation

Page 68

1 or sick as a regular employee.  There is a separate
2 category for elected officials in my opinion.  I
3 don't know whether it's defined by statute.  But he
4 is not considered a regular employee for this
5 personnel handbook.
6 BY MR. CROSBY:
7        Q.   He signed a copy, didn't he?
8    A.   He signed -- all the elected officials
9 sign these copies to accept the handbook as a tool
10 for new hires in terms of defining the
11 relationships between the hiring authority and the
12 employee.
13        Q.   Do you have any understanding as -- as
14 to whether Mr. Beckert currently is allowed in the
15 county building?
16    A.   Well, I don't have any direct
17 knowledge, but I have received a few phone calls
18 that he has been moved to another location.
19        Q.   And -- and I guess that's what I was
20 getting at.  I mean, council apparently took that
21 step and made that decision currently, and that
22 was -- all this was just directed as whether or not
23 that had ever come up in your tenure about moving
24 him?
25    A.   No.  Not to remove him from his office

Page 69

1 location.
2        Q.   And the county owns the building and
3 controls the building, correct?
4    A.   Yes.
5        Q.   And presumably since they've done it
6 now, had council wanted to take that action when
7 you first brought these complaints to their
8 attention, they could have done so?
9        MR. BUYCK:  Note my objection.
10        MR. J. ANDERSON:  Objection.
11        MR. BUYCK:  In a matter of law.
12        THE WITNESS:  Well, I suppose they
13 could have.  I don't know if it was offered as a
14 solution.
15 BY MR. CROSBY:
16        Q.   That -- it would be council that would
17 have to make that decision, correct?  It wouldn't
18 be --
19    A.   It's not me.
20        Q.   You wouldn't have that power?
21    A.   Huh-uh.  Maybe the governor.
22        Q.   And with regard to the employees, there
23 is certain rules set out in here about conduct and
24 a lot of other stuff, but how employees are to
25 conduct themselves as county employees.  And there

18 (Pages 66 - 69)

Gary T. Kubic

April 7, 2021

Holland, Aliciav. Beaufort County et al

Page 94

1 Eargle versus Horry County?

2    A. No.

3    Q. Okay. So when you had issues in
4 regards to disputes between the auditor's office
5 and the treasurer's office, I believe at one time
6 you reached out to the department of revenue at --
7 you've testified to --

8    A. Yes, that's correct.

9    Q. More than one occasion, I believe?

10    A. That's right. More than one occasion.

11    Q. And, in fact, Mr. Beckert and Ms. Walls
12 would come into their offices with their own
13 political stances, correct?

14    A. Yes.

15    Q. And, in fact, they -- they tend to have
16 differing political stances on how these tax
17 revenues and -- and valuation of properties and
18 whatnot should be applied, correct?

19    A. They would have varying opinions. Yes,
20 that's correct.

21    Q. And those were things that you were
22 trying to have their offices come together and --
23 and be able to make a determination as to the
24 appropriate way the county could get the tax bills
25 out and the appropriate way for them to work

Page 95

1 together in harmony to produce the products that
2 each of their offices required, correct?

3    A. Yes.

4    Q. Now, in regards to the performances of
5 their jobs, are you aware of attorney general
6 opinions that were sought by both Ms. Walls as well
7 as Mr. Beckert in regards to what their
8 responsibilities and duties may be?

9    A. You know, I'm aware that they
10 probably -- they did ask attorney general office
11 for an opinion. I don't remember exactly what
12 those -- what their letters requesting an opinion
13 resulted in, but I do think that they sought
14 guidance from that office.

15    Q. And you talked earlier about how many
16 times you have to look to courts, judges, and
17 precedence to make a determination of the true
18 interpretation of a statute, correct?

19    A. Yes.

20    Q. I mean, different people can look at
21 statutes and have differing opinions as to their
22 affect and implications many times, correct?

23    A. Absolutely.

24    Q. And Mr. Beckert would come to you and
25 to others with his interpretations of those

Page 96

1 statutes in regards to his political view as to
2 those statutes many times; would he not?

3    A. Right. He would.

4    Q. So he was presenting his political
5 position many times in these disputes between he
6 and Ms. Walls?

7    A. I would -- I would -- I would qualify
8 it by saying a political view -- I'm not sure if
9 he -- his motives were political. But he certainly
10 had differing opinions as to what the statute
11 intended.

12    Q. Okay. Well, let me ask you this: Were
13 you involved in the recent millage disputes?

14    A. No.

15    Q. Okay. So that was after your tenure as
16 the administrator for Beaufort County?

17    A. There were -- every year there is
18 discussions as to what the appropriate one mill
19 value is. If you're referencing the most recent
20 dispute, I'm not involved in that. But during my
21 tenure, there were questions as to what the
22 appropriate values were.

23    Q. And do you recall even seeking the
24 department of revenue to come down and offer
25 seminars to both the auditor's departments and the

Page 97

1 treasurer's departments on certain issues such as
2 the values of mills?

3    A. Yes. They said they didn't know the
4 route to Beaufort County, so they tried to avoid
5 us. No, I'm just kidding. I'm throwing some
6 light --

7    The department of revenue, we
8 requested -- I requested, I think both Mr. Beckert
9 and Ms. Walls requested assistance from the
10 department of revenue to help guide the county, per
11 se, through that process. And it never really got
12 resolved by the department of revenue.

13    And one of the reasons I think -- I
14 don't know if I should -- one of the reasons I
15 believe that the department of revenue recognizes
16 the authority given elected officials like the
17 auditor or treasurer or county council is that that
18 authority is passed to them by the voters.

19    And in South Carolina, you don't have
20 uniform systems. Some may have more sophisticated
21 computer, others may not. How disputes are handled
22 and how the department -- or the board of
23 equalization's handled, I believe the department of
24 revenue cast a thousand different varying opinions
25 predicated on the individual circumstances of any

25 (Pages 94 - 97)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 134

1 requirements and be paid the full salary, no
2 question.
3        We offered to every elected official
4 the opportunity to contact the legal department
5 with any question that they had regarding a legal
6 matter to get an opinion. That seemed to be a
7 reasonable approach. Simply because we were paying
8 attorneys for legal advice, why not allow an
9 elected official to do that?
10    Q.  But does that elected official have an
11 attorney-client relationship with the county
12 attorney?
13    A.  Once it's established, I would assume
14 they do.
15    Q.  That's your -- that's your opinion on
16 that matter?
17    A.  Well, it depends on whether or not the
18 elected official requests a privileged
19 communication between that elect -- themselves and
20 the attorney. If it's not proffered as a
21 privileged communication, then it's a public record
22 available to anyone.
23        And particularly, I remember the
24 sheriff and I arguing constantly because he wanted
25 to have his own attorney, and I felt that it --

Page 135

1 that was not necessary, that there was enough legal
2 precedent in most cases where he could get the same
3 advice from a person of -- I'm paying rather than
4 paying for a second attorney.
5    Q.  That's -- all right. Do you know if
6 successive administrators felt the same way that
7 you did?
8    A.  I don't -- I don't -- I -- I do not
9 know any of the people -- you know, you have to
10 figure it this way: People referred to me as the
11 legend that can't be replaced. I have -- I have no
12 idea whether they felt one way or another. I just
13 thought I'd throw that in because, you know,
14 sometimes it can get too heavy in these rooms.
15        I don't -- I don't mean to -- this is
16 very serious. I don't know what they thought, and
17 I believe they had the right and privilege to do
18 whatever they wanted to do within the confines of
19 their agreement with county council.
20    MR. J. ANDERSON:  Okay. Well, I thank
21 you for your time.
22    THE WITNESS:  Thank you.
23    MR. J. ANDERSON:  I really appreciate
24 it. And I've got no further questions unless these
25 two gentlemen do.

Page 136

1    MR. CROSBY:  I've just got a couple of
2 follow-ups.
3        EXAMINATION
4 BY MR. CROSBY:
5    Q.  When you took action after your
6 employees -- the staff complained or brought to you
7 complaints about Beckert's -- Beckert's conduct
8 toward them, and you sealed off the -- your part of
9 the building, I mean, you made a determination that
10 what they were telling you had merit and you needed
11 to protect them?
12    MR. J. ANDERSON:  Object to the form.
13    THE WITNESS:  My answer is yes, that I
14 felt that separation created, on a daily basis, a
15 work environment wherein they could feel
16 comfortable. But my style as a county
17 administrator is that I strongly believed in the
18 delegation of authority and responsibility to my
19 employees or department heads.
20        That being said, I knew that it was
21 unreasonable to create a fence so that each party
22 would continuously be separated. And so what I
23 tried to do on those occasions where the level of
24 expertise required a Monica Spells to be present in
25 a meeting on an issue where Mr. Beckert would

Page 137

1 attend, I generally would insert myself as a level
2 of reasonableness and comfortability for both Jim
3 and for my employee, whoever had to be in the
4 meeting.
5 BY MR. CROSBY:
6    Q.  Yeah. I'm -- and -- and I'm just
7 talking about it in the simplest terms. You --
8 from what you'd seen, you had no reason to doubt
9 that Monica Spells and these other employees were
10 accurately relaying their concerns to you about
11 Mr. Beckert's conduct toward them?
12    A.  I had no reason to believe that what
13 was being told to me by my staff, by any individual
14 of my staff, was inaccurate. It was their feeling,
15 and I respected their feelings.
16    Q.  And the same holds true for the
17 concerns that Maria Walls relayed to you about
18 Mr. Beckert's conduct toward her?
19    A.  That's correct. I -- I never tried to
20 insert myself to try to change how a person felt
21 about a circumstance or a meeting or a discussion.
22 I respected their point of view face value, and it
23 was a requirement where I could insert myself to
24 mitigate; if that's what I felt was necessary,
25 tried to do that. Oftentimes I -- I was limited in

35 (Pages 134 - 137)

In the Matter of:

## ALICIA HOLLAND

vs.

## BEAUFORT COUNTY, and JAMES BECKERT, Individually, and in his official capacity

**Ebony Sanders**

September 28, 2021



SPECTRUM
COURT REPORTING SERVICES
www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Ebony Sanders - 9/28/2021

Page 25

BY MR. CROSBY:

1 BY MR. CROSBY:
2     Q   Well, I -- I don't want to misstate what
3 she said.  What did she end up ultimately deciding?
4     A   I cannot remember verbatim what she said
5 because it's been a while.
6     Q   What did you take away from it?
7     A   What I took away from it, that it was no
8 find of -- that it's -- just didn't find a fault.
9     Q   Did -- did anything -- to -- to your
10 knowledge, was any action taken by the county as a
11 result of your grievance?
12     A   Yes.
13     Q   What -- what -- what came about?
14     A   From what I understand, the county
15 administrator, at the time, Ms. Ashley Jacobs, she
16 intervened in between myself and Mr. Beckert.  Any
17 correspondence, any discussions, any conversation
18 was to go through her.  She acted as a shield
19 between the two of us.  I would not have direct
20 contact with him.
21     Q   Does that remain the same today?
22     A   That is correct.
23     Q   When -- when did that go in place?
24     A   That went in place immediately after I
25 wrote the objection before Ms. Edwards got involved.

Page 26

1     Q   So everything that went between you and
2 Mr. Beckert then had to be filtered through the
3 county administrator?
4     A   That is correct.
5     Q   Did that help?
6     A   Yes.  It did.
7     Q   And at some point in time, Mr. Beckert
8 was -- his office was relocated?
9     A   That is my understanding.
10     Q   Does he still maintain an office space in
11 the administrative building?
12     A   I do not know if he's there or not.  The
13 auditor's office has an office space, but not -- him
14 personally, I do not know the answer to that.
15     Q   Have you seen him in the building?
16     A   No.  No.
17     Q   Have you heard any talk about him climbing
18 into his office through his window?
19     A   No.  No.
20     Q   Not -- not something that you have heard?
21 So at least as far as you're concerned, the efforts
22 filtering -- putting a filter in place and, I guess,
23 ultimately, removing Mr. Beckert from the
24 administrative building has helped your situation?
25     A   Yes, sir.

Page 27

1     Q   Do you know whether Mr. Beckert ever
2 responded to your grievance, or if he was asked to
3 respond to it?
4     A   No.  I'm not -- I'm not sure if he was or
5 not.
6     Q   You weren't provided with any response
7 from Mr. Beckert?
8     A   No, sir.  I was not.
9     Q   Are all the statements that you have here
10 in -- as far as Mr. Beckert's conduct toward you
11 that are outlined in your grievance -- are those
12 true statements?
13     A   Yes, sir.  They are.
14     Q   And how did -- I mean, you got to the
15 point a year and a half after you're in this job.
16 Tell me how you were feeling as a result of Mr.
17 Beckert's conduct toward you.
18     A   It was demeaning.  It was unbearable at
19 times.  I felt uneasy.  I felt that my job was in
20 question.  I felt that individuals doubted -- I felt
21 he put people -- doubt in people mind that I had the
22 ability and should have the job that I hold -- the
23 position I hold.
24     Q   Was that a constant set of emotions that
25 you went to work with?

Page 28

1     A   Yes.
2     Q   And were people within your office
3 experiencing -- expressing to you that they were
4 experiencing similar emotions?
5     A   Yes.  There was a high level of
6 frustration amongst myself and others in the office.
7     Q   Was the environment that was being created
8 by Mr. Beckert conducive to good governance --
9         MR. ANDERSON:  Object to the form.
10 BY MR. CROSBY:
11     Q   -- in getting the work of -- of your
12 office done?
13     A   No.  There were bottlenecks that was -- he
14 created.
15     Q   And tell me just an example of how he
16 would do that.
17     A   Not producing tax bills that the statute
18 says that we -- that must be produced that the
19 assessor has to have a bill produced is one example.
20     Q   And would he -- what was his explanation
21 for not producing tax bills?
22     A   He -- in those cases, we would -- wanted
23 us to prove to him the legitimacy of it.
24     Q   And were any of the -- was he able to ever
25 show that his claims that things were not legitimate

7 (Pages 25 to 28)



Deposition of:

# D. Paul Sommerville

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 10

1  treatment of his staff?
2      A.  He -- he complained -- we're not
3  talking about his job performance now.
4      Q.  Right.
5      A.  We're talking about treatment.
6      Q.  Right.
7      A.  Okay.  Gary and I had -- Gary -- Gary
8  told me on several occasions that Jim Beckert
9  was -- I don't want to misquote Gary and it's very
10  difficult to try to remember his exact words, but
11  I'm trying.  I'm going to have to paraphrase
12  because I'm not sure of his exact words, that he
13  was harassing some employees.
14      Q.  Did Gary inform you of any action that
15  he had taken to protect those employees?
16      A.  Yes.  Gary -- I was chairman during
17  some of that -- oh, excuse me, I forgot to turn my
18  phone off.  I'm sorry.  Oh, shoot.  Sorry.  I
19  forgot to turn my phone off.
20      MR. BUYCK:  If you need to get that
21  call you're welcome to.
22      THE WITNESS:  What's that?
23      MR. BUYCK:  If you need to get that
24  call --
25      THE WITNESS:  No, no, no.  I -- it's --

Page 11

1  I'll call them back.
2      Again, would you repeat the question?
3  I'm sorry I was interrupted.
4  BY MR. CROSBY:
5      Q.  I believe the question was did Gary
6  ever tell you or did you learn of any actions that
7  Gary had taken to protect any of the County
8  employees from Jim Beckert's harassment?
9      A.  Yes.
10      Q.  What -- what did you learn?
11      A.  He told me on numerous occasions that
12  he had gone to Beckert's office and talked to him
13  and brought Beckert into his office to talk to him
14  to try to prevent some of that behavior.
15      Q.  Did you ever learn that he had blocked,
16  basically limited Jim Beckert's access to his
17  part -- part of the building?
18      MR. ANDERSON:  Objection.
19      THE WITNESS:  I am not aware that Gary
20  Kubic limited Beckert's access to any part of the
21  building or -- I don't remember that that was
22  discussed.
23  BY MR. CROSBY:
24      Q.  What about, did you become aware that
25  Gary Kubic, in conjunction with the sheriff's

Page 12

1  office, had installed cameras on the County
2  administration building because of Jim Beckert's
3  peering through Maria Walls' windows?
4      A.  Yes.
5      Q.  When did you learn of that?
6      A.  Well, let's see.  Gary left in -- I'm
7  not going to try to pinpoint that date because I
8  don't remember exactly when he left, but sometime
9  prior to Gary leaving he told me that -- he told me
10  he was installing cameras for that purpose.  Among
11  others, there were other -- it wasn't the only
12  purpose, but it was a purpose.
13      Q.  What you learned is that what prompted
14  it was a complaint from Maria Walls about Jim
15  Beckert peering through her window?
16      A.  Yes.
17      MR. ANDERSON:  Object to the form.
18  BY MR. CROSBY:
19      Q.  Did -- did he relay to you that Jim
20  Beckert would peer through his window as well?
21      A.  On numerous occasions, yes.
22      Q.  In your time on County Council, was the
23  issue of Jim Beckert's behavior toward employees
24  and/or Maria Walls ever discussed as an agenda item
25  or in an executive session item where there was

Page 13

1  some effort to determine if anything could be done
2  to stop it?
3      A.  I don't recall.
4      Q.  Did Gary Kubic ever express to you any
5  frustration about his inability to stop Jim
6  Beckert's behavior?
7      A.  Yes.
8      Q.  And -- and tell me -- tell me what you
9  recall about that.
10      A.  I can remember on several occasions
11  Gary being extremely frustrated because he -- he
12  couldn't figure out how to solve that problem, the
13  Beckert problem, in spite of his efforts.
14      Q.  I believe after Maria Walls filed her
15  lawsuit, you were interviewed by the -- the paper
16  and you indicated that -- you acknowledged the
17  complaints that had been received and indicated it
18  had been on an ongoing basis?
19      A.  (Indicating an affirmative response.)
20      Q.  Is that correct?
21      A.  That's correct.
22      Q.  And you're quoted in there as saying,
23  "We concluded that because he's an elected official
24  there wasn't a whole lot we can do."  And it says,
25  "I never felt comfortable with that because I just

4 (Pages 10 - 13)

D. Paul Sommerville                    April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 14

1  kept thinking there has to be something we can do
2  to help these poor people."
3       Do you recall saying that?
4       A.  I do.
5       Q.  When you say we made the decision or we
6  concluded that there wasn't much could be done was
7  that council concluded or are you talking about
8  County government?
9       A.  No, I'm really talking about Gary and
10  myself because my conversations were not with the
11  council itself.  We may have had individual
12  conversations.  I don't recall that we had a group
13  conversation, a council conserv- -- conversation.
14  But I had many conversations with Gary about it and
15  so I guess the "we" I'm talking about really is
16  Gary and I.  I think I was probably chairman at
17  that time.
18       Q.  And as chairman you would have had a
19  lot of direct communications with the County
20  administrator?
21       A.  Daily.
22       Q.  Was there ever a -- a legal opinion
23  that was issued where that was looked at to see if
24  there was anything that could be done?
25       A.  I don't have direct knowledge of any

Page 15

1  conversations that may have taken place between
2  Gary and attorneys or Gary and the governor's
3  office or Gary and whoever.  I mean I had second --
4  I have secondhand information that those
5  conversations took place, but no firsthand
6  information.
7       Q.  Did you ever see any -- anything in
8  writing that came to the conclusion that nothing
9  could be done to stop Jim Beckert from harassing
10  employees and others on County property?
11       A.  I don't recall seeing anything like
12  that.
13       Q.  You certainly felt that -- or -- strike
14  that.
15       You certainly would have liked to have
16  been able to do something to protect these
17  employees from harassment?
18       A.  Oh, my gosh, yes.  Absolutely.
19       Q.  And if there would have been anything
20  within the power of the County administrator that
21  could have been done to protect them, that should
22  have been done, correct?
23       MR. BUYCK:  Note my objection.
24       THE WITNESS:  Would you repeat that,
25  please.

Page 16

1  BY MR. CROSBY:
2       Q.  If there was anything that could have
3  been done within the power of the County
4  administrator or department heads to protect from
5  Jim Beckert's harassing behavior, that should have
6  been done?
7       A.  You mean -- I'm still not understanding
8  --
9       Q.  Is it --
10       A.  -- exactly how you're wording the
11  question.
12       Q.  Well, would you agree that if there
13  were actions that could have been done to protect
14  from Jim Beckert's harassing behavior, that any
15  available avenue should have been pursued?
16       MR. ANDERSON:  Object to the form.
17       THE WITNESS:  Oh, absolutely.  Would
18  have been, certainly would have been by Gary and my
19  opinion would have been pursued by Gary Kubic and
20  would have been pursued by me in my role.  We just
21  never could come up with anything that seemed to
22  have any likelihood of success.  It was very
23  frustrating.
24  BY MR. CROSBY:
25       Q.  Did you ever have any conversations

Page 17

1  over the years with Maria Walls about her concerns
2  about Jim Beckert's behavior?
3       A.  Yes.  I can't tell you how many, but it
4  was probably quite a few.
5       Q.  Was that something that was a constant
6  topic between you and Maria where she would bring
7  up her concerns about Jim Beckert?
8       A.  Yes.
9       Q.  In your observations or in what she
10  told you, did you learn as to whether she feared
11  for her physical safety?
12       A.  I can't answer that.  I don't know the
13  answer to that.
14       Q.  But what she would relay to you was
15  that she was being harassed by Jim Beckert?
16       MR. ANDERSON:  Objection.
17       THE WITNESS:  Yes.
18  BY MR. CROSBY:
19       Q.  When --
20       A.  Excuse me, I just remembered I have got
21  another phone to turn off.  That's it.  I promise
22  there are no more.
23       Q.  When -- sometime after Maria Walls
24  filed her lawsuit against the County, did you learn
25  that Jim Beckert's access to the County

5 (Pages 14 - 17)

D. Paul Sommerville

Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 18

1  Administration Building had been restricted?
2      A.  Yes.
3      Q.  Tell me how you came to learn of that.
4      A.  I believe that the then-County
5  administrator told us that -- told the County
6  Council at an executive session.  It wasn't -- it
7  was after Gary.  This was Ashley Jacobs.
8      Q.  She told council that she had taken the
9  steps to restrict his access --
10     A.  Correct.
11     Q.  -- and prohibit -- prohibit him from
12  having any contact with County employees?
13     A.  Yeah, let me, if I may, clarify
14  something I said a minute ago that we had no
15  executive sessions to talk about Jim Beckert.  That
16  was under Gary Kubic.  But I can't recall any, but
17  now we're moving forward to Ashley Jacobs and under
18  Ashley Jacobs we did have, I don't remember, one or
19  two, but we had at least one.
20     Q.  Okay.  Well, I was going to ask you
21  about Ashley Jacobs.  So did Ashley Jacobs ever
22  relay comp- -- complaints about Jim Beckert's
23  harassment of County employees?
24     A.  Yes.
25     Q.  What do you recall about your

Page 19

1  conversations with Ms. Jacobs?
2      A.  A lot of her complaints about Jim
3  Beckert had to do with his job performance.
4      Q.  Well, would -- I'm talking about
5  specific to his harassment of County employees.
6      A.  Right.  I'm trying to recall if she --
7  she very well may have, but I can't -- I can't
8  swear that that happened, that she did, that she
9  talked about his harassment.  She very -- I'm sorry
10  to say I just don't specifically remember.  I had
11  so many conversations with so many people about his
12  harassment, that I'm not sure if she was one.
13         I had conversations with her about Jim
14  Beckert, but I'm not sure if harassment was part of
15  those con- -- it may -- may well have been, but I'm
16  not sure.
17     Q.  Did she ever relay to you that Jim
18  Beckert exhibited harassing behavior toward her?
19     A.  She never said that directly to me.  I
20  think -- I think I may have heard that secondhand,
21  but I'm not sure.
22     Q.  Did -- did -- did you read in any
23  newspaper articles where she was quoted as that, as
24  having been harassed by Jim Beckert?
25     A.  If there was an article, I read it, but

Page 20

1  I just don't recall it.  I think I have read every
2  article involving Mr. Beckert that's been written.
3  I may have missed one because I'm out of town quite
4  a bit, but I usually catch up when I come back,
5  so...
6      Q.  Were there any -- ever any discussions
7  in executive session about Jim Beckert's treatment
8  of County employees?
9      A.  Yes.
10     Q.  When -- when would that have occurred?
11     A.  Sometime in the first half of 2020.
12     Q.  And what was -- what -- what brought
13  that to be an item of executive session?
14     A.  Well, my impression was that
15  Ms. Jacobs -- Ms. Jacobs was extremely frustrated
16  dealing with Jim Beckert, as was Gary Kubic, the
17  difference being that I had a lot more daily
18  communication with Gary Kubic than I had with
19  Ms. Jacobs simply because I wasn't the chairman
20  beginning in 2020.
21     Q.  What do you recall about --
22     A.  Or -- or '19, for that matter.
23     Q.  What do you recall about the specifics
24  that she was relaying to council about her
25  frustrations with Jim Beckert?

Page 21

1      A.  I recall that her primary focus was
2  getting the tax bills out and getting the --
3  closing the books, getting the CAFR out and his --
4  his role in those things, particularly the tax
5  bills.
6      Q.  Well, and what about specific to his
7  conduct toward County employees and others on
8  County property?
9      A.  It was discussed, but I can't remember
10  the particulars of it.
11     Q.  Was there any executive action
12  discussed that -- that was proposed to be taken
13  with regard to Jim Beckert's conduct toward County
14  employees?
15     A.  Yes.  I don't know who came up with
16  this idea.  I may have known at the time, but I
17  don't know now.  Somebody came up with the idea
18  that we could exclude him or, I'm sorry, that the
19  administrator had control over the building, the
20  County Office Building and, therefore, had the
21  authority to exclude him from this building and
22  that was going to be the action taken and, in fact,
23  that was the action taken.
24     Q.  Now, that was after the lawsuits were
25  filed?

6 (Pages 18 - 21)

D. Paul Sommerville                                April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 22

1    A.   I can't -- I don't know what the
2    sequence was.
3        Q.   Other than that, do you recall any
4    action that was discussed with regard to Jim
5    Beckert's conduct toward --
6        A.   Yes, I heard some conversations about
7    going to the governor, but they were -- they were
8    secondhand conversations and so...
9        Q.   That was something that was discussed
10   in executive session or just something that was
11   talked with outside of?
12       A.   No, I don't recall it being discussed
13   in executive session, but I do recall it being
14   discussed between myself and Josh Gruber, Gary
15   Kubic.
16       Q.   With regard to the County administrator
17   having the power or control over access to the
18   buildings, whatever that timing was, was there any
19   vote on that or was it just a discussion that she
20   actually, the County administrator, possessed that
21   power?
22       A.   My recollection is that in executive
23   session, Ashley Jacobs proposed that idea.  There
24   was never a vote, to my knowledge, and as a -- as I
25   recall, she proposed it as something within her

Page 23

1    authority to do.  It didn't require a vote.
2        Q.   The -- the County does have control
3    over the County property, correct?
4        A.   Absolutely.
5        Q.   So that's basically what she was
6    suggesting is, as in her role as the highest
7    ranking County employee, she had the authority to
8    make that -- take that type of action?
9        MR. BUYCK:  Note my objection.
10       THE WITNESS:  Correct.
11   BY MR. CROSBY:
12       Q.   There was no vote taken that night
13   to -- or in that meeting to give her special power?
14       A.   No, I only -- I only wish that I had
15   thought of it.  I only wish Gary Kubic had thought
16   of it.  As far as I know, Gary Kubic didn't think
17   of it, Josh Gruber didn't think of it, and I didn't
18   think of it, so, but somebody did at some point and
19   I think it -- so...
20       Q.   Do you re-- did you have more than
21   one conversation with Alicia Holland --
22       A.   Yes.
23       Q.   -- about Beckert's behavior towards
24   her?
25       A.   Yes.

Page 24

1        Q.   Was that something that she complained
2    to you about on multiple occasions?
3        A.   Yes.
4        Q.   Was the -- the complaint typically the
5    same, that Beckert was harassing her?
6        A.   Well, a lot of her complaints had to do
7    with his -- because she was the chief financial
8    officer and responsible for the finance of the --
9    of the County, she -- a lot of her complaints,
10   certainly not all of them, but a lot of them had to
11   do with his job performance.  But yes, she also
12   complained about his harassment.
13       Q.   Did she --
14       A.   To me.
15       Q.   -- complain to you that he was causing
16   her discomfort and stress?
17       A.   I'm struggling to answer that question
18   because I'm not sure if -- if my conversation with
19   her was privileged, so...
20       Q.   I don't -- I don't know how it would
21   be, but as her attorney, it's okay to tell me.
22       A.   Okay.  No, I think there were other
23   things that frustrated her as well, but yes, Jim
24   Beckert was certainly one of them.
25       Q.   Did she relay to you that she was

Page 25

1    stressed about whether that Jim was causing her
2    stress in -- in doing her job?
3        A.   Yes.
4        Q.   Let me give you a couple of documents
5    and I'll let him take a break so you can look at
6    them.
7        MR. CROSBY:  What exhibit numbers are
8    these?
9        MS AVANT:  (Inaudible.)
10       THE WITNESS:  Take a break, like make a
11   call?  Or take a break, like wait for them?
12       MR. BUYCK:  You can make a call.
13       MR. CROSBY:  Let's just go off the
14   record.
15       THE VIDEOGRAPHER:  We are going off
16   record.  The time is 2:42 p.m.
17       (A Recess transpired.)
18       (EXHIBIT 14, Letter, 3-6-18, was marked
19   for identification.)
20       (EXHIBIT 15, E-Mail, 5-21-19, was
21   marked for identification.)
22       (EXHIBIT 16, E-Mail, 8-7-20, was marked
23   for identification.)
24       (EXHIBIT 17, E-Mail, 8-19-20, was
25   marked for identification.)

7 (Pages 22 - 25)

D. Paul Sommerville                                    April 8, 2021
Holland, Aliciav. Beaufort County et al

---

Page 30

1  around $10,000?

2     A.  Yes, I do recall that.

3     Q.  And that -- that arose because of

4  Mr. Beckert's claim that Alicia Holland had

5  improperly calculated the millage?

6     A.  Correct. As I recall, he questioned

7  her methodology and demanded that the County do an

8  audit or out- -- bring in an outside auditor to

9  confirm his -- his belief which was different from

10  hers.

11     Q.  And the results of the outside

12  auditor's work confirmed that Ms. Holland was doing

13  her calculations correctly?

14     A.  That's my recollection, yes.

15     Q.  Exhibit No. 14 is a letter to Alan

16  Wilson, the attorney general, in March 6, 2018. Do

17  you recall a request about changing the form of

18  government?

19     A.  Yes.

20     Q.  And on the second page there is a, as

21  part of the request, there was a request of the

22  attorney general as to whether or not if the

23  referendum was successful whether one of the

24  positions could be -- remain elected and one of

25  them be appointed by the County. Do you recall

---

Page 31

1  that?

2     A.  Yes.

3     Q.  Why were you making that particular

4  request?

5     A.  This is signed by the assistant County

6  attorney, Chris Inglese.

7     Q.  You're copied on it, but --

8     A.  Yes.

9     Q.  -- there would have had to have been an

10  approval from -- for him to send that request, it

11  was at the request of either council or yourself as

12  chairman?

13     A.  Oh, yeah, I don't specifically remember

14  the conversations that led up to it, but I remember

15  we talked about it a lot. I say "we." I mean the

16  administrator and I talked about it. The vice

17  chairman and I talked about it. Some of the

18  council members talked about it.

19     Q.  Is that something that's still under

20  review?

21     A.  Yes.

22     Q.  Was -- was there ever a response to

23  this letter from the attorney general?

24     A.  I don't know. I don't recall.

25     Q.  At some point after Jim Beckert was

---

Page 32

1  denied access to the County administration

2  building, did you learn that he was being granted

3  access?

4     A.  Yes.

5     Q.  How did you learn that?

6     A.  It was told to me by a staff member and

7  I'm not sure which one or ones it may have been.

8     Q.  And what was your take on that?

9     A.  Well, I was surprised and I was

10  concerned.

11     Q.  What were you concerned about?

12     A.  My -- it was my understanding that he

13  had been forbidden to come in the building.

14     Q.  And also forbidden to have any direct

15  contact with any County employees?

16     MR. ANDERSON: Object to the form.

17     THE WITNESS: Yes.

18  BY MR. CROSBY:

19     Q.  And that was something that you, as a

20  council member, thought was an appropriate action?

21     MR. ANDERSON: Objection.

22     THE WITNESS: Absolutely. It was the

23  first thing that I can recall that had any teeth in

24  it. By that -- by that, what I mean is that we

25  were -- we could actually do something to help

---

Page 33

1  these people.

2  BY MR. CROSBY:

3     Q.  And to -- to help shield them from Jim

4  Beckert's --

5     A.  Yes.

6     Q.  -- harassing behavior?

7     A.  Yes.

8     Q.  And just -- just looking over time, his

9  behavior over the last several years leading up to

10  this decision to restrict his access, it had

11  been -- what you were hearing had been pretty much

12  the same, the way he was harassing and bullying

13  different people?

14     A.  Yes, but as time went on -- yes, yes.

15     Q.  As time went on, did it escalate?

16     A.  I was about to say that as time went on

17  there were more and more people involved in those

18  conversations.

19     Q.  And his behavior had been pervasive

20  throughout that time and even getting worse?

21     MR. ANDERSON: Object to the form.

22     THE WITNESS: That's an opinion.

23  Perhaps.

24  BY MR. CROSBY:

25     Q.  Well, just the complaints that you --

---

9 (Pages 30 - 33)

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

70–73

Page 70

1  be adequate or suitable or whatever. I don't
2  want to make that a blanket statement, but my
3  knowledge of the interaction with County
4  Administration employees both now and in the
5  past has always been that he is a difficult
6  individual to work with in carrying out the
7  county's business.
8      Q    And that was regardless of gender,
9  race, religion, or anything like that?
10     A    He is difficult to everyone.
11     Q    You made reference to Heidi Lane's
12  Grievance?
13     A    Heidi Lane?
14     Q    You were asked a question about it?
15     A    Yeah, Heidi Lane filed a Grievance. I
16  don't know who it was against. I was never told
17  that.
18     Q    So you did not know it was against
19  Alicia Holland?
20     A    I did not.
21         That Grievance was against Alicia
22  Holland?
23     Q    I believe so.
24     A    Alicia Holland wasn't even here when
25  the Grievance was filed that I am talking about.

Page 71

1      Q    Then I will double-check that.
2      A    Yeah, I am not sure why it would have
3  been against Alicia Holland. I am not saying it
4  wasn't.
5      Q    Okay.
6      A    Okay. But I don't know why it would
7  have been. I wasn't ever -- when I received the
8  Grievance I filed it over to, as I would be
9  accustomed to do, filed it over to my HR
10  department and to the Legal Department and asked
11  them to look into it and give me their opinion
12  about what we needed to do with it.
13         I don't know who it was against. I
14  don't think she ever said who it was against in
15  the communications that I received based on what
16  I recall.
17     Q    All right.
18         So basically you do not know?
19     A    I don't know. I do not know, right.
20     Q    And the task that you raised about
21  rerunning tax rolls, were there any other
22  elected officials involved in that process?
23     A    What do you mean by involved in the
24  process?
25         Were they involved in running the tax

Page 72

1  rolls, or were they involved in assisting with
2  things related to the rerunning of the tax roll?
3      Q    The way that -- did any of them have
4  any involvement?
5      A    It seemed to me that there were things
6  that many employees had to do, including the
7  Treasurer as a result of having to rerun those
8  tax rolls, yes.
9      Q    All right. Can you ban a County
10  Council member from the building?
11     A    Can I ban a County Council member from
12  a building?
13     Q    Yes, from this building?
14     A    So that gets into a legal question.
15         And the only reason I know this is --
16  or I have some familiarity with this is due to
17  my work with the mask mandates. I don't think
18  under state law and based on what I have been
19  told by the Sheriff of this County that we have
20  the right to ban anyone from a public building
21  or declare them to be in a trespass situation.
22         Most recently I had a homeless person
23  camping out outside the Council Chambers here on
24  picnic table. We had to adopt an ordinance for
25  me to be able to prevent that in the future,

Page 73

1  because there was no way for me to remove that
2  person legally from the property without
3  adopting that ordinance banning camping on
4  public property.
5      Q    So you are unable to ban anyone from
6  the administration building?
7         MS. AVANT: Object to the form.
8         THE WITNESS: So again, I could
9  tell someone that they can't come into
10  the building as County Administrator.
11  I don't know how enforceable that would
12  be if they challenged it. That would
13  be something for the legal system to
14  weigh in on and make a determination
15  on.
16  BY MR. J.J. ANDERSON:
17     Q    So the County Council's status as
18  elected officials would not weigh in on your
19  evaluation as to whether or not you can ban them
20  from the administration building?
21     A    Well, so I don't think as -- you know,
22  so the County Council is a little different
23  situation I think, and you are asking me
24  something here that, you know, I feel like is
25  trying to catch me into something.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100                    www.coastalcourt.com

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

74–77

Page 74

1    Banning a legislative official from a
2  County building, I don't know that I as the
3  County Administrator would have that authority.
4  That would seem to me that it could be something
5  that the County Council would have to vote on,
6  because that would be a -- they regulate
7  themselves.
8    I don't have any ability to regulate
9  County Council in my mind as County
10  Administrator.  I work for them.  They hire me.
11  So I don't think I could tell them what they
12  could or could not do.
13    I am charged with the responsibility of
14  managing County properties and facilities, and
15  that is why I continued the policy that was in
16  place when I took over as County Administrator,
17  regardless of how I might have felt about such
18  policies personally.
19    Q    All right, thank you.  I think that is
20  all the questions I have.
21    MR. BUYCK:  I have no questions.
22    MS. AVANT:  Then I am good.
23  BY MR. J.J. ANDERSON:
24    Q    I have been given the Grievance, the
25  written Grievance of Heidi Lane.

Page 75

1    A    Okay.
2    Q    And just the bottom line is:  "I would
3  like to receive an apology from Miss Holland in
4  writing.  This apology should be provided to the
5  same individual who received her original
6  Email."
7    A    When was that?  What was date on that
8  Grievance?
9    Q    I don't have a date on it.  I have got
10  a Bates Number on it.
11    MR. JOHN ANDERSON:  I think the
12  date of the incident is in the first
13  paragraph.
14  BY MR. J.J. ANDERSON:
15    Q    It is in reference to an Email sent by
16  Alicia Holland on May 14, 2019.
17    A    Okay, I wouldn't have been -- I
18  wouldn't have been County Administrator at that
19  point.
20    Q    Okay.
21    REDIRECT EXAMINATION
22  BY MS. AVANT:
23    Q    When did you receive the Grievance from
24  Heidi Lane.
25    A    I don't remember the date.

Page 76

1    Q    Was it during your time as County
2  Administrator I am assuming?
3    A    Yes.
4    Q    Was it in the last six months?
5    A    It could have been.  I don't know.
6    Q    Is it possible Miss Heidi Lane filed an
7  additional Grievance?
8    A    It is possible.
9    Q    Would you have received one from --
10    MS. AVANT:  When was that?  2019?
11  2018?
12    MR. J.J. ANDERSON:  2019?
13  BY MS. AVANT:
14    Q    Would you have received a Grievance in
15  2019?
16    A    I could have if she filed it again.  I
17  mean I don't know.
18    Again, I don't know the details of the
19  Grievance.  I just know it was within my time as
20  County Administrator because I filed -- I would
21  do what I would do and that was to get my HR
22  department and my Legal Department involved in
23  it immediately.
24    I administrate by collaboration and
25  through team work.  I very seldom do anything on

Page 77

1  my own without talking to other folks that need
2  to be involved in advising me on how the
3  appropriate way to do that.  I have done that
4  constantly with issues involving Mr. Beckert.  I
5  have cause.
6    I very seldom respond to Mr. Beckert on
7  my own without having discussed something that
8  has sent to me to ask me to do or directed me to
9  do or whatever.  I do not respond unless I have
10  discussions with the appropriate people that
11  know more details about those matters than I do.
12    MS. AVANT:  I don't have anything
13  else for you.
14    CROSS-EXAMINATION
15  BY MR. BUYCK:
16    Q    I have a couple quick questions in
17  follow-up in regards to Miss Holland.
18    Was she employed with Beaufort County
19  when you became acting, interim or the permanent
20  County Administrator?
21    A    No.
22    Q    Have you ever held any position or
23  supervisory position over Miss Holland in any
24  way?
25    A    I have not.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100                    www.coastalcourt.com



Deposition of:
# Suzanne D. Gregory

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions
800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Suzanne D. Gregory
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 18

1 personnel files of those involved?
2     A.  No, not to my knowledge.
3     Q.  What is your understanding of the
4 computer acceptable use policy?
5     A.  As -- as I can remember it, it was not
6 to be used for personal use, to view any obscene
7 material.  It was a lengthy policy.  That's the two
8 things I can remember right off.
9     Q.  Okay.  And I apologize for not
10 mentioning this first.  I believe a version of this
11 policy begins on Page 58 --
12     A.  Okay.
13     Q.  -- if you want to flip to that.
14         Is it your understanding that all
15 network systems, computers, e-mail addresses,
16 issued cell phones, phone systems, letterhead all
17 belong to Beaufort County?
18     A.  Yes.
19     Q.  And on Page 59, there is a heading that
20 says: Scope.  What's your understanding of the
21 scope of this policy?
22     A.  Well, pretty much as its written here,
23 to -- to ensure that it's used for business
24 purposes and to protect the county and employees.
25     Q.  And -- and under Scope it lists out a

Page 19

1 couple of examples of -- of different types of
2 people that fall into -- into the scope of this
3 policy.  And these different, you know,
4 categorizations of people.  Is it your
5 understanding that, you know, essentially anyone
6 who is given access to county e-mail, county
7 computer systems, county network systems, a county
8 phone, and letterhead would be under the
9 responsibility to abide by this policy?
10     A.  Yes.
11     Q.  Is it also your understanding that this
12 policy applies to any activity that -- that would
13 be in violation of sexual harassment or a hostile
14 work environment?
15     A.  Yes.
16     Q.  And that would also include anything
17 like slander or -- or distributing deliberate
18 misinformation?
19     A.  Yes.
20     Q.  As director of human resources, were
21 you responsible for training provided to county
22 employees?
23     A.  The department was responsible for some
24 of the training that county employees received,
25 yes.

Page 20

1     Q.  And -- and just off the top of your
2 head, do -- can you give me some examples of the
3 type of training that Beaufort County wanted its
4 employees to receive?  And I understand some of it
5 may be job-specific.  I'm --
6     A.  Right.
7     Q.  I'm looking more for -- for something
8 that every employee should have to take.
9     A.  There was harassment training, sexual
10 harassment training, diversity training, e-mail
11 usage training, and I believe there was one other
12 that cannot recall right now.
13     Q.  And would elected officials also have
14 to participate in this training?
15     A.  We -- it's my understanding that we
16 cannot require them to participate.
17     Q.  When an employee's hired to the county,
18 a new employee, what happens from the time they're
19 hired until they start performing their job duties?
20 Do they go through some training and orientation,
21 for example, something like that?
22     A.  At the time I left there, there was an
23 orientation -- new hire orientation where they
24 filled out all the necessary paperwork, they were
25 provided any benefits that they cared to sign up

Page 21

1 for, signed off on any policy statements that we
2 required.  And then they were sent forth to their
3 departments for departmental training.
4     Q.  And how would Beaufort County ensure
5 that -- that all the things you just mentioned were
6 completed when a new hire came in?
7     A.  All of the things that I just mentioned
8 were completed in the human resources training
9 room.  And there was a checklist of all the items
10 that had to be done.
11     Q.  Okay.  And that's kind of what I was
12 getting at.  There -- there is a way to document
13 that item A was completed, item B was completed,
14 item C was completed, correct?
15     A.  Yes.
16     Q.  So walk me through what happens when an
17 employee comes in and wants to -- to make a
18 complaint to you.
19     A.  As I recall, when an employee comes in
20 with an issue, I discuss it with them.  If it's a
21 complaint regarding another employee or something,
22 I -- I get the information from the employee, I ask
23 them to write a statement.  And within that
24 statement, I also ask them to list any witnesses to
25 whatever it is that they are complaining about.

6 (Pages 18 - 21)

Suzanne D. Gregory

April 7, 2021

Holland, Aliciav. Beaufort County et al

Page 38

1 abide by the handbook provided by Beaufort County?
2    A. It's my understanding once he became an
3 elected official, I had no authority to force him
4 to abide by the handbook.
5    Q. And where did that understanding come
6 from? Did someone tell you you didn't have
7 authority over an elected official?
8    A. I don't know if that was told to me
9 directly. But there were a lot of conversations
10 about -- and Mr. Beckert forwarded a lot of
11 information about the authority of an elected
12 official. And because he was not a county
13 employee, as the HR director, I would not have
14 authority over him, just like I would not have
15 authority over a vendor that walked in. If there
16 was something going on with a vendor, I would let
17 administration know.
18    Q. Which department enforces the Computer
19 and Information Systems Acceptable Use Policy?
20    A. If -- if an employee violated that
21 policy and it was brought to the attention of the
22 HR department, we would work with the department
23 head, as I recall, to decide what to do with that
24 employee and -- and take necessary disciplinary
25 action.

Page 39

1    Q. Okay. And whenever we talked about
2 that policy earlier, the scope in that policy
3 didn't limit it to employees --
4    A. Uh-huh.
5    Q. -- that scope would apply to, as you
6 testified earlier, anyone that was given county
7 e-mail, county computer, county network systems,
8 county-issued phone system, which would include an
9 elected official, correct?
10    MR. J. ANDERSON: Object to the form.
11 BY MS. AVANT:
12    Q. You can still answer.
13    A. I -- I believe it would, yes.
14    Q. So would HR enforce the Computer and
15 Information Systems Acceptable Use Policy if an
16 elected official violated it?
17    A. No.
18    Q. So an elected official is not expected
19 to abide by the Computer and Information Systems
20 Acceptable Use Policy?
21    A. No. If I was made aware of a
22 violation, I would make administration aware.
23    Q. And so you rely on county
24 administration to enforce any policies to be taken
25 up with an elected official?

Page 40

1    A. With elected --
2    MR. BUYCK: Note my objection.
3    THE WITNESS: With elected officials,
4 yes.
5 BY MS. AVANT:
6    Q. Okay. And why is that?
7    A. Because I have no authority over
8 elected officials.
9    Q. Has --
10    A. They're not county employees.
11    Q. Has county administration told you you
12 have no authority?
13    A. I don't remember if they directly told
14 me that, but that is my understanding.
15    Q. Was one of those instances with Jim
16 Beckert when he was forwarding statutes to you?
17 Was him sending you, as I believe you just
18 mentioned, him forwarding you a statute letting you
19 know that you had no authority over him, was that
20 one of those instances?
21    A. I cannot recall for sure. I believe he
22 had forwarded something to that effect before.
23 Yes.
24    Q. And do you recall what you did once you
25 received that information from Mr. Beckert?

Page 41

1    A. I believe any confrontational e-mails I
2 got from Mr. Beckert I forwarded either to the
3 deputy county administrator or the county
4 administrator.
5    Q. Did you ever inform anyone in county
6 administration about the comments that were made to
7 you about Mr. Beckert?
8    A. I cannot recall for certain, but I
9 believe I would have.
10    Q. You believe you would have?
11    A. I believe so, yes.
12    Q. Is it your understanding that -- that
13 county administration and county counsel were aware
14 of numerous complaints by females of Beaufort
15 County against Mr. Beckert?
16    MR. BUYCK: Note my objection.
17    MR. J. ANDERSON: Object to form.
18    THE WITNESS: I don't know if it was
19 just females. I don't recall that. But I believe
20 they were aware of complaints regarding
21 Mr. Beckert.
22    MS. AVANT: I'm going to walk around
23 and distribute Exhibit Number 4.
24    (PLF. EXHIBIT 4, The Island Packet
25 Article Dated 8/19/20, was marked for

11 (Pages 38 - 41)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II - 9/27/2021

## Page 17

1  official, sign onto the handbook?
2      A   I don't know that I ever saw his
3  signature, but it's my understanding that he did,
4  yes.  I say I don't know.  I don't recall seeing
5  it, but I might have.  But I think all the elected
6  officials decided to go that way, although I don't
7  know about the legislative delegation.  I see
8  Representative Erickson's name is on here, and I
9  really don't know what became of that.
10     Q   I'll pass you Exhibit Number 19.
11         (Exhibit 19, 3/28/17 Email to
12         Keaveny from Gruber, was marked for
13         identification.)
14 BY MR. CROSBY:
15     Q   And I just wanted to point to the --
16 maybe that third paragraph, Tom.  Looks like an
17 email from you to Josh Gruber.  I guess you're
18 addressing Jim Beckert there?
19     A   It looks like it's from Josh Gruber to
20 me, even though it then says Jim.  So I think I
21 remember this situation, but let's make sure.
22 Yeah, I think this is right.  Hold on a second.  Do
23 you want me to -- are you going to ask me --
24     Q   No.  I was just -- if we look at that
25 third paragraph Mr. Gruber writes there, it says:

## Page 18

1  By electronic communication to the county
2  administrator, you voluntarily adopted this policy.
3      A   There you go.
4      Q   So would that be confirmatory?
5      A   Yeah, yes, sir.
6      Q   And this is where Mr. Beckert is
7  attempting to require an employee to give 30 days
8  notice --
9      A   Right.
10     Q   -- of her leaving the county's
11 employment?
12     A   Right.
13     Q   And Mr. Gruber is pointing to Mr. Beckert
14 that he's not allowed to do that?
15     A   Uh-huh.
16     Q   That's a yes?
17     A   Yes.
18     Q   And Maria Walls, likewise, signed the
19 agreement to be bound by the Beaufort County
20 employee handbook?
21     A   I don't know that I ever saw her
22 signature, but by virtue of things that have gone
23 on with Maria and her employees, I have to believe
24 that she agreed to be bound by it.
25     Q   In order to accept the -- to get the

## Page 19

1  services from the county, there would have to be
2  that agreement in place?
3      A   And I understand she's -- her employees
4  have been receiving those services, so I assume
5  that she signed the document.
6      Q   And once the elected official signs that,
7  the memorandum, the agreement to be bound by the
8  employee handbook and have their personnel, their
9  employees abide by the handbook, the county, as is
10 pointed out in Exhibit 19, expects the elected
11 officials and their employees to abide by the
12 handbook?
13         MR. BUYCK:  Note my objection.
14         THE WITNESS:  You know, I would say that
15 in general, the answer to that question is
16 yes, but I don't think that it gave -- it
17 certainly didn't give -- in my opinion, it
18 didn't give the county administrator authority
19 over their employees.
20 BY MR. CROSBY:
21     Q   Right, but you expected that the
22 employees abide by the various provisions in the
23 handbook?
24     A   Sure, you know, not to take more vacation
25 than you are allotted and what -- all the

## Page 20

1  regulations that are in there, sure, grievance
2  procedures, for instance.
3      Q   To follow the anti-harassment policies?
4      A   Yes, sir.
5      Q   Going back to the office space, tell me
6  what is the -- that interplay with regard to office
7  space between the county and elected officials.
8      A   So it's been a long time since I've
9  looked at the statute that applied, but the state
10 statute requires the counties to provide the
11 elected officials offices and office equipment and
12 office supplies, the things that -- I think the
13 statute is very broad and vague.  It just -- I
14 think it says something like that the county shall
15 provide the elected officials the resources
16 necessary to perform their functions, and so that's
17 what we do.  That's what the county does.
18     Q   And where that office space is located
19 is -- that is within the discretion of the county?
20         MR. BUYCK:  Note my objection.
21         THE WITNESS:  Well, at some point it is.
22 I think it's difficult to -- I think there's
23 some case law out there that indicates it's
24 difficult to move -- instruct officials to
25 move.  We haven't ever tried -- I haven't ever

Spectrum Court Reporting and Legal Video
843.849.0133



Deposition of:

# Gary T. Kubic

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 58

1 Mr. Beckert let them know.
2    Q.   Did he ever express his displeasure to
3 you?
4    A.   Oh, yeah.
5    Q.   That was certainly within your
6 authority to take that action, I assume?
7    A.   Yes.  I think there is a -- I'm not
8 sure if there is a statute or there is a policy.
9 Maybe it's a council policy.  But county
10 administrators are responsible for the -- all
11 buildings of the county, includes maintenance.  The
12 only caveat would be overall security, which I
13 coordinated with the sheriff's office.
14    Q.   Have you got Exhibit Number 1?  Can you
15 pass him a copy there?
16    A.   Give me three minutes so I can read
17 this document.
18    Q.   Just take a second.  You probably
19 helped write it, so...
20    A.   I'm familiar with it.
21    Q.   And that's the county handbook that was
22 adopted -- that version looks like August of 2016?
23    A.   Yes.  Resolution 2016/11.
24    Q.   And I believe that in addition to
25 county employees, that the employees of the

Page 59

1 auditor's and treasurer's office signed off on that
2 document?
3    A.   I believe all elected officials of the
4 county signed off on this document.
5    Q.   Including council members?
6    A.   Well, council doesn't hire employees.
7 I'm not sure if they did.  But all the other
8 elected divisions, including I think the
9 magistrates, the courts, any other unit that had
10 separately had the capability by statute to hire
11 their own employees.
12    Q.   And what was it --
13    A.   All the hiring of employees for county
14 council was done through me.  That's why I don't --
15 I don't know if county --
16    Q.   What's the rationale on -- on having
17 the other elected officials and their employees
18 sign off and adopt this policy?
19    A.   The recommendation and -- came from our
20 outside counsel, I believe, was Attorney Edwards.
21 The idea of having a personnel handbook was so that
22 the employee and the employer, whether it would be
23 county administration, auditor, or treasurer, that
24 the expectations and actions of each party would be
25 defined in writing, and that the uniform standard

Page 60

1 would be created by having all elected officials
2 consent to the rules and regulations of a personnel
3 handbook, which then offered a level of expertise
4 for HR in terms of consistent management or
5 application for vacation, sick leave, whatever the
6 provision or idea would be.
7    Q.   Was the adoption by the elected offices
8 of this -- of Exhibit 1, the manual, a part of
9 the -- I guess the bargain with the county for --
10 to receive HR services and that type of thing?
11    A.   Yeah.  There was a -- sort of a mutual
12 understanding that the HR department was under the
13 control of the county administrator; however, to
14 assist in advertising a position or to assist in
15 management or to assist in producing documents on
16 behalf of the employee W-2, the actual paychecks,
17 how to do electronic deposit, all those things were
18 a result of a mutual understanding of how to
19 process.
20          It didn't necessarily mean that I could
21 tell any elected official who to hire.  That was up
22 to them.  But the process of how to manage and what
23 was expected of both sides, that was the purpose of
24 the handbook:  Consistency.
25    Q.   And consistency on that side, and then

Page 61

1 there was a centralized -- the elected offices got
2 the benefit of using the county's HR services like
3 you say for W-2s and --
4    A.   Right.  Producing a paycheck.
5          MR. J. ANDERSON:  Object to the form.
6          MR. BUYCK:  Note my objection, too.
7          THE WITNESS:  What was your question
8 again?
9 BY MR. CROSBY:
10    Q.   There was two sides to it.  You had
11 consistency and policy over here, but also the
12 benefit to the elected offices would be consistency
13 and the provision of the HR services?
14    A.   Yeah.  There are certain requirements
15 that are involved when you hire an employee.  One
16 is simply recordkeeping, timekeeping,
17 hospitalization, how to produce a paycheck.  All of
18 those things were products of the HR department
19 under my administration as county administrator.
20 So the idea was instead of having all the elected
21 officials having their own HR department, their own
22 check writing, their own hospitalization, for
23 purposes of efficiency and movement, it -- it was
24 under the HR.
25          This, also, handbook was not just for

16 (Pages 58 - 61)

Gary T. Kubic                                   April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 62

1 elected officials, it's also for the new hires to
2 understand what their responsibilities are to the
3 taxpayer of Beaufort County.
4     Q.   Right.  This is the exact same handbook
5 that your staff would sign?
6     A.   Yes.
7     Q.   And it sets forth the expectations with
8 regard to the -- how you expect county employees
9 and those that sign off on this to act in the
10 workplace?  It has --
11         MR. J. ANDERSON:  Objection.
12         MR. BUYCK:  Note my objection.
13 BY MR. CROSBY:
14     Q.   -- certain -- certain forbidden --
15 or behaviors that are set forth in this?
16         MR. BUYCK:  Same objection.
17         MR. J. ANDERSON:  Me too.
18         THE WITNESS:  It -- it's a -- it's a
19 personnel handbook that offers the elected official
20 the hiring authority and the employee hired by the
21 hiring authority to know in writing what the
22 expectations would be for each side.  And so for
23 clarity, and also I think to protect the county
24 overall from random or haphazard claims by
25 employees against the county, if they did not

Page 63

1 follow the handbook, then they have no real
2 position to argue.
3 BY MR. CROSBY:
4     Q.   And --
5     A.   So, if they violated procedure, we had
6 the ability to process them through the conditions
7 and the grievance procedures defined in this book.
8     Q.   And one of the purposes of the -- some
9 of the language in the handbook is to provide a
10 good working environment by prohibiting such things
11 as sexual harassment?
12     A.   Yes.
13     Q.   That's something that was strictly
14 forbidden by the county?
15     A.   Appropriate behavior.
16     Q.   If we look at Page 6 at Paragraph 1.3,
17 it has an anti-harassment policy set forth there.
18     A.   Page 6, 1.3, yes.
19     Q.   And in the second sentence, it says:
20 In addition to county endeavors to provide a
21 working environment in which employees are free
22 from discomfort or pressure resulting from jokes,
23 ridicule, slurs, gossip, threats, bullying,
24 harassment whether relating to such distinctions or
25 simply resulting from a lack of consideration for a

Page 64

1 fellow human being.
2         And then it says:  The county does not
3 tolerate harassment of any kind and strictly
4 forbids retaliation against anyone who has reported
5 harassment in good faith.
6     A.   Yes.  That's what it says.
7     Q.   And basically it's -- what we've talked
8 about earlier, your efforts that we've talked about
9 to protect your staff and your employees from some
10 of Mr. Beckert's conduct were in effort to provide
11 the working anti -- harassment-free environment to
12 your employees?
13     A.   That's correct.  That's just sound --
14 sound management.
15     Q.   Because what -- what Mr. Beckert's
16 conduct, as you observed, would -- rose to the
17 level of what one would describe as harassment
18 within this definition?
19         MR. J. ANDERSON:  Objection.
20         THE WITNESS:  Are you asking me whether
21 or not Mr. Beckert violated this provision as
22 written in the employee handbook?
23 BY MR. CROSBY:
24     Q.   That's another way of saying it.
25     A.   I would have to say I agree with that

Page 65

1 assessment.
2     Q.   And what you did to the best of your
3 ability was try to protect the county's employees
4 from that type of environment?
5     A.   Yes.
6     Q.   And you actually tried to -- in some
7 respects to -- help protect Maria Walls from
8 that conduct by putting up the cameras and taking
9 the concerns to county council?
10     A.   Yes.
11         MR. J. ANDERSON:  Objection.
12 BY MR. CROSBY:
13     Q.   Go over to page -- let me -- let me ask
14 something before this.  There is always this issue
15 about Jim Beckert that seems to permeate, and that
16 is that no one could do anything about him because
17 he was an elected official.  That was -- and you
18 and I have talked about that, that you didn't have
19 statutory authority to control an elected official,
20 correct?
21     A.   Yes.
22     Q.   The office of the auditor and the
23 treasurer are in county-owned property?
24     A.   Beg your pardon?
25     Q.   The offices of both the treasurer and

17 (Pages 62 - 65)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 66

1 the auditor are located in county-owned property?
2    A.   Yes.
3    Q.   And I take it the county provides a
4 budget for their offices?
5    A.   County council does the appropriation
6 for each of the units.
7    Q.   Was there ever any discussion while you
8 were employed with the county about separating the
9 offices or moving Jim Beckert's office to another
10 location?
11    A.   Well, we had discussions because we
12 were locating satellite offices and had satellite
13 offices for both the auditor, treasurer, and other
14 functions on Hilton Head.  We remodeled one stop
15 for the Bluffton South of the Broad office.  But I
16 did not engage -- I did not suggest moving
17 Mr. Beckert out of his main office as a result
18 of -- of these matters.
19    Q.   Page 8, Paragraph 1.6.
20    A.   Page 8.  Okay.  What paragraph?
21    Q.   1.6.
22    A.   All right.
23    Q.   And this -- point you to that second
24 sentence there where it says:  Non-employees may be
25 reported to appropriate law enforcement, which you

Page 67

1 did that, and I believe Mr. -- Ms. Walls may have
2 done that over time.  And it says that and/or
3 barred from the premises.
4        Do you have -- and what you're telling
5 me is that never was a discussion between you and
6 council to your recollection as to whether
7 Mr. Beckert could be moved and barred from the
8 premises over in Ribaut Road?
9    A.   Well, two things:  One, this particular
10 paragraph I would question as to whether it applies
11 to an elected official or not.  And in that sense,
12 to answer your question directly, I did not have
13 any discussions regarding removal of Mr. Beckert
14 from any of his offices to someplace else as a
15 result of these discussions we're having here.
16    Q.   Well, it has two categories of people,
17 either employees or non-employees?
18    A.   Right.
19    Q.   And Mr. Beckert, what you told me, is
20 not an employee?
21        MR. J. ANDERSON:  Objection.
22        THE WITNESS:  In my interpretation,
23 Mr. Beckert is an elected official and not an
24 employee in the sense that he's required to work a
25 40-hour week, that he's required to accrue vacation

Page 68

1 or sick as a regular employee.  There is a separate
2 category for elected officials in my opinion.  I
3 don't know whether it's defined by statute.  But he
4 is not considered a regular employee for this
5 personnel handbook.
6 BY MR. CROSBY:
7    Q.   He signed a copy, didn't he?
8    A.   He signed -- all the elected officials
9 sign these copies to accept the handbook as a tool
10 for new hires in terms of defining the
11 relationships between the hiring authority and the
12 employee.
13    Q.   Do you have any understanding as -- as
14 to whether Mr. Beckert currently is allowed in the
15 county building?
16    A.   Well, I don't have any direct
17 knowledge, but I have received a few phone calls
18 that he has been moved to another location.
19    Q.   And -- and I guess that's what I was
20 getting at.  I mean, council apparently took that
21 step and made that decision currently, and that
22 was -- all this was just directed as whether or not
23 that had ever come up in your tenure about moving
24 him?
25    A.   No.  Not to remove him from his office

Page 69

1 location.
2    Q.   And the county owns the building and
3 controls the building, correct?
4    A.   Yes.
5    Q.   And presumably since they've done it
6 now, had council wanted to take that action when
7 you first brought these complaints to their
8 attention, they could have done so?
9        MR. BUYCK:  Note my objection.
10        MR. J. ANDERSON:  Objection.
11        MR. BUYCK:  In a matter of law.
12        THE WITNESS:  Well, I suppose they
13 could have.  I don't know if it was offered as a
14 solution.
15 BY MR. CROSBY:
16    Q.   That -- it would be council that would
17 have to make that decision, correct?  It wouldn't
18 be --
19    A.   It's not me.
20    Q.   You wouldn't have that power?
21    A.   Huh-uh.  Maybe the governor.
22    Q.   And with regard to the employees, there
23 is certain rules set out in here about conduct and
24 a lot of other stuff, but how employees are to
25 conduct themselves as county employees.  And there

18 (Pages 66 - 69)



Deposition of:

# D. Paul Sommerville

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 22

1    A.  I can't -- I don't know what the
2    sequence was.
3    Q.  Other than that, do you recall any
4    action that was discussed with regard to Jim
5    Beckert's conduct toward --
6    A.  Yes, I heard some conversations about
7    going to the governor, but they were -- they were
8    secondhand conversations and so...
9    Q.  That was something that was discussed
10    in executive session or just something that was
11    talked with outside of?
12    A.  No, I don't recall it being discussed
13    in executive session, but I do recall it being
14    discussed between myself and Josh Gruber, Gary
15    Kubic.
16    Q.  With regard to the County administrator
17    having the power or control over access to the
18    buildings, whatever that timing was, was there any
19    vote on that or was it just a discussion that she
20    actually, the County administrator, possessed that
21    power?
22    A.  My recollection is that in executive
23    session, Ashley Jacobs proposed that idea.  There
24    was never a vote, to my knowledge, and as a -- as I
25    recall, she proposed it as something within her

Page 23

1    authority to do.  It didn't require a vote.
2    Q.  The -- the County does have control
3    over the County property, correct?
4    A.  Absolutely.
5    Q.  So that's basically what she was
6    suggesting is, as in her role as the highest
7    ranking County employee, she had the authority to
8    make that -- take that type of action?
9    MR. BUYCK:  Note my objection.
10    THE WITNESS:  Correct.
11    BY MR. CROSBY:
12    Q.  There was no vote taken that night
13    to -- or in that meeting to give her special power?
14    A.  No, I only -- I only wish that I had
15    thought of it.  I only wish Gary Kubic had thought
16    of it.  As far as I know, Gary Kubic didn't think
17    of it, Josh Gruber didn't think of it, and I didn't
18    think of it, so, but somebody did at some point and
19    I think it -- so...
20    Q.  Do you re-- did you have more than
21    one conversation with Alicia Holland --
22    A.  Yes.
23    Q.  -- about Beckert's behavior towards
24    her?
25    A.  Yes.

Page 24

1    Q.  Was that something that she complained
2    to you about on multiple occasions?
3    A.  Yes.
4    Q.  Was the -- the complaint typically the
5    same, that Beckert was harassing her?
6    A.  Well, a lot of her complaints had to do
7    with his -- because she was the chief financial
8    officer and responsible for the finance of the --
9    of the County, she -- a lot of her complaints,
10    certainly not all of them, but a lot of them had to
11    do with his job performance.  But yes, she also
12    complained about his harassment.
13    Q.  Did she --
14    A.  To me.
15    Q.  -- complain to you that he was causing
16    her discomfort and stress?
17    A.  I'm struggling to answer that question
18    because I'm not sure if -- if my conversation with
19    her was privileged, so...
20    Q.  I don't -- I don't know how it would
21    be, but as her attorney, it's okay to tell me.
22    A.  Okay.  No, I think there were other
23    things that frustrated her as well, but yes, Jim
24    Beckert was certainly one of them.
25    Q.  Did he relay to you that she was

Page 25

1    stressed about whether that Jim was causing her
2    stress in -- in doing her job?
3    A.  Yes.
4    Q.  Let me give you a couple of documents
5    and I'll let him take a break so you can look at
6    them.
7    MR. CROSBY:  What exhibit numbers are
8    these?
9    MS AVANT:  (Inaudible.)
10    THE WITNESS:  Take a break, like make a
11    call?  Or take a break, like wait for them?
12    MR. BUYCK:  You can make a call.
13    MR. CROSBY:  Let's just go off the
14    record.
15    THE VIDEOGRAPHER:  We are going off
16    record.  The time is 2:42 p.m.
17    (A Recess transpired.)
18    (EXHIBIT 14, Letter, 3-6-18, was marked
19    for identification.)
20    (EXHIBIT 15, E-Mail, 5-21-19, was
21    marked for identification.)
22    (EXHIBIT 16, E-Mail, 8-7-20, was marked
23    for identification.)
24    (EXHIBIT 17, E-Mail, 8-19-20, was
25    marked for identification.)

7 (Pages 22 - 25)

Ex. 3
Beaufort County Adopts Testimony:
Topic 18: Each Action Considered by the County in
Response to Allegations Concerning Beckert's Conduct,
Including the Specific Action Considered, the Date of
Each Consideration and the Identity of the Person(s)
Involved in Each Consideration



Deposition of:

# Robert Bechtold

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Robert Bechtold                                    April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 10

1  that falls under my charge also had a complaint.
2      Q.  And who was that?
3      A.  That was our -- I'm sorry, I don't know
4  why I'm drawing a blank right now.  If I could just
5  have a second.  That was our assessor.
6      Q.  Ebony Sanders?
7      A.  Ebony Sanders.
8      Q.  What did you learn about Ebony Sanders'
9  issues with Jim Beckert?
10     A.  That she filed -- again, I'm really not
11  certain, other than that she filed a complaint
12  against it -- against him.  I don't know how it was
13  done or other than -- I believe -- I'm really not
14  certain.  I read it in something and before, and
15  this would have been after, you know, I was
16  directed to help move the office and everything.  I
17  don't remember if it was the paper or if it was --
18  but I didn't know prior to that.
19     Q.  Did you have any involvement in
20  investigating the complaint filed by Ebony Sanders?
21     A.  No.
22     Q.  Did you ever attend any meetings or
23  accompany Ashley Jacobs to any meetings between her
24  and Jim Beckert?
25     A.  No.  I don't -- no, I don't believe I

Page 11

1  have ever been in the same room.  I don't -- I
2  don't think so, no.
3      Q.  At some point in time you were involved
4  in moving the -- the auditor -- the auditor's
5  office?
6      A.  I was.
7      Q.  Tell me about that.
8      A.  I -- Ashley, I believe it was verbally
9  or otherwise, she asked me to find a place for me
10  outside of the main administrative building and I
11  don't know if it was my decision or hers
12  ultimately, but I found a place down there at
13  records management.  And I went over to see
14  Mr. Beckert and let him know that we found an
15  alternate location for him.  And he -- he had
16  requested that if it were done, if he could have it
17  done outside of normal operational hours.  And I
18  said sure.  And then I had a crew come over and
19  help move all of the stuff down to the records
20  management building to the ultimate location.
21     Q.  When was that?
22     A.  I don't know the date.
23     Q.  It was sometime before Ashley Jacobs
24  left the County's employment, obviously?
25     A.  Yes.

Page 12

1      Q.  Do you recall what month it was in?
2      A.  I believe it was in the Fall.  I mean,
3  really, I believe it was sometime in the Fall.
4      Q.  When you met with Ash- -- I mean, with
5  Jim Beckert about moving his office, tell me about
6  any conversations you had with him, other than him
7  asking you to do it outside of operational hours.
8      A.  I mean, it -- it was insignificant, so
9  I mean, nothing specific.  That was the only
10  request that he made that -- that stuck out to me
11  because I had gone over there to coordinate that
12  with him and so...
13     Q.  And did he ask you why he was being
14  asked to move?
15     A.  I have -- I mean, I have no idea.  This
16  is a, again, 46 departments in my daily activities,
17  I don't know that it's possible for me to retain
18  that, so I don't specifically know.
19     Q.  Did he seem to object to having to move
20  offices?
21     A.  He did.  In fact, I mean, ultimately,
22  he did.  So, I don't remember.  I mean, again, I
23  don't know really the context of the conversation.
24  I was there to execute something, you know, a
25  directive and so I went, communicated what I needed

Page 13

1  to communicate to him, let him know where it was
2  going to be.  He requested that I do it after
3  hours, so I facilitated that.
4      Q.  And that's -- that's all I'm asking.
5  You only know what you know.
6      A.  Right.
7      Q.  And I don't know it until you answer
8  the question.
9      A.  Uh-huh.
10     Q.  So don't, you know, feel offended by
11  me.
12     A.  Oh, I'm not at all.  I'm trying to
13  recollect things that I can't and that's
14  frustrating.
15     Q.  Some people have good memories and some
16  people don't.
17         You -- what you're telling me is that
18  when you went to move him, Mr. Beckert did not put
19  up any type of opposition, his only request was to
20  do it after hours?
21     A.  Yeah, I mean, that was his request.
22     Q.  And he complied with the move?
23     A.  He did.
24     Q.  Now, sometime later I believe you
25  were -- became a point of contact for Mr. Beckert?

4 (Pages 10 - 13)

Robert Bechtold
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 14

1     A.   I did.
2     Q.   Tell me about that.
3     A.   Mr. Greenway and I had a discussion
4  about him -- I mean, I got an additional directive
5  and that directive was to aid Mr. Beckert by being
6  a -- being the throughput for communications to the
7  staff, if that makes sense.
8     Q.   You became the -- the conduit for any
9  communications with --
10    A.   Yes.
11    Q.   -- the County employees?
12    A.   Yes.
13    Q.   Because Mr. Greenway had told you that
14 he didn't want Mr. Beckert to have any direct
15 contact with the County employees?
16       MR. ANDERSON:  Object to the form.
17       You can still answer.
18 BY MR. CROSBY:
19    Q.   Correct?
20    A.   Yes.
21    Q.   So whatever contact, would that have
22 been after David Cadd left the County's employment?
23    A.   Yes.
24    Q.   And at some point in time you became
25 involved in allow -- escorting Mr. Beckert into,

Page 15

1  back into the building where his office formerly
2  was?
3     A.   Yes.
4     Q.   Tell me about that.
5     A.   There was some communication to
6  Mr. Beckert and a request that he provided a
7  24-hour notice when he needed to come up there and
8  so I had coordinated that with Mr. Beckert.  And so
9  he would call me, sometimes on the weekend,
10 sometimes on a Monday to kind of give me a general
11 idea of what his plans were for the week.  And then
12 when he arrived at the building, he would contact
13 me via phone or text and he would walk around the
14 front of the building, I would move through the
15 building and let him in the door adjacent to the
16 auditor's office.
17    Q.   And who gave the authority for
18 Mr. Beckert to have access to the building?
19    A.   Who gave the authority?
20    Q.   Correct.
21    A.   I'm not certain if that was Ash- -- it
22 was the same standing as I understood it from
23 before.  So I don't know, but the notice to come up
24 there, I don't know where that came from, but I
25 mean, ultimately, I wasn't surprised by it so I

Page 16

1  don't know if it was Ashley or Eric when he
2  arrived.  I just knew that the frequency was
3  greater because he had relieved Mr. Cadd.  So...
4     Q.   Prior to Mr. Cadd being relieved, did
5  you escort Mr. Beckert into building during that
6  time?
7     A.   No.
8     Q.   So this started sometime in 2021?
9     A.   Yes.
10    Q.   And what I'm trying to get at is, was
11 it your understanding that between Ms. Jacobs and
12 council the decision had been made to move
13 Mr. Beckert's office?
14    A.   Yes.
15    Q.   Do you know who made the decision to
16 allow Mr. Beckert to be able to return to the
17 auditor's office off of Ribaut Road?
18    A.   Do I know who specifically, no, I
19 don't.
20    Q.   Did you have any conversations with
21 anyone about any change in the policy of having
22 Mr. Beckert refrain from entering that building?
23    A.   No.  I mean, again, I think that the --
24 I'm uncertain of where it started, but I know that
25 it was reaffirmed sometime later because it was

Page 17

1  shifted -- whoever, their responsibility was
2  shifted to me, so that's when I got the ground
3  rules and ground work of what that looked like.
4     Q.   Of what looked like?
5     A.   Of -- me having to escort him into
6  the building and, I mean, that.
7     Q.   Well, I guess that's what I'm trying to
8  get at.  Did you have any discussions with
9  Mr. Greenway that there had been some change in
10 policy whereby Mr. Beckert, after Mr. Cadd's
11 departure, could now return to the building?
12    A.   I'm sure I had discussions.  I mean,
13 nothing remarkable.  It was the same standing, as I
14 understood it, the same standing notice and he
15 needed to be escorted into the building.  I knew of
16 that prior to and so the discussions were about, I
17 mean, the frequency was all.
18    Q.   Well, prior to Mr. Cadd's leaving, you
19 told me that he wasn't entering the building?
20    A.   No, I wasn't responsible for that.  I'm
21 not certain who was.  But I know that after
22 Mr. Cadd's departure that was the task that I'd
23 received.
24    Q.   Do you know whether Mr. Beckert was
25 entering the building prior to Mr. Cadd's

5 (Pages 14 - 17)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II – 9/27/2021

Page 61

1   I can try to -- try to remember some of it. But
2   there were several things on the second lawsuit to
3   make him -- to ask the court to require him to do.
4   One is to maintain an abatement book of taxes that
5   are abated, and that's necessary so that bond
6   rating agencies and others know what property --
7   what property that could generate tax revenue is
8   not generating tax revenue due to agreements
9   pursuant to state statute. So that's the abatement
10  book.
11        There was an issue with him getting
12  involved in determination or adjudications about
13  the applicability of 4 percent versus 6 percent
14  assessment ratios on property, which falls within
15  the purview solely of Ebony Sanders and the Board
16  of Adjustments and Appeals, so to have him stay out
17  of that, because he intervened in one case and
18  adjudicated himself when he shouldn't have done it.
19        And there are a couple of other things
20  that we've asked the court to require him to do. I
21  just can't remember off the top of my head.
22        Q    And that one hasn't resulted in an order
23  yet?
24        A    It has not. There have been no orders
25  issued in that case. I think his lawyer just filed

Page 62

1   an answer this month, earlier this month.
2        Q    Was there ever any consideration of
3   filing a similar-type lawsuit against Mr. Beckert
4   with regard to his behavior toward county employees
5   or Ms. Walls?
6        MR. ANDERSON: Objection.
7        THE WITNESS: I don't remember having any
8   conversations about -- with county council or
9   with the administrator about county government
10  taking an action, a lawsuit against
11  Mr. Beckert, no.
12  BY MR. CROSBY:
13        Q    Subject to the questions about the
14  grievances, I'm going to pass you to Mr. Anderson
15  and see if he has any questions.
16        MR. ANDERSON: I can't hear you. My
17  apologies.
18        MR. CROSBY: Do you have any questions?
19  I was going to pass the witness.
20        MR. ANDERSON: Yeah, I do, but can I get
21  five minutes? Unless --
22        MR. CROSBY: No. Go ahead.
23        MR. ANDERSON: Mind if I have five
24  minutes?
25        MR. CROSBY: Sure.

Page 63

1        MR. ANDERSON: Thank you.
2        THE VIDEOGRAPHER: Off the record at
3   11:49.
4        (A recess transpired.)
5        THE VIDEOGRAPHER: On the record at
6   11:53.
7        EXAMINATION
8   BY MR. ANDERSON:
9        Q    Good morning, Mr. Keaveny.
10        A    Good morning.
11        Q    We've met before. My name is Jon
12  Anderson, and I represent Jim Beckert both as the
13  auditor and himself personally.
14        I have a few questions. I'm going to
15  want to get to -- some of them are follow-up to
16  the questions you just received. I'd like to direct
17  you to 24, to Exhibit 24, and that is the email --
18  it says at the top: Holland, Alicia, but it
19  starts -- it's a three-page, Holland 299 to 301.
20        A    Yeah.
21        Q    Okay. I'm not sure the one you have has
22  a Bates stamp on it.
23        And who do you think that -- Amelia Furr
24  Ruple, she sends an email and says: As you are
25  aware, we have been instructed that questions

Page 64

1   relating to the duties between the auditor and the
2   treasurer be resolved by the Beaufort County
3   attorney.
4        Now, that's a lot of passive writing in
5   there. I'm wondering who instructed the DOR?
6        A    Yeah. So I can't answer that question,
7   but I can tell you that when I received it -- I
8   have worked with Amelia a lot with regard to
9   Mr. Beckert and the issues between the treasurer
10  and the auditor since July of 2015, a lot, and I
11  kind of read that as Mr. Cleland having
12  instructed their -- Mr. Cleland, who's a deputy
13  director, having instructed Amelia and Sandy's
14  office to refer things to us.
15        Because, see, Amelia and Sandy, they work
16  in a -- I can't remember what their division is,
17  but they're kind of like a training arm of DOR, and
18  they provide training and they provide assistance
19  to the treasurer and the auditor with regard to the
20  tax process.
21        Q    Let me ask you this: I know right now
22  you're deputy, but you've been the county attorney
23  for Beaufort. Who is your client?
24        A    You know, that's a -- who is the -- so
25  that's an issue for CLEs, you know, who is your



Deposition of:

# Gary T. Kubic

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 66

1 the auditor are located in county-owned property?
2    A.   Yes.
3    Q.   And I take it the county provides a
4 budget for their offices?
5    A.   County council does the appropriation
6 for each of the units.
7    Q.   Was there ever any discussion while you
8 were employed with the county about separating the
9 offices or moving Jim Beckert's office to another
10 location?
11    A.   Well, we had discussions because we
12 were locating satellite offices and had satellite
13 offices for both the auditor, treasurer, and other
14 functions on Hilton Head.  We remodeled one store
15 for the Bluffton South of the Broad office.  But I
16 did not engage -- I did not suggest moving
17 Mr. Beckert out of his main office as a result
18 of -- of these matters.
19    Q.   Page 8, Paragraph 1.6.
20    A.   Page 8.  Okay.  What paragraph?
21    Q.   1.6.
22    A.   All right.
23    Q.   And this -- point you to that second
24 sentence there where it says:  Non-employees may be
25 reported to appropriate law enforcement, which you

Page 67

1 did that, and I believe Mr. -- Ms. Walls may have
2 done that over time.  And it says that and/or
3 barred from the premises.
4        Do you have -- and what you're telling
5 me is that never was a discussion between you and
6 council to your recollection as to whether
7 Mr. Beckert could be moved and barred from the
8 premises over in Ribaut Road?
9    A.   Well, two things:  One, this particular
10 paragraph I would question as to whether it applies
11 to an elected official or not.  And in that sense,
12 to answer your question directly, I did not have
13 any discussions regarding removal of Mr. Beckert
14 from any of his offices to someplace else as a
15 result of these discussions we're having here.
16    Q.   Well, it has two categories of people,
17 either employees or non-employees?
18    A.   Right.
19    Q.   And Mr. Beckert, what you told me, is
20 not an employee?
21        MR. J. ANDERSON:  Objection.
22        THE WITNESS:  In my interpretation,
23 Mr. Beckert is an elected official and not an
24 employee in the sense that he's required to work a
25 40-hour week, that he's required to accrue vacation

Page 68

1 or sick as a regular employee.  There is a separate
2 category for elected officials in my opinion.  I
3 don't know whether it's defined by statute.  But he
4 is not considered a regular employee for this
5 personnel handbook.
6 BY MR. CROSBY:
7    Q.   He signed a copy, didn't he?
8    A.   He signed -- all the elected officials
9 sign these copies to accept the handbook as a tool
10 for new hires in terms of defining the
11 relationships between the hiring authority and the
12 employee.
13    Q.   Do you have any understanding as -- as
14 to whether Mr. Beckert currently is allowed in the
15 county building?
16    A.   Well, I don't have any direct
17 knowledge, but I have received a few phone calls
18 that he has been moved to another location.
19    Q.   And -- and I guess that's what I was
20 getting at.  I mean, council apparently took that
21 step and made that decision currently, and that
22 was -- all this was just directed as whether or not
23 that had ever come up in your tenure about moving
24 him?
25    A.   No.  Not to remove him from his office

Page 69

1 location.
2    Q.   And the county owns the building and
3 controls the building, correct?
4    A.   Yes.
5    Q.   And presumably since they've done it
6 now, had council wanted to take that action when
7 you first brought these complaints to their
8 attention, they could have done so?
9        MR. BUYCK:  Note my objection.
10        MR. J. ANDERSON:  Objection.
11        MR. BUYCK:  In a matter of law.
12        THE WITNESS:  Well, I suppose they
13 could have.  I don't know if it was offered as a
14 solution.
15 BY MR. CROSBY:
16    Q.   That -- it would be council that would
17 have to make that decision, correct?  It wouldn't
18 be --
19    A.   It's not me.
20    Q.   You wouldn't have that power?
21    A.   Huh-uh.  Maybe the governor.
22    Q.   And with regard to the employees, there
23 is certain rules set out in here about conduct and
24 a lot of other stuff, but how employees are to
25 conduct themselves as county employees.  And there

18 (Pages 66 - 69)

Gary T. Kubic                                                    April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 78

1  obviously he was elected and he was -- you know, I
2  guess, met the age criteria and residency.  I'm
3  talking about more of his actual financial
4  qualifications.
5        A.   Well, I don't know exactly the
6  circumstances, but there -- circumstances arose
7  where I asked HR to provide me -- because I didn't
8  know that I'd hired Mr. Beckert as a lifeguard, and
9  I didn't know that Mr. Beckert was fired from the
10 magistrate's office.
11       So I checked his application, and quite
12 frankly, I thought it was insufficient, no
13 references of prior employment except for his wife.
14 He listed Beaufort Memorial, but I couldn't get any
15 information, and then I saw the letter coming out
16 of the magistrate's office which basically said he
17 failed in performing his clerk's duties, and they
18 dismissed him.
19       So going back to my earlier comment in
20 the middle of this deposition, if you meet the
21 requirements to run for office and you get elected,
22 it does not mean that you have management
23 experience, that you have intuitive abilities to
24 conduct the operation of any office, it just means
25 that you got one more vote than the guy who's

Page 79

1  running against you.  And so if the voters
2  determine you're qualified, I guess you're
3  qualified.
4        Q.   Notwithstanding that he had been
5  dismissed from employment with the county, he later
6  became auditor?
7        A.   That's correct.
8        Q.   What was his position with Beaufort
9  Memorial?
10       A.   I have no idea.  I think he was
11 involved at the -- from memory, I'd have to look at
12 the application.  Maybe -- I think it was human
13 resources or something of that sort.
14       Q.   Did you try to find out anything about
15 his employment there?
16       A.   Yeah.  We -- you know, when you list --
17 and, you know, Beaufort Memorial, they're the top
18 employers of the county:  School district, Beaufort
19 County government, grocery stores, and hospitals, I
20 mean, there is not too much -- so we said, well,
21 okay, what did he do at the hospital, what was his
22 work experience?
23       We called -- we contacted the hospital,
24 and they said they have no record of his
25 employment.  They couldn't provide any

Page 80

1  recommendations.  So I thought that was odd.
2        It was -- the curiosity rose when we
3  asked for references on the application.  And I
4  think it was -- I think the application was for a
5  magistrate position.  It might have been for a
6  lifeguard.  I'm not sure.
7        Q.   Piqued my curiosity as well, and I
8  haven't been able to find out anything either.
9  They have no records, so don't feel bad about that.
10       MR. CROSBY:  Did he write -- write that
11 letter?  Did Gary write the letter?
12       No.  He would have been gone.
13 BY MR. CROSBY:
14       Q.   Was there ever any discussion during
15 your employment with the county about this --
16 whether or not there was an ability to change the
17 form of government to have an elected treasurer and
18 a -- one -- either the treasurer or the auditor,
19 one elected and one not?
20       A.   Yes.
21       Q.   Tell me about that.
22       A.   Well, during my tenure, the previous
23 county treasurer, Joy Logan, I started
24 investigating discrepancies in her office in
25 collection.  And I determined that she fired an

Page 81

1  employee for -- I believe for theft and then
2  rehired her.  And I'm not sure if it was during
3  Alicia's tenure or David Starkey, the previous CFO,
4  where I asked for a forensic audit, and we hired an
5  outside firm out of Atlanta.  And I can't
6  remember -- KP -- KPG maybe -- and it was
7  determined that there were $250,000 stolen from the
8  county under Joy Logan.
9        So, at that time I recommended to
10 council take a serious look as to whether or not
11 the processes between the auditor and treasurer
12 necessitated to be two separate offices.  And the
13 reason for that was that I thought it would be
14 better to have it under the control of the county
15 administrator.
16       Joy left, I forget who came in her
17 place.  Eventually Maria won election.  And with
18 these discrepancies between the two departments,
19 Mr. Beckert and -- and Maria Walls, I resurrected
20 the idea, and I think several councilmen also
21 thought it was a good idea to change the form of
22 government, merge those two departments into one.
23       Historically, you needed a checks and
24 balance because the recordkeeping used to be by pen
25 and paper:  A billing, a collection, and it was

21 (Pages 78 - 81)

Gary T. Kubic                                            April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 82

1 recorded that way. In today's modern world with
2 technology, it's so easy to have the controls in
3 place to do it with one system instead of two.
4         Several councilmen felt that that would
5 not be approved by -- the merger would be approved
6 by the electorate, which was necessary, but it was
7 discussed in -- in depth at the time. And it arose
8 in several occasions with those two units of
9 government.
10     Q. During your tenure, there was no action
11 taken on -- on that?
12     A. I don't think we ever proposed it to be
13 a consideration. I think -- I'll have to go
14 back -- I don't believe -- was there a vote? I'm
15 not sure. You can't help me, can you?
16     Q. He can't.
17         MR. KEAVENY: I can't.
18         THE WITNESS: I can't remember. Maybe
19 there -- was rejected by council. I can't -- I
20 can't recall. I think there was also some concern
21 by council at the time that we had referendums on
22 sales tax and other issues that they felt had --
23 more pressing issues for the sales tax to go
24 forward than changing the form of government. I
25 think they felt it was too difficult, didn't want

Page 83

1 to give me too much control.
2 BY MR. CROSBY:
3     Q. But it was your thought during that
4 time that the -- those offices would be merged and
5 would -- there would become a county employee or
6 would just those two offices merge and be --
7     A. I think the --
8         MR. BUYCK: Note my objection.
9 BY MR. CROSBY:
10     Q. -- one -- one elected office.
11         MR. J. ANDERSON: Same objection.
12         THE WITNESS: I think -- I think it
13 would go under the control of the county
14 administrator as a unit of government. And quite
15 frankly today, I still agree that for efficiency
16 purposes and accountability and ease of operation,
17 that's the way to go.
18 BY MR. CROSBY:
19     Q. Were there any particular members of
20 county council during your tenure that would --
21 that were close to Jim Beckert, just based on your
22 observations?
23     A. Well, everyone knew that Jim Beckert
24 was the finance chairman for Brian Flewelling, and
25 even in certain sessions or committee meetings,

Page 84

1 Councilman Flewelling -- and I believe he had
2 mentioned that. And I think Councilman Howard
3 mentioned that she was a neighbor, lived close to
4 Mr. Beckert. Those two come to mind readily.
5         I'm not sure about anybody else. I'm
6 running -- I'm trying to run through who the other
7 councilmen were.
8         I think Sommerville was relatively
9 independent. Stewart was independent. It was just
10 basically, I think, Councilman Flewelling, maybe
11 Councilman Covert toward the end of my
12 administration.
13     Q. Would Councilman Flewelling in your
14 observations take Jim's side in some of these
15 disputes?
16         MR. BUYCK: Note my objection.
17         MR. J. ANDERSON: Object to the form.
18         THE WITNESS: You know, Councilman
19 Flewelling in my opinion is a very good elected
20 official in the sense that he chooses his words
21 very carefully. So I don't think he ever overtly
22 said you got to take Jim Beckert's side. I think
23 he would be more -- expressed -- I think he
24 expressed, hey, let's take another second look at
25 his concerns and see if there would be an ability

Page 85

1 to incorporate either a portion or all of his
2 objections into a process or procedure.
3         MR. CROSBY: Why don't we take just a
4 few minutes break. I'm about -- probably about
5 done. I need to take care of piece of personal --
6 or other legal business real quick.
7         THE WITNESS: Okay. I got to get my
8 dog out of the cage.
9         THE VIDEOGRAPHER: We are going off
10 record. This is the end of media unit one. The
11 time is 3:24 p.m.
12         (A recess transpired.)
13         THE VIDEOGRAPHER: We are back on
14 record. This is the beginning of media unit two.
15 The time is 3:43 p.m.
16         (PLF. EXHIBIT 8, E-mail Chain with the
17 Top Line E-mail From Joshua Gruber Dated 5/21/14,
18 was marked for identification.)
19 BY MR. CROSBY:
20     Q. Mr. Kubic, you get the opportunity to
21 look over --
22     A. Yes.
23     Q. -- Exhibit 8?
24         Do you have an independent recollection
25 of -- of that, the contents of Exhibit 8?

22 (Pages 82 - 85)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 90

1    A.   Yes.  Could I stop you for one second?
2  Is it possible to --
3    Q.   Sure.
4    A.   -- pull the curtain over, because when
5  I look at you, I'm -- I'm squinting --
6    Q.   I understand.
7    A.   -- and I don't want my appearance on
8  the videotape to --
9    Q.   Would --
10    A.   -- affect this overall countenance --
11    Q.   We both may need --
12    A.   -- of my view.
13    Q.   -- a little powder on our --
14    A.   Yeah.
15    Q.   -- on our foreheads, but that's --
16    A.   She's getting --
17    Q.   -- okay.
18    A.   -- clear anyway.
19       COURT REPORTER:  Wait.  One at a time.
20       THE WITNESS:  That's a whole -- that's
21  a whole -- I -- I have little red dots, but go
22  ahead.
23       Yes.  It would have to go before the --
24  the voters.  It would be a referendum on changing
25  the form of government.

Page 91

1  BY MR. BUYCK:
2    Q.   And do you know whether there was a
3  referendum in 2011 that failed?
4    A.   I can't remember.
5    Q.   Do you know that that's the same
6  electorate that elected Ms. Walls and Mr. Beckert
7  in 2014 and reelected them both in 2018?
8    A.   Yes.  It would be the same electorate,
9  of course.
10    Q.   Okay.  But despite that electorate
11  being the ones who are the ones that elect for
12  those offices, those offices themselves are state
13  offices provided by the state constitution, are
14  they not?
15    A.   Yes.
16    Q.   So really there is -- there is state
17  officials being elected officials within the
18  county; is that correct?  They report --
19    A.   Yes.
20    Q.   -- to the department of revenue?
21    A.   Yes.
22    Q.   So each of those entities themselves
23  report to the department of revenue, being the
24  treasurer's office and the auditor's office?
25    A.   Not knowing what they're required to

Page 92

1  report, I would assume that your statement is
2  accurate.  I don't know their total operation, but
3  if they're state officials, then their
4  responsibility would be to the state.
5    Q.   Okay.
6    A.   They don't report necessarily to county
7  councilmen.
8    Q.   Right.  You talked about chain of
9  command earlier.  And under that chain of command,
10  you as the county administrator report to council,
11  correct?
12    A.   Yes.
13    Q.   So how many council members are there?
14  11?
15    A.   11.
16    Q.   And the 11 council members are each
17  themselves elected officials, correct?
18    A.   Yes.
19    Q.   And each of those 11 elected officials
20  come to council with differing opinions and
21  differing politics and differing views and -- and
22  they try to reach a consensus when they go have
23  meetings and votes and those type things, correct?
24    A.   Yes.
25    Q.   But if we kind of thought of this as a

Page 93

1  flow chart that you often see of organizations,
2  county council's not over the auditor or treasurer,
3  are they?
4    A.   No.
5    Q.   They're all elected officials
6  essentially on the same line, correct?
7    A.   Yes.
8    Q.   And if we had to go up the chain, we
9  would probably put DOR or the department of revenue
10  above the auditor and the treasurer?
11    A.   Yes.  If that's what the statute says,
12  yes.  That'd be --
13    Q.   Okay.
14    A.   -- correct.  And then you'd have the
15  voters at the very top.
16    Q.   The voters, because ultimately that's
17  who everybody has to reply to, correct?
18    A.   Yes.
19    Q.   In fact, the Supreme Court of South
20  Carolina has stated that the threat of displeasing
21  the electorate and losing reelection bids should be
22  sufficient check on the behavior of an elected
23  official.  Have you heard that verbiage before?
24    A.   No, but that doesn't surprise me.
25    Q.   Have you ever read a case entitled

24 (Pages 90 - 93)



Deposition of:

# D. Paul Sommerville

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

### Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 10

1  treatment of his staff?
2      A.  He -- he complained -- we're not
3  talking about his job performance now.
4      Q.  Right.
5      A.  We're talking about treatment.
6      Q.  Right.
7      A.  Okay.  Gary and I had -- Gary -- Gary
8  told me on several occasions that Jim Beckert
9  was -- I don't want to misquote Gary and it's very
10 difficult to try to remember his exact words, but
11 I'm trying.  I'm going to have to paraphrase
12 because I'm not sure of his exact words, that he
13 was harassing some employees.
14     Q.  Did Gary inform you of any action that
15 he had taken to protect those employees?
16     A.  Yes.  Gary -- I was chairman during
17 some of that -- oh, excuse me, I forgot to turn my
18 phone off.  I'm sorry.  Oh, shoot.  Sorry.  I
19 forgot to turn my phone off.
20     MR. BUYCK:  If you need to get that
21 call you're welcome to.
22     THE WITNESS:  What's that?
23     MR. BUYCK:  If you need to get that
24 call --
25     THE WITNESS:  No, no, no.  I -- it's --

Page 11

1  I'll call them back.
2      Again, would you repeat the question?
3  I'm sorry I was interrupted.
4  BY MR. CROSBY:
5      Q.  I believe the question was did Gary
6  ever tell you or did you learn of any actions that
7  Gary had taken to protect any of the County
8  employees from Jim Beckert's harassment?
9      A.  Yes.
10     Q.  What -- what did you learn?
11     A.  He told me on numerous occasions that
12 he had gone to Beckert's office and talked to him
13 and brought Beckert into his office to talk to him
14 to try to prevent some of that behavior.
15     Q.  Did you ever learn that he had blocked,
16 basically limited Jim Beckert's access to his
17 part -- part of the building?
18     MR. ANDERSON:  Objection.
19     THE WITNESS:  I am not aware that Gary
20 Kubic limited Beckert's access to any part of the
21 building or -- I don't remember that that was
22 discussed.
23 BY MR. CROSBY:
24     Q.  What about, did you become aware that
25 Gary Kubic, in conjunction with the sheriff's

Page 12

1  office, had installed cameras on the County
2  administration building because of Jim Beckert's
3  peering through Maria Walls' windows?
4      A.  Yes.
5      Q.  When did you learn of that?
6      A.  Well, let's see.  Gary left in -- I'm
7  not going to try to pinpoint that date because I
8  don't remember exactly when he left, but sometime
9  prior to Gary leaving he told me that -- he told me
10 he was installing cameras for that purpose.  Among
11 others, there were other -- it wasn't the only
12 purpose, but it was a purpose.
13     Q.  What you learned is that what prompted
14 it was a complaint from Maria Walls about Jim
15 Beckert peering through her window?
16     A.  Yes.
17     MR. ANDERSON:  Object to the form.
18 BY MR. CROSBY:
19     Q.  Did -- did he relay to you that Jim
20 Beckert would peer through his window as well?
21     A.  On numerous occasions, yes.
22     Q.  In your time on County Council, was the
23 issue of Jim Beckert's behavior toward employees
24 and/or Maria Walls ever discussed as an agenda item
25 or in an executive session item where there was

Page 13

1  some effort to determine if anything could be done
2  to stop it?
3      A.  I don't recall.
4      Q.  Did Gary Kubic ever express to you any
5  frustration about his inability to stop Jim
6  Beckert's behavior?
7      A.  Yes.
8      Q.  And -- and tell me -- tell me what you
9  recall about that.
10     A.  I can remember on several occasions
11 Gary being extremely frustrated because he -- he
12 couldn't figure out how to solve that problem, the
13 Beckert problem, in spite of his efforts.
14     Q.  I believe after Maria Walls filed her
15 lawsuit, you were interviewed by the -- the paper
16 and you indicated that -- you acknowledged the
17 complaints that had been received and indicated it
18 had been on an ongoing basis?
19     A.  (Indicating an affirmative response.)
20     Q.  Is that correct?
21     A.  That's correct.
22     Q.  And you're quoted in there as saying,
23 "We concluded that because he's an elected official
24 there wasn't a whole lot we can do."  And it says,
25 "I never felt comfortable with that because I just

4 (Pages 10 - 13)

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

**Page 14**

1  kept thinking there has to be something we can do
2  to help these poor people."
3      Do you recall saying that?
4      A.  I do.
5      Q.  When you say we made the decision or we
6  concluded that there wasn't much could be done was
7  that council concluded or are you talking about
8  County government?
9      A.  No, I'm really talking about Gary and
10  myself because my conversations were not with the
11  council itself.  We may have had individual
12  conversations.  I don't recall that we had a group
13  conversation, a council conserv--- conversation.
14  But I had many conversations with Gary about it and
15  so I guess the "we" I'm talking about really is
16  Gary and I.  I think I was probably chairman at
17  that time.
18      Q.  And as chairman you would have had a
19  lot of direct communications with the County
20  administrator?
21      A.  Daily.
22      Q.  Was there ever a -- a legal opinion
23  that was issued where that was looked at to see if
24  there was anything that could be done?
25      A.  I don't have direct knowledge of any

**Page 15**

1  conversations that may have taken place between
2  Gary and attorneys or Gary and the governor's
3  office or Gary and whoever.  I mean I had second --
4  I have secondhand information that those
5  conversations took place, but no firsthand
6  information.
7      Q.  Did you ever see any -- anything in
8  writing that came to the conclusion that nothing
9  could be done to stop Jim Beckert from harassing
10  employees and others on County property?
11      A.  I don't recall seeing anything like
12  that.
13      Q.  You certainly felt that -- or -- strike
14  that.
15      You certainly would have liked to have
16  been able to do something to protect these
17  employees from harassment?
18      A.  Oh, my gosh, yes.  Absolutely.
19      Q.  And if there would have been anything
20  within the power of the County administrator that
21  could have been done to protect them, that should
22  have been done, correct?
23      MR. BUYCK:  Note my objection.
24      THE WITNESS:  Would you repeat that,
25  please.

**Page 16**

1  BY MR. CROSBY:
2      Q.  If there was anything that could have
3  been done within the power of the County
4  administrator or department heads to protect from
5  Jim Beckert's harassing behavior, that should have
6  been done?
7      A.  You mean -- I'm still not understanding
8  --
9      Q.  Is it --
10      A.  -- exactly how you're wording the
11  question.
12      Q.  Well, would you agree that if there
13  were actions that could have been done to protect
14  from Jim Beckert's harassing behavior, that any
15  available avenue should have been pursued?
16      MR. ANDERSON:  Object to the form.
17      THE WITNESS:  Oh, absolutely.  Would
18  have been, certainly would have been by Gary and my
19  opinion would have been pursued by Gary Kubic and
20  would have been pursued by me in my role.  We just
21  never could come up with anything that seemed to
22  have any likelihood of success.  It was very
23  frustrating.
24  BY MR. CROSBY:
25      Q.  Did you ever have any conversations

**Page 17**

1  over the years with Maria Walls about her concerns
2  about Jim Beckert's behavior?
3      A.  Yes.  I can't tell you how many, but it
4  was probably quite a few.
5      Q.  Was that something that was a constant
6  topic between you and Maria where she would bring
7  up her concerns about Jim Beckert?
8      A.  Yes.
9      Q.  In your observations or in what she
10  told you, did you learn as to whether she feared
11  for her physical safety?
12      A.  I can't answer that.  I don't know the
13  answer to that.
14      Q.  But what she would relay to you was
15  that she was being harassed by Jim Beckert?
16      MR. ANDERSON:  Objection.
17      THE WITNESS:  Yes.
18  BY MR. CROSBY:
19      Q.  When --
20      A.  Excuse me, I just remembered I have got
21  another phone to turn off.  That's it.  I promise
22  there are no more.
23      Q.  When -- sometime after Maria Walls
24  filed her lawsuit against the County, did you learn
25  that Jim Beckert's access to the County

5 (Pages 14 - 17)

D. Paul Sommerville
Holland, Alicia v. Beaufort County et al

April 8, 2021

Page 18

1  Administration Building had been restricted?
2      A.  Yes.
3      Q.  Tell me how you came to learn of that.
4      A.  I believe that the then-County
5  administrator told us that -- told the County
6  Council at an executive session.  It wasn't -- it
7  was after Gary.  This was Ashley Jacobs.
8      Q.  She told council that she had taken the
9  steps to restrict his access --
10     A.  Correct.
11     Q.  -- and prohibit -- prohibit him from
12  having any contact with County employees?
13     A.  Yeah, let me, if I may, clarify
14  something I said a minute ago that we had no
15  executive sessions to talk about Jim Beckert.  That
16  was under Gary Kubic.  But I can't recall any, but
17  now we're moving forward to Ashley Jacobs and under
18  Ashley Jacobs we did have, I don't remember, one or
19  two, but we had at least one.
20     Q.  Okay.  Well, I was going to ask you
21  about Ashley Jacobs.  So did Ashley Jacobs ever
22  relay comp-- -- complaints about Jim Beckert's
23  harassment of County employees?
24     A.  Yes.
25     Q.  What do you recall about your

Page 19

1  conversations with Ms. Jacobs?
2      A.  A lot of her complaints about Jim
3  Beckert had to do with his job performance.
4      Q.  Well, would -- I'm talking about
5  specific to his harassment of County employees.
6      A.  Right.  I'm trying to recall if she --
7  she very well may have, but I can't -- I can't
8  swear that that happened, that she did, that she
9  talked about his harassment.  She very -- I'm sorry
10  to say I just don't specifically remember.  I had
11  so many conversations with so many people about his
12  harassment, that I'm not sure if she was one.
13     I had conversations with her about Jim
14  Beckert, but I'm not sure if harassment was part of
15  those con-- -- it may -- may well have been, but I'm
16  not sure.
17     Q.  Did she ever relay to you that Jim
18  Beckert exhibited harassing behavior toward her?
19     A.  She never said that directly to me.  I
20  think -- I think I may have heard that secondhand,
21  but I'm not sure.
22     Q.  Did -- did -- did you read in any
23  newspaper articles where she was quoted as that, as
24  having been harassed by Jim Beckert?
25     A.  If there was an article, I read it, but

Page 20

1  I just don't recall it.  I think I have read every
2  article involving Mr. Beckert that's been written.
3  I may have missed one because I'm out of town quite
4  a bit, but I usually catch up when I come back,
5  so...
6      Q.  Were there any -- ever any discussions
7  in executive session about Jim Beckert's treatment
8  of County employees?
9      A.  Yes.
10     Q.  When -- when would that have occurred?
11     A.  Sometime in the first half of 2020.
12     Q.  And what was -- what -- what brought
13  that to be an item of executive session?
14     A.  Well, my impression was that
15  Ms. Jacobs -- Ms. Jacobs was extremely frustrated
16  dealing with Jim Beckert, as was Gary Kubic, the
17  difference being that I had a lot more daily
18  communication with Gary Kubic than I had with
19  Ms. Jacobs simply because I wasn't the chairman
20  beginning in 2020.
21     Q.  What do you recall about --
22     A.  Or -- or '19, for that matter.
23     Q.  What do you recall about the specifics
24  that she was relaying to council about her
25  frustrations with Jim Beckert?

Page 21

1      A.  I recall that her primary focus was
2  getting the tax bills out and getting the --
3  closing the books, getting the CAFR out and his --
4  his role in those things, particularly the tax
5  bills.
6      Q.  Well, and what about specific to his
7  conduct toward County employees and others on
8  County property?
9      A.  It was discussed, but I don't remember
10  the particulars of it.
11     Q.  Was there any executive action
12  discussed that -- that was proposed to be taken
13  with regard to Jim Beckert's conduct toward County
14  employees?
15     A.  Yes.  I don't know who came up with
16  this idea.  I may have known at the time, but I
17  don't know now.  Somebody came up with the idea
18  that we could exclude him or, I'm sorry, that the
19  administrator had control over the building, the
20  County Office Building and, therefore, had the
21  authority to exclude him from that building and
22  that was going to be the action taken and, in fact,
23  that was the action taken.
24     Q.  Now, that was after the lawsuits were
25  filed?

6 (Pages 18 - 21)

D. Paul Sommerville                                                April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 22

1    A.  I can't -- I don't know what the
2  sequence was.
3    Q.  Other than that, do you recall any
4  action that was discussed with regard to Jim
5  Beckert's conduct toward --
6    A.  Yes, I heard some conversations about
7  going to the governor, but they were -- they were
8  secondhand conversations and so...
9    Q.  That was something that was discussed
10  in executive session or just something that was
11  talked with outside of?
12    A.  No, I don't recall it being discussed
13  in executive session, but I do recall it being
14  discussed between myself and Josh Gruber, Gary
15  Kubic.
16    Q.  With regard to the County administrator
17  having the power or control over access to the
18  buildings, whatever that timing was, was there any
19  vote on that or was it just a discussion that
20  actually, the County administrator, possessed that
21  power?
22    A.  My recollection is that in executive
23  session, Ashley Jacobs proposed that idea.  There
24  was never a vote, to my knowledge, and as a -- as I
25  recall, she proposed it as something within her

Page 23

1  authority to do.  It didn't require a vote.
2    Q.  The -- the County does have control
3  over the County property, correct?
4    A.  Absolutely.
5    Q.  So that's basically what she was
6  suggesting is, as in her role as the highest
7  ranking County employee, she had the authority to
8  make that -- take that type of action?
9        MR. BUYCK:  Note my objection.
10        THE WITNESS:  Correct.
11  BY MR. CROSBY:
12    Q.  There was no vote taken that night
13  to -- or in that meeting to give her special power?
14    A.  No, I only -- I only wish that I had
15  thought of it.  I only wish Gary Kubic had thought
16  of it.  As far as I know, Gary Kubic didn't think
17  of it, Josh Gruber didn't think of it, and I didn't
18  think of it, so, but somebody did at some point and
19  I think it -- so...
20    Q.  Do you re-- did you have more than
21  one conversation with Alicia Holland --
22    A.  Yes.
23    Q.  -- about Beckert's behavior towards
24  her?
25    A.  Yes.

Page 24

1    Q.  Was that something that she complained
2  to you about on multiple occasions?
3    A.  Yes.
4    Q.  Was the -- the complaint typically the
5  same, that Beckert was harassing her?
6    A.  Well, a lot of her complaints had to do
7  with his -- because she was the chief financial
8  officer and responsible for the finance of the --
9  of the County, she -- a lot of her complaints,
10  certainly not all of them, but a lot of them had to
11  do with his job performance.  But yes, she also
12  complained about his harassment.
13    Q.  Did she --
14    A.  To me.
15    Q.  -- complain to you that he was causing
16  her discomfort and stress?
17    A.  I'm struggling to answer that question
18  because I'm not sure if -- if my conversation with
19  her was privileged, so...
20    Q.  I don't -- I don't know how it would
21  be, but as her attorney, it's okay to tell me.
22    A.  Okay.  No, I think there were other
23  things that frustrated her as well, but yes, Jim
24  Beckert was certainly one of them.
25    Q.  Did she relay to you that she was

Page 25

1  stressed about whether that Jim was causing her
2  stress in -- in doing her job?
3    A.  Yes.
4    Q.  Let me give you a couple of documents
5  and I'll let him take a break so you can look at
6  them.
7        MR. CROSBY:  What exhibit numbers are
8  these?
9        MS AVANT:  (Inaudible.)
10        THE WITNESS:  Take a break, like make a
11  call?  Or take a break, like wait for them?
12        MR. BUYCK:  You can make a call.
13        MR. CROSBY:  Let's just go off the
14  record.
15        THE VIDEOGRAPHER:  We are going off
16  record.  The time is 2:42 p.m.
17        (A Recess transpired.)
18        (EXHIBIT 14, Letter, 3-6-18, was marked
19  for identification.)
20        (EXHIBIT 15, E-Mail, 5-21-19, was
21  marked for identification.)
22        (EXHIBIT 16, E-Mail, 8-7-20, was marked
23  for identification.)
24        (EXHIBIT 17, E-Mail, 8-19-20, was
25  marked for identification.)

7 (Pages 22 - 25)

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 34

1  that you were hearing were becoming more people
2  involved in it?
3      A.  The only reason I'm reluctant to say
4  yes on that is because the complaints were
5  consistent for a long period of time and I -- it
6  would be really hard for me to graph it and say
7  they went up or they went down, but there were a
8  lot of complaints over a long period of time.
9      Q.  You knew about these complaints.  Were
10  there others that -- that knew about them as well?
11      A.  I would be speculating, but I -- I
12  would certainly assume so.
13      Q.  Well, you had conversations with Gary
14  Kubic about it?
15      A.  Yes, I did.
16      Q.  You had conversations with Ashley
17  Jacobs about it?
18      A.  I did.
19      Q.  You had conversations with Alicia
20  Holland?
21      A.  Yes.
22      Q.  You had conversations with Maria Walls?
23      A.  Yes.
24      Q.  And each of them relayed similar
25  concerns to you?

Page 35

1      A.  Yes.
2      Q.  Did you ever have any conversations
3  from anyone from human resources, Susan Gregory
4  specifically?
5      A.  I don't believe so.  I believe my
6  conversations were with the administrator to whom
7  she reported.
8      Q.  How about any other members of council?
9      A.  Oh, yes.  Oh, yes.
10      Q.  Who else would you have had
11  conversations with at council?
12      A.  There was Stewart, Alice Howard, that I
13  can recall.
14      Q.  Do you remember any conversation with
15  Cynthia Bensch about her frustrations with Jim
16  Beckert's behavior?
17      A.  No, I do not.  That's not to say it
18  didn't happen, but I don't recall it.
19      Q.  You may have said this, but were you
20  frustrated by the inability to curb Jim Beckert's
21  behavior or is that another way to prevent --
22  protect the -- those on County property from his
23  harassment?
24      MR. ANDERSON:  Objection.
25      THE WITNESS:  Yes, absolutely.

Page 36

1  BY MR. CROSBY:
2      Q.  Is that because both the employees and
3  others accessing County property should not be
4  subjected to harassing, abusive behavior?
5      MR. ANDERSON:  Objection.
6      THE WITNESS:  Yes, and I felt powerless
7  and it was an awful, awful feeling.  I -- I
8  sympathized with them.  I had many conversations
9  with them.  It was very frustrating.
10      MR. CROSBY:  I'm going to take just a
11  quick break and we'll get finished up.  Okay?
12      THE WITNESS:  Okay.  Sure.  Sure.
13      MR. CROSBY:  Go off the record?
14      THE VIDEOGRAPHER:  We are going off
15  record.  The time is 3:10 p.m.
16      (A brief recess was taken.)
17      THE VIDEOGRAPHER:  We are back on
18  record.  The time is 3:15 p.m.
19  BY MR. CROSBY:
20      Q.  During the several years that you were
21  receiving complaints about Jim Beckert's behavior
22  and having discussions with other members of
23  council, was there ever a consideration of filing a
24  resolution condemning Jim Beckert's behavior?
25      A.  At what level?

Page 37

1      Q.  Well, at the council level.
2      A.  Council level.  I may have heard it
3  discussed, but I don't recall that it ever got any
4  traction.
5      Q.  There was no motion or -- ever made
6  with regard to adopting a resolution of
7  condemnation of his behavior?
8      A.  Formally, no.
9      Q.  Was it discussed -- discussed
10  informally?
11      A.  It may have been and I'm -- I'm not
12  sure, but I may have heard certain -- some
13  individuals discussing that possibility.
14      Q.  Would the -- was that something that
15  would have passed council?
16      MR. BUYCK:  Note my objection.
17  BY MR. CROSBY:
18      Q.  Based on your experience?
19      A.  That would be pure conjecture.
20      Q.  It just never got to that -- that
21  point?
22      A.  No.
23      Q.  Prior to the discussion with Ashley
24  Jacobs, it sounds like there was no forward action
25  with regard to Jim Beckert ever formally discussed

10 (Pages 34 - 37)



Deposition of:

## D. Paul Sommerville

*April 8, 2021*

In the Matter of:

## Holland, Aliciav. Beaufort County et al

### Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville　　　　　　　　　　　　　April 8, 2021
Holland, Alicia v. Beaufort County et al

Page 26

1　　　　THE VIDEOGRAPHER: We are back on
2　record. The time is 2:55 p.m.
3　BY MR. CROSBY:
4　　　Q. Mr. Sommerville, can you get the
5　document that's marked as Exhibit 16?
6　　　A. Yes.
7　　　Q. Is that an e-mail from Alicia Holland
8　to you?
9　　　A. Yes.
10　　　Q. Do you recall why she would have been
11　forwarding you her resignation letter at this point
12　in time?
13　　　A. I'm sorry?
14　　　Q. Do you recall why she would have
15　been -- I think she had already left the County's
16　employment by this time. Do you know why she would
17　have been forwarding you her resignation letter?
18　　　A. I don't recall specifically, no.
19　　　Q. Did y'all bump into each other or have
20　a conversation whereby that came up and later she
21　sent you this?
22　　　A. I recall have -- well, I had numerous
23　conversations with her since she left. I recall
24　one conversation that had to do with her
25　resignation and I think I remember saying, "I have

Page 27

1　never seen your resignation" so that may have
2　triggered it.
3　　　Q. And she later forwarded that to you
4　with her comments about her decision to leave?
5　　　A. Yes, yes.
6　　　Q. And then Exhibit No. 17 looks like a
7　reply to an e-mail received from you to Alicia
8　Holland. Is that where she wrote back and said
9　that, "Jim Beckert is a sick and dangerous
10　individual. He has harassed and bullied Maria,
11　myself, and Ebony that I am aware of. There may be
12　others I'm not aware of. Jim is the primary reason
13　I left my employment with Beaufort County."
14　　　　　Did you forward to Alicia Holland a
15　copy of the lawsuit that was filed by Maria Walls?
16　　　A. I may have. I don't -- I don't
17　specifically recall. I -- I'm trying to think if I
18　had it. I'm pretty sure I had it.
19　　　Q. I mean, it has at the top of it, the
20　subject line in -- in that e-mail, the next e-mail
21　down is from you to Alicia Holland and the subject
22　is "Maria Walls versus Beaufort County."
23　　　A. I don't doubt that I did. I just don't
24　specifically recall it.
25　　　Q. Do you know if you forwarded it to

Page 28

1　anyone else?
2　　　A. I don't recall.
3　　　Q. It looks like Ashley Jacobs had sent it
4　to yourself and the other members of -- of council.
5　　　A. That's what it appears to me. It
6　appears that I received it and forwarded it to
7　Alicia.
8　　　Q. And where she indicates in that first
9　line where she says that, "He," being Jim Beckert,
10　"has harassed and bullied Maria, myself," Maria and
11　herself, you would agree that that's -- Jim
12　Beckert's conduct was, toward Maria Walls and
13　Alicia Holland, was -- would be considered as
14　harassment and bullying in nature?
15　　　A. Well, I never witnessed any of this
16　firsthand, but this is the way Jim Beckert's
17　actions were characterized to me by Maria and
18　Alicia.
19　　　Q. All right. When they would talk to you
20　about it, they would relay it in those terms, that
21　he was a bully and that he was harassing them?
22　　　A. Yes.
23　　　Q. Did you ever witness Jim Beckert
24　exhibit that type of behavior to anyone?
25　　　A. The only thing I recall seeing him do

Page 29

1　was he had a phone that he liked to carry out where
2　everybody could see it. At least that was my
3　impression. Maybe some people carry their phone
4　anyway, maybe some people just walk around with it.
5　But I guess it was Maria or Alicia who said that --
6　that he was recording them and as a -- as a method
7　of harassing them.
8　　　Q. And you -- you had witnessed that
9　yourself?
10　　　A. Well, I witnessed him -- witnessed him
11　with a phone in his hand, but I don't know. I
12　can't say what he was doing with it. I mean, I --
13　　　Q. It appeared to you that he could have
14　been recording?
15　　　A. He certainly could have been.
16　　　　　MR. ANDERSON: Object to the form.
17　BY MR. CROSBY:
18　　　Q. When he would walk around with it, he
19　would have the camera side pointing out?
20　　　A. I don't recall.
21　　　Q. On Exhibit 15, it references hiring an
22　outside firm to help determine if the millage had
23　been calculated correctly. Do you recall that?
24　　　A. Yes.
25　　　Q. And that the cost was going to be

8 (Pages 26 - 29)

Ex. 3
Beaufort County Adopts Testimony:
Topic 13: The Role of County Council Over the Auditor's
Office and/or Responsibilities



Deposition of:

# Suzanne D. Gregory

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Suzanne D. Gregory
April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 26

1  him in that transitional period. What were the
2  circumstances behind you meeting him during that
3  period?
4      A.  I don't recall exactly, but I believe
5  it was just a -- somewhat of a meet-and-greet and
6  give him the general information about human
7  resources and -- and answer questions for him, as I
8  recall.
9      Q.  And the general information about human
10 resources, would that have been providing him with
11 a copy of this handbook?
12     A.  I don't recall.
13     Q.  Do you recall if he was provided a copy
14 of the Computer and Information Systems Acceptable
15 Use Policy?
16     A.  I don't recall.
17     Q.  I want to bring around what's being
18 marked as Exhibit 2 and 3.
19         (PLF. EXHIBIT 2, Computer Information
20 Systems Acceptable Use Policy, was marked for
21 identification.)
22         (PLF. EXHIBIT 3, Orientation Checklist,
23 was marked for identification.)
24     MR. J. ANDERSON:  Thank you.
25     MR. BUYCK:  Thank you.  Here you go,

Page 27

1  Ms. Jacob [sic].  Take your time and look through
2  those.
3  BY MS. AVANT:
4      Q.  Have you had a chance to review both
5  documents?
6      A.  Yes.
7      Q.  Exhibit 2 right there in front of you
8  is the Computer Information Systems Acceptable Use
9  Policy we spoke about a little earlier.
10     A.  Uh-huh.
11     Q.  We spoke about it earlier, it was in
12 the -- in the handbook that was provided to
13 employees.  Based on -- and I understand you
14 haven't been there for a few years, but is it your
15 understanding that this policy in Exhibit 2 is
16 essentially the same as what is in the handbook?
17     A.  Yes.
18     Q.  And on the very last page of that
19 policy, I believe it's Page 8, it looks like
20 Mr. Beckert has signed this policy in March of
21 2015.  Is that your understanding?
22     A.  That's what it -- yes.  Yes.
23     Q.  And would that have been during his
24 transition period?
25     A.  I don't recall the date of his swearing

Page 28

1  in, but I -- I would -- I would think so, yes.
2      Q.  Do you recall if you were the -- the
3  member of the HR department to sit down and go over
4  these documents with Mr. Beckert?
5      A.  I was not.  We -- we have someone -- or
6  a few people that -- that did the new hire
7  orientation, and I was not one of those.
8      Q.  Okay.  And Exhibit Number 3 right in
9  front of you is that orientation checklist we
10 talked about earlier.  It appears from -- from
11 Exhibit 3 that Mr. Beckert signed this orientation
12 checklist on the same date that he signed this
13 Computer Information Systems Acceptable Use Policy;
14 is that correct?
15     A.  Yes.
16     Q.  So based off this -- excuse me --
17 orientation checklist and the fact that it's signed
18 by Mr. Beckert, does that indicate to you that he
19 has been through orientation with Beaufort County?
20     A.  Yes.
21     Q.  And is this the same orientation
22 checklist that's used for county employees?
23     A.  Yes.
24     Q.  And underneath the -- the received
25 section of that orientation checklist, there is a

Page 29

1  section for personnel policies and procedures
2  manual.  And that is checked, correct?
3      A.  Yes.
4      Q.  Which would indicate that he has
5  received the personnel policies and procedures of
6  Beaufort County?
7      A.  Yes.
8      Q.  And you testified earlier that those
9  procedures and policies were authorized and
10 approved by county administration?
11     A.  Yes.
12     Q.  Going back to your experience with
13 Mr. Beckert, you indicated earlier that there were
14 several instances that led to that -- that tense
15 relationship between you and Mr. Beckert?
16     A.  Yes.
17     Q.  Do you recall any of those instances
18 specifically?
19     A.  Not specifically.  I -- I recall one in
20 which he wanted -- I don't recall what it was he
21 wanted to do, but he wanted to do something with
22 one of his employees as far as -- I believe it was
23 a disciplinary action or something that -- that was
24 contradictory to -- and I don't -- either
25 employment law or our policy.  And there was a --

8 (Pages 26 - 29)

Suzanne D. Gregory
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 30

1    MR. BUYCK: I apologize.
2    THE WITNESS: -- there was some back
3    and forth about that instance.
4    BY MS. AVANT:
5    Q. Did you ever receive any complaints
6    about Mr. Beckert?
7    A. Yes.
8    Q. Do you recall from who?
9    A. A number of people, at least in general
10   conversation.
11   Q. Do you recall any names?
12   A. Oh. Well, certainly I know Alicia
13   Holland was one, Melissa Beere in my office was
14   one, Monica Spells, Maria Walls, Ebony Sanders, I
15   believe Katherine Mead.
16   Q. I'm sorry. Can you repeat that last
17   name?
18   A. Yeah, Katherine Mead. Those are the
19   names I remember right off.
20   Q. And are all the names you just
21   mentioned women?
22   A. Yes.
23   Q. Do you remember what Melissa -- you
24   said Beere?
25   A. Beere.

Page 31

1    Q. Beere. And is that B-E-A-R-Y?
2    A. B-E-E-R-E.
3    Q. B-E-E-R-E. All right. Do you remember
4    what her complaint about Mr. Beckert was about?
5    A. Not specifically. It was a general
6    conversation she had with him and had to do with
7    rudeness.
8    Q. Do you remember what Monica Spells's
9    complaint was about?
10   A. Not specifically. And it wasn't a
11   single conversation. She -- I believe she had
12   mentioned several times where she had less than
13   pleasant conversations with him.
14   Q. So Monica Spells had approached you
15   multiple times about Mr. Beckert?
16   A. She didn't approach me about that, but
17   Monica and I had a lot of conversations, and he
18   had -- he had been mentioned several times in some
19   of our conversations.
20   Q. Did you document those conversations
21   with Ms. Spells?
22   A. No.
23   Q. Did you document the conversation with
24   Ms. Beere?
25   A. No.

Page 32

1    Q. Did you document the complaint by
2    Ms. Holland?
3    A. I don't recall.
4    Q. Did you document the complaint from
5    Maria Walls?
6    A. I don't believe that was in the form of
7    a complaint. There again, I think that was just a
8    conversation discussing his -- his demeanor.
9    Q. Do you remember the -- the conversation
10   between you and Ebony Sanders about Mr. Beckert?
11   A. I don't.
12   Q. What about between you and Katherine
13   Mead?
14   A. Not specifically, no.
15   Q. Did you document the conversation
16   between you and Ebony Sanders?
17   A. I don't recall. I don't believe so.
18   Q. Did you document the conversation
19   between you and Katherine Mead?
20   A. No.
21   Q. So what needs to be done for a
22   conversation between you and an employee of
23   Beaufort County where another member of Beaufort
24   County is mentioned in a negative way, a negative
25   interaction like these ladies have had? What would

Page 33

1    need to happen for you to document that? Would
2    they have to use the word I want to file a
3    complaint?
4    A. No. But if -- if -- if Mr. Beckert
5    comes up in general conversation when we're talking
6    about three or four things and it's just a comment
7    about him being rude on a phone call, that -- that
8    wouldn't be documented.
9    Q. Were each and every one of these
10   conversations just a comment within another
11   conversation?
12   A. As far as I can recall, yes.
13   Q. And after hearing two or three of these
14   comments from two or three of these ladies, did you
15   feel the need to document his behavior, seeing as
16   it was happening to multiple women?
17   A. His behavior was -- I don't believe it
18   was specific to women, the rudeness that was mostly
19   talked about. And I be -- I -- I am certain
20   administration was aware of the situation.
21   Q. All right. And what makes you say that
22   you don't believe it was strictly to women, his
23   behavior?
24   A. I recall conversations about him
25   getting -- well, I'm aware of conversations he had

9 (Pages 30 - 33)

Suzanne D. Gregory                                   April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 34

1  with -- I believe it was the deputy county
2  administrator at the time and another person,
3  who I'm not sure what capacity he worked in at the
4  time, where it was very confrontational.
5      Q.  Did any of these ladies indicate to you
6  that Mr. Beckert was partaking in any other
7  behavior that was more than rude, but maybe took it
8  a step further?
9      A.  Not that I can recall, no.
10     Q.  Are you aware that Mr. Beckert would
11 stare into Maria Walls's window outside of her
12 office?
13     A.  I was -- I was told that, yes.
14     Q.  Do you recall who told you that?
15     A.  I believe it was the county
16 administrator.
17     Q.  And who was that at that time?  I know
18 Beaufort County has been through quite a few
19 lately.
20     A.  Gary Kubic.
21     Q.  And was that documented in your
22 department?
23     A.  Not in my department.  I believe Gary
24 Kubic may have documented that.
25     Q.  Why weren't these complaints or these

Page 35

1  comments documented anywhere?
2      A.  Comments weren't documented because it
3  was casual conversation that -- that I wasn't
4  approached in a serious manner.  It was -- it was
5  almost just here's another Jim Beckert situation,
6  you know, here -- and -- and it -- no one walked --
7  no one walked into my office of the list I gave you
8  and said:  I have a problem with Jim Beckert.  It
9  was just we were talking about this, the other, and
10 then his name would come up.
11     Q.  And what was the -- do you remember the
12 context of the other conversation?  Was it other
13 HR-related issues?
14     A.  I don't recall.
15     Q.  I guess I'm trying to figure out your
16 definition of a comment --
17     A.  Uh-huh.
18     Q.  -- to figure out whether it's something
19 that should have been documented, because we looked
20 at the -- the handbook earlier, and it states in
21 there that any complaint should be documented in
22 written form.
23     A.  Uh-huh.
24     Q.  And when you've got multiple, as you've
25 termed them, comments about the same individual,

Page 36

1  I'm trying to figure out why they weren't written
2  down somewhere.  So what is your understanding of
3  comment?
4      A.  A comment is something stated in a
5  conversation that -- I -- I don't know how to
6  answer that.
7      Q.  If someone were to call you about a
8  situation involving employee A and employee B, that
9  they were not involved in, just something that they
10 observed --
11     A.  Uh-huh.
12     Q.  -- would that be documented or would
13 employee A have to come sit down in your office in
14 a serious manner for you to document that?
15     A.  If someone came to me about employee A
16 and B having a conversation or a problem, I would
17 likely contact employee A or B to look into it if
18 it was a serious matter.
19     Q.  And did you ever contact Jim Beckert
20 about the, as you -- as you have termed them,
21 comments against him?  Did you ever contact him to
22 discuss them with him?
23     A.  No.  I -- I made administration aware
24 of anything that went on because they were dealing
25 with him as an elected official at the time the

Page 37

1  best they could.
2      Q.  And what were they dealing with him on?
3  Was there another issue going on that you're aware
4  of?
5      A.  I -- I -- I believe there were several
6  issues going on with him, but one was his behavior.
7      Q.  And when there is an issue with his
8  behavior, he was the director of human resources,
9  you were not involved in that?
10     A.  No, not directly.  Because, there
11 again, he's an elected official, not a county
12 employee, and I had no authority over him.
13     Q.  So, if human resources doesn't have any
14 authority over him as an elected official, why did
15 human resources require him to complete an
16 orientation checklist and sign the Computer and
17 Information Systems Acceptable Use Policy and gave
18 him a handbook?
19     A.  It's my understanding at the time this
20 was done, he was in the transition period.  And
21 before he was sworn in, he was considered a county
22 employee -- a temporary county employee.  That's
23 why he had to complete this paperwork.
24     Q.  Is it your understanding that once he
25 became an elected official, he no longer had to

10 (Pages 34 - 37)

Suzanne D. Gregory                                    April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 38

1   abide by the handbook provided by Beaufort County?
2       A.   It's my understanding once he became an
3   elected official, I had no authority to force him
4   to abide by the handbook.
5       Q.   And where did that understanding come
6   from?  Did someone tell you you didn't have
7   authority over an elected official?
8       A.   I don't know if that was told to me
9   directly.  But there were a lot of conversations
10  about -- and Mr. Beckert forwarded a lot of
11  information about the authority of an elected
12  official.  And because he was not a county
13  employee, as the HR director, I would not have
14  authority over him, just like I would not have
15  authority over a vendor that walked in.  If there
16  was something going on with a vendor, I would let
17  administration know.
18      Q.   Which department enforces the Computer
19  and Information Systems Acceptable Use Policy?
20      A.   If -- if an employee violated that
21  policy and it was brought to the attention of the
22  HR department, we would work with the department
23  head, as I recall, to decide what to do with that
24  employee and -- and take necessary disciplinary
25  action.

Page 39

1       Q.   Okay.  And whenever we talked about
2   that policy earlier, the scope in that policy
3   didn't limit it to employees --
4       A.   Uh-huh.
5       Q.   -- that scope would apply to, as you
6   testified earlier, anyone that was given county
7   e-mail, county computer, county network systems,
8   county-issued phone system, which would include an
9   elected official, correct?
10      MR. J. ANDERSON:  Object to the form.
11  BY MS. AVANT:
12      Q.   You can still answer.
13      A.   I -- I believe it would, yes.
14      Q.   So would HR enforce the Computer and
15  Information Systems Acceptable Use Policy if an
16  elected official violated it?
17      A.   No.
18      Q.   So an elected official is not expected
19  to abide by the Computer and Information Systems
20  Acceptable Use Policy?
21      A.   No.  If I was made aware of a
22  violation, I would make administration aware.
23      Q.   And so you rely on county
24  administration to enforce any policies to be taken
25  up with an elected official?

Page 40

1       A.   With elected --
2       MR. BUYCK:  Note my objection.
3       THE WITNESS:  With elected officials,
4   yes.
5   BY MS. AVANT:
6       Q.   Okay.  And why is that?
7       A.   Because I have no authority over
8   elected officials.
9       Q.   Has --
10      A.   They're not county employees.
11      Q.   Has county administration told you you
12  have no authority?
13      A.   I don't remember if they directly told
14  me that, but that is my understanding.
15      Q.   Was one of those instances with Jim
16  Beckert when he was forwarding statutes to you?
17  Was him sending you, as I believe you just
18  mentioned, him forwarding you a statute letting you
19  know that you had no authority over him, was that
20  one of those instances?
21      A.   I cannot recall for sure.  I believe he
22  had forwarded something to that effect before.
23  Yes.
24      Q.   And do you recall what you did once you
25  received that information from Mr. Beckert?

Page 41

1       A.   I believe any confrontational e-mails I
2   got from Mr. Beckert I forwarded either to the
3   deputy county administrator or the county
4   administrator.
5       Q.   Did you ever inform anyone in county
6   administration about the comments that were made to
7   you about Mr. Beckert?
8       A.   I cannot recall for certain, but I
9   believe I would have.
10      Q.   You believe you would have?
11      A.   I believe so, yes.
12      Q.   Is it your understanding that -- that
13  county administration and county counsel were aware
14  of numerous complaints by females of Beaufort
15  County against Mr. Beckert?
16      MR. BUYCK:  Note my objection.
17      MR. J. ANDERSON:  Object to form.
18      THE WITNESS:  I don't know if it was
19  just females.  I don't recall that.  But I believe
20  they were aware of complaints regarding
21  Mr. Beckert.
22      MS. AVANT:  I'm going to walk around
23  and distribute Exhibit Number 4.
24      (PLF. EXHIBIT 4, The Island Packet
25  Article Dated 8/19/20, was marked for

11 (Pages 38 - 41)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II – 9/27/2021

## Page 13

1  the discovery that's been served on the county?
2      A  He's aware that we've been served with
3  discovery.
4      Q  And, of course, you, as a lawyer,
5  understand --
6      A  Sure.
7      Q  -- the county would have an obligation to
8  preserve --
9      A  Right.
10      Q  -- any discoverable material?
11      A  Right, right.
12      MR. BUYCK:  And just for the record, I've
13  given you the issues set forth regarding
14  videos and that we don't have the capacity to
15  maintain the videos for a lengthy period of
16  time.  There have been several letters
17  exchanged between your office and my office
18  relative to that, and if there's something
19  that y'all want within the time frames in
20  which we're able to get it and you're aware of
21  it, then let us -- let us know what you're
22  aware of, and we'll try to preserve it the
23  best we can, but otherwise, we don't have the
24  capacity to do so.
25      And I'm just -- I'm just putting this out

## Page 14

1  there again because I don't want it to look
2  like we're trying to hide something from you.
3      MR. CROSBY:  Well, just know you have an
4  obligation, if they know there's video of him
5  going in there, to preserve it, and that can
6  be preserved right immediately.
7      MR. BUYCK:  This is the first I've heard
8  of it, but I'll do whatever is necessary, but
9  like I said, if y'all will let me know of
10  things, I'll be glad to try to preserve it.
11      MR. CROSBY:  Well, I just let -- I just
12  let you know about that.
13      MR. BUYCK:  That's fine.
14      MR. CROSBY:  But they already knew, so I
15  would presume that it's been preserved.
16      MR. BUYCK:  Okay.  First I've heard of
17  it, so --
18      THE WITNESS:  If it exists.  I don't even
19  know if it exists.
20      MR. CROSBY:  I think our next exhibit is
21  Number 18.
22      (Exhibit 18, 8/15/16 Email to Cadd
23      from Beckert, was marked for
24      identification.)
25      MR. CROSBY:  I think the next exhibit's

## Page 15

1  supposed to be -- is 18 in what we've marked
2  so far.
3  BY MR. CROSBY:
4      Q  Do you recognize the attachment to
5  Exhibit 18?
6      A  I do.
7      Q  Just explain to me what this is.
8      A  All right.  Let me just read it fully for
9  a second.
10      Q  Yeah.  Take your time.
11      A  I remember seeing it, but it's been a
12  long time.
13      All right.  Yes.  So I'm sorry.  Your
14  question is?
15      Q  What is the attachment to Exhibit 18?
16      A  Being a lawyer, I can be long-winded, and
17  I apologize for that, so if I get long-winded and
18  don't answer your question, just kind of get me
19  back to where you want to be.
20      But what this document is is it's a
21  letter from Gary Kubic to basically all the elected
22  officials in the county regarding Beaufort --
23  county council's decision to adopt a new personnel
24  handbook for the first time since 2005.  And so
25  this new handbook went into effect, I think by

## Page 16

1  resolution of council, on August 1st, 2016, and the
2  regulations and the rules that are set forth in
3  that personnel handbook apply only to folks over
4  whom the administrator has authority, hiring and
5  firing authority.  The county administrator's
6  authority does not extend to the offices of the
7  elected officials.
8      And so what Mr. Kubic decided he wanted
9  to do was to provide the elected officials,
10  including the magistrates who are selected by a
11  state senator, the opportunity to adopt -- to
12  review the handbook and to decide whether or not
13  they wanted to utilize it for their personnel, and
14  if they did, he wanted them to sign this document
15  so that we could then -- HR could then process
16  payroll, vacation times, all kinds of benefits,
17  everything, for the employees for the elected
18  officials the same as the employees over whom he
19  had authority.
20      Q  And so is that sort of an exchange
21  between the county and the elected official where
22  if they sign on to the -- be bound by the handbook,
23  that the county then provides certain services?
24      A  That's exactly right.
25      Q  And did Jim Beckert, as an elected

4  (Pages 13 to 16)

Thomas J. Keaveny, II - 9/27/2021

Page 17

1  official, sign onto the handbook?
2      A   I don't know that I ever saw his
3  signature, but it's my understanding that he did,
4  yes.  I say I don't know.  I don't recall seeing
5  it, but I might have.  But I think all the elected
6  officials decided to go that way, although I don't
7  know about the legislative delegation.  I see
8  Representative Erickson's name is on here, and I
9  really don't know what became of that.
10     Q   I'll pass you Exhibit Number 19.
11         (Exhibit 19, 3/28/17 Email to
12         Keaveny from Gruber, was marked for
13         identification.)
14  BY MR. CROSBY:
15     Q   And I just wanted to point to the --
16  maybe that third paragraph, Tom.  Looks like an
17  email from you to Josh Gruber.  I guess you're
18  addressing Jim Beckert there?
19     A   It looks like it's from Josh Gruber to
20  me, even though it then says Jim.  So I think I
21  remember this situation, but let's make sure.
22  Yeah, I think this is right.  Hold on a second.  Do
23  you want me to -- are you going to ask me --
24     Q   No.  I was just -- if we look at that
25  third paragraph Mr. Gruber writes there, it says:

Page 18

1  By electronic communication to the county
2  administrator, you voluntarily adopted this policy.
3      A   There you go.
4      Q   So would that be confirmatory?
5      A   Yeah, yes, sir.
6      Q   And this is where Mr. Beckert is
7  attempting to require an employee to give 30 days
8  notice --
9      A   Right.
10     Q   -- of her leaving the county's
11  employment?
12     A   Right.
13     Q   And Mr. Gruber is pointing to Mr. Beckert
14  that he's not allowed to do that?
15     A   Uh-huh.
16     Q   That's a yes?
17     A   Yes.
18     Q   And Maria Walls, likewise, signed the
19  agreement to be bound by the Beaufort County
20  employee handbook?
21     A   I don't know that I ever saw her
22  signature, but by virtue of things that have gone
23  on with Maria and her employees, I have to believe
24  that she agreed to be bound by it.
25     Q   In order to accept the -- to get the

Page 19

1  services from the county, there would have to be
2  that agreement in place?
3      A   And I understand she's -- her employees
4  have been receiving those services, so I assume
5  that she signed the document.
6      Q   And once the elected official signs that,
7  the memorandum, the agreement to be bound by the
8  employee handbook and have their personnel, their
9  employees abide by the handbook, the county, as is
10  pointed out in Exhibit 19, expects the elected
11  officials and their employees to abide by the
12  handbook?
13         MR. BUYCK:  Note my objection.
14         THE WITNESS:  You know, I would say that
15  in general, the answer to that question is
16  yes, but I don't think that it gave -- it
17  certainly didn't give -- in my opinion, it
18  didn't give the county administrator authority
19  over their employees.
20  BY MR. CROSBY:
21     Q   Right, but you expected that the
22  employees abide by the various provisions in the
23  handbook?
24     A   Sure, you know, not to take more vacation
25  than you are allotted and what -- all the

Page 20

1  regulations that are in there, sure, grievance
2  procedures, for instance.
3      Q   To follow the anti-harassment policies?
4      A   Yes, sir.
5      Q   Going back to the office space, tell me
6  what is the -- that interplay with regard to office
7  space between the county and elected officials.
8      A   So it's been a long time since I've
9  looked at the statute that applied, but the state
10  statute requires the counties to provide the
11  elected officials offices and office equipment and
12  office supplies, the things that -- I think the
13  statute is very broad and vague.  It just -- I
14  think it says something like that the county shall
15  provide the elected officials the resources
16  necessary to perform their functions, and so that's
17  what we do.  That's what the county does.
18     Q   And where that office space is located
19  is -- that is within the discretion of the county?
20         MR. BUYCK:  Note my objection.
21         THE WITNESS:  Well, at some point it is.
22  I think it's difficult to -- I think there's
23  some case law out there that indicates it's
24  difficult to move -- instruct officials to
25  move.  We haven't ever tried -- I haven't ever

5  (Pages 17 to 20)



Deposition of:

# Gary T. Kubic

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 42

1 didn't have to feel that way, that I was there to
2 help all involved, even Mr. Beckert.
3 BY MR. CROSBY:
4      Q.  Employees feeling uncomfortable or
5 nervous in the presence of Mr. Beckert, when
6 they're feeling like that, that interferes with
7 number one, isn't it, and that's producing the
8 product for the public?
9      MR. J. ANDERSON:  Object to the form.
10      THE WITNESS:  I've been a -- I was an
11 administrator for 43 years.  People who can't focus
12 on the mission at hand 100 percent won't produce a
13 product that is 100 percent.
14      So, if you have gaps in the process,
15 whether it be individuals or IT software or
16 whatever, you try to find ways to fill the gaps so
17 that the product is the best it can be.
18      And in this case, those two units, the
19 auditor and treasurer, I cannot express how
20 critical that function was.  And -- and we
21 facilitated -- you know, when you reach a point
22 where you can't produce a tax bill properly, I
23 decided that we would produce a written protocol
24 that the treasurer and the auditor would follow.
25      The protocol was created.  It was

Page 43

1 submitted for review to Mr. Beckert, to Maria
2 Walls, to county council for comment.  Came back
3 in, we refined the product, went back to council
4 and said:  Here's how we're going to produce the
5 tax bill if we follow step one to step two to step
6 three to step four.
7      I don't know if they use that still
8 today or not, but it was an attempt to make sure
9 that everything was able to be completed on a
10 timely basis for the tax bills to go out.
11      MR. CROSBY:  Pass that around.
12      (PLF. EXHIBIT 7, E-mail Chain with the
13 Top Line E-mail from Cynthia Bensch Dated 9/22/16,
14 was marked for identification.)
15      MR. CROSBY:  This is Exhibit Number 7.
16      MR. BUYCK:  You got a Bates number?
17      MR. J. ANDERSON:  No.
18      MR. BUYCK:  Cynthia Bensch.
19      MR. J. ANDERSON:  Ronnie, would you
20 read off the date of the two in the front?
21      MR. CROSBY:  The -- the top of it is
22 an -- is an e-mail forwarded September 22nd, 2016,
23 from Cynthia Bensch to Maria Walls.
24      MR. J. ANDERSON:  Thank you.
25      MR. BUYCK:  Chelsi, do you happen to

Page 44

1 know the Bates number of what that would be or how
2 it was identified in your discovery?  It might help
3 me without a copy.
4      MS. AVANT:  I think the e-mail would
5 begin with Bates number 000283.
6      MR. BUYCK:  Okay.  Thank you.  And that
7 was -- is that the Walls?
8      MS. AVANT:  That's in the Walls case.
9      MR. BUYCK:  Okay.
10      MS. AVANT:  And for some reason, that's
11 not -- that's what -- it's on my screen, but if
12 that's not right, let me know.
13      MR. BUYCK:  That's fine.  I'm just
14 trying to pull it up.
15      THE WITNESS:  DOR.  I forgot about
16 this.
17      MR. CROSBY:  Mr. Kubic, while you look
18 at that, let me take a quick break off the record
19 and give you a minute to look that over.  I'm going
20 to --
21      THE VIDEOGRAPHER:  We are going off
22 record.  The time is 2:11 p.m.
23      (A recess transpired.)
24      THE VIDEOGRAPHER:  We are back on
25 record.  The time is 2:21 p.m.

Page 45

1 BY MR. CROSBY:
2      Q.  Before we went off, Mr. Kubic, I passed
3 to you Exhibit 7.  Did you have an opportunity to
4 look that over?
5      A.  Yes.
6      Q.  And this is an e-mail exchange between
7 you and someone named Cynthia Bensch?
8      A.  Councilman Bensch.
9      Q.  She was on council at the time?
10      A.  Yes.
11      Q.  And what -- what was the -- the general
12 nature of what these communications related to?
13      A.  Generally speaking, this is
14 communications that were generated as a result of
15 trying to develop a road map -- a written road map
16 of duties and responsibilities that involved the
17 auditor's office and the treasurer's office, county
18 administration so that each of the areas of
19 responsibility, as this memorandum had indicated,
20 these various steps would be followed, and we would
21 ultimately lead to the generation of a tax bill and
22 the collection of a tax bill.
23      Q.  Was that the beginning efforts of
24 creating that protocol that you were referring to
25 earlier?

12 (Pages 42 - 45)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

**Page 46**

1    A.   Yes.

2    Q.   And what necessitated the need to

3  develop that?

4    A.   Well, it became clear that -- to me

5  that the ability of the auditor and the ability of

6  the treasurer to coordinate their actions in

7  concert to produce a tax bill was very difficult if

8  not impossible.  And so in the alternative to

9  produce what I thought would be a viable pathway

10  that all of us could walk on to produce the product

11  that if we had it in a format -- a written format

12  that we were all aware, and that includes county

13  council as well, that we could agree to it, and

14  then there would be no question as to dates and

15  times and responsibilities and levels of functions

16  of all of the various parties involved to

17  generate a bill and to collect a bill, that it

18  would work.  And so these e-mails that are included

19  in this exhibit all reflect the exchanges that

20  occurred to develop that protocol -- that written

21  protocol.

22    Q.   What was the source of the difficulty

23  in getting the treasurer's office and the auditor's

24  office to work in concert?

25    A.   Could you repeat that, please?

**Page 47**

1    Q.   What was the source of the difficulty

2  in getting the treasurer's office and auditor's

3  office to work in concert?

4    A.   Well, I -- it's a hard question for me

5  to answer as to what the source was between --

6  because of the -- you know, there are other --

7  those two individuals involved.  From my

8  perspective, it was the inability of these two

9  individuals to agree on almost anything to get the

10  bill done.

11    Q.   When I look at this, in -- on the

12  second page where you're writing, I assume, to

13  Mr. Beckert, you indicate that the treasurer was in

14  concurrence with what you had come up with?

15    A.   Yeah.  The -- the -- as an

16  administrator, when you produce a -- a document,

17  sort of like instructions on how to get something

18  done or whatever, one of these initial steps before

19  you agree to the protocol is to have everybody --

20  to give everybody a chance to comment on the

21  proposal before it became an actual instructive

22  document.  And Maria Walls agreed, Jim Beckert did

23  not.

24    Q.   All right.  So the source of the

25  disagreement was Jim Beckert?

**Page 48**

1    MR. J. ANDERSON:  Object to the form.

2    THE WITNESS:  The source of the

3  disagreement of this protocol was Jim Beckert.

4  BY MR. CROSBY:

5    Q.   And if we look at what Councilman

6  Bensch wrote to you on the Page 1 of Exhibit 7 --

7  and this is in September 2016, correct, that --

8  this interchange?

9    A.   Yes.

10    Q.   And if I recall correctly, was Mr. --

11  when was Mr. Beckert sworn in?

12    A.   I don't know.

13    Q.   July of 2016 -- or was it '14?  I meant

14  '14.  I think it was '14.  And he says -- she says:

15  Gary, this situation seems to be getting out of

16  control.  And the situation is the inability of

17  Mr. Beckert to work with the administration and the

18  treasurer's office to generate the tax bills?

19    MR. J. ANDERSON:  Object to the form.

20    THE WITNESS:  I believe this is a

21  collection of -- I think the impression that

22  councilman -- Councilperson Bensch reflects in her

23  e-mail to me is a result of the complaints or the

24  arguments proffered with regard to how to create a

25  tax bill, proffered by Mr. Beckert's impression as

**Page 49**

1  to how to, Maria Walls's impression as to how to,

2  and to a degree my impression as to how it should

3  be done, because the IT and the generation of that

4  information was my responsibility.  I have the

5  responsibility of IT.

6    So I think not knowing what each of

7  those two individuals were communicating with

8  council, I believe she was reflecting the result of

9  receiving communiqué primarily from Jim and

10  primarily from Maria, and so she drafted this

11  conclusion.

12  BY MR. CROSBY:

13    Q.   And she asked you:  Is there any

14  recourse to stop this?

15    A.   Yeah.  She did.

16    Q.   And it goes further and says:  He seems

17  unreachable through normal communications and

18  extremely paranoid.

19    Did you share that observation?

20    A.   Did I share that observation with

21  Cynthia Bensch?

22    Q.   Yeah.  Did you -- did -- was your

23  observations consistent with what she wrote there?

24    A.   I would say I didn't use those direct

25  words, but I think it would be reasonable for

13 (Pages 46 - 49)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 54

1 his obsession with control and authority has to
2 obviously affect office morale and performance in
3 many departments, and says: I know you're very
4 concerned.
5        Was she correct that you were concerned
6 about Mr. Beckert's affect on the morale and
7 performance of the various county departments that
8 were under your control?
9    A. Yes.
10   Q. And that goes back to what you talked
11 about earlier?
12   A. It goes back to Monica Spells, several
13 of my staff members, Dave Thomas in purchasing,
14 Alicia, Maria Walls. You know, it -- it -- it's
15 without question that Mr. Beckert was a disruptive
16 force generally.
17   Q. The -- did Maria Walls relay to you
18 other concerns she had with Mr. Beckert's behavior
19 toward her other than the staring through her
20 window?
21   A. Yes. Maria on several occasions told
22 me that she was afraid. She also shared with me a
23 notebook of various things that Mr. Beckert was
24 doing in terms of affecting her department, tape
25 recording her. And she gave me a copy of that

Page 55

1 notebook I think with the hope that I would be able
2 to somehow correct the situation. The problem for
3 me was I was the county administrator, and I have
4 11 bosses, and besides going to the department of
5 revenue and county council, there is not much else
6 I could possibly do. I couldn't dismiss him or get
7 him out of office. He was an elected official.
8    Q. Did you go to council with the -- those
9 concerns that -- about Ms. Walls's that she had
10 expressed to you?
11   A. Yes. The procedure that I employ with
12 council, because there are 11, is that I first
13 advise, which I did, my concerns to county chairman
14 and the vice chair, and I think it was at the time
15 Paul Sommerville and Jerry Stewart. As a matter of
16 fact, the protocol -- written protocol on how to
17 get a tax bill was an example of that concern. I
18 think I addressed in several of the meetings,
19 particularly finance, that we were having
20 difficulties with the auditor in general.
21        And I think there were times where the
22 auditor and treasurer in those meetings were
23 present, and they both spoke to it, and it was
24 clear from their comments that -- that it was very
25 difficult for them to cooperate with each other.

Page 56

1    Q. Did -- after you carried the concerns
2 Ms. Walls raised to council, were there ever any
3 solutions proposed by council on how to alleviate
4 these concerns that she had raised to you?
5    A. It was my impression that council felt
6 that having them both present at their committee
7 meetings or allowing each of them separately or
8 collectively to address council from the podium
9 about their concerns on a matter in dispute, which
10 they permitted.
11        I do believe that I advised
12 Mr. Sommerville and Mr. Stewart of my concerns
13 regarding the inability of both parties to resolve
14 their differences so that there could be a
15 collective positive outcome in the responsibilities
16 of each at the department, because what's unique
17 about these two departments is they're independent,
18 but their product is -- is a combination of --
19 of -- of both efforts.
20        And then the third component is the IT,
21 which is the software processing to actually create
22 the tax rolls which then go towards the final
23 product in printing the bills.
24        So, yeah, they were aware, and I think
25 the heightened awareness of it was the tax bills.

Page 57

1 I mean, there were disputes on language, there were
2 disputes on timeliness. And I wasn't the only one
3 that called the department of revenue. Mr. Beckert
4 called them countless times trying to get them to
5 see his way.
6    Q. And what you learned from your
7 conversations with the department of revenue was
8 that Mr. Beckert's interpretation of the laws was
9 inaccurate?
10   A. Yes. And I think a few times with the
11 extensions -- you know, they were -- they were
12 granting us extensions to push the date to produce
13 the bills back a month or so. But they were keenly
14 aware of Mr. Beckert.
15   Q. And when you were talking -- mentioned
16 earlier about Ms. Walls's concerns for her safety,
17 you were talking about her physical safety?
18   A. Yes.
19        MR. J. ANDERSON: Object to the form.
20 BY MR. CROSBY:
21   Q. And she expressed that to you?
22   A. Yes. More than one occasion.
23   Q. Was council aware that you had locked
24 Mr. Beckert out of your end of the building?
25   A. I'm not sure. I'm certain that

15 (Pages 54 - 57)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 58

1  Mr. Beckert let them know.
2      Q.   Did he ever express his displeasure to
3  you?
4      A.   Oh, yeah.
5      Q.   That was certainly within your
6  authority to take that action, I assume?
7      A.   Yes.  I think there is a -- I'm not
8  sure if there is a statute or there is a policy.
9  Maybe it's a council policy.  But county
10  administrators are responsible for the -- all
11  buildings of the county, includes maintenance.  The
12  only caveat would be overall security, which I
13  coordinated with the sheriff's office.
14      Q.   Have you got Exhibit Number 1?  Can you
15  pass him a copy there?
16      A.   Give me three minutes so I can read
17  this document.
18      Q.   Just take a second.  You probably
19  helped write it, so...
20      A.   I'm familiar with it.
21      Q.   And that's the county handbook that was
22  adopted -- that version looks like August of 2016?
23      A.   Yes.  Resolution 2016/11.
24      Q.   And I believe that in addition to
25  county employees, that the employees of the

Page 59

1  auditor's and treasurer's office signed off on that
2  document?
3      A.   I believe all elected officials of the
4  county signed off on this document.
5      Q.   Including council members?
6      A.   Well, council doesn't hire employees.
7  I'm not sure if they did.  But all the other
8  elected divisions, including I think the
9  magistrates, the courts, any other unit that had
10  separately had the capability by statute to hire
11  their own employees.
12      Q.   And what was it --
13      A.   All the hiring of employees for county
14  council was done through me.  That's why I don't --
15  I don't know if county --
16      Q.   What's the rationale on -- on having
17  the other elected officials and their employees
18  sign off and adopt this policy?
19      A.   The recommendation and -- came from our
20  outside counsel, I believe, was Attorney Edwards.
21  The idea of having a personnel handbook was so that
22  the employee and the employer, whether it would be
23  county administration, auditor, or treasurer, that
24  the expectations and actions of each party would be
25  defined in writing, and that the uniform standard

Page 60

1  would be created by having all elected officials
2  consent to the rules and regulations of a personnel
3  handbook, which then offered a level of expertise
4  for HR in terms of consistent management or
5  application for vacation, sick leave, whatever the
6  provision or idea would be.
7      Q.   Was the adoption by the elected offices
8  of this -- of Exhibit 1, the manual, a part of
9  the -- I guess the bargain with the county for --
10  to receive HR services and that type of thing?
11      A.   Yeah.  There was a -- sort of a mutual
12  understanding that the HR department was under the
13  control of the county administrator; however, to
14  assist in advertising a position or to assist in
15  management or to assist in producing documents on
16  behalf of the employee W-2, the actual paychecks,
17  how to do electronic deposit, all those things were
18  a result of a mutual understanding of how to
19  process.
20           It didn't necessarily mean that I could
21  tell any elected official who to hire.  That was up
22  to them.  But the process of how to manage and what
23  was expected of both sides, that was the purpose of
24  the handbook:  Consistency.
25      Q.   And consistency on that side, and then

Page 61

1  there was a centralized -- the elected offices got
2  the benefit of using the county's HR services like
3  you say for W-2s and --
4      A.   Right.  Producing a paycheck.
5           MR. J. ANDERSON:  Object to the form.
6           MR. BUYCK:  Note my objection, too.
7           THE WITNESS:  What was your question
8  again?
9  BY MR. CROSBY:
10      Q.   There was two sides to it.  You had
11  consistency and policy over here, but also the
12  benefit to the elected offices would be consistency
13  and the provision of the HR services?
14      A.   Yeah.  There are certain requirements
15  that are involved when you hire an employee.  One
16  is simply recordkeeping, timekeeping,
17  hospitalization, how to produce a paycheck.  All of
18  those things were products of the HR department
19  under my administration as county administrator.
20  So the idea was instead of having all the elected
21  officials having their own HR department, their own
22  check writing, their own hospitalization, for
23  purposes of efficiency and movement, it -- it was
24  under the HR.
25           This, also, handbook was not just for

16 (Pages 58 - 61)

Gary T. Kubic                                      April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 62

1 elected officials, it's also for the new hires to
2 understand what their responsibilities are to the
3 taxpayer of Beaufort County.
4    Q.   Right.  This is the exact same handbook
5 that your staff would sign?
6    A.   Yes.
7    Q.   And it sets forth the expectations with
8 regard to the -- how you expect county employees
9 and those that sign off on this to act in the
10 workplace?  It has --
11        MR. J. ANDERSON:  Objection.
12        MR. BUYCK:  Note my objection.
13 BY MR. CROSBY:
14    Q.   -- certain -- certain forbidden --
15 or behaviors that are set forth in this?
16        MR. BUYCK:  Same objection.
17        MR. J. ANDERSON:  Me too.
18        THE WITNESS:  It -- it's a -- it's a
19 personnel handbook that offers the elected official
20 the hiring authority and the employee hired by the
21 hiring authority to know in writing what the
22 expectations would be for each side.  And so for
23 clarity, and also I think to protect the county
24 overall from random or haphazard claims by
25 employees against the county, if they did not

Page 63

1 follow the handbook, then they have no real
2 position to argue.
3 BY MR. CROSBY:
4    Q.   And --
5    A.   So, if they violated procedure, we had
6 the ability to process them through the conditions
7 and the grievance procedures defined in this book.
8    Q.   And one of the purposes of the -- some
9 of the language in the handbook is to provide a
10 good working environment by prohibiting such things
11 as sexual harassment?
12    A.   Yes.
13    Q.   That's something that was strictly
14 forbidden by the county?
15    A.   Appropriate behavior.
16    Q.   If we look at Page 6 at Paragraph 1.3,
17 it has an anti-harassment policy set forth there.
18    A.   Page 6, 1.3, yes.
19    Q.   And in the second sentence, it says:
20 In addition to county endeavors to provide a
21 working environment in which employees are free
22 from discomfort or pressure resulting from jokes,
23 ridicule, slurs, gossip, threats, bullying,
24 harassment whether relating to such distinctions or
25 simply resulting from a lack of consideration for a

Page 64

1 fellow human being.
2        And then it says:  The county does not
3 tolerate harassment of any kind and strictly
4 forbids retaliation against anyone who has reported
5 harassment in good faith.
6    A.   Yes.  That's what it says.
7    Q.   And basically it's -- what we've talked
8 about earlier, your efforts that we've talked about
9 to protect your staff and your employees from some
10 of Mr. Beckert's conduct were in effort to provide
11 the working anti -- harassment-free environment to
12 your employees.
13    A.   That's correct.  That's just sound --
14 sound management.
15    Q.   Because what -- what Mr. Beckert's
16 conduct, as you observed, would -- rose to the
17 level of what one would describe as harassment
18 within this definition?
19        MR. J. ANDERSON:  Objection.
20        THE WITNESS:  Are you asking me whether
21 or not Mr. Beckert violated this provision as
22 written in the employee handbook?
23 BY MR. CROSBY:
24    Q.   That's another way of saying it.
25    A.   I would have to say I agree with that

Page 65

1 assessment.
2    Q.   And what you did to the best of your
3 ability was try to protect the county's employees
4 from that type of environment?
5    A.   Yes.
6    Q.   And you actually tried to -- in some
7 respects -- to help protect Maria Walls from
8 that conduct by putting up the cameras and taking
9 the concerns to county council?
10    A.   Yes.
11        MR. J. ANDERSON:  Objection.
12 BY MR. CROSBY:
13    Q.   Go over to page -- let me -- let me ask
14 something before this.  There is always this issue
15 about Jim Beckert that seems to permeate, and that
16 is that no one could do anything about him because
17 he was an elected official.  That was -- and you
18 and I have talked about that, that you didn't have
19 statutory authority to control an elected official,
20 correct?
21    A.   Yes.
22    Q.   The office of the auditor and the
23 treasurer are in county-owned property?
24    A.   Beg your pardon?
25    Q.   The offices of both the treasurer and

17 (Pages 62 - 65)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 66

1 the auditor are located in county-owned property?
2     A.   Yes.
3     Q.   And I take it the county provides a
4 budget for their offices?
5     A.   County council does the appropriation
6 for each of the units.
7     Q.   Was there ever any discussion while you
8 were employed with the county about separating the
9 offices or moving Jim Beckert's office to another
10 location?
11     A.   Well, we had discussions because we
12 were locating satellite offices and had satellite
13 offices for both the auditor, treasurer, and other
14 functions on Hilton Head.  We remodeled one stop
15 for the Bluffton South of the Broad office.  But I
16 did not engage -- I did not suggest moving
17 Mr. Beckert out of his main office as a result
18 of -- of these matters.
19     Q.   Page 8, Paragraph 1.6.
20     A.   Page 8.  Okay.  What paragraph?
21     Q.   1.6.
22     A.   All right.
23     Q.   And this -- point you to that second
24 sentence there where it says:  Non-employees may be
25 reported to appropriate law enforcement, which you

Page 67

1 did that, and I believe Mr. -- Ms. Walls may have
2 done that over time.  And it says that and/or
3 barred from the premises.
4          Do you have -- and what you're telling
5 me is that never was a discussion between you and
6 council to your recollection as to whether
7 Mr. Beckert could be moved and barred from the
8 premises over in Ribaut Road?
9     A.   Well, two things:  One, this particular
10 paragraph I would question as to whether it applies
11 to an elected official or not.  And in that sense,
12 to answer your question directly, I did not have
13 any discussions regarding removal of Mr. Beckert
14 from any of his offices to someplace else as a
15 result of these discussions we're having here.
16     Q.   Well, it has two categories of people,
17 either employees or non-employees?
18     A.   Right.
19     Q.   And Mr. Beckert, what you told me, is
20 not an employee?
21     MR. J. ANDERSON:  Objection.
22     THE WITNESS:  In my interpretation,
23 Mr. Beckert is an elected official and not an
24 employee in the sense that he's required to work a
25 40-hour week, that he's required to accrue vacation

Page 68

1 or sick as a regular employee.  There is a separate
2 category for elected officials in my opinion.  I
3 don't know whether it's defined by statute.  But he
4 is not considered a regular employee for this
5 personnel handbook.
6 BY MR. CROSBY:
7     Q.   He signed a copy, didn't he?
8     A.   He signed -- all the elected officials
9 sign these copies to accept the handbook as a tool
10 for new hires in terms of defining the
11 relationships between the hiring authority and the
12 employee.
13     Q.   Do you have any understanding as -- as
14 to whether Mr. Beckert currently is allowed in the
15 county building?
16     A.   Well, I don't have any direct
17 knowledge, but I have received a few phone calls
18 that he has been moved to another location.
19     Q.   And -- and I guess that's what I was
20 getting at.  I mean, council apparently took that
21 step and made that decision currently, and that
22 was -- all this was just directed as whether or not
23 that had ever come up in your tenure about moving
24 him?
25     A.   No.  Not to remove him from his office

Page 69

1 location.
2     Q.   And the county owns the building and
3 controls the building, correct?
4     A.   Yes.
5     Q.   And presumably since they've done it
6 now, had council wanted to take that action when
7 you first brought these complaints to their
8 attention, they could have done so?
9     MR. BUYCK:  Note my objection.
10     MR. J. ANDERSON:  Objection.
11     MR. BUYCK:  In a matter of law.
12     THE WITNESS:  Well, I suppose they
13 could have.  I don't know if it was offered as a
14 solution.
15 BY MR. CROSBY:
16     Q.   That -- it would be council that would
17 have to make that decision, correct?  It wouldn't
18 be --
19     A.   It's not me.
20     Q.   You wouldn't have that power?
21     A.   Huh-uh.  Maybe the governor.
22     Q.   And with regard to the employees, there
23 is certain rules set out in here about conduct and
24 a lot of other stuff, but how employees are to
25 conduct themselves as county employees.  And there

9:20-cv-03479-DCN-MHC    Date Filed 06/02/23    Entry Number 121-3    Page 78 of 200

Gary T. Kubic                                            April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 70

1 is also expectations that the county is going to
2 endeavor to provide that nonhostile,
3 harassment-free workplace for the employees --
4        A.  Yes.
5        Q.  -- correct?
6        It's a two-way street there.  Employees
7 are expected to not harass people, and if the
8 county sees it, the county is expected to take
9 action to protect those employees?
10       A.  There is multiple facets of conduct
11 required by a public employee.  First and foremost,
12 they have to treat the public under the same
13 conditions in terms of respect and appropriate
14 behavior.  You can't swear at an employee or a
15 taxpayer just because he disagrees with the amount
16 on his tax bill.  There is proper conduct that way.
17       There is also parameters that -- in
18 this handbook as to how employee-to-employee
19 conduct should be entertained in the workplace,
20 just to protect not only from sexual harassments,
21 but in terms of providing a workplace where people
22 can feel safe as an employee, be able to conduct
23 their business with fellow employees without having
24 to worry about interference from another individual
25 who may disagree or just don't like the clothes

Page 71

1 you're wearing that day.
2        And so this handbook was recommended by
3 outside counsel to create a standard for both
4 employee and employer to follow so that there would
5 be a clear understanding that if there was a breach
6 on anyone's part, there was a basis for either
7 dismissal or discipline, whatever was deemed
8 appropriate based on the grievance or the poor
9 conduct.
10       Q.  What you're telling me in a -- in a
11 broad sense, sort of long answer is that this is
12 the expectation for anyone in county -- on county
13 property, whether it be the public or employees or
14 anyone else, that this was expected -- was intended
15 to provide as a guidance for behavior, period?
16       MR. J. ANDERSON: Objection.
17       MR. BUYCK:  Same objection.
18       THE WITNESS:  Yes.  And it's also -- it
19 was designed to help -- you know, an elected
20 official, you don't have to be a manager of an
21 employee, you don't have any qual -- real
22 qualifications to hold public office, all except is
23 you have to win the most popular vote.  So there is
24 no assumption for me as a -- or from a county
25 administrator that because you get elected, you

Page 72

1 automatically have all the knowledge and
2 intelligence and experience to manage and conduct
3 employees or procedures.
4        And so it's a handbook, not only for
5 the employees you hire, but it's also a handbook
6 for the elected official or hiring authority to
7 understand and know those rules as well because an
8 elected official just comes from the general
9 population.  There are no, quote/unquote,
10 requirements that you have to be in business or
11 have a certain degree.  If you have the right age
12 and you're a resident, you probably can run for any
13 position.  So it's -- it's designed to help both
14 parties -- all parties, actually.
15 BY MR. CROSBY:
16       Q.  Were you ever asked by any of the
17 council members to resolve any of these issues
18 related to Jim Beckert in his favor one way or the
19 other?
20       A.  Could you repeat the question, please?
21       Q.  Were you ever asked to resolve any of
22 the issues that would come up about Jim Beckert in
23 a -- in a fashion that was favorable to him?
24       A.  There were several times where a
25 conflict would exist with Mr. Beckert and Maria or

Page 73

1 Mr. Beckert and IT, and council would ask me in
2 terms of my responsibilities and duties as county
3 administrator to help resolve the issue, which I
4 did try to do.  But as I was reminded by
5 Mr. Beckert, that he is an auditor under a separate
6 chapter of the South Carolina code of law and that
7 his duties and responsibilities are defined by
8 that, and that I have no real ability to instruct
9 him or order him or advise him as to what conduct
10 would be appropriate for his office.
11       But council did ask, as anyone would
12 in -- as a reasonable person, look, let's get the
13 issue on the table, let's expose our differences,
14 and let's come to a solution so that, you know, a
15 product is produced for the taxpayer.
16       Q.  Did any individual councilman ever ask
17 you to side with Beckert or, you know, try to --
18 with regard to any of these conflicts?
19       A.  I don't -- I don't -- to answer your
20 question with the word side, I think they're smart
21 enough -- I think councilmen basically in these
22 public meetings would encourage -- I would rather
23 use the encourage -- to take a look at
24 Mr. Beckert's arguments and determine whether or
25 not any facets of his arguments had merit, and

19 (Pages 70 - 73)

Ex. 3
Beaufort County Adopts Testimony:
Topic 14: The Role of the Auditor in Calculating the
County's Millage

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, and JAMES BECKERT, Individually, and in his official capacity

**David Cadd**

September 28, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

David Cadd - 9/28/2021

## Page 13

1  giving me a pay raise. And I said, I didn't want a
2  pay rise because the pay raises for -- the county
3  staff was on hold due to the coronavirus, the
4  COVID-19. And so until they got theirs, I didn't
5  want to discuss my pay raise. That's just the way I
6  have been taught. So I said no. I said, once we
7  learn what's going to be done with them, then we can
8  discuss mine.
9      Q   So in January of 20-- I mean, December
10  of 2020, he was offering you an increase in pay?
11      A   Yes.
12      Q   And did he tell you why he was wanting to
13  increase your pay?
14      A   He said I was doing a good job. I was
15  holding down the fort because he was no longer
16  allowed in the building due to a different
17  situation, and I said, okay. So he said I was doing
18  a good job. I was taking care of everything. I was
19  making sure that when the court came out and told
20  him he had to fix the tax bills, that I was keeping
21  up with that. Making sure everything was being
22  done. So I said, okay. That's great. And,
23  basically, you know, that was it and yep. That --
24  yeah. That was it.
25      Q   Why was -- why was he resisting the tax

## Page 14

1  bill issue? What was the problem there?
2      A   He felt like --
3          MR. ANDERSON: Object to the form.
4      A   I'm sorry?
5  BY MR. CROSBY:
6      Q   You can go ahead.
7      A   Okay.
8      Q   You may hear lawyers object to a question
9  every now and then.
10      A   Okay.
11      Q   He didn't like the way I asked the
12  question, but that's okay. You can answer it.
13      A   What he -- Mr. Beckert told me in his own
14  words were that he was responsible for setting the
15  debt millage and not county council, and they set
16  it, and he didn't approve it. So he was going to
17  change it in the computer system.
18      Q   And help me -- help me understand that a
19  little bit better. You -- you guys work in this
20  finance stuff. Help me -- help me understand how
21  that affected my tax bill from Beaufort County.
22      A   The millage is set by county council.
23  They -- they have a finance committee that
24  determines the millage -- whoever is on the finance
25  committee is determined by the county. That's where

## Page 15

1  they get their information. They get all their
2  information together between that, the -- you know,
3  the finance department and everything. And then,
4  from that point, they go forward, and after they
5  agree to it, then, they present it for the three
6  readings to county council to approve the millage
7  rate.
8          Mr. Beckert felt like the debt
9  millage, which is a separate from the operation
10  millage, which I was just was talking about, was
11  set -- is to be set by him. The critical ans came
12  up with a debt millage level. He did not approve of
13  it because he didn't feel like it was going to --
14  that they miscalculated is what he told me. They
15  miscalculated. So after the county council approved
16  the millage for the debt millage for critical role
17  of lands, he came back and changed it to a different
18  level, which was higher than what they originally
19  had.
20      Q   He on his own changed it in the -- in the
21  system?
22      A   On his own, he sent an e-mail out to
23  county council from what I understand. I didn't --
24  I didn't see the e-mail that he was changing the
25  millage rate.

## Page 16

1      Q   Did he have authority to do that?
2      A   I don't know. I -- I just don't know. I
3  mean, through my training, everything was set by
4  county council. Not by Mr. Beckert. But, I mean,
5  that's in the courts right now. So I -- I really
6  can't justify who's right or who's wrong.
7      Q   Do you know whether the court had ruled on
8  that?
9      A   I -- I do not. I don't -- that's with the
10  county right now. I do not know if the court has
11  ruled on that yet or not. I know it was before
12  Judge Mullens before I left back in October or
13  November of 2020.
14      Q   Give you Exhibit Number 50.
15          (Plaintiff's Deposition Exhibit No.
16  50 was marked for identification.)
17      A   Yes, sir.
18  BY MR. CROSBY:
19      Q   Pass that around, the two copies if you
20  don't mind.
21      A   Oh, I keep the yellow one. Check.
22      Q   I think you're copied on -- on that -- on
23  the CC line?
24      A   Usually, yes. Most e-mails, I am. Yes,
25  sir.

4  (Pages 13 to 16)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

## JOHN HERVOCHON

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

JOHN HERVOCHON - 9/27/2021

**Page 9**

1    MR. CROSBY: You said the next one would
2    be 27?
3            (Exhibit 27, 10/22/19 Email to
4    Hervochon from Caporale, was marked for
5    identification.)
6    BY MR. CROSBY:
7    Q   If you'd just take the one with the
8    yellow sticker and then pass the other two to
9    Mr. Buyck.
10   Who is Rick -- is it Caporale?
11   A   Caporale.
12   Q   Caporale.
13   A   He was my predecessor on county council.
14   Q   You took his place?
15   A   Yes, sir.
16   Q   This is an email from Mr. Caporale to you
17   attaching a piece that he had written for who he
18   refers to there as the Duke of Dyslexia. That's
19   Mr. Beckert?
20   A   Presumably.
21   Q   Is that something that you -- the manner
22   in which you refer to Mr. Beckert?
23   A   No, sir.
24   Q   And here he's indicating to you that this
25   is a press release that he wrote for Mr. Beckert.

**Page 10**

1    Why would he -- why is he forwarding that to you?
2    A   I don't recall specifically.
3    Q   Do you have an understanding of why
4    Mr. Caporale would be drafting a press release for
5    Mr. Beckert?
6    A   No, I don't. I know that Rick and Jim
7    had some sort of relationship when Rick was on
8    counsel, but beyond that, I don't know why he would
9    do that.
10   Q   Did you have a conversation with
11   Mr. Caporale about the press release that was -- he
12   had drafted?
13   A   I don't recall.
14   Q   You are familiar with the I guess
15   controversy or discussion surrounding the contents
16   of the press release?
17   A   Correct.
18   Q   Is that the matter that ended up with the
19   independent auditing firm coming in and looking
20   into the matter?
21   A   Can you specify the question?
22   Q   Do you recall in some of these financial
23   discussions an issue that arose between Mr. Beckert
24   and Alicia Holland regarding some of the
25   calculations?

**Page 11**

1    A   Which calculations are you referring to?
2    Q   Well, I'm referring to the ones that are
3    in this memo.
4    A   And can you repeat the question, please?
5    Q   Do you recall when this controversy
6    arose?
7    A   I do. This is in reference to the
8    rollback millage, if I'm not mistaken.
9    Q   Do you know what kind of relationship
10   Mr. Caporale and Mr. Beckert had such that he would
11   be writing public press releases?
12   A   No, I do not.
13   Q   Did you question that at the time?
14   A   His relationship?
15   Q   Yeah, and why he would be drafting a
16   press release.
17   A   I don't recall.
18   Q   And you developed a relationship with
19   Mr. Beckert whereby you would help him draft
20   documents, correct?
21   A   I don't recall ever helping draft
22   documents. I recall asking for information to be
23   presented a little bit more clearly, but as far as
24   drafting, no.
25   Q   Do you recall helping him edit some of

**Page 12**

1    his emails?
2    A   Edit emails?
3    Q   Yes, some of the information that he was
4    sending out.
5    A   I don't recall that, no.
6            (Exhibit 28, Email Chain Ending in a
7    6/22/20 Email to Beckert from Hervochon,
8    was marked for identification.)
9    BY MR. CROSBY:
10   Q   And here's where Mr. Beckert was to
11   present to the Beaufort County School District, and
12   he sent you a draft of his presentation, asked for
13   your input?
14   A   Uh-huh, yes, sir.
15   Q   Do you remember that?
16   A   Not specifically, no, sir.
17   Q   Why would Mr. Beckert be requesting your
18   input into his presentation?
19   A   I had told him several times that he
20   needed to present information to public bodies more
21   clearly, and I'm presuming that this was the
22   genesis of one of those conversations.
23   Q   Did you ever review the final draft of
24   this presentation?
25   A   I don't recall.

Spectrum Court Reporting and Legal Video
843.849.0133

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II - 9/27/2021

Page 45

1  to him that what he was saying was inaccurate?
2      A   I don't have an independent recollection
3  of having talked to him, but I indicate in my email
4  that we had explained -- we had explained this to
5  him previously.  As I said, we'd explained Item A
6  to Mr. Beckert.  He simply doesn't like the answer,
7  and he won't accept it.
8      Q   And that was -- quite often if you
9  explained something to Mr. Beckert that was
10  contrary to what he was saying, he wouldn't like
11  the answers?
12      MR. ANDERSON:  Objection.
13      THE WITNESS:  There were times when he
14      disagreed with us, yes.
15  BY MR. CROSBY:
16      Q   And you write here:  He would rather
17  continue his personal crusade against the treasurer
18  by alleging she's violating state law?
19      A   Yes.
20      Q   And you believed he had a personal
21  crusade against Maria Walls?
22      MR. ANDERSON:  Objection.
23      THE WITNESS:  He seemed -- he seemed to,
24      yes, by that time.
25  BY MR. CROSBY:

Page 46

1      Q   Did you also observe over time that he
2  had a crusade against Alicia Holland?
3      MR. ANDERSON:  Objection.
4      THE WITNESS:  No, I didn't.  I didn't
5      learn about problems that Alicia and
6      Mr. Beckert had until later on, and my
7      impression was that I learned about them at or
8      about the time they arose.  I don't think that
9      was as early as February in 2018.
10      The problems with Mr. Beckert and
11      Ms. Walls started immediately when they both
12      got sworn in.  I mean, they had disagreements,
13      they weren't necessarily acrimonious, but as
14      the disagreements continued, they got more
15      intense, they got acrimonious, but Ms. Holland
16      was not involved initially.
17  BY MR. CROSBY:
18      Q   And you write here:  Frankly, I believe
19  that is defamatory per se, and what you mean by
20  that is that by accusing her -- falsely accusing
21  Ms. Walls of violating state statutes, that could
22  harm her reputation?
23      MR. ANDERSON:  Objection.
24      MR. BUYCK:  Note my objection.
25      THE WITNESS:  Harm her representation in

Page 47

1  her profession.
2  BY MR. CROSBY:
3      Q   Yeah.
4      Q   Right?
5      Q   Then you say you suspect it's only a
6  matter of time before she decides she's had enough
7  and takes some kind of action, which I guess you
8  accurately predicted, it just might have took
9  longer than you thought?
10      A   Yes.
11      Q   And then you say:  If Mr. Kubic were
12  still here, he would have taken action by now.
13      A   Yes.
14      Q   What do you think that Mr. Kubic would
15  have done?
16      A   Well, Mr. Kubic -- so here we're talking
17  in February of 2018.  Mr. Kubic had been gone since
18  September of 2017 and actually really kind of
19  really since the summer of 2017 when his parents --
20  when his mother died first and then his dad died.
21      But Mr. Kubic was a very hands-on guy.
22  He was a -- so I think he would have been much more
23  aggressive in talking to Mr. Beckert, you know,
24  frankly and candidly, and I think that his absence
25  just kind of allowed -- created a bit of a vacuum

Page 48

1  that Mr. Beckert filled.
2      Q   What is -- let me ask, before we move on
3  to that, did Alicia Holland ever discuss with you
4  any issues she was having with Jim Beckert?
5      A   She did, and I believe she did that in a
6  personal -- not as a county attorney, as a just
7  one-on-one personal relationship.
8      Q   And tell me what she relayed to you.
9      A   You know, this is a long time ago, and as
10  you know, a lot has gone on since 2015 here.  We've
11  been through four administrators, interim and not,
12  and it's just kind of hard to keep some of these
13  things straight.
14      But it's my recollection that in -- that
15  a real controversy seemed to arise between Alicia
16  and Jim Beckert in 2019 when he started challenging
17  her calculation of the value of the mill.  And the
18  value of the mill was critical because -- to county
19  government because it is the basis for determining
20  how many mills people will be taxed on their tax
21  bill.
22      And the budgets are done in the spring,
23  and they have to be passed by state law.  County
24  budgets have to be passed by June 30th.  And so in
25  figuring out what your budget is, county council

12  (Pages 45 to 48)

Thomas J. Keaveny, II - 9/27/2021

Page 49

1  has to figure out what their expenses are, what
2  they're going to buy, what they're not going to
3  buy, what their personnel costs are going to be,
4  and all of that.
5      So unlike most of us, you know, when
6  we're in private practice, you think, okay, well,
7  what are my revenues, and then I'll kind of figure
8  out what my overhead can be and what my expenses
9  can be. Government is more like, well, what are
10 our expenses, and everybody tries to keep them down
11 as much as they can, and then they say, okay, well,
12 how much money -- how many mills do we have to
13 charge the taxpayers in order to make that
14 expenditure? And in order to do that, you've got
15 to figure out what the value of the mill is because
16 that figure -- that determines how many mills
17 people are charged.
18     So the value of the mill is very
19 important, and when Mr. Kubic was here, Mr. Kubic
20 had a finance background, came here from Ohio and
21 was in some capacity I think in finance. I know
22 that was his background. And he and Alicia worked
23 very well together. And Alicia was our CFO, she's
24 a CPA, and she's an amazingly capable person and
25 professional.

Page 50

1      And she had been calculating the value of
2  the mill -- she and her department, the finance
3  department, had been calculating the value of the
4  mill for budget purposes for years and years and
5  years, and Mr. Beckert decided he wanted to get
6  involved in that issue, and he started challenging
7  Alicia's -- the process she used to calculate the
8  value of the mill, and that was the issue that I
9  became aware of.
10     And I remember being in a meeting with
11 her one day and -- one morning over by my office,
12 and she and I and maybe one or two other assistant
13 county administrators, and she was like sitting to
14 my right, and she said, "Tom, I just feel like I'm
15 having heart issues." I told her she needed to
16 call her doctor immediately and get in to her
17 doctor. And she was saying it was because
18 Mr. Beckert was just haranguing her and wouldn't
19 let up on her, and it was having -- taking a
20 physical toll on her.
21     So that's really -- that was the -- that
22 was the -- kind of the summer. It was the summer
23 of 2019 that I recall.
24     Q  And was it just the one occasion that she
25 confided in you?

Page 51

1      A  No, no. She confided in me several
2  times, but just on person-to-person, not as a
3  county attorney. She wasn't calling me and asking
4  me for legal advice as a county attorney about how
5  to handle Mr. Beckert.
6      But I recommended that she -- we have no
7  control over Mr. Beckert. Everybody knows we have
8  no control over Mr. Beckert, and she knew we didn't
9  because she was a witness to all the stuff that had
10 been going on with Maria, because, obviously, Maria
11 and Alicia work together. It's all finance. It's
12 numbers. Maria collects the revenue, and Alicia
13 accounts for it and all of that, so everybody --
14 you know, everybody works hand in hand and closely
15 on these issues.
16     And so yeah -- so yeah, so she and I
17 talked many times about it.
18     Q  Did you ever -- let me ask you this:
19 What steps, if any, did Ashley Jacobs take to
20 intervene on Ms. Holland's behalf?
21     A  Like I said, Ms. Jacobs and I did not
22 have a good relationship, and we didn't talk. I
23 mean, I think the last time -- we just -- the last
24 time we talked productively was probably early
25 summer/late spring of 2019, so by the time that

Page 52

1  Alicia was telling me of these issues, Ms. Jacobs
2  and I had a strained relationship.
3      Q  What was the source of that?
4      A  I really don't know. I mean, I can
5  speculate, but there's no purpose in that.
6      Q  You never learned why y'all -- why your
7  relationship became strained?
8      A  No, no.
9      Q  So you're -- as we sit here, are you
10 aware of anything that Ms. Jacobs did to -- with
11 regard to Ms. Holland's situation with Jim Beckert?
12     A  I don't know what she did or didn't do.
13 Truly, I have no information.
14     Q  In the accusations that Mr. Beckert would
15 make with regard to Ms. Walls violating statutes,
16 did you ever make a determination that she had
17 violated state law?
18     A  Oh, I don't -- I don't think I ever
19 concluded that either one of them violated state
20 law, certainly not intentionally violated state
21 law. I can't sit here and say I remember telling
22 Maria that I disagreed with her interpretation of
23 the statute, but I can imagine that happened. I'm
24 confident that I -- I don't have independent
25 recollection of specific issues with Mr. Beckert,



Deposition of:

# D. Paul Sommerville

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville                                      April 8, 2021
Holland, Alicia v. Beaufort County et al

Page 26

1    THE VIDEOGRAPHER: We are back on
2  record. The time is 2:55 p.m.
3  BY MR. CROSBY:
4    Q. Mr. Sommerville, can you get the
5  document that's marked as Exhibit 16?
6    A. Yes.
7    Q. Is that an e-mail from Alicia Holland
8  to you?
9    A. Yes.
10   Q. Do you recall why she would have been
11 forwarding you her resignation letter at this point
12 in time?
13   A. I'm sorry?
14   Q. Do you recall why she would have
15 been -- I think she had already left the County's
16 employment by this time. Do you know why she would
17 have been forwarding you her resignation letter?
18   A. I don't recall specifically, no.
19   Q. Did y'all bump into each other or have
20 a conversation whereby that came up and later she
21 sent you this?
22   A. I recall have -- well, I had numerous
23 conversations with her since she left. I recall
24 one conversation that had to do with her
25 resignation and I think I remember saying, "I have

Page 27

1  never seen your resignation" so that may have
2  triggered it.
3    Q. And she later forwarded that to you
4  with her comments about her decision to leave?
5    A. Yes, yes.
6    Q. And then Exhibit No. 17 looks like a
7  reply to an e-mail received from you to Alicia
8  Holland. Is that where she wrote back and said
9  that, "Jim Beckert is a sick and dangerous
10 individual. He has harassed and bullied Maria,
11 myself, and Ebony that I am aware of. There may be
12 others I'm not aware of. Jim is the primary reason
13 I left my employment with Beaufort County."
14   Did you forward to Alicia Holland a
15 copy of the lawsuit that was filed by Maria Walls?
16   A. I may have. I don't -- I don't
17 specifically recall. I -- I'm trying to think if I
18 had it. I'm pretty sure I had it.
19   Q. I mean, it has at the top of it, the
20 subject line in -- in that e-mail, the next e-mail
21 down is from you to Alicia Holland and the subject
22 is "Maria Walls versus Beaufort County."
23   A. I don't doubt that I did. I just don't
24 specifically recall it.
25   Q. Do you know if you forwarded it to

Page 28

1  anyone else?
2    A. I don't recall.
3    Q. It looks like Ashley Jacobs had sent it
4  to yourself and the other members of -- of council.
5    A. That's what it appears to me. It
6  appears that I received it and forwarded it to
7  Alicia.
8    Q. And where she indicates in that first
9  line where she says that, "He," being Jim Beckert,
10 "has harassed and bullied Maria, myself," Maria and
11 herself, you would agree that that's -- Jim
12 Beckert's conduct was, toward Maria Walls and
13 Alicia Holland, was -- would be considered as
14 harassment and bullying in nature?
15   A. Well, I never witnessed any of this
16 firsthand, but this is the way Jim Beckert's
17 actions were characterized to me by Maria and
18 Alicia.
19   Q. All right. When they would talk to you
20 about it, they would relay it in those terms, that
21 he was a bully and that he was harassing them?
22   A. Yes.
23   Q. Did you ever witness Jim Beckert
24 exhibit that type of behavior to anyone?
25   A. The only thing I recall seeing him do

Page 29

1  was he had a phone that he liked to carry out where
2  everybody could see it. At least that was my
3  impression. Maybe some people carry their phone
4  anyway, maybe some people just walk around with it.
5  But I guess it was Maria or Alicia who said that --
6  that he was recording them and as a -- as a method
7  of harassing them.
8    Q. And you -- you had witnessed that
9  yourself?
10   A. Well, I witnessed him -- witnessed him
11 with a phone in his hand, but I don't know. I
12 can't say what he was doing with it. I mean, I --
13   Q. It appeared to you that he could have
14 been recording?
15   A. He certainly could have been.
16   MR. ANDERSON: Object to the form.
17 BY MR. CROSBY:
18   Q. When he would walk around with it, he
19 would have the camera side pointing out?
20   A. I don't recall.
21   Q. On Exhibit 15, it references hiring an
22 outside firm to help determine if the millage had
23 been calculated correctly. Do you recall that?
24   A. Yes.
25   Q. And that the cost was going to be

8 (Pages 26 - 29)

D. Paul Sommerville      April 8, 2021
Holland, Aliciav. Beaufort County et al

**Page 30**

1   around $10,000?
2      A. Yes, I do recall that.
3      Q. And that -- that arose because of
4   Mr. Beckert's claim that Alicia Holland had
5   improperly calculated the millage?
6      A. Correct. As I recall, he questioned
7   her methodology and demanded that the County do an
8   audit or out-- bring in an outside auditor to
9   confirm his -- his belief which was different from
10   hers.
11      Q. And the results of the outside
12   auditor's work confirmed that Ms. Holland was doing
13   her calculations correctly?
14      A. That's my recollection, yes.
15      Q. Exhibit No. 14 is a letter to Alan
16   Wilson, the attorney general, in March 6, 2018. Do
17   you recall a request about changing the form of
18   government?
19      A. Yes.
20      Q. And on the second page there is a, as
21   part of the request, there was a request of the
22   attorney general as to whether or not if the
23   referendum was successful whether one of the
24   positions could be -- remain elected and one of
25   them be appointed by the County. Do you recall

**Page 31**

1   that?
2      A. Yes.
3      Q. Why were you making that particular
4   request?
5      A. This is signed by the assistant County
6   attorney, Chris Inglese.
7      Q. You're copied on it, but --
8      A. Yes.
9      Q. -- there would have had to have been an
10   approval from -- for him to send that request, it
11   was at the request of either council or yourself as
12   chairman?
13      A. Oh, yeah, I don't specifically remember
14   the conversations that led up to it, but I remember
15   we talked about it a lot. I say "we." I mean the
16   administrator and I talked about it. The vice
17   chairman and I talked about it. Some of the
18   council members talked about it.
19      Q. Is that something that's still under
20   review?
21      A. Yes.
22      Q. Was -- was there ever a response to
23   this letter from the attorney general?
24      A. I don't know. I don't recall.
25      Q. At some point after Jim Beckert was

**Page 32**

1   denied access to the County administration
2   building, did you learn that he was being granted
3   access?
4      A. Yes.
5      Q. How did you learn that?
6      A. It was told to me by a staff member and
7   I'm not sure which one or ones it may have been.
8      Q. And what was your take on that?
9      A. Well, I was surprised and I was
10   concerned.
11      Q. What were you concerned about?
12      A. My -- it was my understanding that he
13   had been forbidden to come in the building.
14      Q. And also forbidden to have any direct
15   contact with any County employees?
16      MR. ANDERSON: Object to the form.
17      THE WITNESS: Yes.
18   BY MR. CROSBY:
19      Q. And that was something that you, as a
20   council member, thought was an appropriate action?
21      MR. ANDERSON: Objection.
22      THE WITNESS: Absolutely. It was the
23   first thing that I can recall that had any teeth in
24   it. By that -- by that, what I mean is that we
25   were -- we could actually do something to help

**Page 33**

1   these people.
2   BY MR. CROSBY:
3      Q. And to -- to help shield them from Jim
4   Beckert's --
5      A. Yes.
6      Q. -- harassing behavior?
7      A. Yes.
8      Q. And just -- just looking over time, his
9   behavior over the last several years leading up to
10   this decision to restrict his access, it had
11   been -- what you were hearing had been pretty much
12   the same, the way he was harassing and bullying
13   different people?
14      A. Yes, but as time went on -- yes, yes.
15      Q. As time went on, did it escalate?
16      A. I was about to say that as time went on
17   there were more and more people involved in those
18   conversations.
19      Q. And his behavior had been pervasive
20   throughout that time and even getting worse?
21      MR. ANDERSON: Object to the form.
22      THE WITNESS: That's an opinion.
23   Perhaps.
24   BY MR. CROSBY:
25      Q. Well, just the complaints that you --

9 (Pages 30 - 33)

Ex. 3
Beaufort County Adopts Testimony:
Topic 15: The Relationship Between County Council
Members and Beckert

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

---

## JOHN HERVOCHON

September 27, 2021

---



SPECTRUM
COURT REPORTING SERVICES

www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

JOHN HERVOCHON - 9/27/2021

Page 9

1        MR. CROSBY: You said the next one would
2    be 27?
3            (Exhibit 27, 10/22/19 Email to
4            Hervochon from Caporale, was marked for
5            identification.)
6    BY MR. CROSBY:
7        Q   If you'd just take the one with the
8    yellow sticker and then pass the other two to
9    Mr. Buyck.
10       Who is Rick -- is it Caporale?
11       A   Caporale.
12       Q   Caporale.
13       A   He was my predecessor on county council.
14       Q   You took his place?
15       A   Yes, sir.
16       Q   This is an email from Mr. Caporale to you
17   attaching a piece that he had written for who he
18   refers to there as the Duke of Dyslexia. That's
19   Mr. Beckert?
20       A   Presumably.
21       Q   Is that something that you -- the manner
22   in which you refer to Mr. Beckert?
23       A   No, sir.
24       Q   And here he's indicating to you that this
25   is a press release that he wrote for Mr. Beckert.

Page 10

1    Why would he -- why is he forwarding that to you?
2        A   I don't recall specifically.
3        Q   Do you have an understanding of why
4    Mr. Caporale would be drafting a press release for
5    Mr. Beckert?
6        A   No, I don't.  I know that Rick and Jim
7    had some sort of relationship when Rick was on
8    counsel, but beyond that, I don't know why he would
9    do that.
10       Q   Did you have a conversation with
11   Mr. Caporale about the press release that was -- he
12   had drafted?
13       A   I don't recall.
14       Q   You are familiar with the I guess
15   controversy or discussion surrounding the contents
16   of the press release?
17       A   Correct.
18       Q   Is that the matter that ended up with the
19   independent auditing firm coming in and looking
20   into the matter?
21       A   Can you specify the question?
22       Q   Do you recall in some of these financial
23   discussions an issue that arose between Mr. Beckert
24   and Alicia Holland regarding some of the
25   calculations?

Page 11

1        A   Which calculations are you referring to?
2        Q   Well, I'm referring to the ones that are
3    in this memo.
4        A   And can you repeat the question, please?
5        Q   Do you recall when this controversy
6    arose?
7        A   I do.  This is in reference to the
8    rollback millage, if I'm not mistaken.
9        Q   Do you know what kind of relationship
10   Mr. Caporale and Mr. Beckert had such that he would
11   be writing public press releases?
12       A   No, I do not.
13       Q   Did you question that at the time?
14       A   His relationship?
15       Q   Yeah, and why he would be drafting a
16   press release.
17       A   I don't recall.
18       Q   And you developed a relationship with
19   Mr. Beckert whereby you would help him draft
20   documents, correct?
21       A   I don't recall ever helping draft
22   documents.  I recall asking for information to be
23   presented a little bit more clearly, but as far as
24   drafting, no.
25       Q   Do you recall helping him edit some of

Page 12

1    his emails?
2        A   Edit emails?
3        Q   Yes, some of the information that he was
4    sending out.
5        A   I don't recall that, no.
6            (Exhibit 28, Email Chain Ending in a
7            6/22/20 Email to Beckert from Hervochon,
8            was marked for identification.)
9    BY MR. CROSBY:
10       Q   And here's where Mr. Beckert was to
11   present to the Beaufort County School District, and
12   he sent you a draft of his presentation, asked for
13   your input?
14       A   Uh-huh, yes, sir.
15       Q   Do you remember that?
16       A   Not specifically, no, sir.
17       Q   Why would Mr. Beckert be requesting your
18   input into his presentation?
19       A   I had told him several times that he
20   needed to present information to public bodies more
21   clearly, and I'm presuming that this was the
22   genesis of one of those conversations.
23       Q   Did you ever review the final draft of
24   this presentation?
25       A   I don't recall.

3  (Pages 9 to 12)

JOHN HERVOCHON – 9/27/2021

Page 17

1    Q   Did you make any of the edits to this
2    document on Mr. Beckert's behalf?
3    A   Not that I can recall.
4    Q   I'm just curious to why he'd be sending
5    it to you before it went out.
6    A   Is that a question?
7    Q   Yes. I mean, I'm curious. Do you know
8    why -- have any idea why he'd be sending it to you?
9    A   We had talked about the particular issue
10   a number of times.
11   Q   But you were going to get a copy of it
12   before -- because you were copied on Exhibit 31,
13   correct?
14   A   Presumably.
15   Q   Yes. And I'm trying to gain an
16   understanding as to why Mr. Beckert, an hour before
17   this document was sent out to full council, would
18   run it by you.
19   A   I can't speak for Mr. Beckert.
20   Q   Well, did you do anything with it when he
21   sent it to you?
22   A   I don't recall. It's entirely possible
23   that I didn't even see it until I got the second
24   iteration of it.
25   Q   Well, somebody made some changes. The

Page 18

1    paragraphs were changed. The formatting was
2    changed somewhat there. Did you help him do that?
3    A   I don't recall. If I did, the exhibit
4    would be in your possession because I provided
5    everything that I sent to him.
6    Q   Well, do you know if Exhibit 31 is a
7    version that you -- a version that you edited?
8    A   I don't know that I did edit it.
9    Q   Did you have some understanding with
10   Mr. Beckert with regard to these issues that --
11   where you needed to approve what he was sending out
12   before he sent it out?
13   A   No, absolutely not.
14   Q   Do you know whether the numbers that are
15   contained in Exhibit 31, as stated by Mr. Beckert,
16   were indeed accurate?
17   A   I don't recall at the time.
18   Q   Do you recall today whether you and
19   Mr. Beckert have any kind of relationship such that
20   he runs certain issues by you?
21   A   Currently?
22   Q   Yes.
23   A   I haven't talked to Mr. Beckert in
24   probably a year and a half.
25   Q   Have you ever had any relationship or

Page 19

1    agreement with Mr. Beckert whereby you were -- he
2    was running certain issues by you before he went
3    public with him?
4    A   Agreement, no.
5    Q   Understanding?
6    A   Understanding, I would say no. I don't
7    think that appropriately characterizes the
8    relationship that we had.
9    Q   What was the relationship whereby he
10   would send you emails in advance?
11   A   He would raise issues to me and ask me
12   what my opinion was in my role as vice chairman at
13   the time of the finance committee and given my
14   background in finance.
15   Q   Would you do anything to verify his
16   numbers, since he was sending it -- running it by
17   you?
18   A   Occasionally, but most of the numbers
19   that he was pulling I did not have access to on a
20   daily basis.
21        (Exhibit 32, Text Messages, were
22        marked for identification.)
23   MR. BUYCK: Ronnie, I notice that the
24   text messages that you've got here do not bear
25   a Bates stamp or anything. Do you know where

Page 20

1    these came from?
2    MR. CROSBY: Well, that's stuff y'all
3    produced. I don't know.
4    MR. BUYCK: Okay. This came from --
5    MR. CROSBY: I wouldn't have had access
6    to it anywhere else. Chelci will be here
7    tomorrow. She probably can do better with
8    that than I can.
9    BY MR. CROSBY:
10   Q   And this is -- Exhibit Number 32 is an
11   exchange between you and Mr. Beckert.
12   A   Uh-huh, yes, sir.
13   Q   And he's commenting, it sounds like, on
14   some of his election -- or some -- I don't know if
15   it's election or not, on some -- well, tell me,
16   what was this conversation about?
17   A   This was about the campaign at the time
18   because we both got elected the same cycle.
19   Q   So you would -- this would answer a
20   question earlier. You would have known
21   Mr. Beckert, then, before you got elected?
22   A   It was right -- it was right in that time
23   frame, correct.
24   Q   Did y'all help each other with your
25   campaigns?

5 (Pages 17 to 20)



Deposition of:

# Gary T. Kubic

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

**Page 26**

1 concerned, was exemplary. Her level of experience
2 and knowledge, quite frankly, were far superior
3 than Mr. Beckert or a lot of others who were
4 involved.
5        Her level of responsibility was -- was
6 great in terms of what was necessary to provide
7 information -- financial information to council.
8        And so I took offense to the fact that
9 he would -- as well as he did this to me -- go
10 behind our backs and directly, either through
11 e-mail or conversations, discuss his viewpoints
12 regarding my performance and Alicia's performance
13 with my bosses who were county council members.
14        And on a few occasions, the chairman of
15 county council would call me and say, hey, have you
16 read these e-mails that Mr. Beckert is writing
17 about you?
18        I had no knowledge that he was writing
19 e-mails and not copying me to council members,
20 which I found quite odd because if a council
21 member's going to get it in writing or verbally from
22 and they get it in writing or verbally from
23 someone, what's a councilman going to do, he's
24 going to pick up the phone or come into my office
25 and say, hey, what's going on? And that was --

**Page 27**

1 that -- that upset me quite a bit.
2 BY MR. CROSBY:
3     Q.   The proper chain of command would have
4 been to -- if he was complaining about Alicia
5 Holland, would have been to --
6     A.   Complain to me.
7     Q.   To you?
8     A.   Correct.
9     Q.   And instead when these complaints would
10 go to council about you or any of your staff, it
11 was -- would come off to you as an effort to
12 embarrass you or -- or sort of sabotage you
13 without -- without you having any knowledge of it?
14        MR. J. ANDERSON:  Object to the form.
15        THE WITNESS:  Proper form, whether
16 public or private, about a disagreement would
17 typically require that the persons involved in
18 difference of opinions, that they would talk about
19 it. Mr. Beckert liked to surprise council in
20 public meetings or surprise my employees about a
21 complaint.
22        I don't know why he would do that. I
23 mean, he could complain to me. I guess it was
24 because he may have felt I never would resolve it
25 to the level of what he thought was appropriate.

**Page 28**

1 I'm not sure.
2        My orders to my staff were that if you
3 mention anybody in an e-mail about anything,
4 positive or negative, that you cc a courtesy copy
5 to the person who you mention in the e-mail, just
6 for proper form, and so that no one would accuse
7 anyone in my staff of going behind their back and
8 trying to create or disrupt a relationship between
9 me or my staff or me and council or me and another
10 elected official.
11 BY MR. CROSBY:
12     Q.   Just to be clear, throughout your time
13 at -- as county administrator during Mr. Beckert's
14 tenure, that -- sending e-mails to council making
15 accusations about you or your staff was something
16 that occurred regularly, correct?
17        MR. J. ANDERSON:  Object to the form.
18        THE WITNESS:  I -- I'll say -- I'll say
19 yes with a caveat. I don't know what -- what --
20 how the frequency of what you consider regularly.
21 But as a matter of form, I think that was his -- a
22 standard method of operation for Mr. Beckert, and I
23 don't know how frequently he used it because -- you
24 know, if he sent it to council without my knowing,
25 I have no idea how many times it occurred.

**Page 29**

1 BY MR. CROSBY:
2     Q.   And he accused you of violating laws
3 and policies on a number of occasions?
4     A.   Yes.
5        MR. J. ANDERSON:  Object to the form.
6 BY MR. CROSBY:
7     Q.   And the accusations that he made
8 against you were -- were false?
9        MR. J. ANDERSON:  Object to the form.
10        THE WITNESS:  Yes.
11 BY MR. CROSBY:
12     Q.   Did -- would you describe Mr. Beckert's
13 conduct as being totalitarian in nature the way he
14 carried himself?
15        MR. J. ANDERSON:  Objection.
16        THE WITNESS:  After a period of time,
17 my nonprofessional opinion about how a person
18 behaves or what they're thinking about it reminded
19 me that Mr. Beckert was -- or had some type of
20 inferiority complex, and to offset that paranoia,
21 he would become zealous in the way he would treat
22 or discuss other individuals who did not share his
23 viewpoint.
24        And at times -- at times he would
25 extend that anger to private companies, to the

8 (Pages 26 - 29)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 54

1 his obsession with control and authority has to
2 obviously affect office morale and performance in
3 many departments, and says: I know you're very
4 concerned.
5         Was she correct that you were concerned
6 about Mr. Beckert's affect on the morale and
7 performance of the various county departments that
8 were under your control?
9     A. Yes.
10    Q. And that goes back to what you talked
11 about earlier?
12    A. It goes back to Monica Spells, several
13 of my staff members, Dave Thomas in purchasing,
14 Alicia, Maria Walls. You know, it -- it -- it's
15 without question that Mr. Beckert was a disruptive
16 force generally.
17    Q. The -- did Maria Walls relay to you
18 other concerns she had with Mr. Beckert's behavior
19 toward her other than the staring through her
20 window?
21    A. Yes. Maria on several occasions told
22 me that she was afraid. She also shared with me a
23 notebook of various things that Mr. Beckert was
24 doing in terms of affecting her department, tape
25 recording her. And she gave me a copy of that

Page 55

1 notebook I think with the hope that I would be able
2 to somehow correct the situation. The problem for
3 me was I was the county administrator, and I have
4 11 bosses, and besides going to the department of
5 revenue and county council, there is not much else
6 I could possibly do. I couldn't dismiss him or get
7 him out of office. He was an elected official.
8     Q. Did you go to council with the -- those
9 concerns that -- about Ms. Walls's that she had
10 expressed to you?
11    A. Yes. The procedure that I employ with
12 council, because there are 11, is that I first
13 advise, which I did, my concerns to county chairman
14 and the vice chair, and I think it was at the time
15 Paul Sommerville and Jerry Stewart. As a matter of
16 fact, the protocol -- written protocol on how to
17 get a tax bill was an example of that concern. I
18 think I addressed in several of the meetings,
19 particularly I think finance, that we were having
20 difficulties with the auditor in general.
21        And I think there were times where the
22 auditor and treasurer in those meetings were
23 present, and they both spoke to it, and it was
24 clear from their comments that -- that it was very
25 difficult for them to cooperate with each other.

Page 56

1     Q. Did -- after you carried the concerns
2 Ms. Walls raised to council, were there ever any
3 solutions proposed by council on how to alleviate
4 these concerns that she had raised to you?
5     A. It was my impression that council felt
6 that having them both present at their committee
7 meetings or allowing each of them separately or
8 collectively to address council from the podium
9 about their concerns on a matter in dispute, which
10 they permitted.
11        I do believe that I advised
12 Mr. Sommerville and Mr. Stewart of my concerns
13 regarding the inability of both parties to resolve
14 their differences so that there could be a
15 collective positive outcome in the responsibilities
16 of each at the department, because what's unique
17 about these two departments is they're independent,
18 but their product is -- is a combination of --
19 of -- of both efforts.
20        And then the third component is the IT,
21 which is the software processing to actually create
22 the tax rolls which then go towards the final
23 product in printing the bills.
24        So, yeah, they were aware, and I think
25 the heightened awareness of it was the tax bills.

Page 57

1 I mean, there were disputes on language, there were
2 disputes on timeliness. And I wasn't the only one
3 that called the department of revenue. Mr. Beckert
4 called them countless times trying to get them to
5 see his way.
6     Q. And what you learned from your
7 conversations with the department of revenue was
8 that Mr. Beckert's interpretation of the laws was
9 inaccurate?
10    A. Yes. And I think a few times with the
11 extensions -- you know, they were -- they were
12 granting us extensions to push the date to produce
13 the bills back a month or so. But they were keenly
14 aware of Mr. Beckert.
15    Q. And when you were talking -- mentioned
16 earlier about Ms. Walls's concerns for her safety,
17 you were talking about her physical safety?
18    A. Yes.
19        MR. J. ANDERSON: Object to the form.
20 BY MR. CROSBY:
21    Q. And she expressed that to you?
22    A. Yes. More than one occasion.
23    Q. Was council aware that you had locked
24 Mr. Beckert out of your end of the building?
25    A. I'm not sure. I'm certain that

15 (Pages 54 - 57)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 82

1 recorded that way.  In today's modern world with
2 technology, it's so easy to have the controls in
3 place to do it with one system instead of two.
4        Several councilmen felt that that would
5 not be approved by -- the merger would be approved
6 by the electorate, which was necessary, but it was
7 discussed in -- in depth at the time.  And it arose
8 in several occasions with those two units of
9 government.
10      Q.  During your tenure, there was no action
11 taken on -- on that?
12      A.  I don't think we ever proposed it to be
13 a consideration.  I think -- I'll have to go
14 back -- I don't believe -- was there a vote?  I'm
15 not sure.  You can't help me, can you?
16      Q.  He can't.
17      MR. KEAVENY:  I can't.
18      THE WITNESS:  I can't remember.  Maybe
19 there -- was rejected by council.  I can't -- I
20 can't recall.  I think there was also some concern
21 by council at the time that we had referendums on
22 sales tax and other issues that they felt had --
23 more pressing issues for the sales tax to go
24 forward than changing the form of government.  I
25 think they felt it was too difficult, didn't want

Page 83

1 to give me too much control.
2 BY MR. CROSBY:
3      Q.  But it was your thought during that
4 time that the -- those offices would be merged and
5 would -- there would become a county employee or
6 would just those two offices merge and be --
7      A.  I think the --
8      MR. BUYCK:  Note my objection.
9 BY MR. CROSBY:
10      Q.  -- one -- one elected office.
11      MR. J. ANDERSON:  Same objection.
12      THE WITNESS:  I think -- I think it
13 would go under the control of the county
14 administrator as a unit of government.  And quite
15 frankly today, I still agree that for efficiency
16 purposes and accountability and ease of operation,
17 that's the way to go.
18 BY MR. CROSBY:
19      Q.  Were there any particular members of
20 county council during your tenure that would --
21 that were close to Jim Beckert, just based on your
22 observations?
23      A.  Well, everyone knew that Jim Beckert
24 was the finance chairman for Brian Flewelling, and
25 even in certain sessions or committee meetings,

Page 84

1 Councilman Flewelling -- and I believe he had
2 mentioned that.  And I think Councilman Howard
3 mentioned that she was a neighbor, lived close to
4 Mr. Beckert.  Those two come to mind readily.
5        I'm not sure about anybody else.  I'm
6 running -- I'm trying to run through who the other
7 councilmen were.
8        I think Sommerville was relatively
9 independent.  Stewart was independent.  It was just
10 basically, I think, Councilman Flewelling, maybe
11 Councilman Covert toward the end of my
12 administration.
13      Q.  Would Councilman Flewelling in your
14 observations take Jim's side in some of these
15 disputes?
16      MR. BUYCK:  Note my objection.
17      MR. J. ANDERSON:  Object to the form.
18      THE WITNESS:  You know, Councilman
19 Flewelling in my opinion is a very good elected
20 official in the sense that he chooses his words
21 very carefully.  So I don't think he ever overtly
22 said you got to take Jim Beckert's side.  I think
23 he would be more -- expressed -- I think he
24 expressed, hey, let's take another second look at
25 his concerns and see if there would be an ability

Page 85

1 to incorporate either a portion or all of his
2 objections into a process or procedure.
3      MR. CROSBY:  Why don't we take just a
4 few minutes break.  I'm about -- probably about
5 done.  I need to take care of piece of personal --
6 or other legal business real quick.
7      THE WITNESS:  Okay.  I got to get my
8 dog out of the cage.
9      THE VIDEOGRAPHER:  We are going off
10 record.  This is the end of media unit one.  The
11 time is 3:24 p.m.
12      (A recess transpired.)
13      THE VIDEOGRAPHER:  We are back on
14 record.  This is the beginning of media unit two.
15 The time is 3:43 p.m.
16      (PLF. EXHIBIT 8, E-mail Chain with the
17 Top Line E-mail From Joshua Gruber Dated 5/21/14,
18 was marked for identification.)
19 BY MR. CROSBY:
20      Q.  Mr. Kubic, you get the opportunity to
21 look over --
22      A.  Yes.
23      Q.  -- Exhibit 8?
24        Do you have an independent recollection
25 of -- of that, the contents of Exhibit 8?

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com

Ex. 3
Beaufort County Adopts Testimony:
Topic 16: All Litigation Involving the County and
Beckert

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

```
 1              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
 2                  BEAUFORT DIVISION

 3

 4

 5   ALICIA HOLLAND,

 6      Plaintiff,

 7

 8

 9
     vs.                          CASE NUMBER
10                        9:20-cv-03479-DCN-MHC

11

12

13
     BEAUFORT COUNTY and JAMES BECKERT,
14   Individually, and in his Official Capacity,

15      Defendants.

16   --------------------------/

17          The videotaped deposition of ERIC

18   GREENWAY, a witness in the above-entitled cause,

19   taken pursuant to Notice and agreement, before

20   Ceil Weser, Certified Court Reporter and Notary

21   Public, before Robert Claxton, videographer, at

22   the Offices of Beaufort County Administration

23   Building, 100 Ribaut Road, Suite 170, Beaufort,

24   South Carolina, on the 12th day of April, 2022,

25   commencing at or about the hour of 8:14 a.m.
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
**800-791-1100**          **www.coastalcourt.com**

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY                    30–33

Page 30

1    Q    But you didn't see the headlines
2    yourself, is that what you are saying?
3        A    I don't see the headlines.
4    Q    So prior to you coming in --
5        A    So let me make sure you understand
6    something. I don't read the newspaper. I don't
7    watch the news. I listen to the news on the
8    radio in my car.
9        I get a summary every day from the
10   Public Information Officer here highlighting the
11   news of notes for the area. I look at that
12   summary.
13       I very seldom sit down and read an
14   entire article in a newspaper because that
15   information if in my role that information
16   generally is unproductive to me being effective
17   as a County Administrator; because it is all
18   about selling articles and getting clicks on the
19   internet, so if that makes sense to you.
20   Q    It does make sense.
21       Now, did you get that summary as
22   Planning Director?
23       A    I did not get that summary as Planning
24   Director because it was not done prior to me
25   hiring the current Public Information Officer,

Page 31

1    Mr. Chris Ophardt.
2    Q    So you created that?
3        A    (Nods).
4    Q    Did you create that role or did you
5    just hire someone to fill that role?
6        A    I hired someone to fill that role. So
7    Ashley Jacobs had a Public Information Officer,
8    but I didn't get a summary or news from her. It
9    was a different situation then.
10   Q    So what led you to you getting that
11   summary, was that part of their job description
12   or was that something you requested?
13       A    No, Ophardt did that on his own and
14   sent that out to me and various other people.
15   It is a very good thing that he does. It is
16   about hiring talented people to help you
17   administer the duties of the County. And he is
18   a talented individual who does that summary.
19       I didn't give him any direction or
20   didn't request any summary or anything.
21   Q    So whenever you took on the role as
22   County Administrator, whether that was acting,
23   interim, permanent, were you ever briefed on
24   these lawsuits and/or Beaufort County lawsuits
25   against Mr. Beckert?

Page 32

1        A    I was not briefed on any of the
2    lawsuits to my knowledge until Mr. Buyck and I
3    had --
4    Q    I want to stop you because I am sure he
5    is about to start talking. To the extent that
6    you are about to tell me conversations that you
7    had with him --
8        A    I won't tell you any conversations. I
9    know better than that.
10   Q    Just making sure.
11       A    That was the first time I was briefed
12   on a lawsuit is when he and I had the discussion
13   about this deposition coming up, because I was
14   really confused as to why you all wanted to
15   depose me.
16   Q    Okay.
17       So what was your knowledge about the
18   lawsuits prior to your conversation with Mr.
19   Buyck?
20       A    That they were in process. And that
21   people were being deposed as a part of them.
22   Q    What about the subject matter of the
23   lawsuits? Did you just think that they were
24   arguing over tax money or did you think that it
25   was about harassment? What was your knowledge

Page 33

1    of the lawsuits prior to your conversation with
2    Mr. Buyck?
3        MR. JOHN ANDERSON: Objection.
4        THE WITNESS: I knew what the
5    nature of the lawsuits were about.
6    BY MS. AVANT:
7    Q    How did you know that?
8        A    Because again I heard people talking
9    about them.
10       May have glanced at a headline in the
11   paper about them.
12   Q    And what about the County's lawsuits
13   against Mr. Beckert, what is your knowledge of
14   those?
15       A    I am a little more familiar with those
16   because I am deeply involved in those.
17   Q    You want to explain to me what they are
18   about.
19       A    Well, we are -- we have a lawsuit right
20   now about him performing -- compelling him to
21   perform the duties of his office as an Auditor.
22   And that involves several things that we feel
23   that he has not done properly as Auditor and has
24   failed to do as Auditor.
25       Do you --



In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II - 9/27/2021

**Page 57**

1  authorized the county government, whether it was
2  council or the administration or both, to ban him
3  from the administration building, and we told him
4  no, we weren't going to do that.
5       You know, he has a lawyer named Jim Brown
6  who represents him in a lawsuit that the county had
7  to file against him to make him do certain things,
8  and, you know, Mr. Brown may have raised it. I
9  mean, I kind of have this real fuzzy idea in the
10  back of my head that he might have, and I kind of
11  think that we had to go through that with our
12  lawyers. We have some lawyers in Charleston, Dawes
13  Cooke and John Fletcher, who represent us, and I
14  think they had some conversation about it.
15       Q  How many lawsuits has the county filed
16  against Mr. Beckert?
17       A  Two now.
18       Q  And remind me what the substance of those
19  were. What was being sought in those lawsuits by
20  the county?
21       A  In both cases, the county is trying to
22  ask a court -- the county is asking a court to
23  require Mr. Beckert to do certain things that the
24  county believes state statutes require him to do
25  that he is not doing or does not do or does do that

**Page 58**

1  he shouldn't do.
2       Q  Were those by way of writs of mandamus?
3       A  That's what -- yeah. One of the
4  causes -- the first lawsuit against Mr. Beckert
5  we've asked for a writ of mandamus. That's a writ
6  from the court requiring him to do something and/or
7  to enjoin him from doing something, and maybe
8  there's maybe a declaratory judgment action in
9  that -- in that lawsuit as well.
10       Q  And what was -- the second one was
11  similar?
12       A  The second one is similar. So the first
13  one was asking the court to require him to use a
14  certain debt service millage that was different
15  than the one he wanted to use. That was the
16  purpose of the first lawsuit.
17       The second lawsuit is really a lawsuit to
18  ask the court to require him to do several things
19  that he does not do that we believe he should do or
20  to ask the court to enjoin him from doing things
21  that he does that we don't think he should do.
22       Q  And have those lawsuits been resolved?
23       A  They have not.
24       Q  Did they -- did the filing of those
25  lawsuits result in Mr. Beckert doing what he was

**Page 59**

1  supposed to do?
2       MR. ANDERSON: Objection.
3       THE WITNESS: Well, with regard to the
4  first lawsuit -- there actually -- the first
5  lawsuit involved two issues that we asked the
6  court to require him to do. One was to enter
7  onto the tax bills a law enforcement user fee
8  for real property that is located in the Town
9  of Hilton Head, and that is to recoup the
10  costs of the services that the sheriff
11  provides to the town by contract.
12       Mr. Beckert -- we had emails back and
13  forth from Mr. Beckert indicating that he
14  didn't think the ordinance that was adopted
15  was correct and was legal and gave us the
16  impression he wasn't going to do it, even
17  though the law is that every ordinance is
18  presumed to be legal and valid.
19       So we were concerned that the tax bills
20  that he was -- the duplicate he was preparing
21  would not contain those fees, and we wanted to
22  make sure that they did, so we filed a lawsuit
23  for that. And then he was -- we know that he
24  wanted to use a different debt service millage
25  than the county council approved, so we asked

**Page 60**

1  the court to require him to do both.
2       He actually put the -- he didn't -- in
3  the end, he didn't challenge the law
4  enforcement user fee, but he did challenge the
5  debt service millage, so we got a court order
6  from Judge Carmen Mullen requiring him to use
7  the debt service millage that the county
8  council approved on the bills that went out --
9  well, the tax bills for tax year FY '20 that
10  were prepared in the fall of '20, should have
11  gone out in November of '20, but they didn't
12  get out until maybe February/March of this
13  year, that -- the last year's tax bill.
14  BY MR. CROSBY:
15       Q  Right, yeah. I remember getting one in
16  March.
17       A  I'm sure you did.
18       Q  Yeah.
19       A  You have until March to pay, I think,
20  right?
21       Q  Right.
22       And so what was the -- is that both
23  lawsuits, or what was the other lawsuit?
24       A  No. That's just the first lawsuit. The
25  second lawsuit, I don't have it in front of me, but

15 (Pages 57 to 60)

Thomas J. Keaveny, II – 9/27/2021

**Page 61**

1  I can try to -- try to remember some of it.  But
2  there were several things on the second lawsuit to
3  make him -- to ask the court to require him to do.
4  One is to maintain an abatement book of taxes that
5  are abated, and that's necessary so that bond
6  rating agencies and others know what property --
7  what property that could generate tax revenue is
8  not generating tax revenue due to agreements
9  pursuant to state statute.  So that's the abatement
10  book.
11        There was an issue with him getting
12  involved in determination or adjudications about
13  the applicability of 4 percent versus 6 percent
14  assessment ratios on property, which falls within
15  the purview solely of Ebony Sanders and the Board
16  of Adjustments and Appeals, so to have him stay out
17  of that, because he intervened in one case and
18  adjudicated himself when he shouldn't have done it.
19        And there are a couple of other things
20  that we've asked the court to require him to do.  I
21  just can't remember off the top of my head.
22        Q   And that one hasn't resulted in an order
23  yet?
24        A   It has not.  There have been no orders
25  issued in that case.  I think his lawyer just filed

**Page 62**

1  an answer this month, earlier this month.
2        Q   Was there ever any consideration of
3  filing a similar-type lawsuit against Mr. Beckert
4  with regard to his behavior toward county employees
5  or Ms. Walls?
6        MR. ANDERSON:  Objection.
7        THE WITNESS:  I don't remember having any
8  conversations about -- with county council or
9  with the administrator about county government
10  taking an action, a lawsuit against
11  Mr. Beckert, no.
12  BY MR. CROSBY:
13        Q   Subject to the questions about the
14  grievances, I'm going to pass you to Mr. Anderson
15  and see if he has any questions.
16        MR. ANDERSON:  I can't hear you.  My
17  apologies.
18        MR. CROSBY:  Do you have any questions?
19  I was going to pass the witness.
20        MR. ANDERSON:  Yeah, I do, but can I get
21  five minutes?  Unless --
22        MR. CROSBY:  No.  Go ahead.
23        MR. ANDERSON:  Mind if I have five
24  minutes?
25        MR. CROSBY:  Sure.

**Page 63**

1        MR. ANDERSON:  Thank you.
2        THE VIDEOGRAPHER:  Off the record at
3  11:49.
4        (A recess transpired.)
5        THE VIDEOGRAPHER:  On the record at
6  11:53.
7        EXAMINATION
8  BY MR. ANDERSON:
9        Q   Good morning, Mr. Keaveny.
10        A   Good morning.
11        Q   We've met before.  My name is Jon
12  Anderson, and I represent Jim Beckert both as the
13  auditor and himself personally.
14        I have a few questions.  I'm going to
15  want to get to -- some of them are follow-up to
16  questions you just received.  I'd like to direct
17  you to 24, to Exhibit 24, and that is the email --
18  it says at the top:  Holland, Alicia, but it
19  starts -- it's a three-page, Holland 299 to 301.
20        A   Yeah.
21        Q   Okay.  I'm not sure the one you have has
22  a Bates stamp on it.
23        And who do you think that -- Amelia Furr
24  Ruple, she sends an email and says:  As you are
25  aware, we have been instructed that questions

**Page 64**

1  relating to the duties between the auditor and the
2  treasurer be resolved by the Beaufort County
3  attorney.
4        Now, that's a lot of passive writing in
5  there.  I'm wondering who instructed the DOR?
6        A   Yeah.  So I can't answer that question,
7  but I can tell you that when I received it -- I
8  have worked with Amelia a lot with regard to
9  Mr. Beckert and the issues between the treasurer
10  and the auditor since July of 2015, a lot, and I
11  kind of read that as Mr. Cleland having
12  instructed their -- Mr. Cleland, who's a deputy
13  director, having instructed Amelia and Sandy's
14  office to refer things to us.
15        Because, see, Amelia and Sandy, they work
16  in a -- I can't remember what their division is,
17  but they're kind of like a training arm of DOR, and
18  they provide training and they provide assistance
19  to the treasurer and the auditor with regard to the
20  tax process.
21        Q   Let me ask you this:  I know right now
22  you're deputy, but you've been the treasurer
23  county attorney for Beaufort.  Who is your client?
24        A   You know, that's a -- who is the -- so
25  that's an issue for CLEs, you know, who is your

16  (Pages 61 to 64)

Ex. 3
Beaufort County Adopts Testimony:
Topic 17: Control Over County Real and Personal
Property and the Identity of the Person Charged with the
Responsibility of Ensuring Said Property is Used in
Accordance with Applicable Policies and Procedures



Deposition of:

**Robert Bechtold**

*April 8, 2021*

In the Matter of:

**Holland, Aliciav. Beaufort County et al**

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Robert Bechtold

Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 10

1 that falls under my charge also had a complaint.
2    Q.  And who was that?
3    A.  That was our -- I'm sorry, I don't know
4 why I'm drawing a blank right now. If I could just
5 have a second. That was our assessor.
6    Q.  Ebony Sanders?
7    A.  Ebony Sanders.
8    Q.  What did you learn about Ebony Sanders'
9 issues with Jim Beckert?
10    A.  That she filed -- again, I'm really not
11 certain, other than that she filed a complaint
12 against it -- against him. I don't know how it was
13 done or other than -- I believe -- I'm really not
14 certain. I read it in something and before, and
15 this would have been after, you know, I was
16 directed to help move the office and everything. I
17 don't remember if it was the paper or if it was --
18 but I didn't know prior to that.
19    Q.  Did you have any involvement in
20 investigating the complaint filed by Ebony Sanders?
21    A.  No.
22    Q.  Did you ever attend any meetings or
23 accompany Ashley Jacobs to any meetings between her
24 and Jim Beckert?
25    A.  No. I don't -- no, I don't believe I

Page 11

1 have ever been in the same room. I don't -- I
2 don't think so, no.
3    Q.  At some point in time you were involved
4 in moving the -- the auditor -- the auditor's
5 office?
6    A.  I was.
7    Q.  Tell me about that.
8    A.  I -- Ashley, I believe it was verbally
9 or otherwise, she asked me to find a place for him
10 outside of the main administrative building and I
11 don't know if it was my decision or hers
12 ultimately, but I found a place down there at
13 records management. And I went over to see
14 Mr. Beckert and let him know that we found an
15 alternate location for him. And he -- he had
16 requested that if it were done, if he could have it
17 done outside of normal operational hours. And I
18 said sure. And then I had a crew come over and
19 help move all of the stuff down to the records
20 management building to the ultimate location.
21    Q.  When was that?
22    A.  I don't know the date.
23    Q.  It was sometime before Ashley Jacobs
24 left the County's employment, obviously?
25    A.  Yes.

Page 12

1    Q.  Do you recall what month it was in?
2    A.  I believe it was in the Fall. I mean,
3 really, I believe it was sometime in the Fall.
4    Q.  When you met with Ash- -- I mean, with
5 Jim Beckert about moving his office, tell me about
6 any conversations you had with him, other than him
7 asking you to do it outside of operational hours.
8    A.  I mean, it -- it was insignificant, so
9 I mean, nothing specific. That was the only
10 request that he made that -- that stuck out to me
11 because I had gone over there to coordinate that
12 with him and so...
13    Q.  And did he ask you why he was being
14 asked to move?
15    A.  I have -- I mean, I have no idea. This
16 is a, again, 46 departments in my daily activities,
17 I don't know that it's possible for me to retain
18 that, so I don't specifically know.
19    Q.  Did he seem to object to having to move
20 offices?
21    A.  He did. In fact, I mean, ultimately,
22 he did. So, I don't remember. I mean, again, I
23 don't know really the context of the conversation.
24 I was there to execute something, you know, a
25 directive and so I went, communicated what I needed

Page 13

1 to communicate to him, let him know where it was
2 going to be. He requested that I do it after
3 hours, so I facilitated that.
4    Q.  And that's -- that's all I'm asking.
5 You only know what you know.
6    A.  Right.
7    Q.  And I don't know it until you answer
8 the question.
9    A.  Uh-huh.
10    Q.  So don't, you know, feel offended by
11 me.
12    A.  Oh, I'm not at all. I'm trying to
13 recollect things that I can't and that's
14 frustrating.
15    Q.  Some people have good memories and some
16 people don't.
17      You -- what you're telling me is that
18 when you went to move him, Mr. Beckert did not put
19 up any type of opposition, his only request was to
20 do it after hours?
21    A.  Yeah, I mean, that was his request.
22    Q.  And he complied with the move?
23    A.  He did.
24    Q.  Now, sometime later I believe you
25 were -- became a point of contact for Mr. Beckert?

4 (Pages 10 - 13)

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

```
 1                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
 2                     BEAUFORT DIVISION

 3

 4

 5   ALICIA HOLLAND,

 6       Plaintiff,

 7

 8

 9                                    CASE NUMBER
     vs.
10                        9:20-cv-03479-DCN-MHC

11

12

13
     BEAUFORT COUNTY and JAMES BECKERT,
14   Individually, and in his Official Capacity,

15       Defendants.
16   --------------------------/

17           The videotaped deposition of ERIC

18   GREENWAY, a witness in the above-entitled cause,

19   taken pursuant to Notice and agreement, before

20   Ceil Weser, Certified Court Reporter and Notary

21   Public, before Robert Claxton, videographer, at

22   the Offices of Beaufort County Administration

23   Building, 100 Ribaut Road, Suite 170, Beaufort,

24   South Carolina, on the 12th day of April, 2022,

25   commencing at or about the hour of 8:14 a.m.
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
**800-791-1100**          **www.coastalcourt.com**

ALICIA HOLLAND vs BEAUFORT COUNTY
9:20-cv-03479-DCN-MHC - ERIC GREENWAY

10–13

Page 10

1  A  I have a daughter.
2  Q  **And how old is your daughter?**
3  A  She will be 21 at the end of June.
4  Q  **Does she live in Beaufort County?**
5  A  No, she does not.
6  Q  **What county does she live in?**
7  A  She lives with my ex-wife.
8  Q  **So walk me through this because I am**
9  **fairly ignorant when it comes to this process,**
10  **how did you get put in the running for County**
11  **Administrator?  Did you apply for it?  Were you**
12  **approached about it?  How did that work out?**
13  A  I was approached to be acting County
14  Administrator by the County Council, shortly
15  around the time that they were deciding to
16  depart ways with the then County Administrator.
17  Q  **Which would have been Ashley Jacobs, is**
18  **that right?**
19  A  Yes.
20  Q  **Who approached you?**
21  A  The Chairman of the County Council.
22  Q  **And tell me a little bit about that**
23  **conversation.**
24  A  The conversation went something along
25  the lines of hey, we need somebody to step in

Page 11

1  the role to be acting County Administrator, and
2  while we are looking for an interim County
3  Administrator would you fulfill that role for us
4  because a few people have suggested that you
5  would be able to step into the role and fulfill
6  those duties while we are looking for an
7  interim.
8  Q  **And was just your performance as acting**
9  **County Administrator what gave you the push to**
10  **be the interim, or did you put in for that?  How**
11  **does that work?**
12  A  I did not put in for any of the
13  positions.
14  When I became acting they started
15  looking for an interim.  I don't think they were
16  successful for an interim.  I wasn't a part of
17  that process.  I was doing my duty as acting
18  County Administrator while they were looking for
19  an interim.
20  They came back to me after several
21  weeks and said hey, we have been unsuccessful in
22  finding an interim.  Would you be willing to
23  assume those duties while we are looking for a
24  permanent County Administrator?
25  Q  **And then when it comes to --**

Page 12

1  **Why don't you do this, tell me about**
2  **your duties as County Administrator?**
3  A  My duties as County Administrator are
4  pretty simple overall.  That is to administer
5  the administration sections of the County for
6  as -- as far as budget.
7  Taking care of employees' needs through
8  HR.  Overseeing the various department heads.
9  There is about 48 department heads that are
10  underneath the purview of the County
11  Administrator.
12  Q  **And of those department heads, does any**
13  **of your purview include the Treasurer or**
14  **Auditor's Office?**
15  A  They are not.
16  Q  **So how do you work in conjunction with**
17  **them?**
18  A  The County Administration provides some
19  benefit support with regards to HR functions and
20  things like that.
21  But beyond that I have no authority or
22  duty over the Treasurer or the Auditor.
23  Q  **Does the County provide them office**
24  **space?**
25  A  We provide office space in the

Page 13

1  administration building here and in Myrtle Park
2  in Bluffton.
3  Q  **Does the County provide them office**
4  **supplies, such as postage, paper, their**
5  **computers, their Email addresses, is all that**
6  **provided by the county?**
7  A  The County provides them certain
8  assets, but we don't provide them paper or
9  anything like that.  We provide IT, we provide
10  IT support.
11  Q  **So where do they get their office**
12  **supplies from?**
13  A  I have no idea.
14  Q  **What about postage, do they use the**
15  **county postage room?**
16  A  I am sure they use our Mail room, yeah.
17  Q  **Do they have a division on the county's**
18  **website?**
19  A  Say that again.
20  Q  **Do they have a -- a division may not**
21  **have been the best word.  Let me rephrase this.**
22  **Do they have a portion of the county**
23  **website designated to their office?**
24  A  They have a web page on the County
25  website, if that is what you are asking, yes.



Ebony Sanders - 9/28/2021

Page 9

1      Q   All right. And do you recall what it was
2   about?
3      A   Not clearly what it was about, but I know
4   it was about a form-- -- it was about taxation. I
5   can tell you that much from what I can recollect.
6      Q   And when -- when you say conflict, can you
7   help me understand what your definition of conflict
8   with him would be?
9      A   My definition of conflict with -- on
10   the -- when you're defining the word conflict, it's
11   not only -- it's not consideration of a
12   disagreement. We have disagreements with people.
13   That's not what I'm looking at. Conflict to me
14   would be intimidation, retaliation, bullying. Those
15   are the type of things that conflict in my
16   definition would be for Jim Beckert -- with Jim
17   Beckert.
18      Q   Can you give us some examples of times
19   when -- or how Mr. -- Mr. Beckert would intimidate
20   you?
21      A   Yes.
22      Q   Can you please do that?
23      A   There's been occasions when he's come to
24   my office, and he's been -- he's intimidated me on
25   one or two occasions, my staff, and I had to address

Page 10

1   that matter accordingly.
2      Q   So beyond intimidation of you, he would
3   also intimidate your staff?
4      A   That is correct.
5      Q   What about an example of how he might
6   bully you?
7      A   He's bullied me personally in my office
8   face-to-face, as well as in verbal -- as in written
9   communication that we have received. So we've had
10   those instances as well.
11      Q   Can you be more specific about what --
12   what that would look like when he would bully you?
13      A   Yes. Accusations of things that are not
14   true. Accusations against my staff that are not
15   true and the department that is not true.
16      Q   You're not a political figure, are you?
17      A   That is correct.
18      Q   So those weren't political differences
19   between -- that Mr. Beckert was trying to hash out?
20      A   That is correct.
21      Q   What I'm understanding is that he would
22   come in and just falsely accuse you and your staff
23   of not doing your jobs properly?
24      MR. ANDERSON: Object to the form. You
25   can go ahead.

Page 11

1      A   I'm -- one more time can you ask the
2   question? I got distracted when he objected. But
3   one more time can you ask the question?
4   BY MR. CROSBY:
5      Q   Well, with some of the -- the behaviors
6   that Mr. Beckert would exhibit toward you and your
7   staff, would he falsely accuse you of not doing your
8   jobs properly?
9      A   That is correct. Yes. He has.
10      Q   Can you be more specific? Can you give us
11   some specific examples?
12      A   He -- you know, he has accused me of -- he
13   has accused me of -- falsely accused me of treating
14   him -- being a racist. He has accused me of not
15   having the ability to do my job. He has come to my
16   office and bullied my staff, one particular
17   gentleman who has autism, and I had to defend him.
18      Q   I'm going to give you what's marked as
19   Exhibit 47.
20      (Plaintiff's Deposition Exhibit No.
21      47 was marked for identification.)
22      Q   Can you give me a minute?
23   BY MR. CROSBY:
24      Q   Yes, ma'am. And if there's more you want
25   to say here, I don't want to cut you off on your

Page 12

1   answer.
2      A   I just need a minute.
3      Q   Ma'am?
4      A   I just need a minute.
5      MR. CROSBY: Okay.
6      MR. BUYCK: And what we're going to do is
7   we're going to pass these around. If you'll
8   hand me that exhibit. You're going to keep the
9   one with the yellow, and we're going to keep a
10   circle going around. I'm going to take one,
11   and I'm going to pass one to Mr. Anderson.
12      MR. CROSBY: Thank you, Tom.
13      MR. ANDERSON: You want to explain
14   objections?
15      MR. CROSBY: I thought I did it.
16   BY MR. CROSBY:
17      Q   But, again, there may be a time when they
18   object to a question I ask. And I think it just
19   threw --
20      A   I understood.
21      Q   I figured it just threw you off on what
22   the question was.
23      A   Yes. It did. I understand.
24      Q   And that does -- that happens.
25      A   I do -- I apologize. I do apologize.

3 (Pages 9 to 12)

Ebony Sanders – 9/28/2021

Page 21

1   -- to change or to stop Mr. Beckert from behaving in
2   that manner prior to filing the grievance?
3       A   Not to my knowledge, no.
4       Q   If an action was taken, you weren't --
5       A   I would not --
6       Q   -- told about it?
7       A   That is correct.
8       Q   Was it common knowledge within the county
9   administrative building and within the government
10  that Mr. Beckert was behaving abusively toward
11  yourself and others?
12      MR. ANDERSON:  Object to the form.
13      A   Yes.
14  BY MR. CROSBY:
15      Q   You're okay.
16      A   Yes.
17      Q   So tell me what happened when you -- when
18  you filed your grievance.
19      A   I filed a grievance based on a
20  recommendation from an outside source.  It went to
21  human resources.  I sent a copy to Amanda Kinkaid.
22  Well, she's human resources.  Ashley Jacobs received
23  a copy as well.
24      Q   And was -- did the county investigate it?
25      A   Yes.  I was instructed that the county

Page 22

1   would investigate the matter.
2       Q   And was that done?
3       A   Yes.  It was.
4       Q   And was an outside law firm hired to come
5   in and do an independent investigation?
6       A   An attorney was hired to do an
7   investigation.  I'm not clear if it was an outside
8   firm or not.
9       Q   A lady named Linda Evans?
10      A   That is correct.
11      Q   And did Ms. Evans interview you?
12      A   She did.
13      Q   How about any of the --
14      MR. BUYCK:  Let me correct you.  It's
15  Edwards --
16      MR. CROSBY:  Edwards.
17      MR. BUYCK:  -- and not the actress.
18      MR. CROSBY:  Okay.  Shows how old you are.
19  BY MR. CROSBY:
20      Q   Yeah.  Linda Edwards.  I apologize.  And
21  just tell me about that investigative process.  What
22  you -- what happened?  Talk to you.  Did she talk to
23  any of your staff?
24      A   Yes.  She did.
25      Q   And what was the ultimate outcome of -- of

Page 23

1   that, Ms. Sanders?
2       A   Ms. Edwards informed me that she didn't
3   find any -- I'm not sure if she said issues.  I
4   cannot remember the complete conversation, but the
5   end result was that they didn't find anything.
6       Q   Now, you as a county employee have to sign
7   off on a -- the county handbook?  Employee handbook?
8       A   I did not sign off on the county handbook.
9       Q   How did you get around that?
10      A   When you -- I cannot remember, but I
11  remember not signing it at the time.
12      Q   The -- the conditions that you were
13  subjected to with regard to Mr. Beckert, in your
14  estimation, did -- did that constitute a
15  hostile-type environment when he would come around?
16      MR. BUYCK:  Note my objection.  You can
17  answer.
18      A   One more -- repeat the question.
19  BY MR. CROSBY:
20      Q   Was Mr. Beckert's interactions with you
21  and your staff -- did that create a hostile
22  environment to work in?
23      MR. BUYCK:  Same objection.  You can
24  answer.
25      A   Yes.

Page 24

1   BY MR. CROSBY:
2       Q   And you've already described it as
3   bullying and intimidation?
4       A   Yes.
5       Q   What you're telling me is that the
6   investigation performed by Ms. Edwards did not make
7   that determination?  Didn't make a finding against
8   of any sort?
9       A   I do not recall completely.  I don't
10  recall exactly our conversation with her.
11      Q   Were you -- was there a report or anything
12  of -- from her investigation that was provided to
13  you?
14      A   I don't remember receiving one.  So I
15  can't say for certain.  I'm not going to say for
16  certain.  It's been a while, but I know I did speak
17  with her.
18      Q   But your ultimate conversation, what you
19  gleaned from it, was that she did not make any type
20  of a finding favorable to you or -- or that your
21  allegations were -- had merit?
22      MR. BUYCK:  Note my objection.  You can
23  answer to the best you can.
24      A   She did not say it was not a merit.  She
25  did not say that from my conversations with her.

6  (Pages 21 to 24)



Deposition of:
# D. Paul Sommerville

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions
800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville
Holland, Alicia v. Beaufort County et al

April 8, 2021

Page 6

1    Q.   During your service on County Council,
2  did you become aware by some means of complaints
3  from employees and perhaps others about what they
4  perceived to be harassing or abusive conduct toward
5  them by Jim Beckert?
6    A.   What was the word before "conduct"?  I
7  heard you say harassing and some kind of conduct.
8    Q.   Abusive?
9    A.   Abusive conduct.  Yes.
10    Q.   And tell me how you -- you came to know
11  of those complaints.  And I'll ask you some
12  specifics, but I would just like some generalities
13  to start with.
14    A.   Well, I had -- I have no idea how many
15  conversations with a number of people on that
16  topic.
17    Q.   To the extent you can, when did you
18  first learn about any complaints about Jim
19  Beckert's behavior?
20    A.   I believe Mr. Beckert was first elected
21  -- think about this.  About 9- -- about 2015, I
22  think.  This is his second term, I think.  Towards
23  the end of second term.  So I'm going to say
24  2015 -- that may not be exactly right -- is when he
25  first became auditor, I think, close.

Page 7

1    And I don't remember, to be honest with
2  you, when the first time I heard the complaints
3  about him, so I can't really put a date to it.
4    Q.   Sometime after he took office?
5    A.   Yes, sir.
6    Q.   And what was the nature of the
7  complaints, as best you can recall?
8    A.   Well, they took two forms.  One was --
9  was his job performance and another was the way he
10  treated some individuals that I became aware of.
11    Q.   There were some people that would
12  complain about Mr. Beckert's performance as
13  auditor?
14    A.   Yes, sir, to me.  I don't know, I'm
15  sure they -- well, I'm not sure of anything.  They
16  may have complained to others, but they definitely,
17  some people definitely complained to me.
18    Q.   And then there were complaints about
19  his behavior to -- towards specific others?
20    A.   A lot of the complaints had to do with
21  his job performance, but you're asking me about
22  what?
23    Q.   About his behavior toward people
24  employed -- County employees.
25    A.   Employees.  Yes, several County

Page 8

1  employees complained to me specifically about his
2  behavior towards them.
3    Q.   And can you give me the names of some
4  that you can recall?
5    A.   Yes, sir, I'll give you the ones I can
6  recall.  Alicia Holland, Maria Walls, the CFO of --
7  of the school board, Tanya --
8    Q.   Crosby?
9    A.   -- Crosby.  Thank you.  No, I'm sorry,
10  Tanya Crosby did not complain to me about his
11  treatment of her.  She complained about his job
12  performance.  I want to be clear about that.
13    I recall those two, but I'm not sure
14  beyond that.
15    Q.   Did you ever learn of any complaints by
16  Ebony Sanders?
17    MR. ANDERSON:  Objection.
18    THE WITNESS:  Ebony Sanders, no, sir, I
19  do not.
20  BY MR. CROSBY:
21    Q.   What about Monica Spells?
22    MR. ANDERSON:  Same objection.
23    THE WITNESS:  Am I hearing things?
24    MR. ANDERSON:  No, sir.  I'm objecting,
25  but you can answer the question.

Page 9

1    THE WITNESS:  Oh, okay.  I want to --
2  don't want to dis- -- I don't want to be
3  dismissive.
4    MR. ANDERSON:  No, sir.  It's a
5  speaking objection.  You can answer.
6    THE WITNESS:  I understand.
7    Okay.  You're asking me if I had
8  complaints from Monica Spells --
9  BY MR. CROSBY:
10    Q.   Yes.
11    A.   -- about Beckert directly?
12    Q.   Yes.
13    A.   Directly, no.
14    Q.   How about indirectly?
15    A.   I don't recall specifically.
16    Q.   Did Gary Kubic ever express concerns to
17  you about Beckert's treatment of some of his staff?
18    A.   Yes.
19    Q.   What do you recall was relayed to you
20  by Gary Kubic?
21    A.   Would you repeat the question, please.
22    Q.   What -- do you recall what Gary Kubic
23  told you about that?
24    A.   About?
25    Q.   About his concerns about Beckert's

3 (Pages 6 - 9)

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 10

1  treatment of his staff?
2      A.  He -- he complained -- we're not
3  talking about his job performance now.
4      Q.  Right.
5      A.  We're talking about treatment.
6      Q.  Right.
7      A.  Okay.  Gary and I had -- Gary -- Gary
8  told me on several occasions that Jim Beckert
9  was -- I don't want to misquote Gary and it's very
10  difficult to try to remember his exact words, but
11  I'm trying.  I'm going to have to paraphrase
12  because I'm not sure of his exact words, that he
13  was harassing some employees.
14      Q.  Did Gary inform you of any action that
15  he had taken to protect those employees?
16      A.  Yes.  Gary -- I was chairman during
17  some of that -- oh, excuse me, I forgot to turn my
18  phone off.  I'm sorry.  Oh, shoot.  Sorry.  I
19  forgot to turn my phone off.
20      MR. BUYCK:  If you need to get that
21  call you're welcome to.
22      THE WITNESS:  What's that?
23      MR. BUYCK:  If you need to get that
24  call --
25      THE WITNESS:  No, no, no.  I -- it's --

Page 11

1  I'll call them back.
2      Again, would you repeat the question?
3  I'm sorry I was interrupted.
4  BY MR. CROSBY:
5      Q.  I believe the question was did Gary
6  ever tell you or did you learn of any actions that
7  Gary had taken to protect any of the County
8  employees from Jim Beckert's harassment?
9      A.  Yes.
10      Q.  What -- what did you learn?
11      A.  He told me on numerous occasions that
12  he had gone to Beckert's office and talked to him
13  and brought Beckert into his office to talk to him
14  to try to prevent some of that behavior.
15      Q.  Did you ever learn that he had blocked,
16  basically limited Jim Beckert's access to his
17  part -- part of the building?
18      MR. ANDERSON:  Objection.
19      THE WITNESS:  I am not aware that Gary
20  Kubic limited Beckert's access to any part of the
21  building or -- I don't remember that that was
22  discussed.
23  BY MR. CROSBY:
24      Q.  What about, did you become aware that
25  Gary Kubic, in conjunction with the sheriff's

Page 12

1  office, had installed cameras on the County
2  administration building because of Jim Beckert's
3  peering through Maria Walls' windows?
4      A.  Yes.
5      Q.  When did you learn of that?
6      A.  Well, let's see.  Gary left in -- I'm
7  not going to try to pinpoint that date because I
8  don't remember exactly when he left, but sometime
9  prior to Gary leaving he told me that -- he told me
10  he was installing cameras for that purpose.  Among
11  others, there were other -- it wasn't the only
12  purpose, but it was a purpose.
13      Q.  What you learned is that what prompted
14  it was a complaint from Maria Walls about Jim
15  Beckert peering through her window?
16      A.  Yes.
17      MR. ANDERSON:  Object to the form.
18  BY MR. CROSBY:
19      Q.  Did -- did he relay to you that Jim
20  Beckert would peer through his window as well?
21      A.  On numerous occasions, yes.
22      Q.  In your time on County Council, was the
23  issue of Jim Beckert's behavior toward employees
24  and/or Maria Walls ever discussed as an agenda item
25  or in an executive session item where there was

Page 13

1  some effort to determine if anything could be done
2  to stop it?
3      A.  I don't recall.
4      Q.  Did Gary Kubic ever express to you any
5  frustration about his inability to stop Jim
6  Beckert's behavior?
7      A.  Yes.
8      Q.  And -- and tell me -- tell me what you
9  recall about that.
10      A.  I can remember on several occasions
11  Gary being extremely frustrated because he -- he
12  couldn't figure out how to solve that problem, the
13  Beckert problem, in spite of his efforts.
14      Q.  I believe after Maria Walls filed her
15  lawsuit, you were interviewed by the -- the paper
16  and you indicated that -- you acknowledged the
17  complaints that had been received and indicated it
18  had been on an ongoing basis?
19      A.  (Indicating an affirmative response.)
20      Q.  Is that correct?
21      A.  That's correct.
22      Q.  And you're quoted in there as saying,
23  "We concluded that because he's an elected official
24  there wasn't a whole lot we can do."  And it says,
25  "I never felt comfortable with that because I just

4 (Pages 10 - 13)

D. Paul Sommerville                                    April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 14

1  kept thinking there has to be something we can do
2  to help these poor people."
3       Do you recall saying that?
4       A. I do.
5       Q. When you say we made the decision or we
6  concluded that there wasn't much could be done was
7  that council concluded or are you talking about
8  County government?
9       A. No, I'm really talking about Gary and
10  myself because my conversations were not with the
11  council itself. We may have had individual
12  conversations. I don't recall that we had a group
13  conversation, a council conserv- -- conversation.
14  But I had many conversations with Gary about it and
15  so I guess the "we" I'm talking about really is
16  Gary and I. I think I was probably chairman at
17  that time.
18       Q. And as chairman you would have had a
19  lot of direct communications with the County
20  administrator?
21       A. Daily.
22       Q. Was there ever a -- a legal opinion
23  that was issued where that was looked at to see if
24  there was anything that could be done?
25       A. I don't have direct knowledge of any

Page 15

1  conversations that may have taken place between
2  Gary and attorneys or Gary and the governor's
3  office or Gary and whoever. I mean I had second --
4  I have secondhand information that those
5  conversations took place, but no firsthand
6  information.
7       Q. Did you ever see any -- anything in
8  writing that came to the conclusion that nothing
9  could be done to stop Jim Beckert from harassing
10  employees and others on County property?
11       A. I don't recall seeing anything like
12  that.
13       Q. You certainly felt that -- or -- strike
14  that.
15       You certainly would have liked to have
16  been able to do something to protect these
17  employees from harassment?
18       A. Oh, my gosh, yes. Absolutely.
19       Q. And if there would have been anything
20  within the power of the County administrator that
21  could have been done to protect them, that should
22  have been done, correct?
23       MR. BUYCK: Note my objection.
24       THE WITNESS: Would you repeat that,
25  please.

Page 16

1  BY MR. CROSBY:
2       Q. If there was anything that could have
3  been done within the power of the County
4  administrator or department heads to protect from
5  Jim Beckert's harassing behavior, that should have
6  been done?
7       A. You mean -- I'm still not understanding
8  --
9       Q. Is it --
10       A. -- exactly how you're wording the
11  question.
12       Q. Well, would you agree that if there
13  were actions that could have been done to protect
14  from Jim Beckert's harassing behavior, that any
15  available avenue should have been pursued?
16       MR. ANDERSON: Object to the form.
17       THE WITNESS: Oh, absolutely. Would
18  have been, certainly would have been by Gary and my
19  opinion would have been pursued by Gary Kubic and
20  would have been pursued by me in my role. We just
21  never could come up with anything that seemed to
22  have any likelihood of success. It was very
23  frustrating.
24  BY MR. CROSBY:
25       Q. Did you ever have any conversations

Page 17

1  over the years with Maria Walls about her concerns
2  about Jim Beckert's behavior?
3       A. Yes. I can't tell you how many, but it
4  was probably quite a few.
5       Q. Was that something that was a constant
6  topic between you and Maria where she would bring
7  up her concerns about Jim Beckert?
8       A. Yes.
9       Q. In your observations or in what she
10  told you, did you learn as to whether she feared
11  for her physical safety?
12       A. I can't answer that. I don't know the
13  answer to that.
14       Q. But what she would relay to you was
15  that she was being harassed by Jim Beckert?
16       MR. ANDERSON: Objection.
17       THE WITNESS: Yes.
18  BY MR. CROSBY:
19       Q. When --
20       A. Excuse me, I just remembered I have got
21  another phone to turn off. That's it. I promise
22  there are no more.
23       Q. When -- sometime after Maria Walls
24  filed her lawsuit against the County, did you learn
25  that Jim Beckert's access to the County

5 (Pages 14 - 17)

D. Paul Sommerville                                April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 18

1    Administration Building had been restricted?
2        A.  Yes.
3        Q.  Tell me how you came to learn of that.
4        A.  I believe that the then-County
5    administrator told us that -- told the County
6    Council at an executive session.  It wasn't -- it
7    was after Gary.  This was Ashley Jacobs.
8        Q.  She told council that she had taken the
9    steps to restrict his access --
10       A.  Correct.
11       Q.  -- and prohibit -- prohibit him from
12   having any contact with County employees?
13       A.  Yeah, let me, if I may, clarify
14   something I said a minute ago that we had no
15   executive sessions to talk about Jim Beckert.  That
16   was under Gary Kubic.  But I can't recall any, but
17   now we're moving forward to Ashley Jacobs and under
18   Ashley Jacobs we did have, I don't remember, one or
19   two, but we had at least one.
20       Q.  Okay.  Well, I was going to ask you
21   about Ashley Jacobs.  So did Ashley Jacobs ever
22   relay comp- -- complaints about Jim Beckert's
23   harassment of County employees?
24       A.  Yes.
25       Q.  What do you recall about your

Page 19

1    conversations with Ms. Jacobs?
2        A.  A lot of her complaints about Jim
3    Beckert had to do with his job performance.
4        Q.  Well, would -- I'm talking about
5    specific to his harassment of County employees.
6        A.  Right.  I'm trying to recall if she --
7    she very well may have, but I can't -- I can't
8    swear that that happened, that she did, that she
9    talked about his harassment.  She very -- I'm sorry
10   to say I just don't specifically remember.  I had
11   so many conversations with so many people about his
12   harassment, that I'm not sure if she was one.
13       I had conversations with her about Jim
14   Beckert, but I'm not sure if harassment was part of
15   those con- -- it may -- may well have been, but I'm
16   not sure.
17       Q.  Did she ever relay to you that Jim
18   Beckert exhibited harassing behavior toward her?
19       A.  She never said that directly to me.  I
20   think -- I think I may have heard that secondhand,
21   but I'm not sure.
22       Q.  Did -- did -- did you read in any
23   newspaper articles where she was quoted as that, as
24   having been harassed by Jim Beckert?
25       A.  If there was an article, I read it, but

Page 20

1    I just don't recall it.  I think I have read every
2    article involving Mr. Beckert that's been written.
3    I may have missed one because I'm out of town quite
4    a bit, but I usually catch up when I come back,
5    so...
6        Q.  Were there any -- ever any discussions
7    in executive session about Jim Beckert's treatment
8    of County employees?
9        A.  Yes.
10       Q.  When -- when would that have occurred?
11       A.  Sometime in the first half of 2020.
12       Q.  And what was -- what -- what brought
13   that to be an item of executive session?
14       A.  Well, my impression was that
15   Ms. Jacobs -- Ms. Jacobs was extremely frustrated
16   dealing with Jim Beckert, as was Gary Kubic, the
17   difference being that I had a lot more daily
18   communication with Gary Kubic than I had with
19   Ms. Jacobs simply because I wasn't the chairman
20   beginning in 2020.
21       Q.  What do you recall about --
22       A.  Or -- or '19, for that matter.
23       Q.  What do you recall about the specifics
24   that she was relaying to council about her
25   frustrations with Jim Beckert?

Page 21

1        A.  I recall that her primary focus was
2    getting the tax bills out and getting the --
3    closing the books, getting the CAFR out and his --
4    his role in those things, particularly the tax
5    bills.
6        Q.  Well, and what about specific to his
7    conduct toward County employees and others on
8    County property?
9        A.  It was discussed, but I can't remember
10   the particulars of it.
11       Q.  Was there any executive action
12   discussed that -- that was proposed to be taken
13   with regard to Jim Beckert's conduct toward County
14   employees?
15       A.  Yes.  I don't know who came up with
16   this idea.  I may have known at the time, but I
17   don't know now.  Somebody came up with the idea
18   that we could exclude him or, I'm sorry, that the
19   administrator had control over the building, the
20   County Office Building and, therefore, had the
21   authority to exclude him from that building and
22   that was going to be the action taken and, in fact,
23   that was the action taken.
24       Q.  Now, that was after the lawsuits were
25   filed?

6 (Pages 18 - 21)

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 22

1    A. I can't -- I don't know what the
2   sequence was.
3    Q. Other than that, do you recall any
4   action that was discussed with regard to Jim
5   Beckert's conduct toward --
6    A. Yes, I heard some conversations about
7   going to the governor, but they were -- they were
8   secondhand conversations and so...
9    Q. That was something that was discussed
10  in executive session or just something that was
11  talked with outside of?
12   A. No, I don't recall it being discussed
13  in executive session, but I do recall it being
14  discussed between myself and Josh Gruber, Gary
15  Kubic.
16   Q. With regard to the County administrator
17  having the power or control over access to the
18  buildings, whatever that timing was, was there any
19  vote on that or was it just a discussion that she
20  actually, the County administrator, possessed that
21  power?
22   A. My recollection is that in executive
23  session, Ashley Jacobs proposed that idea. There
24  was never a vote, to my knowledge, and as a -- as I
25  recall, she proposed it as something within her

Page 23

1   authority to do. It didn't require a vote.
2    Q. The -- the County does have control
3   over the County property, correct?
4    A. Absolutely.
5    Q. So that's basically what she was
6   suggesting is, as in her role as the highest
7   ranking County employee, she had the authority to
8   make that -- take that type of action?
9    MR. BUYCK: Note my objection.
10   THE WITNESS: Correct.
11  BY MR. CROSBY:
12   Q. There was no vote taken that night
13  to -- or in that meeting to give her special power?
14   A. No, I only -- I only wish that I had
15  thought of it. I only wish that Gary Kubic had thought
16  of it. As far as I know, Gary Kubic didn't think
17  of it, Josh Gruber didn't think of it, and I didn't
18  think of it, so, but somebody did at some point and
19  I think it -- so...
20   Q. Do you re -- did you have more than
21  one conversation with Alicia Holland --
22   A. Yes.
23   Q. -- about Beckert's behavior towards
24  her?
25   A. Yes.

Page 24

1    Q. Was that something that she complained
2   to you about on multiple occasions?
3    A. Yes.
4    Q. Was the -- the complaint typically the
5   same, that Beckert was harassing her?
6    A. Well, a lot of her complaints had to do
7   with his -- because she was the chief financial
8   officer and responsible for the finance of the --
9   of the County, she -- a lot of her complaints,
10  certainly not all of them, but a lot of them had to
11  do with his job performance. But yes, she also
12  complained about his harassment.
13   Q. Did she --
14   A. To me.
15   Q. -- complain to you that he was causing
16  her discomfort and stress?
17   A. I'm struggling to answer that question
18  because I'm not sure if -- if my conversation with
19  her was privileged, so...
20   Q. I don't -- I don't know how it would
21  be, but as her attorney, it's okay to tell me.
22   A. Okay. No, I think there were other
23  things that frustrated her as well, but yes, Jim
24  Beckert was certainly one of them.
25   Q. Did she relay to you that she was

Page 25

1   stressed about whether that Jim was causing her
2   stress in -- in doing her job?
3    A. Yes.
4    Q. Let me give you a couple of documents
5   and I'll let him take a break so you can look at
6   them.
7    MR. CROSBY: What exhibit numbers are
8   these?
9    MS AVANT: (Inaudible.)
10   THE WITNESS: Take a break, like make a
11  call? Or take a break, like wait for them?
12   MR. BUYCK: You can make a call.
13   MR. CROSBY: Let's just go off the
14  record.
15   THE VIDEOGRAPHER: We are going off
16  record. The time is 2:42 p.m.
17   (A Recess transpired.)
18   (EXHIBIT 14, Letter, 3-6-18, was marked
19  for identification.)
20   (EXHIBIT 15, E-Mail, 5-21-19, was
21  marked for identification.)
22   (EXHIBIT 16, E-Mail, 8-7-20, was marked
23  for identification.)
24   (EXHIBIT 17, E-Mail, 8-19-20, was
25  marked for identification.)

7 (Pages 22 - 25)

Ex. 3
Beaufort County Adopts Testimony:
Topic 12: The Role of County Council Over the Day-to-
Day Operations of the County



Deposition of:

# Brian Flewelling

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Brian Flewelling
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 22

1  he was so adamant about it and I -- and finally at
2  the end I had to lay down the law, this is my
3  product, I'm paying for it, I need to have
4  authority to say what I want and what I don't want.
5        And he said okay and that was it. But
6  he was adamant about it, arguing with me about
7  something that I didn't think was his within his --
8  that I didn't think it was right for him to argue
9  with me and I felt like he was being a little bit
10  of a jerk.
11        And so that was 2008 and I'm sure that
12  it happened -- I saw him in a disagreement with his
13  wife, you know, over relatively simple things and
14  he's had a little bit of an attitude that I felt
15  was not the way I would have handled a disagreement
16  with my wife. And it was something very minor,
17  it's just the way he said something was, you know,
18  a little bit of a jerk. And, you know, I can't
19  even remember what the disagreement was or what he
20  said or even really the way he said it. Just like
21  I felt it was something jerky, you know.
22  BY MR. CROSBY:
23    Q.  Is -- is -- is Jim still married?
24    A.  Yes, to my knowledge.
25    Q.  Do they still have the Pinpoint

Page 23

1  Printing business?
2    A.  I don't believe he does that anymore.
3    Q.  Did you know Jim when he worked at
4  Beaufort Memorial Hospital?
5    A.  No. When I first met him, he may have
6  been at Beaufort Memorial, but honestly, I didn't
7  keep track of where he was working or what he was
8  doing.
9    Q.  Do you know of your own personal
10  knowledge if he ever worked there?
11    A.  Like having seen him there, no, not to
12  my own personal knowledge.
13    Q.  Has he told you he worked there?
14    A.  Not that I recall, no.
15    Q.  Were you -- you act like you were
16  familiar with that. Do you know -- you just don't
17  know one way or the other if he ever worked there?
18    A.  That's right. I don't recall that he
19  ever said he was gainfully employed by Beaufort
20  Memorial, but I recall having conversations about
21  him that it was implied that he worked there in,
22  like, HR or something like that.
23    Q.  Have you ever seen Jim exhibit what you
24  would consider behavior that would -- you would
25  classify as him being a jerk or being out of the

Page 24

1  way toward anyone else other than maybe a couple of
2  times with yourself and then his wife?
3    A.  No.
4    Q.  So if there were problems at the County
5  with regard to Jim Beckert harassing employees that
6  were beyond the ability of the County administrator
7  to resolve, that was just never brought to your
8  attention?
9    A.  No, I don't believe it was.
10    Q.  And even so, you would have expected
11  the County administrator to have had the ability
12  and authority to take necessary action to protect
13  the employees of Beaufort County?
14    A.  That's correct.
15    Q.  That would have fellen -- fallen
16  directly in the purview of the County administrator
17  as the top employee in the County?
18    A.  That's correct.
19        MR. CROSBY: Let me take just a quick
20  break. If you want to be at ease for a minute.
21        THE VIDEOGRAPHER: We are going off
22  record. The time is 1:43 p.m.
23        (A brief recess was taken.)
24        THE VIDEOGRAPHER: We are back on
25  record. The time is 1:51 p.m.

Page 25

1  BY MR. CROSBY:
2    Q.  As a member of County Council, would
3  you agree that the employees of the County ought to
4  be provided the working environment that is free of
5  harassment as -- as is set forth in the personnel
6  manual?
7    A.  Yes.
8    Q.  And that behavior by anyone, be it a
9  County employee, elected official, that disrupts
10  the working environment and causes employees of
11  Beaufort County to feel harassed or hostility,
12  should be addressed by the County if -- if they
13  come to know of that?
14    A.  I'm -- I don't really have an answer to
15  that question, sir. I'm not really sure I
16  understand what you're saying.
17    Q.  Well, if -- if the County leadership,
18  such as County administration become -- becomes
19  aware of a pattern of abusive behavior toward
20  County employees, would you agree that it be your
21  expectation that whatever the source of that
22  abusive behavior that it be addressed such that the
23  employees are working in a proper secure
24  environment?
25    A.  Within the bounds of the law, yes.

7 (Pages 22 - 25)

Brian Flewelling
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 26

1     Q.  Within the bounds of law and the bounds
2  of what -- what's set forth in County policy?
3     A.  And the law.  I'm not sure -- I'm not
4  sure what goes on, but I would expect the County
5  administrator to make sure that our employees have
6  a safe work environment.
7     Q.  And that is something you're really
8  obligated to, not only as a matter of policy, but
9  as a matter of law that all employees are entitled
10 to a safe working environment?
11    A.  Yes, sir.
12    Q.  And that's what the public, the voters
13 in Beaufort County would -- you would think that
14 that's what they would expect, correct?
15    MR. BUYCK:  Note my objection.
16    THE WITNESS:  Yes, sir.
17 BY MR. CROSBY:
18    Q.  In preparation for your deposition, did
19 you review a recording of a telephone conversation
20 or -- between you and Maria Walls from January
21 2020?
22    A.  Is that when that conversation
23 happened?
24    Q.  Yeah.
25    A.  Yes.

Page 27

1     Q.  Is that the one you were referring, you
2  thought it was October of 2 --
3     A.  That's correct, sir, that's the one I
4  thought it was --
5     Q.  Okay.  That's the one you were making
6  reference to?
7     A.  Right.  Exactly.
8     Q.  And that's where you were saying you
9  were trying to be an intermediary?
10    A.  Right.
11    Q.  Was anything in that conversation
12 between you and Ms. Walls that you felt was
13 inaccurate?
14    A.  You mean at the time that I was
15 doing -- I was --
16    Q.  Well, just when you reviewed it, I
17 mean, does that sound like an accurate recording of
18 the conversation between you and Ms. Walls on that
19 day?
20    A.  Yes.
21    MR. CROSBY:  We'll mark a placeholder
22 for a transcript of that for -- was it 13 now?
23    MS. AVANT:  13.
24    (EXHIBIT 13, Audio Recording
25 Transcript, was marked for identification.)

Page 28

1  BY MR. CROSBY:
2     Q.  I'm not going to bother you with going
3  through that line by line.  If you've listened to
4  it, we have got it.
5     With that said, I don't have any other
6  questions.
7     MR. BUYCK:  I have no questions.
8     MR. ANDERSON:  I don't have any
9  questions.  Thank you, sir.
10    MR. BUYCK:  All right.  We're done.
11    THE VIDEOGRAPHER:  We're going off
12 record.  The time is 1:55 p.m.  This concludes the
13 video-recorded testimony of Brian Flewelling and
14 will be retained by Veritext.
15    (The witness, after having been advised
16 of his right to read and sign this transcript, does
17 not waive that right.)
18    (The deposition concluded at 1:55 p.m.)
19
20
21
22
23
24
25

Page 29

1     CERTIFICATE OF REPORTER
2
3     I, Julie L. Bonomo, Court Reporter and
4  Notary Public for the State of South Carolina at
5  Large, do hereby certify that the foregoing
6  transcript is a true, accurate, and complete
7  record.
8     I further certify that I am neither
9  related to nor counsel for any party to the cause
10 pending or interested in the events thereof.
11    Witness my hand, I have hereunto
12 affixed my official seal this 18th day of April,
13 2021, at Charleston, Charleston County, South
14 Carolina.
15
16
17
18
19
20
21
22
23
24    Julie L. Bonomo
      Court Reporter
      My Commission expires
25    July 28, 2027

8 (Pages 26 - 29)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II - 9/27/2021

Page 13

1  the discovery that's been served on the county?
2      A  He's aware that we've been served with
3  discovery.
4      Q  And, of course, you, as a lawyer,
5  understand --
6      A  Sure.
7      Q  -- the county would have an obligation to
8  preserve --
9      A  Right.
10     Q  -- any discoverable material?
11     A  Right, right.
12         MR. BUYCK:  And just for the record, I've
13  given you the issues set forth regarding
14  videos and that we don't have the capacity to
15  maintain the videos for a lengthy period of
16  time.  There have been several letters
17  exchanged between your office and my office
18  relative to that, and if there's something
19  that y'all want within the time frames in
20  which we're able to get it and you're aware of
21  it, then let us -- let us know what you're
22  aware of, and we'll try to preserve it the
23  best we can, but otherwise, we don't have the
24  capacity to do so.
25         And I'm just -- I'm just putting this out

Page 14

1  there again because I don't want it to look
2  like we're trying to hide something from you.
3         MR. CROSBY:  Well, just know you have an
4  obligation, if they know there's video of him
5  going in there, to preserve it, and that can
6  be preserved right immediately.
7         MR. BUYCK:  This is the first I've heard
8  of it, but I'll do whatever is necessary, but
9  like I said, if y'all will let me know of
10  things, I'll be glad to try to preserve it.
11         MR. CROSBY:  Well, I just let -- I just
12  let you know about that.
13         MR. BUYCK:  That's fine.
14         MR. CROSBY:  But they already knew, so I
15  would presume that it's been preserved.
16         MR. BUYCK:  Okay.  First I've heard of
17  it, so --
18         THE WITNESS:  If it exists.  I don't even
19  know if it exists.
20         MR. CROSBY:  I think our next exhibit is
21  Number 18.
22         (Exhibit 18, 8/15/16 Email to Cadd
23  from Beckert, was marked for
24  identification.)
25         MR. CROSBY:  I think the next exhibit's

Page 15

1  supposed to be -- is 18 in what we've marked
2  so far.
3  BY MR. CROSBY:
4      Q  Do you recognize the attachment to
5  Exhibit 18?
6      A  I do.
7      Q  Just explain to me what this is.
8      A  All right.  Let me just read it fully for
9  a second.
10     Q  Yeah.  Take your time.
11     A  I remember seeing it, but it's been a
12  long time.
13        All right.  Yes.  So I'm sorry.  Your
14  question is?
15     Q  What is the attachment to Exhibit 18?
16     A  Being a lawyer, I can be long-winded, and
17  I apologize for that, so if I get long-winded and
18  don't answer your question, just kind of get me
19  back to where you want to be.
20        But what this document is is it's a
21  letter from Gary Kubic to basically all the elected
22  officials in the county regarding Beaufort --
23  county council's decision to adopt a new personnel
24  handbook for the first time since 2005.  And so
25  this new handbook went into effect, I think by

Page 16

1  resolution of council, on August 1st, 2016, and the
2  regulations and the rules that are set forth in
3  that personnel handbook apply only to folks over
4  whom the administrator has authority, hiring and
5  firing authority.  The county administrator's
6  authority does not extend to the offices of the
7  elected officials.
8         And so what Mr. Kubic decided he wanted
9  to do was to provide the elected officials,
10  including the magistrates who are selected by a
11  state senator, the opportunity to adopt -- to
12  review the handbook and to decide whether or not
13  they wanted to utilize it for their personnel, and
14  if they did, he wanted them to sign this document
15  so that we could then -- HR could then process
16  payroll, vacation times, all kinds of benefits,
17  everything, for the employees for the elected
18  officials the same as the employees over whom he
19  had authority.
20     Q  And so that sort of an exchange
21  between the county and the elected official where
22  if they sign on to the -- be bound by the handbook,
23  that the county then provides certain services?
24     A  That's exactly right.
25     Q  And did Jim Beckert, as an elected

4  (Pages 13 to 16)

Thomas J. Keaveny, II - 9/27/2021

Page 17

1  official, sign onto the handbook?
2      A  I don't know that I ever saw his
3  signature, but it's my understanding that he did,
4  yes.  I say I don't know.  I don't recall seeing
5  it, but I might have.  But I think all the elected
6  officials decided to go that way, although I don't
7  know about the legislative delegation.  I see
8  Representative Erickson's name is on here, and I
9  really don't know what became of that.
10     Q  I'll pass you Exhibit Number 19.
11         (Exhibit 19, 3/28/17 Email to
12         Keaveny from Gruber, was marked for
13         identification.)
14  BY MR. CROSBY:
15     Q  And I just wanted to point to the --
16  maybe that third paragraph, Tom.  Looks like an
17  email from you to Josh Gruber.  I guess you're
18  addressing Jim Beckert there?
19     A  It looks like it's from Josh Gruber to
20  me, even though it then says Jim.  So I think I
21  remember this situation, but let's make sure.
22  Yeah, I think this is right.  Hold on a second.  Do
23  you want me to -- are you going to ask me --
24     Q  No.  I was just -- if we look at that
25  third paragraph Mr. Gruber writes there, it says:

Page 18

1  By electronic communication to the county
2  administrator, you voluntarily adopted this policy.
3     A  There you go.
4     Q  So would that be confirmatory?
5     A  Yeah, yes, sir.
6     Q  And this is where Mr. Beckert is
7  attempting to require an employee to give 30 days
8  notice --
9     A  Right.
10    Q  -- of her leaving the county's
11 employment?
12    A  Right.
13    Q  And Mr. Gruber is pointing to Mr. Beckert
14 that he's not allowed to do that?
15    A  Uh-huh.
16    Q  That's a yes?
17    A  Yes.
18    Q  And Maria Walls, likewise, signed the
19 agreement to be bound by the Beaufort County
20 employee handbook?
21    A  I don't know that I ever saw her
22 signature, but by virtue of things that have gone
23 on with Maria and her employees, I have to believe
24 that she agreed to be bound by it.
25    Q  In order to accept the -- to get the

Page 19

1  services from the county, there would have to be
2  that agreement in place?
3     A  And I understand she's -- her employees
4  have been receiving those services, so I assume
5  that she signed the document.
6     Q  And once the elected official signs that,
7  the memorandum, the agreement to be bound by the
8  employee handbook and have their personnel, their
9  employees abide by the handbook, the county, as is
10 pointed out in Exhibit 19, expects the elected
11 officials and their employees to abide by the
12 handbook?
13        MR. BUYCK:  Note my objection.
14        THE WITNESS:  You know, I would say that
15 in general, the answer to that question is
16 yes, but I don't think that it gave -- it
17 certainly didn't give -- in my opinion, it
18 didn't give the county administrator authority
19 over their employees.
20 BY MR. CROSBY:
21    Q  Right, but you expected that the
22 employees abide by the various provisions in the
23 handbook?
24    A  Sure, you know, not to take more vacation
25 than you are allotted and what -- all the

Page 20

1  regulations that are in there, sure, grievance
2  procedures, for instance.
3     Q  To follow the anti-harassment policies?
4     A  Yes, sir.
5     Q  Going back to the office space, tell me
6  what is the -- that interplay with regard to office
7  space between the county and elected officials.
8     A  So it's been a long time since I've
9  looked at the statute that applied, but the state
10 statute requires the counties to provide the
11 elected officials offices and office equipment and
12 office supplies, the things that -- I think the
13 statute is very broad and vague.  It just -- I
14 think it says something like that the county shall
15 provide the elected officials the resources
16 necessary to perform their functions, and so that's
17 what we do.  That's what the county does.
18    Q  And where that office space is located
19 is -- that is within the discretion of the county?
20        MR. BUYCK:  Note my objection.
21        THE WITNESS:  Well, at some point it is.
22 I think it's difficult to -- I think there's
23 some case law out there that indicates it's
24 difficult to move -- instruct officials to
25 move.  We haven't ever tried -- I haven't ever

5  (Pages 17 to 20)



Deposition of:

# Gary T. Kubic

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

## Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 58

1 Mr. Beckert let them know.
2    Q.   Did he ever express his displeasure to
3 you?
4    A.   Oh, yeah.
5    Q.   That was certainly within your
6 authority to take that action, I assume?
7    A.   Yes.  I think there is a -- I'm not
8 sure if there is a statute or there is a policy.
9 Maybe it's a council policy.  But county
10 administrators are responsible for the -- all
11 buildings of the county, includes maintenance.  The
12 only caveat would be overall security, which I
13 coordinated with the sheriff's office.
14    Q.   Have you got Exhibit Number 1?  Can you
15 pass him a copy there?
16    A.   Give me three minutes so I can read
17 this document.
18    Q.   Just take a second.  You probably
19 helped write it, so...
20    A.   I'm familiar with it.
21    Q.   And that's the county handbook that was
22 adopted -- that version looks like August of 2016?
23    A.   Yes.  Resolution 2016/11.
24    Q.   And I believe that in addition to
25 county employees, that the employees of the

Page 59

1 auditor's and treasurer's office signed off on that
2 document?
3    A.   I believe all elected officials of the
4 county signed off on this document.
5    Q.   Including council members?
6    A.   Well, council doesn't hire employees.
7 I'm not sure if they did.  But all the other
8 elected divisions, including I think the
9 magistrates, the courts, any other unit that had
10 separately had the capability by statute to hire
11 their own employees.
12    Q.   And what was it --
13    A.   All the hiring of employees for county
14 council was done through me.  That's why I don't --
15 I don't know if county --
16    Q.   What's the rationale on -- on having
17 the other elected officials and their employees
18 sign off and adopt this policy?
19    A.   The recommendation and -- came from our
20 outside counsel, I believe, was Attorney Edwards.
21 The idea of having a personnel handbook was so that
22 the employee and the employer, whether it would be
23 county administration, auditor, or treasurer, that
24 the expectations and actions of each party would be
25 defined in writing, and that the uniform standard

Page 60

1 would be created by having all elected officials
2 consent to the rules and regulations of a personnel
3 handbook, which then offered a level of expertise
4 for HR in terms of consistent management or
5 application for vacation, sick leave, whatever the
6 provision or idea would be.
7    Q.   Was the adoption by the elected offices
8 of this -- of Exhibit 1, the manual, a part of
9 the -- I guess the bargain with the county for --
10 to receive HR services and that type of thing?
11    A.   Yeah.  There was a -- sort of a mutual
12 understanding that the HR department was under the
13 control of the county administrator; however, to
14 assist in advertising a position or to assist in
15 management or to assist in producing documents on
16 behalf of the employee W-2, the actual paychecks,
17 how to do electronic deposit, all those things were
18 a result of a mutual understanding of how to
19 process.
20        It didn't necessarily mean that I could
21 tell any elected official who to hire.  That was up
22 to them.  But the process of how to manage and what
23 was expected of both sides, that was the purpose of
24 the handbook:  Consistency.
25    Q.   And consistency on that side, and then

Page 61

1 there was a centralized -- the elected offices got
2 the benefit of using the county's HR services like
3 you say for W-2s and --
4    A.   Right.  Producing a paycheck.
5        MR. J. ANDERSON:  Object to the form.
6        MR. BUYCK:  Note my objection, too.
7        THE WITNESS:  What was your question
8 again?
9 BY MR. CROSBY:
10    Q.   There was two sides to it.  You had
11 consistency and policy over here, but also the
12 benefit to the elected offices would be consistency
13 and the provision of the HR services?
14    A.   Yeah.  There are certain requirements
15 that are involved when you hire an employee.  One
16 is simply recordkeeping, timekeeping,
17 hospitalization, how to produce a paycheck.  All of
18 those things were products of the HR department
19 under my administration as county administrator.
20 So the idea was instead of having all the elected
21 officials having their own HR department, their own
22 check writing, their own hospitalization, for
23 purposes of efficiency and movement, it -- it was
24 under the HR.
25        This, also, handbook was not just for

16 (Pages 58 - 61)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 62

1 elected officials, it's also for the new hires to
2 understand what their responsibilities are to the
3 taxpayer of Beaufort County.
4     Q.   Right.  This is the exact same handbook
5 that your staff would sign?
6     A.   Yes.
7     Q.   And it sets forth the expectations with
8 regard to the -- how you expect county employees
9 and those that sign off on this to act in the
10 workplace?  It has --
11         MR. J. ANDERSON:  Objection.
12         MR. BUYCK:  Note my objection.
13 BY MR. CROSBY:
14     Q.   -- certain -- certain forbidden --
15 or behaviors that are set forth in this?
16         MR. BUYCK:  Same objection.
17         MR. J. ANDERSON:  Me too.
18         THE WITNESS:  It -- it's a -- it's a
19 personnel handbook that offers the elected official
20 the hiring authority and the employee hired by the
21 hiring authority to know in writing what the
22 expectations would be for each side.  And so for
23 clarity, and also I think to protect the county
24 overall from random or haphazard claims by
25 employees against the county, if they did not

Page 63

1 follow the handbook, then they have no real
2 position to argue.
3 BY MR. CROSBY:
4     Q.   And --
5     A.   So, if they violated procedure, we had
6 the ability to process them through the conditions
7 and the grievance procedures defined in this book.
8     Q.   And one of the purposes of the -- some
9 of the language in the handbook is to provide a
10 good working environment by prohibiting such things
11 as sexual harassment?
12     A.   Yes.
13     Q.   That's something that was strictly
14 forbidden by the county?
15     A.   Appropriate behavior.
16     Q.   If we look at Page 6 at Paragraph 1.3,
17 it has an anti-harassment policy set forth there.
18     A.   Page 6, 1.3, yes.
19     Q.   And in the second sentence, it says:
20 In addition to county endeavors to provide a
21 working environment in which employees are free
22 from discomfort or pressure resulting from jokes,
23 ridicule, slurs, gossip, threats, bullying,
24 harassment whether relating to such distinctions or
25 simply resulting from a lack of consideration for a

Page 64

1 fellow human being.
2         And then it says:  The county does not
3 tolerate harassment of any kind and strictly
4 forbids retaliation against anyone who has reported
5 harassment in good faith.
6     A.   Yes.  That's what it says.
7     Q.   And basically it's -- what we've talked
8 about earlier, your efforts that we've talked about
9 to protect your staff and your employees from some
10 of Mr. Beckert's conduct were in effort to provide
11 the working anti -- harassment-free environment to
12 your employees?
13     A.   That's correct.  That's just sound --
14 sound management.
15     Q.   Because what -- what Mr. Beckert's
16 conduct, as you observed, would -- rose to the
17 level of what one would describe as harassment
18 within this definition?
19         MR. J. ANDERSON:  Objection.
20         THE WITNESS:  Are you asking me whether
21 or not Mr. Beckert violated this provision as
22 written in the employee handbook?
23 BY MR. CROSBY:
24     Q.   That's another way of saying it.
25     A.   I would have to say I agree with that

Page 65

1 assessment.
2     Q.   And what you did to the best of your
3 ability was try to protect the county's employees
4 from that type of environment?
5     A.   Yes.
6     Q.   And you actually tried to -- in some
7 respects to -- to help protect Maria Walls from
8 that conduct by putting up the cameras and taking
9 the concerns to county council?
10    A.   Yes.
11         MR. J. ANDERSON:  Objection.
12 BY MR. CROSBY:
13    Q.   Go over to page -- let me -- let me ask
14 something before this.  There is always this issue
15 about Jim Beckert that seems to permeate, and that
16 is that no one could do anything about him because
17 he was an elected official.  That was -- and you
18 and I have talked about that, that you didn't have
19 statutory authority to control an elected official,
20 correct?
21    A.   Yes.
22    Q.   The office of the auditor and the
23 treasurer are in county-owned property?
24    A.   Beg your pardon?
25    Q.   The offices of both the treasurer and

17 (Pages 62 - 65)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 66

1 the auditor are located in county-owned property?
2     A.  Yes.
3     Q.  And I take it the county provides a
4 budget for their offices?
5     A.  County council does the appropriation
6 for each of the units.
7     Q.  Was there ever any discussion while you
8 were employed with the county about separating the
9 offices or moving Jim Beckert's office to another
10 location?
11     A.  Well, we had discussions because we
12 were locating satellite offices and had satellite
13 offices for both the auditor, treasurer, and other
14 functions on Hilton Head.  We remodeled one stop
15 for the Bluffton South of the Broad office.  But I
16 did not engage -- I did not suggest moving
17 Mr. Beckert out of his main office as a result
18 of -- of these matters.
19     Q.  Page 8, Paragraph 1.6.
20     A.  Page 8.  Okay.  What paragraph?
21     Q.  1.6.
22     A.  All right.
23     Q.  And this -- point you to that second
24 sentence there where it says:  Non-employees may be
25 reported to appropriate law enforcement, which you

Page 67

1 did that, and I believe Mr. -- Ms. Walls may have
2 done that over time.  And it says that and/or
3 barred from the premises.
4         Do you have -- and what you're telling
5 me is that never was a discussion between you and
6 council to your recollection as to whether
7 Mr. Beckert could be moved and barred from the
8 premises over in Ribaut Road?
9     A.  Well, two things:  One, this particular
10 paragraph I would question as to whether it applies
11 to an elected official or not.  And in that sense,
12 to answer your question directly, I did not have
13 any discussions regarding removal of Mr. Beckert
14 from any of his offices to someplace else as a
15 result of these discussions we're having here.
16     Q.  Well, it has two categories of people,
17 either employees or non-employees?
18     A.  Right.
19     Q.  And Mr. Beckert, what you told me, is
20 not an employee?
21     MR. J. ANDERSON:  Objection.
22     THE WITNESS:  In my interpretation,
23 Mr. Beckert is an elected official and not an
24 employee in the sense that he's required to work a
25 40-hour week, that he's required to accrue vacation

Page 68

1 or sick as a regular employee.  There is a separate
2 category for elected officials in my opinion.  I
3 don't know whether it's defined by statute.  But he
4 is not considered a regular employee for this
5 personnel handbook.
6 BY MR. CROSBY:
7     Q.  He signed a copy, didn't he?
8     A.  He signed -- all the elected officials
9 sign these copies to accept the handbook as a tool
10 for new hires in terms of defining the
11 relationships between the hiring authority and the
12 employee.
13     Q.  Do you have any understanding as -- as
14 to whether Mr. Beckert currently is allowed in the
15 county building?
16     A.  Well, I don't have any direct
17 knowledge, but I have received a few phone calls
18 that he has been moved to another location.
19     Q.  And -- and I guess that's what I was
20 getting at.  I mean, council apparently took that
21 step and made that décision currently, and that
22 was -- all this was just directed as whether or not
23 that had ever come up in your tenure about moving
24 him?
25     A.  No.  Not to remove him from his office

Page 69

1 location.
2     Q.  And the county owns the building and
3 controls the building, correct?
4     A.  Yes.
5     Q.  And presumably since they've done it
6 now, had council wanted to take that action when
7 you first brought these complaints to their
8 attention, they could have done so?
9     MR. BUYCK:  Note my objection.
10     MR. J. ANDERSON:  Objection.
11     MR. BUYCK:  In a matter of law.
12     THE WITNESS:  Well, I suppose they
13 could have.  I don't know if it was offered as a
14 solution.
15 BY MR. CROSBY:
16     Q.  That -- it would be council that would
17 have to make that decision, correct?  It wouldn't
18 be --
19     A.  It's not me.
20     Q.  You wouldn't have that power?
21     A.  Huh-uh.  Maybe the governor.
22     Q.  And with regard to the employees, there
23 is certain rules set out in here about conduct and
24 a lot of other stuff, but how employees are to
25 conduct themselves as county employees.  And there

18 (Pages 66 - 69)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 70

1 is also expectations that the county is going to
2 endeavor to provide that nonhostile,
3 harassment-free workplace for the employees --
4        A.   Yes.
5        Q.   -- correct?
6        It's a two-way street there.  Employees
7 are expected to not harass people, and if the
8 county sees it, the county is expected to take
9 action to protect those employees?
10       A.   There is multiple facets of conduct
11 required by a public employee.  First and foremost,
12 they have to treat the public under the same
13 conditions in terms of respect and appropriate
14 behavior.  You can't swear at an employee or a
15 taxpayer just because he disagrees with the amount
16 on his tax bill.  There is proper conduct that way.
17       There is also parameters that -- in
18 this handbook as to how employee-to-employee
19 conduct should be entertained in the workplace,
20 just to protect not only from sexual harassments,
21 but in terms of providing a workplace where people
22 can feel safe as an employee, be able to conduct
23 their business with fellow employees without having
24 to worry about interference from another individual
25 who may disagree or just don't like the clothes

Page 71

1 you're wearing that day.
2        And so this handbook was recommended by
3 outside counsel to create a standard for both
4 employee and employer to follow so that there would
5 be a clear understanding that if there was a breach
6 on anyone's part, there was a basis for either
7 dismissal or discipline, whatever was deemed
8 appropriate based on the grievance or the poor
9 conduct.
10       Q.   What you're telling me in a -- in a
11 broad sense, sort of long answer is that this is
12 the expectation for anyone in county -- on county
13 property, whether it be the public or employees or
14 anyone else, that this was expected -- was intended
15 to provide as a guidance for behavior, period?
16       MR. J. ANDERSON:  Objection.
17       MR. BUYCK:  Same objection.
18       THE WITNESS:  Yes.  And it's also -- it
19 was designed to help -- you know, an elected
20 official, you don't have to be a manager of an
21 employee, you don't have any qual -- real
22 qualifications to hold public office, all except is
23 you have to win the most popular vote.  So there is
24 no assumption for me as a -- or from a county
25 administrator that because you get elected, you

Page 72

1 automatically have all the knowledge and
2 intelligence and experience to manage and conduct
3 employees or procedures.
4        And so it's a handbook, not only for
5 the employees you hire, but it's also a handbook
6 for the elected official or hiring authority to
7 understand and know those rules as well because an
8 elected official just comes from the general
9 population.  There are no, quote/unquote,
10 requirements that you have to be in business or
11 have a certain degree.  If you have the right age
12 and you're a resident, you probably can run for any
13 position.  So it's -- it's designed to help both
14 parties -- all parties, actually.
15 BY MR. CROSBY:
16       Q.   Were you ever asked by any of the
17 council members to resolve any of these issues
18 related to Jim Beckert in his favor one way or the
19 other?
20       A.   Could you repeat the question, please?
21       Q.   Were you ever asked to resolve any of
22 the issues that would come up about Jim Beckert in
23 a -- in a fashion that was favorable to him?
24       A.   There were several times where a
25 conflict would exist with Mr. Beckert and Maria or

Page 73

1 Mr. Beckert and IT, and council would ask me in
2 terms of my responsibilities and duties as county
3 administrator to help resolve the issue, which I
4 did try to do.  But as I was reminded by
5 Mr. Beckert, that he is an auditor under a separate
6 chapter of the South Carolina code of law and that
7 his duties and responsibilities are defined by
8 that, and that I have no real ability to instruct
9 him or order him or advise him as to what conduct
10 would be appropriate for his office.
11       But council did ask, as anyone would
12 in -- as a reasonable person, look, let's get the
13 issue on the table, let's expose our differences,
14 and let's come to a solution so that, you know, a
15 product is produced for the taxpayer.
16       Q.   Did any individual councilman ever ask
17 you to side with Beckert or, you know, try to --
18 with regard to any of these conflicts?
19       A.   I don't -- I don't -- to answer your
20 question with the word side, I think they're smart
21 enough -- I think councilmen basically in these
22 public meetings would encourage -- I would rather
23 use the encourage -- to take a look at
24 Mr. Beckert's arguments and determine whether or
25 not any facets of his arguments had merit, and

19 (Pages 70 - 73)

Ex. 3
## Beaufort County Adopts Testimony:
## Correspondence RE Adopting Testimony

# BUYCK LAW FIRM, LLC

ATTORNEYS & COUNSELORS AT LAW

305 WINGO WAY
P.O. BOX 2424
MT. PLEASANT, SC 29465-2424

TELEPHONE: (843) 377-1400
FAX (843) 284-8105
E-MAIL: HWB@BUYCKFIRM.COM

Hugh W. Buyck
G. Wade Cooper

George B. Smythe, Jr.
Jeffrey H. Lappin

January 20, 2023

**Via Email Only**
Chelci S. Avant, Esq.
Peters, Murdaugh, Parker, Eltzroth & Detrick, PA
101 Mulberry Street East
Hampton, SC 29925

Re:     Alicia Holland v Beaufort County and James Beckert, Individually and in His Official
Capacity
C/A:  9:20-cv-03479-DCN-MHC (Federal District Court)
BLF File No.: 12.42

Dear Chelci:

We have considered the various "attempts to clarify topics." relative to your 30(b)(6) deposition notice.  While I do not believe that these streamline the issues as set forth by Judge Cherry's rulings, we do not take issue with any of the testimony you have set forth.  We agree that pursuant to Rule 30(b)(6) that the designated matters are those on which these witnesses will testify as either current or prior members of Beaufort County council, or in their role as the county administrator(s).  By doing so, we do not waive any of the legal oppositions relative to Mr. Beckert not being an employee of the county, but rather a constitutional officer of the state of South Carolina.

Although cancelled by you on a prior occasion, we continue to have our IT and Personnel 30(b)(6) witnesses available.  Should you still desire to go forth with these, please let us know as everyone's calendars are busy and we need to get these on the books.

In regards to the mediation, my client has suggested Carrie Fox as a potential mediator.  I have not had an opportunity to run this by J.J. Anderson or whether he has any additional suggestions.  Also, can't recall your providing a suggested mediator, but we're certainly amenable to mediation.  We just need to get this on the books.  Let's all get together on a conference call in the near future to further discuss.

BUYCK LAW FIRM, LLC
January 20, 2023

With kind regards,

Yours truly,

*Hugh W. Buyck*

Hugh W. Buyck

HWB: aeh

cc:     J.J. Anderson, Esq.
        Jonathan Anderson, Esq.

## Chelci Avant

| | |
|---|---|
| **From:** | Chelci Avant |
| **Sent:** | Tuesday, January 17, 2023 9:41 AM |
| **To:** | Hugh W. Buyck |
| **Cc:** | Ronnie L. Crosby; Casey M. Gore; Rebecca E. Gardner; Athena Hodge; George Smythe; Jonathan L. Anderson; JJ Anderson |
| **Subject:** | RE: Holland v. Beaufort Co. & Jim Beckert |
| **Attachments:** | RULE 11 LTR.pdf |

Hugh –
Please see the attached letter with exhibits
(https://www.dropbox.com/scl/fo/28jwakti8zhc0cvfzjyht/h?dl=0&rlkey=xp5i4d5wj5rxailc7nvl40lsl)
Thanks,



**Chelci S. Avant**
**Attorney**

📞 803.903.1787
📱 843.908.3132
🌐 parkerlawgroupsc.com
✉ cavant@parkerlawgroupsc.com
📍 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

  

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

**From:** Chelci Avant
**Sent:** Friday, January 13, 2023 3:28 PM
**To:** 'Hugh W. Buyck' <HWB@Buyckfirm.com>
**Cc:** Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>; 'Athena Hodge' <Athena@Buyckfirm.com>; 'George Smythe' <George@buyckfirm.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh –
Do we need to contact Judge Cherry for a telephone conference to get this resolved?  I plan on emailing her Monday if we have not received a response.
Thanks,



### Chelci S. Avant
**Attorney**

📞 803.903.1787
📱 843.908.3132
🌐 parkerlawgroupsc.com
✉ cavant@parkerlawgroupsc.com
📍 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

  

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

**From:** Chelci Avant
**Sent:** Friday, January 6, 2023 7:54 AM
**To:** 'Hugh W. Buyck' <HWB@Buyckfirm.com>
**Cc:** Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>; 'Athena Hodge' <Athena@Buyckfirm.com>; 'George Smythe' <George@buyckfirm.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh –

At yesterday's status conference Judge Cherry stated we need to resolve the 30(b)(6) issues. Please confirm that Beaufort County agrees to adopt the testimony we've provided in the emails below by COB Monday, January 9th. Thanks,



### Chelci S. Avant
**Attorney**

📞 803.903.1787
📱 843.908.3132
🌐 parkerlawgroupsc.com
✉ cavant@parkerlawgroupsc.com
📍 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

  

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

**From:** Chelci Avant
**Sent:** Wednesday, December 28, 2022 12:51 PM
**To:** 'Hugh W. Buyck' <HWB@Buyckfirm.com>
**Cc:** Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>; Athena Hodge <Athena@Buyckfirm.com>; George Smythe <George@buyckfirm.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh –
To clarify, does the county agree to be bound by the testimony I've listed below?
Also, Judge Cherry did state that I could provide proposed testimony to the County if testimony was applicable to the disputed topics in leu of fine-tuned topics.
While I appreciate your timely response this morning, I do not appreciate your mischaracterization of our communications.  Attached are two email threads that show I have been very responsive and have often followed-up on the 30(b)(6) topic testimony sent to you on *October 17*$^{th}$.  I do recall you being in trial for one (1) week during these communications, but please do not overlook that the testimony was sent to you over two (2) months ago.
Thanks,



**Chelci S. Avant**
Attorney

📞 803.903.1787
📱 843.908.3132
🌐 parkerlawgroupsc.com
✉ cavant@parkerlawgroupsc.com
📍 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

  

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

**From:** Hugh W. Buyck <HWB@Buyckfirm.com>
**Sent:** Wednesday, December 28, 2022 11:23 AM
**To:** Chelci Avant <cavant@parkerlawgroupsc.com>
**Cc:** Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>; Athena Hodge <Athena@Buyckfirm.com>; George Smythe <George@buyckfirm.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

**Caution:** This email came from outside the ParkerLaw network. Use caution when clicking on links and attachments.

Dear Chelci,

As we discussed last week, we will stand by the responses of the various deposition transcripts you provided. We still believe, though, that the topics are overly broad and not reasonably tailored, including the examples you provided. Many are duplicative and others are not particular.

This is especially true in regards to the multiple conclusory assertions within the Complaint. For instance, many allegations refer specifically to conduct by Beckert for which only he would have knowledge. As asserted throughout, Mr. Beckert is not a County employee but rather a State constitutional officer. Others do not specify a time or date of specific meetings and continually do not provide "reasonable particularity" as required by the Rule and Judge Cherry's rulings. She mentioned your providing "high level" questions that we can address rather than this listing which I don't think is reasonable in light of her ruling.

We have continued to offer Patrick Hill and Emily Stewart to address the IT and personnel issues set forth within the original topics of 1-4 and 9-11. Should you like to move forth on these, we are happy to try and accommodate.

Through our email chains, we have tried to reply to your inquiries and both have busy schedules. Many times I've offered a time without a reply. Others, I've been in trial or deposition so please don't make bold statements of us not being cooperative as we both work through these issues. I welcome more specific topics as contemplated by Judge Cherry's ruling.

I will be out of the office the balance of this Holiday week and return on Tuesday.

With kind regards,

**Hugh W. Buyck**
**Buyck Law Firm, LLC**
305 Wingo Way
PO Box 2424
Mount Pleasant, SC 29464
Work: 843.377.1400
Cell: 843.224.2791

**Confidential & Privileged:**

Unless otherwise indicated or obvious from the nature of the above communication, the information contained herein may be attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies (electronic, paper or otherwise) which you may have of this communication.

**From:** Chelci Avant <cavant@parkerlawgroupsc.com>
**Sent:** Wednesday, December 28, 2022 9:41 AM
**To:** Hugh W. Buyck <HWB@Buyckfirm.com>
**Cc:** Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>; Athena Hodge <Athena@Buyckfirm.com>; George Smythe <George@buyckfirm.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh –
We have been more than patient. I sent you the topics with proposed testimony (per Judge Cherry's request) on October 17th. To date, we have not received a response from you.

If we do not have your responses by noon on Friday, we'll let Judge Cherry know we need to discuss the 30(b)(6) topics in the upcoming status conference.

Thanks,

**Chelci S. Avant**
Attorney

☐ 803.903.1787
☐ 843.908.3132
☐ parkerlawgroupsc.com
☐ cavant@parkerlawgroupsc.com
☐ 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

☐ ☐ ☐

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

▫

**From:** Chelci Avant
**Sent:** Tuesday, December 27, 2022 10:07 AM
**To:** Hugh W. Buyck <HWB@Buyckfirm.com>
**Cc:** Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>; Athena Hodge <Athena@Buyckfirm.com>; George Smythe <George@buyckfirm.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh –

Just following up on the email below. We were supposed to receive your response last week.

Thanks,

**Chelci S. Avant**
Attorney

☐ 803.903.1787
☐ 843.908.3132
☐ parkerlawgroupsc.com
☐ cavant@parkerlawgroupsc.com
☐ 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

☐ ☐ ☐

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

5

▫

**From:** Chelci Avant
**Sent:** Friday, December 16, 2022 10:39 AM
**To:** Hugh W. Buyck <HWB@Buyckfirm.com>
**Subject:** FW: Holland v. Beaufort Co. & Jim Beckert

**Chelci S. Avant**
Attorney

☐ 803.903.1787
☐ 843.908.3132
☐ parkerlawgroupsc.com
☐ cavant@parkerlawgroupsc.com
☐ 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

☐ ☐ ☐

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

▫

**From:** Chelci Avant
**Sent:** Wednesday, November 9, 2022 12:45 PM
**To:** 'Hugh W. Buyck' <HWB@Buyckfirm.com>; 'George Smythe' <George@buyckfirm.com>
**Cc:** 'Athena Hodge' <Athena@Buyckfirm.com>; 'Jonathan L. Anderson' <landerson@arslawsc.com>; 'JJ Anderson' <janderson@arslawsc.com>; 'Molly C. Jankowski' <mjankowski@arslawsc.com>; Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh –
Just following up on this. It's been several weeks.
Thanks,

**Chelci S. Avant**
Attorney

☐ 803.903.1787
☐ 843.908.3132
☐ parkerlawgroupsc.com
☐ cavant@parkerlawgroupsc.com
☐ 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the
named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and
do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks,

**From:** Chelci Avant
**Sent:** Monday, October 17, 2022 3:19 PM
**To:** Hugh W. Buyck <HWB@Buyckfirm.com>; George Smythe <George@buyckfirm.com>
**Cc:** Athena Hodge <Athena@Buyckfirm.com>; Jonathan L. Anderson <janderson@arslawsc.com>; JJ Anderson
<janderson@arslawsc.com>; Molly C. Jankowski <mjankowski@arslawsc.com>; Ronnie L. Crosby
<RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner
<rgardner@parkerlawgroupsc.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

Hugh,
Below is my attempt to clarify topics. I've also listed testimony by County employees – this testimony addresses
questions within each topic should The County choose to designate this testimony as its own rather than prepare a
representative as to the information contained in each deposition designation. However, these deposition designations
do not represent The County's testimony and/or knowledge as a whole – in accordance with Judge Cherry's order,
please review these topics and designations, and we'll schedule a phone conference to discuss. Even with the
deposition designations, we still may need to depose The County on specific topics.

**<span style="color:red">Topic 5: The allegations contained in Plaintiff's Complaint.</span>**
We plan to ask The County about the following paragraphs in Plaintiff's Complaint:

- 15
- 19
- 22
- 23
- 24
- 25
- 29
- 39
- 42
- 72
- 75
- 76
- 77
- 79
- 81
- 82

**<span style="color:red">Topic 6: Instances of harassment involving Beckert.</span>**
We plan to question a representative on instances described in Alicia Holland's Complaint as well as Maria Walls's
Complaint. This topic also encompasses instances provided via discovery responses and/or deposition testimony
(including Alicia Holland's and Maria Walls's).

Testimony of County Employees:
- Sommerville:
    - 6:1 – 6:16
    - 10:7 – 10:13
    - 17:14 – 17:17
    - 18:20 – 18:24
    - 23:20 – 24:12
    - 24:25 – 25:3
    - 28:19 – 28:22
- Kubik:
    - 14:19 – 15:11
    - 16:23 – 17:9
    - 19:15 – 20:6
    - 21:12 – 21:15
    - 22:9 – 22:22
    - 37:13 – 38:5
    - 50:4 – 50:8
    - 51:10 – 51:14
    - 120:7 – 120:17
    - 125:17 – 126:7
- Gregory:
    - 13:8 – 13:16
    - 13:20 – 14:9
    - 15:10 – 15:24
    - 16:4 – 16:17
    - 19:11 – 19:19
    - 34:5 – 34:16

**Topic 7: Instances of bullying involving Beckert.**
We plan to question a representative on instances described in Alicia Holland's Complaint as well as Maria Walls's Complaint. This topic also encompasses instances provided via discovery responses and/or deposition testimony (including Alicia Holland's and Maria Walls's).
Testimony of County Employees:
- Sanders:
    - 10:5 – 10:15
    - 11:5 – 11:17
- Kubik:
    - 37:13 – 38:5

**Topic 8: Instances of inappropriate behavior involving Beckert.**
We plan to question a representative on instances described in Alicia Holland's Complaint as well as Maria Walls's Complaint. This topic also encompasses instances provided via discovery responses and/or deposition testimony (including Alicia Holland's and Maria Walls's).
Testimony of County Employees:
- Keaveny:
    - 22:15 – 23:1
    - 48:2 – 51:17
    - 92:24 – 93:5
- Sanders:
    - 9:18 – 10:1
    - 21:8 – 21:13
- Sommerville:

- o 6:1 – 6:16
- o 7:23 – 8:2
- o 9:16 – 9:18
- o 10:7 – 10:13
- o 17:14 – 17:17
- o 18:20 – 18:24
- o 23:20 – 24:12
- o 24:25 – 25:3
- Kubik:
  - o 8:12 – 8:16
  - o 13:12 – 13:22
  - o 14:4 – 15:11
  - o 16:23 – 17:9
  - o 19:15 – 20:6
  - o 21:12 – 21:15
  - o 37:13 – 38:5
  - o 40:21 – 42:2
  - o 50:4 – 50:8
  - o 51:10 – 51:14
  - o 53:7 – 53:24
  - o 54:17 – 55:7
  - o 64:20 – 65:5
  - o 118:1 – 118:7
  - o 120:7 – 120:17
  - o 122:1 – 122:24
  - o 125:17 – 126:7
- Gregory:
  - o 34:5 – 34:16
  - o 35:2 – 35:5
  - o 37:2 – 37:6

## Topic 12: The role of County Council over the day-to-day operation of The County.

We essentially want to know what, if any, role The County has over the day-to-day operations of The County.  Does County Council wholly rely on the Administrator?  Does Council field complaints from employees?  Does Council involve itself in the operations of different departments?

Testimony of County Employees:
- Flewelling:
  - o 24:10 – 24:18
  - o 25:2 – 26:16
- Keaveny:
  - o 15:20 – 17:9
  - o 20:3 – 20:4
- Sommerville:
  - o 28:19 – 28:22
- Kubik:
  - o 59:16 – 60:24
  - o 61:10 – 63:12
  - o 69:22 – 72:14

## Topic 13: The role County Council over the Auditor's office and/or responsibilities.

We understand that this is laid out by statute, however, the actions of some Council members and testimony offered does not paint a clear picture.  Does County Council interfere with the Auditor's office?  Does Council members involve

themselves in the Auditor's accusations and/or presentations (*see* Hervochon's deposition)? Essentially, we'd like to ask a County representative how the statute differs from reality.

Testimony of County Employees:

- Keaveny:
  - 15:20 – 17:9
  - 20:3 – 20:4
- Kubik:
  - 45:13 – 45:22
  - 46:2 – 46:21
  - 55:8 – 57:5
  - 57:23 – 58:1
  - 59:16 – 60:24
  - 61:1- - 63:12
  - 64:7 – 64:14
  - 69:22 – 72:14
- Gregory:
  - 29:19 – 30:3
  - 36:19 – 37:6
  - 37:24 – 38: 4
  - 39:18 – 40:4

**Topic 14: The role of the Auditor in calculating The County's millage.**

There seems to be some confusion as to whether Beckert has a roll in calculating The County's millage.  We'd like to get a clear answer on that as well as go over instances involving Beckert's millage calculations and/or accusations and why they were entertained.

Testimony of County Employees:

- Sommerville:
  - 29:21 – 30:14
- Hervochon:
  - 10:22 – 11:8
- Keaveny:
  - 48:14 – 50:9
- Cadd:
  - 14:13 – 15:25

**Topic 15: The relationship between County Council members and Beckert.**

It's been alleged in Plaintiff's Complaint that Beckert has acted like a silent County Council member.  We'd like to get The County's stance on its Council Members' relationships with Beckert, both professionally and personally.

Testimony of County Employees:

- Kubik:
  - 26:8 – 27:8
  - 55:8 – 57:5
  - 83:19 – 85:2
- Hervochon:
  - 10:3 – 10:9
  - 19:9 – 19:14

**Topic 16: All litigation involving The County and Beckert.**

If The County is willing to accept the testimony referenced below, then I believe we can cross this topic off of our list.

Testimony of County Employees:

- Keaveny:
  - 57:15 – 60:13

- o   60:22 – 62:1
- Greenway:
  - o   33:12 – 33:24

**Topic 17: Control over County real and personal property and the identity of the person charged with the responsibility of ensuring said property is used in accordance with applicable policies and procedures.**

In our Response to your Motion, we narrowed down this topic a bit – Plaintiff will inquire as to all real properties owned and/or controlled by The County that Beckert has and/or had an office, staff and/or frequented, we well as real properties which house an elected official's office. As to personal property, computer, Information Technology, mailroom and/or postage, websites, phone systems, etc. which both employees and elected officials have access to. Testimony of County Employees:

- Keaveny:
  - o   20:5 – 20:17
- Greenway:
  - o   12:16 – 13:25
  - o   73:17 – 74:18
- Sommerville:
  - o   23:2 – 23:10
- Bechtold:
  - o   11:3 – 11:20
- Kubik:
  - o   58:5 – 58:13
  - o   65:22 – 66:18
  - o   69:2 – 69:14
- Gregory:
  - o   18:14 – 18:18
  - o   19:4  - 19:19
  - o   39:1 – 40:4

**Topic 18: Each action considered by The County in response to allegations concerning Beckert's conduct, including the specific action considered, the date of each consideration, and the identity of the person(s) involved in each consideration.**

We'd like to know all courses of action considered by The County and/or County Council in response to Beckert's behavior. The deposition designations below discuss *some* courses of action considered by The County. Testimony of County Employees:

- Keaveny:
  - o   62:2 – 62:11
- Sommerville:
  - o   13:22 – 14:17
  - o   16:12 – 16:23
  - o   21:11 – 21:23
  - o   22:16 – 23:1
  - o   23:5 – 23:10
  - o   36:20 – 37:8
- Bechtold:
  - o   11:3 – 11:20
  - o   14:3 – 16:14
- Kubik:
  - o   66:7 – 66:18
  - o   68:19 – 69:1
  - o   80:14 – 83:17
  - o   89:24 – 90:3

- o   90:23 – 90:25

**Topic 19: Each action taken by The County in response to allegations concerning Beckert's conduct, including the specific action taken, the date each action was taken, and the identity of the person(s) involved in each action.**

We'd like to know each action taken by The County and/or County Council in response to Beckert's behavior.  The deposition designations below discuss *some* taken by The County.

Testimony of County Employees:

- Sanders:
  - o   25:9 – 25:20
- Greenway:
  - o   34:3 – 34:16
  - o   36:8 – 37:3
  - o   37:23 – 38:5
  - o   39:9 – 39:17
  - o   41:16 – 45:8
- Sommerville:
  - o   11:5 – 11:14
  - o   11:24 – 12:16
  - o   16:12 – 16:23
  - o   17:23 – 18:19
  - o   21:11 – 21:23
  - o   22:16 – 23:1
  - o   32:12 – 33:7
- Bechtold:
  - o   11:3 – 11:20
  - o   14:3 – 16:14
- Kubik:
  - o   11:9 – 11:15
  - o   12:22 – 13:14
  - o   15:8 – 15:21
  - o   20:3 – 20:21
  - o   23:5 – 23:17
  - o   38:7 – 39:4
  - o   4-:21 – 42:2
  - o   57:23 – 58:1
  - o   58:5 – 58:13
  - o   64:7 – 64:14
  - o   65:2 – 65:10
  - o   68:19 – 69:14
  - o   94:3 – 94:10
  - o   136:5 – 137:4

If we think of anything else, we'll send it your way.
Thanks,

**Chelci S. Avant**
Attorney

☐ 803.903.1787
☐ 843.908.3132
☐ parkerlawgroupsc.com
☐ cavant@parkerlawgroupsc.com
☐ 101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

☐ ☐ ☐

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

▪

**From:** Hugh W. Buyck <HWB@Buyckfirm.com>
**Sent:** Thursday, October 13, 2022 4:44 PM
**To:** Chelci Avant <cavant@parkerlawgroupsc.com>; George Smythe <George@buyckfirm.com>
**Cc:** Athena Hodge <Athena@Buyckfirm.com>; Jonathan L. Anderson <landerson@arslawsc.com>; JJ Anderson <janderson@arslawsc.com>; Molly C. Jankowski <mjankowski@arslawsc.com>; Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>
**Subject:** RE: Holland v. Beaufort Co. & Jim Beckert

┃ **Caution:** This email came from outside the ParkerLaw network. Use caution when clicking on links and attachments.

No problem.

**Hugh W. Buyck**
**Buyck Law Firm, LLC**
305 Wingo Way
PO Box 2424
Mount Pleasant, SC 29464
Work: 843.377.1400
Cell:  843.224.2791

**Confidential & Privileged:**

Unless otherwise indicated or obvious from the nature of the above communication, the information contained herein may be attorney-client privileged and confidential information/work product.  This communication is intended for the use of the individual or entity named above.  If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies (electronic, paper or otherwise) which you may have of this communication.

**From:** Chelci Avant <cavant@parkerlawgroupsc.com>
**Sent:** Thursday, October 13, 2022 4:03 PM

13

**To:** Hugh W. Buyck <HWB@Buyckfirm.com>; George Smythe <George@buyckfirm.com>
**Cc:** Athena Hodge <Athena@Buyckfirm.com>; Jonathan L. Anderson <landerson@arslawsc.com>; JJ Anderson <janderson@arslawsc.com>; Molly C. Jankowski <mjankowski@arslawsc.com>; Ronnie L. Crosby <RCrosby@parkerlawgroupsc.com>; Casey M. Gore <cgore@parkerlawgroupsc.com>; Rebecca E. Gardner <rgardner@parkerlawgroupsc.com>
**Subject:** Holland v. Beaufort Co. & Jim Beckert

Hugh & George:

I'll get you updated topics (more specific) and testimony by Monday.

Thanks,

**Chelci S. Avant**
**Attorney**

   803.903.1787
   843.908.3132
   parkerlawgroupsc.com
   cavant@parkerlawgroupsc.com
   101 Mulberry St. E., P.O. Box 487, Hampton, SC 29924

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Please note my new email address and other contact information contained in my signature. Thanks.

# PARKER

January 17, 2023

Hugh W. Buyck (via email)
George B. Smythe, Jr. (via email)
BUYCK & SANDERS, LLC
305 Wingo Way
Post Office Box 2424
Mount Pleasant, SC 29465

      RE:    Alicia Holland v. Beaufort County and James Beckert
               Case No.: 9:20-cv-03479-DCN-MHC

Hugh:

      As you know, Judge Molly Cherry asked us to resolve the issue Beaufort County has with Plaintiff's 30(b)(6) topics. This request was made on October 5, 2022 during the status conference on this issue. At said conference, Judge Cherry stated that Plaintiff's counsel could either (1) re-draft fine-tuned topics OR (2) propose testimony of persons already deposed for Beaufort County to adopt as its own in lieu of providing duplicative testimony. In accordance with Judge Cherry's instructions, I emailed you clarified topics and a list of proposed testimony of Beaufort County employees. Exhibit A. Since October 17, 2022, the following has occurred:

- November 9, 2022: I emailed you to follow-up on the October 17, 2022 email containing clarified topics and a list of proposed testimony of Beaufort County employees as Plaintiff's counsel did not receive any response. Exhibit B.

- November 15, 2022: I emailed you to follow-up (again) on the October 17, 2022 email containing clarified topics and a list of proposed testimony of Beaufort County employees as Plaintiff's counsel did not receive any response from the October 17, 2022 email or the November 9, 2022 email. Exhibit C.

- November 17, 2022: You asked to speak via telephone. Exhibit D.

- November 28, 2022: We set a telephone call for December 1, 2022. Exhibit E.

- December 1, 2022: You failed to call my cell phone as agreed upon in Exhibit F.

- December 1, 2022: You asked to speak via telephone after your trial in Beaufort, SC. Exhibit G.

- December 7, 2022: I reached out to you to schedule the phone call. Exhibit H.

- December 15, 2022: I reached out to you to schedule the phone call. Exhibit I.

# PARKER

- December 16, 2022: You and I spoke on the phone, during which you agreed to respond to my October 17, 2022 email by the end of the following week.

- December 27, 2022: I emailed you to follow-up on your response to the October 17, 2022 email. Exhibit J.

- December 28, 2022: I emailed you *again* to follow-up on a response to the October 17, 2022 email. Exhibit K.

- December 28, 2022: You responded to my December 28, 2022 email, stating the county would stand by the testimony provided in the October 17, 2022 email while objecting to the testimony all the same. You also argued that Plaintiff's counsel providing testimony did not comply with Judge Cherry's instructions, however, you acknowledged Plaintiff's counsel proposing testimony in an email on October 13, 2022. Exhibits L & M.

- December 28, 2022: I responded asking for clarification – "To clarify, does the county agree to be bound by the testimony I've listed below?" Exhibit N.

- January 5, 2023: A status conference was held before Judge Cherry. At said conference, Judge Cherry encouraged us to resolve the 30(b)(6) issue.

- January 6, 2023: I emailed you again asking for clarification. Exhibit O.

- January 13, 2023: I emailed you again asking for clarification and letting you know our next step would be to contact Judge Cherry. Exhibit P.

As you can see from the timeline above and the attached exhibits, Plaintiff's counsel has worked diligently to resolve *your* issues with our 30(b)(6) topics. Instead of your cooperation, we have received little to no response. Please confirm, in writing, that Beaufort County will be bound to the testimony detailed above (this testimony can also be found in Exhibit A) by 5:00 p.m. Friday, January 20, 2023. If no response is received, we will contact Judge Cherry for a status conference.

Sincerely,

Chelci S. Avant

/CSA
Enclosures.

cc:     Ronnie L. Crosby (via email)
        Jonathan L. Anderson (via email)
        Jonathan J. Anderson (via email)

Ex. 3
Beaufort County Adopts Testimony:
Topic 6: Instances of Harassment Involving Beckert



Deposition of:

**Suzanne D. Gregory**

*April 7, 2021*

In the Matter of:

**Holland, Aliciav. Beaufort County et al**

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Suzanne D. Gregory
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 10

```
 1   fairly familiar with them.  It's been a while.
 2      Q.  For example, is there a personnel
 3   handbook you're familiar with?
 4      A.  Yes.
 5      Q.  Okay.  What's your understanding of --
 6   of policies in the workplace, their purpose, and
 7   what they are?
 8      A.  They help guide employees and, in some
 9   cases, management in knowing what they are supposed
10   to do and not supposed to do and how certain
11   procedures are handled.  So it provides guidance.
12      Q.  Guidance on acceptable behavior in the
13   workplace?
14      A.  In addition to other things, yes.
15      Q.  Would policies and procedures also set
16   the standard for employees?
17      A.  To some extent, yes.
18      Q.  Do policies and procedures also let
19   employees know where to turn to for help?
20      A.  I believe so.  Yes, ma'am.
21      Q.  And when I say turn to for help, I
22   mean, you know, do they go to their immediate
23   supervisor, do they go to human resources, what
24   type of paperwork would be filled out, that sort of
25   thing; kind of the procedural side of an issue.
```

Page 11

```
 1      A.  I don't recall the details in the
 2   handbook, but I believe there would be some
 3   guidance in there.
 4      Q.  Okay.  I've got the handbook here for
 5   you.  And let's mark that as Exhibit 1.
 6      (PLF. EXHIBIT 1, Beaufort County
 7   Personnel Handbook, was marked for identification.)
 8      MR. BUYCK:  Thank you.  There you go.
 9      THE WITNESS:  Thank you.
10   BY MS. AVANT:
11      Q.  Do you recognize this personnel
12   handbook?
13      A.  Yes.
14      Q.  Is this the handbook that was
15   distributed during your time as director of human
16   resources for Beaufort County?
17      A.  Yes.
18      Q.  Now, as director of human resources,
19   before we get into this handbook, what were your
20   job duties?
21      A.  There were quite a few of them, but
22   generally speaking, I oversaw the human resources
23   department which handled benefits, compensation
24   matters, policy interpretation, the timekeeping
25   system, different programs that we had for
```

Page 12

```
 1   employees, assisting department heads with issues
 2   they had, answering employee questions, open
 3   enrollment, dealing with various benefit vendors.
 4   That's what I can think of off the top of my head.
 5      Q.  Okay.  And sounds like you had a lot --
 6   a lot you were responsible for, so I won't take
 7   that as an exhaustive list.
 8      A.  Thank you.
 9      Q.  So based off what you just said, you
10   would -- you would answer employee questions?
11      A.  That was part of my job, yes.
12      Q.  And would those questions oftentimes be
13   about different policies within Beaufort County?
14      A.  Yes.  It could be various.  That --
15   that would be one of the types of questions, yes.
16      Q.  All right.  Open up that handbook to
17   Page 6.  Under the introduction heading, the second
18   paragraph that starts with:  Our success as a
19   county.
20      A.  Uh-huh.
21      Q.  Why don't you read that for the record,
22   please?
23      A.  Our success as a county is built upon
24   recognition of the skills and efforts made by each
25   employee, and our policy is to work with all
```

Page 13

```
 1   members of this team in a professional manner and
 2   treat each team member with dignity and respect.
 3      Q.  All right.  And -- and this personnel
 4   handbook, as a policy of Beaufort County, was --
 5   was endorsed by county administration?
 6      A.  Yes.
 7      Q.  And at the bottom of Page 6, there is
 8   an anti-harassment policy.  What's your
 9   understanding of the anti-harassment policy?
10      A.  That as an -- as an entity we don't
11   tolerate harassment from employees, management,
12   that the workplace should be free of any -- any
13   type of harassment.
14      Q.  And would that include sexual
15   harassment?
16      A.  Yes.
17      Q.  And I believe sexual harassment is
18   addressed on the next page there, Page 7.
19      A.  Okay.
20      Q.  And under sexual harassment, it defines
21   it as unwelcome sexual advances, requests for
22   sexual favors and other physical, verbal, or visual
23   conduct based on sex constitutes sexual harassment
24   when -- and then they -- they name off a couple of
25   examples.
```

4 (Pages 10 - 13)

Suzanne D. Gregory                                    April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 14

1    And the last example is: The conduct
2 has the purpose or effect of unreasonably
3 interfering with a individual's work performance or
4 creating an intimidating, hostile, or offensive
5 work environment.
6        Is that your understanding of sexual
7 harassment?
8    A. Yes. That -- that's one of the
9 criteria, yes.
10   Q. And the next section there, Section
11 1.5, the complaint procedure and investigation, is
12 part of that proper procedure to report an incident
13 to the human resources director?
14   A. Yes.
15   Q. And did you often receive complaints of
16 sexual harassment from Beaufort County employees?
17      MR. BUYCK: Note my objection.
18      You can answer.
19 BY MS. AVANT:
20   Q. You still answer.
21   A. Oh, I'm sorry. Not often. I'm -- I'm
22 trying to remember if -- if I received any that
23 were characterized as sexual harassment. But it
24 certainly was not often, no.
25   Q. Would a complaint have to be

Page 15

1 characterized as sexual harassment to be -- to be
2 investigated as sexual harassment? And what I mean
3 by that is would the complainant have to come in
4 and use the term sexual harassment for you as the
5 director of human resources to take that complaint
6 and investigate it as a sexual harassment issue?
7    A. No. It -- it would depend on the
8 conversation I had with the employee to determine
9 if it fell under the sexual harassment category.
10   Q. All right. And the last paragraph
11 there, it says: Every harassment allegation is
12 investigated.
13      What type of investigative measures are
14 taken by you?
15   A. Depending on the claim, typically
16 speaking, we would get a statement from the person
17 who is alleging the harassment, we would get a list
18 of anybody that they indicated would be witnesses
19 to that harassment, we would get statements from
20 those witnesses, we would certainly talk to the
21 person who had been alleged to -- to harass; and
22 review all the information, the who, what, when,
23 why, how, and make a determination and get with
24 administration on how to move forward.
25   Q. The next page there, Number 8, under

Page 16

1 corrective action, I want you to read that first
2 paragraph for me. If management concludes, is how
3 it begins.
4    A. If management concludes that a
5 complaint of harassment has merit, appropriate
6 action is taken. Employees may be disciplined.
7 Non-employees may be reported to the appropriate
8 law enforcement agency and/or barred from the
9 premises.
10   Q. What is your understanding of a
11 non-employee?
12   A. That could be anyone who is not
13 employed by Beaufort County. That could be a
14 customer, a vendor, anyone who is not on the county
15 employee roster.
16   Q. Could it be an elected official?
17   A. It could be, yes.
18   Q. The next little portion there that is
19 under the heading important, it says: Complaints
20 made to members of management or to the human
21 resources director -- excuse me -- involve the
22 completion of a written complaint report.
23   A. I'm sorry. Where are you?
24   Q. Underneath corrective action --
25   A. And that --

Page 17

1    Q. -- there is a --
2    A. Oh, okay.
3    Q. -- a bold: Important.
4    A. Okay.
5    Q. And it's basically just saying that any
6 complaint made to you would be documented in a
7 written complaint report. Is that your
8 understanding of the procedure you're supposed to
9 take as human resources director?
10      MR. BUYCK: Note my objection.
11      THE WITNESS: Yes.
12 BY MS. AVANT:
13   Q. So any complaint that's brought to you
14 is documented in a -- in a written report?
15   A. Uh-huh. Yes.
16   Q. And where are those reports kept?
17   A. At this time, I don't know. I haven't
18 been there for over a year.
19   Q. Do you recall where they were kept when
20 you were there?
21   A. They would have -- any report made
22 would have either been on the hard drive, the
23 county network, I guess, or in a legal file in my
24 office.
25   Q. Are written complaints placed in

5 (Pages 14 - 17)

Suzanne D. Gregory

April 7, 2021

Holland, Aliciav. Beaufort County et al

Page 18

1 personnel files of those involved?

2    A.  No, not to my knowledge.

3    Q.  What is your understanding of the

4 computer acceptable use policy?

5    A.  As -- as I can remember it, it was not

6 to be used for personal use, to view any obscene

7 material.  It was a lengthy policy.  That's the two

8 things I can remember right off.

9    Q.  Okay.  And I apologize for not

10 mentioning this first.  I believe a version of this

11 policy begins on Page 58 --

12    A.  Okay.

13    Q.  -- if you want to flip to that.

14       Is it your understanding that all

15 network systems, computers, e-mail addresses,

16 issued cell phones, phone systems, letterhead all

17 belong to Beaufort County?

18    A.  Yes.

19    Q.  And on Page 59, there is a heading that

20 says:  Scope.  What's your understanding of the

21 scope of this policy?

22    A.  Well, pretty much as its written here,

23 to -- to ensure that it's used for business

24 purposes and to protect the county and employees.

25    Q.  And -- and under Scope it lists out a

Page 19

1 couple of examples of -- of different types of

2 people that fall into -- into the scope of this

3 policy.  And these different, you know,

4 categorizations of people.  Is it your

5 understanding that, you know, essentially anyone

6 who is given access to county e-mail, county

7 computer systems, county network systems, a county

8 phone, and letterhead would be under the

9 responsibility to abide by this policy?

10    A.  Yes.

11    Q.  Is it also your understanding that this

12 policy applies to any activity that -- that would

13 be in violation of sexual harassment or a hostile

14 work environment?

15    A.  Yes.

16    Q.  And that would also include anything

17 like slander or -- or distributing deliberate

18 misinformation?

19    A.  Yes.

20    Q.  As director of human resources, were

21 you responsible for training provided to county

22 employees?

23    A.  The department was responsible for some

24 of the training that county employees received,

25 yes.

Page 20

1    Q.  And -- and just off the top of your

2 head, do -- can you give me some examples of the

3 type of training that Beaufort County wanted its

4 employees to receive?  And I understand some of it

5 may be job-specific.  I'm --

6    A.  Right.

7    Q.  I'm looking more for -- for something

8 that every employee should have to take.

9    A.  There was harassment training, sexual

10 harassment training, diversity training, e-mail

11 usage training, and I believe there was one other

12 that cannot recall right now.

13    Q.  And would elected officials also have

14 to participate in this training?

15    A.  We -- it's my understanding that we

16 cannot require them to participate.

17    Q.  When an employee's hired to the county,

18 a new employee, what happens from the time they're

19 hired until they start performing their job duties?

20 Do they go through some training and orientation,

21 for example, something like that?

22    A.  At the time I left there, there was an

23 orientation -- new hire orientation where they

24 filled out all the necessary paperwork, they were

25 provided any benefits that they cared to sign up

Page 21

1 for, signed off on any policy statements that we

2 required.  And then they were sent forth to their

3 departments for departmental training.

4    Q.  And how would Beaufort County ensure

5 that -- that all the things you just mentioned were

6 completed when a new hire came in?

7    A.  All of the things that I just mentioned

8 were completed in the human resources training

9 room.  And there was a checklist of all the items

10 that had to be done.

11    Q.  Okay.  And that's kind of what I was

12 getting at.  There -- there is a way to document

13 that item A was completed, item B was completed,

14 item C was completed, correct?

15    A.  Yes.

16    Q.  So walk me through what happens when an

17 employee comes in and wants to -- to make a

18 complaint to you.

19    A.  As I recall, when an employee comes in

20 with an issue, I discuss it with them.  If it's a

21 complaint regarding another employee or something,

22 I -- I get the information from the employee, I ask

23 them to write a statement.  And within that

24 statement, I also ask them to list any witnesses to

25 whatever it is that they are complaining about.

6 (Pages 18 - 21)

Suzanne D. Gregory
Holland, Alicia v. Beaufort County et al

April 7, 2021

**Page 34**

1  with -- I believe it was the deputy county
2  administrator at the time and another person,
3  who I'm not sure what capacity he worked in at the
4  time, where it was very confrontational.
5      Q.  Did any of these ladies indicate to you
6  that Mr. Beckert was partaking in any other
7  behavior that was more than rude, but maybe took it
8  a step further?
9      A.  Not that I can recall, no.
10     Q.  Are you aware that Mr. Beckert would
11 stare into Maria Walls's window outside of her
12 office?
13     A.  I was -- I was told that, yes.
14     Q.  Do you recall who told you that?
15     A.  I believe it was the county
16 administrator.
17     Q.  And who was that at that time?  I know
18 Beaufort County has been through quite a few
19 lately.
20     A.  Gary Kubic.
21     Q.  And was that documented in your
22 department?
23     A.  Not in my department.  I believe Gary
24 Kubic may have documented that.
25     Q.  Why weren't these complaints or these

**Page 35**

1  comments documented anywhere?
2      A.  Comments weren't documented because it
3  was casual conversation that -- that I wasn't
4  approached in a serious manner.  It was -- it was
5  almost just here's another Jim Beckert situation,
6  you know, here -- and -- and it -- no one walked --
7  no one walked into my office of the list I gave you
8  and said:  I have a problem with Jim Beckert.  It
9  was just we were talking about this, the other, and
10 then his name would come up.
11     Q.  And what was the -- do you remember the
12 context of the other conversation?  Was it other
13 HR-related issues?
14     A.  I don't recall.
15     Q.  I guess I'm trying to figure out your
16 definition of a comment --
17     A.  Uh-huh.
18     Q.  -- to figure out whether it's something
19 that should have been documented, because we looked
20 at the -- the handbook earlier, and it states in
21 there that any complaint should be documented in
22 written form.
23     A.  Uh-huh.
24     Q.  And when you've got multiple, as you've
25 termed them, comments about the same individual,

**Page 36**

1  I'm trying to figure out why they weren't written
2  down somewhere.  So what is your understanding of
3  comment?
4      A.  A comment is something stated in a
5  conversation that -- I -- I don't know how to
6  answer that.
7      Q.  If someone were to call you about a
8  situation involving employee A and employee B, that
9  they weren't involved in, just something that they
10 observed --
11     A.  Uh-huh.
12     Q.  -- would that be documented or would
13 employee A have to come sit down in your office in
14 a serious manner for you to document that?
15     A.  If someone came to me about employee A
16 and B having a conversation or a problem, I would
17 likely contact employee A or B to look into it if
18 it was a serious matter.
19     Q.  And did you ever contact Jim Beckert
20 about the, as you -- as you have termed them,
21 comments against him?  Did you ever contact him to
22 discuss them with him?
23     A.  No.  I -- I made administration aware
24 of anything that went on because they were dealing
25 with him as an elected official at the time the

**Page 37**

1  best they could.
2      Q.  And what were they dealing with him on?
3  Was there another issue going on that you're aware
4  of?
5      A.  I -- I -- I believe there were several
6  issues going on with him, but one was his behavior.
7      Q.  And when there is an issue with his
8  behavior, he was the director of human resources,
9  you were not involved in that?
10     A.  No, not directly.  Because, there
11 again, he's an elected official, not a county
12 employee, and I had no authority over him.
13     Q.  So, if human resources doesn't have any
14 authority over him as an elected official, why did
15 human resources require him to complete an
16 orientation checklist and sign the Computer and
17 Information Systems Acceptable Use Policy and gave
18 him a handbook?
19     A.  It's my understanding at the time this
20 was done, he was in the transition period.  And
21 before he was sworn in, he was considered a county
22 employee -- a temporary county employee.  That's
23 why he had to complete this paperwork.
24     Q.  Is it your understanding that once he
25 became an elected official, he no longer had to

10 (Pages 34 - 37)



Deposition of:

**Gary T. Kubic**

*April 7, 2021*

In the Matter of:

**Holland, Aliciav. Beaufort County et al**

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 14

1  Mr. Beckert's actions and what your staff related
2  to you?
3      A.  Yes.
4      Q.  And you as their supervisor and the --
5  in your role as county administrator, you had an
6  obligation to provide a nonhostile, comfortable
7  workplace for your staff --
8          MR. J. ANDERSON:  Object to the form.
9          THE WITNESS:  That's correct.
10 BY MR. CROSBY:
11     Q.  -- correct?
12 I mean, it's important to -- for their
13 productivity and for their -- their well-being to
14 be free from any type of discomfort caused by
15 others in the workplace, correct?
16         MR. J. ANDERSON:  Object to the form.
17         THE WITNESS:  Yes.
18 BY MR. CROSBY:
19     Q.  Did any of the employees at your
20 staff -- let's keep with them right now -- did any
21 of the staff relate to you that Mr. Beckert would
22 from time to time just stare at them?
23     A.  Starting with myself, yes, stare from
24 the sidewalk through my window.  I used to get to
25 work early.  I caught him several times just

Page 15

1  looking through the window standing there.  It was
2  kind of odd.  I even had mentioned it to the
3  sheriff a few times and others.
4          Maria Walls had indicated to me that
5  she felt that Mr. Beckert was staring at her
6  through her office window.  As a result of that, I
7  think I told her to advise the sheriff as well, to
8  notify him that she felt uncomfortable.  And then I
9  also authorized security cameras at that corner to
10 have the ability to video those occurrences, and
11 also for general security of the building itself.
12 I think it -- you know, I'm -- I'm
13 going back.  I hope I get -- Monica Spells, I
14 think, told me a few times that Mr. Beckert
15 demanded access through a card swipe to our side of
16 the building, and I told her that -- you could
17 program the various access points for those cards.
18 And as a result of talking with her, I told her not
19 to program access for Mr. Beckert on -- on that
20 doorway that accessed my office space, that area,
21 that corridor.
22     Q.  Where is your office -- I think the
23 treasurer's office is on the first floor of the
24 county building?
25     A.  Yes.

Page 16

1      Q.  Get my directions, maybe the
2  treasurer's office would be on the south end?
3      A.  Well, I don't have a compass, and I
4  couldn't tell you --
5      Q.  Where --
6      A.  -- which way the sun rose on the
7  buildings.  But basically it's a rectangle building
8  which is divided in half, two corridors.  The front
9  corridor facing Ribaut Road had the treasurer and
10 the auditor, I think a mailroom, planning on that
11 side.  And on the other side was the clerk of
12 council, myself, some of my staff members for --
13 for Monica Spells, Beaufort County channel, and at
14 the end was the HR division.
15         So that was parallel -- there were
16 parallel corridors.  And in between was a central
17 reception area at one time where the general public
18 could come in and access the offices, and that door
19 I restricted coming into my area.  You could buzz
20 and have somebody come in and -- if it was a
21 taxpayer or another official, we would let them
22 through the doorway.
23     Q.  Let's go back to you -- your
24 interaction with Mr. Beckert and his staring in
25 your window.  How many times did that occur?

Page 17

1      A.  Well, I didn't count them, but if
2  you're talking about -- you know, I don't know.  I
3  never really took a count.  It was almost at least
4  once or twice a week.  It would depend on when he
5  arrived at work, and generally I'd get there about
6  7:00, 7:30.  He'd get there early as well.  He
7  parked right across from my window.  And I never
8  really took a count, but it was more than one, and
9  it could be, you know, 20, 30.  I -- I'm not sure.
10     Q.  And he would -- you didn't -- did he
11 ever have a conversation about why it was that he
12 would stand outside your window?
13     A.  No.  I really never talked to him about
14 it.
15     Q.  Did -- it sounds like you got to the
16 point where you were just limiting your interaction
17 with him in professional business settings?
18     A.  You know, looking through my window and
19 being a county administrator, I was going to use a
20 BS kind of language, but quite frankly I had more
21 important things to consider in my duties than to
22 worry about a person and why that person would be
23 staring or looking at me through my window.  I just
24 thought it was unusual, and I treated it that way.
25 You know, I just -- I moved on in my daily

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 18

1 activities.
2    Q.  Just -- just to be clear, was -- were
3 there other people who would routinely come to your
4 window and just stare at you?
5    A.  Well, I like to think that I was a
6 popular kind of guy and fairly good-looking, but I
7 lost all my hair, and then that kind of eliminated
8 that possibility pretty much.
9      No, I don't mean to be frivolous. I
10 know this is an important matter. But no. No.
11      And what made it unique from normal
12 traffic on the sidewalk by the public or other
13 elected officials or staff, those occurrences
14 occurred when it was early in the morning with only
15 a few people in the building at that time. It was
16 at the beginning of the day, and that's what I
17 thought was interesting.
18    Q.  Did you ever get the sense that he was
19 doing it to intimidate you?
20    A.  I don't know. I -- I have no idea what
21 he was thinking about. And quite frankly, my
22 personality, I wouldn't have thought that he was
23 doing it to intimidate -- at least I wasn't
24 intimidated by it, per se, because I figured I'm a
25 big boy, and that's kind of incidental. So not

Page 19

1 knowing his motives, I really don't know.
2      I guess it was probably to maybe some
3 a signal that he was present. But I did -- I did
4 go to the sheriff because, you know, at various
5 times I've been required to wear bulletproof vests
6 and different kinds of things on campus in Beaufort
7 County because of threats, and so just to get on
8 record -- and I didn't do it in writing; I just
9 mentioned it to the sheriff -- this is occurring
10 in the morning. And he said, well, you know, do
11 you -- do you want to continue or do you want to do
12 anything for him?
13      I said, no, I just want you to know.
14 And that was the extent of it.
15    Q.  Just talk about his behavior toward --
16 staring with regard to Maria Walls. Did she relay
17 that to you?
18    A.  Yes, several times.
19    Q.  And when she relayed it, it was
20 something that she didn't like?
21    A.  Yeah. That -- you know, that was -- my
22 interpretation of what Maria expressed to me in
23 those moments about Mr. Beckert looking in her
24 window, she was clearly upset, she was clearly
25 worried about physical harm. I would try to

Page 20

1 counsel her on visiting and -- and making sure that
2 she related those incidents to the proper
3 authorities, that being the sheriff. I told her I
4 would introduce a video camera to record those
5 events. And, yeah, she was visibly upset. She --
6 it troubled her.
7    Q.  And so while the cameras may have had a
8 secondary function of providing -- serving as
9 security, the -- the -- the initial driver was
10 because of Mr. Beckert's coming and staring
11 at Maria -- through Maria Walls's window?
12      MR. J. ANDERSON: Object to the form of
13 the question.
14      THE WITNESS: I would say that's true.
15 I would also say that the camera is in plain view,
16 and the idea was that, you know, generally if you
17 walked in that area and you looked up or you knew
18 that the cameras were rolling as security that it
19 would maybe serve as a deterrent, which was the
20 ultimate intent, to stop that action from
21 happening.
22 BY MR. CROSBY:
23    Q.  Did you ever learn of him staring at
24 any other employees or any employees other than
25 yourself of the county?

Page 21

1    A.  The only other -- no. The only other
2 employee that mentioned some occurrences outside
3 the building or along the building was Tony
4 Criscitiello, the planning director. But, again,
5 Tony didn't think too much of it, but he did
6 mention it to me that he thought Mr. Beckert was --
7 was interested in the planning division.
8      I think maybe at that time Mr. Beckert
9 wanted to get a couple of tables or whatever, but
10 you'd have to check with Tony. But I think Tony
11 did mention it to me once or twice.
12    Q.  Did Monica Spells ever tell you that
13 Beckert stared at her in the hall and made her feel
14 uncomfortable?
15    A.  Yes.
16    Q.  How about Melissa Beere -- Beere?
17    A.  Who?
18      MR. KEAVENY: Beere. Melissa Beere.
19      MR. CROSBY: Beere.
20      THE WITNESS: Where does she work at?
21      MR. KEAVENY: HR.
22 BY MR. CROSBY:
23    Q.  I think she worked in --
24    A.  Oh, Melissa. No, I don't think I had a
25 conversation with Melissa about that.

6 (Pages 18 - 21)

Gary T. Kubic                                                    April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 22

1    Q.   Who --
2    A.   I can't remember.
3    Q.   Who are the staff members that --
4 that -- that you're referring to that worked
5 under -- under you that -- directly there?
6    A.   Cheryl Harris, which was my executive
7 assistant.
8    Q.   Cheryl?
9    A.   Cheryl Harris, Monica Spells, there
10 were two black females who came into my office who
11 were auditor employees who wanted me to do
12 something about what they thought was harassment by
13 Mr. Beckert; and I advised them that Mr. Beckert
14 was a separate elected official, and that they had
15 the opportunity to go down to the general bulletin
16 board and look up the EEOC. And if they needed
17 assistance in terms of how to contact the EEOC
18 about their complaints, they could go into my staff
19 HR, and they would provide numbers and forms, if
20 that was necessary, for them to complete.
21       I don't remember their names. I
22 know -- I think they both were dismissed or fired.
23    Q.   Did Ebony Sanders ever relay any
24 complaints to you about Mr. Beckert?
25    A.   Not directly. I think her

Page 23

1 complaints -- I think Monica may have mentioned
2 that Ebony was also concerned. But I don't -- I
3 don't remember Ebony ever coming in directly and
4 having that type of conversation with me.
5    Q.   By putting up the cameras on the
6 outside of the county building, it was an attempt
7 by you to deter Beckert's conduct to -- to keep him
8 from looking through Maria Walls's window in
9 essence?
10       MR. J. ANDERSON: Object to the form.
11       THE WITNESS: That was one of my
12 intents. That was one of my hopes. Yes.
13 BY MR. CROSBY:
14    Q.   Much as dividing off and preventing
15 Mr. Beckert from coming into your side of the
16 building was to protect your employees?
17    A.   Yes.
18       MR. J. ANDERSON: Same objection.
19 BY MR. CROSBY:
20    Q.   Did you ever address directly with
21 Mr. Beckert his conduct toward the employees or
22 Ms. Walls?
23    A.   Indirectly I told Mr. Beckert several
24 times that he was elected and replaced Sharon
25 Burris who was literally a tragedy as an elected

Page 24

1 official in my opinion for a lot of reasons, and
2 that the opportunity that he had was to use wisdom
3 in talking to others who had more experience about
4 budget, about office management, about hiring
5 practices, about statutory interpretation, to aid
6 him in developing a level of expertise to better
7 operate his office. He rejected all those.
8       I think he took offense, quite frankly,
9 that I was a nonelected official trying to advise
10 him as an elected official as to how to operate
11 within the confines of governmental procedures.
12    Q.   Did you have -- ever have any
13 conversations with Alicia Holland about any
14 concerns she had about Mr. Beckert's conduct toward
15 her?
16    A.   My recollection on that topic would be
17 that I think Alicia talked to me about some of the
18 differences of opinion regarding budgetary
19 management and systems management. I think we had
20 disputes with the auditor's office on who had the
21 responsibility of protracting and entering into
22 contracts for services or product.
23       I remember I had to explain to
24 Mr. Beckert that there's a statute that allows
25 council to establish the purchasing unit and

Page 25

1 policy. And that as the controlling entity,
2 council creates that policy. And then, you know,
3 there is buy-in from a lot of the elected
4 officials.
5       At times, Mr. Beckert felt that he had
6 sole authority on who he could contract with, what
7 services would be provided. And I think those
8 discussions evolved with Alicia's because the
9 purchasing department was part of her chain of
10 command.
11    Q.   And would Mr. Beckert accuse her of
12 violating policies and laws with regard to what she
13 was doing?
14    A.   Yes. He would -- I don't want to say
15 this -- but Mr. Beckert basically had disagreements
16 along those lines with almost everybody outside the
17 auditor's office.
18    Q.   And his accusations with regard to
19 Alicia Holland's conduct, his accusations about her
20 violating laws or policies were not true?
21       MR. J. ANDERSON: Object to the form.
22       MR. BUYCK: Same objection.
23       THE WITNESS: What upset -- they
24 weren't true. And what upset me is that Alicia
25 worked for me, and her conduct, as far as I was

7 (Pages 22 - 25)

Gary T. Kubic                                    April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 34

1  conflicts that were occurring between the auditor
2  and the treasurer at that time.
3      Q.  And in essence SouthData was willing to
4  give up the county's account if they had to have
5  anymore dealings with Jim Beckert?
6      MR. J. ANDERSON:  Object to the form.
7      THE WITNESS:  I'm not sure exactly what
8  SouthData's position was with the overall contract
9  with the county.  But I think they basically had
10 told me, without this letter at the time, that they
11 did not want to take any verbal instructions from
12 Mr. Beckert.
13     And I kept trying to convince them that
14 Maria Walls, Jim Beckert, Gary Kubic, we are trying
15 to work these things out.  But I guess it reached a
16 point where they said, hey, it's not worth the --
17 the business of the county.
18 BY MR. CROSBY:
19     Q.  It says their own Exhibit 9 for
20 SouthData to renew contract IFB 081214, we're
21 requesting the county to include an addendum
22 guaranteeing that SouthData will no longer be
23 required to directly communicate with the Beaufort
24 County Auditor's Office.
25     So it sounds like they were

Page 35

1  willing to -- weren't going to renew that contract
2  if they had to deal with Jim Beaufort?
3      A.  I think what they were saying in the
4  letter, my interpretation of the letter, was they
5  were willing to continue their service with
6  Beaufort County, but not take any instruction or
7  changes from Mr. Beckert in that regard; that they
8  would continue to provide a service, but they
9  didn't want to do it with Mr. Beckert.
10     And I know that sounds like
11 gobbledygook, but I guess they were basically
12 saying, look, if it was Maria Walls or Gary Kubic
13 or someone else, we can handle it.  But they didn't
14 want to continue the relationship as it was
15 originally established.
16     Q.  In Exhibit 10 in the forth paragraph,
17 it says:  We produce billing and assessment
18 documents for approximately 140 counties in the
19 southeast and have never experienced a level of
20 frustration nor have we ever requested that any
21 portion of a contract be terminated.
22     Have you ever had in your experience in
23 government ever had a private vendor make such an
24 expression that they would give up a portion of a
25 contract or make a request not to have a particular

Page 36

1  individual -- to have to deal with a particular
2  individual?
3      A.  Let me limit my answer to say that
4  during my time with Beaufort County, this is the
5  only case I've ever had where a company that we
6  contracted with would want to withdraw from the
7  contract based on these types of circumstances.  I
8  can't remember all the way back to 1980 and '90
9  and --
10     Q.  And who was Dave Thomas?  Was he
11 someone under your supervision?
12     A.  Dave Thomas was under the chain of
13 command of Alicia Holland.  He was the director of
14 purchasing.  Since I am the county administrator,
15 all those employees are under my chain of command,
16 but he directly reported to Alicia Holland.
17     Q.  And it's my understanding that steps
18 were taken to have Maria Walls be the one that were
19 communicating with SouthData under these contracts?
20     MR. J. ANDERSON:  Object to the form.
21     THE WITNESS:  Yes.  If you understand
22 the significance of this process, all general
23 revenue created by a tax bill, real or personal,
24 came through this printing process.  So the
25 importance from my point of view of getting this

Page 37

1  done efficiently and timely was critical.
2      And so my directive to these folks is,
3  look, if you don't want to talk to Jim Beckert and
4  you don't want to take his phone calls, stay with
5  us, you know our system, you've been with us for a
6  while, Maria will do the contacting or I'll do the
7  contacting with you, and we'll be able to continue
8  so that the, quote/unquote, tax bills are available
9  in a timely fashion for the charging and collection
10 of the revenue produced by taxes as directed by
11 Beaufort County Council.
12 BY MR. CROSBY:
13     Q.  In watching Jim Beckert's interaction
14 with county employees and -- as well as Maria Walls
15 over the years, would you describe his behavior or
16 his -- as -- as being of a bullying nature?
17     A.  I would describe Mr. Beckert's actions
18 that if he didn't like you, he was very aggressive
19 in how he conducted himself amongst those
20 individuals.  He was a very aggressive -- he
21 harassed everybody, I mean, to the point where I
22 know a lot of my staff, you know, didn't want to
23 meet.  And I would try to make myself available as
24 a conduit, a mediator so that business could still
25 be conducted without all the friction generated by

10 (Pages 34 - 37)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 38

1 Mr. Beckert.

2    Q.  Would his aggressiveness, would you

3 describe it as abusive toward individuals at times?

4        MR. J. ANDERSON:  Object to the form.

5        THE WITNESS:  Yes.

6 BY MR. CROSBY:

7    Q.  And I take it what you did by locking

8 the doors, at least with regard to your staff and

9 his access to them, was an attempt to protect them

10 from what one would describe as a hostile

11 environment?

12        MR. J. ANDERSON:  Object to form.

13        THE WITNESS:  I would say generally the

14 answer is yes.  The idea of separation, obviously,

15 is to keep each side away from each other.  And so

16 my intent was to limit, because you cannot be

17 exclusive.

18        In the working conditions and product

19 that we were required to produce for the taxpayer,

20 you have occasions where people doing their

21 functions have to interact with others.

22        So physically putting a lock on the

23 door was one method.  The second method would be to

24 try to include or avoid one-on-one situations so

25 that you'd have more people in the meetings, and

Page 39

1 the idea or intent of that was to soften and

2 hopefully modify behavior patterns of individuals

3 because they were in a group setting rather than a

4 one-on-one setting.

5 BY MR. CROSBY:

6    Q.  Wouldn't an ordinary functioning of

7 county government with regard to the auditor and

8 treasurer, would there typically just be free

9 access between, for example, the auditor and

10 someone on your staff so that they could -- if they

11 needed something they could reach directly out to

12 them?

13        MR. J. ANDERSON:  Object to the form.

14        THE WITNESS:  Well, the purpose first

15 and foremost of every elected official in every

16 unit of government is to provide whatever their

17 level of duty and responsibility is to serve the

18 needs of the taxpayer.

19        Whether you like an individual or you

20 don't like an individual, in my world, my

21 authority, is not relevant.  I can dislike an

22 employee but not confront them, verbally abuse

23 them.  As long as their work product is 100 percent

24 and sufficient, I never thought I would have to

25 like or dislike anyone.  I want to see the results

Page 40

1 of their efforts.

2        Given those facts, Mr. Beckert gave

3 several people the impression during meetings

4 and -- and -- that he was just confrontational.  I

5 mean, they were always nervous.  And that's why I

6 tried to increase my presence at committee meetings

7 if I knew he was going to be there or meetings that

8 involved Alicia or Maria, I tried to be there.

9        The auditor's office and the

10 treasurer's office is hand in glove.  They cannot

11 work independently and produce a product that

12 satisfies the needs of the taxpayer.  They -- and

13 that's why in my opinion, and I'm going well beyond

14 in my response, is I don't think you need in this

15 day and age of technology two separately elected

16 officials, auditor and treasurer, to generate a tax

17 bill, whether it's personal property or real

18 property.  But that's -- that's for another

19 election or referendum.

20 BY MR. CROSBY:

21    Q.  In what -- in what you've -- in your

22 response there and your prior responses, because of

23 Mr. Beckert's aggressiveness toward individuals

24 working for the county and in it, he -- you created

25 a system where you served as a conduit and/or, I

Page 41

1 guess, attending more meetings sort of as a

2 protector?

3        MR. BUYCK:  Note my objection.

4 BY MR. CROSBY:

5    Q.  -- for your employees --

6        MR. J. ANDERSON:  Object to the form.

7 BY MR. CROSBY:

8    Q.  I mean, the reason you did that was an

9 attempt to protect your employees from

10 Mr. Beckert's --

11    A.  There --

12    Q.  -- aggressive and abusive behaviors --

13    A.  There were two reasons.

14        MR. BUYCK:  Same objection.

15        MR. J. ANDERSON:  Same objection.

16        THE WITNESS:  There were two reasons:

17 One, the primary focus to produce a product that

18 would satisfy the needs of the taxpayer.  Two, it

19 was to make sure that those present in the meeting,

20 elected or not elected, understood that we are all

21 together to get that done, that the objective of

22 the meeting was to produce product.  And, three, to

23 your point, indirectly to protect or to give

24 comfort from my presence to employees who felt

25 that -- uncomfortable with Mr. Beckert, that they

11 (Pages 38 - 41)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 50

1 council to come to the same conclusions predicated
2 on what I was telling them or what I was seeing
3 occur.
4     Q.  And she goes on in the next sentence
5 and says:  Harassing another person by walking by
6 their office and standing there and staring at
7 them, then walking backwards to repeat staring is
8 very bizarre behavior.
9     Who -- who was she making reference to?
10    A.  Well, I don't know how she decided to
11 write that.  I would probably assume, and it's
12 terrible to do this, that she had conversations
13 with Maria Walls.
14    Q.  And the person that she was talking
15 about doing the harassing by staring was Jim
16 Beckert?
17    A.  Yes.  That's --
18        MR. J. ANDERSON:  Object to the form.
19        THE WITNESS:  -- how I interpret this.
20 BY MR. CROSBY:
21    Q.  And you would concur with her that that
22 type of behaviors, staring and what she's outlining
23 here, is both bizarre and harassing in nature?
24        MR. J. ANDERSON:  Objection.
25        MR. JJ ANDERSON:  Object to the form.

Page 51

1 It's leading.
2        THE WITNESS:  Well, you don't have to
3 lead me to my conclusions.  I will tell you that in
4 the normal course of doing business, some of the
5 behaviors of Mr. Beckert were not normal business
6 procedures or strategies or behavior.
7 BY MR. CROSBY:
8    Q.  Do you concur with Ms. --
9    A.  In my opinion.
10    Q.  Okay.  Do you concur with Ms. Bensch's
11 assessment that his interactions, and if it's
12 referring to Ms. Walls, rose to the level of a
13 harassment?
14    A.  Yes.
15        MR. J. ANDERSON:  Objection.
16        MR. BUYCK:  Same objection.
17 BY MR. CROSBY:
18    Q.  And then she goes on, she says:  Is
19 there anyone with authority to speak with him about
20 limits of acceptable behavior?
21        Did you ever respond to her question,
22 either in person or in writing?
23    A.  I don't know if I responded direct -- I
24 think I -- I might have responded to county council
25 collectively.  I don't think I responded to Cynthia

Page 52

1 Bennett's directly on point.  My position was as
2 county administrator, I served at the pleasure of
3 county council that my duties and responsibilities
4 were defined by county council, that -- I think I
5 told council I have no statutory ability to go to
6 an elected official and instruct an elected
7 official as to how they should conduct their office
8 or level of operation.
9        I basically did have conversations with
10 Mr. Beckert that, you know, arguing and being
11 aggressive with individuals doesn't achieve
12 anything, that normal disagreement is appropriate.
13 Anybody can have an idea about anything.  There is
14 differences of opinions almost all the way down the
15 chain of command.  But ultimately, you know, you
16 come to some resolution.  And that was very
17 difficult with Mr. Beckert.
18    Q.  Did you ever observe that he made any
19 changes in his behavior toward others as a result
20 of your advice?
21    A.  I don't know if he changed his behavior
22 to become less aggressive.  I think he maintained
23 his persona all the way through.  I don't -- I
24 don't think he ever changed any -- he -- he just
25 acted that way.  That was his method of operation

Page 53

1 in terms of his personality and being aggressive.
2    Q.  Was this -- Mr. Beckert's harassing
3 nature of his behavior, was that ever brought to
4 the attention of the council?
5        MR. J. ANDERSON:  Object to the form.
6        MR. BUYCK:  Same objection.
7        THE WITNESS:  Are you asking me if I
8 ever brought to the attention of council his
9 aggressive behavior?
10 BY MR. CROSBY:
11    Q.  Yes.
12    A.  I'm not sure I used the word
13 aggressive.  I think I told council several times
14 that Mr. Beckert clearly was argumentative,
15 disruptive, unwilling to at least listen to a
16 contrary point of view.  And I don't know if I
17 should be -- well, in -- in his -- in this letter,
18 he refers to the department of revenue.  I'm going
19 to expand my answer to say that I reached out to
20 the department of revenue to ask them for
21 assistance, and they basically had a difficult time
22 with Mr. Beckert as well, to the point where it's
23 my interpretation that they didn't want to get
24 involved with him either.
25    Q.  And Ms. Bensch goes on to write that

14 (Pages 50 - 53)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

**Page 118**

1 Could you -- could you be a little more clear on --
2 on what you meant by aggressive?
3     A.  Manner of speech, his countenance in
4 terms of sitting in a meeting and having
5 Mr. Beckert stare at you with intensity, those
6 types of observations is what I meant by a
7 nontypical office type behavior.
8     Q.  Okay.  So staring at you -- and I don't
9 want to put words in your mouth, but I don't -- you
10 know, we're trying -- is it -- would he be more
11 curt?  Would he be -- would he scream at you?  I
12 mean, what -- what's -- what does aggressive mean
13 when you say manner of speech?
14     A.  You can take a look at the -- all the
15 committee meetings are on videotape.
16     Q.  Uh-huh.
17     A.  There were occasions where Mr. Beckert
18 would get aggressive and argumentative.  So I can
19 recall distinctly a meeting that I tried to
20 create -- I think David Cadd, his assistant,
21 Mr. Beckert, Maria, myself, and maybe a couple of
22 other people -- to try to resolve issues, and I
23 didn't anticipate that it would generate anger by
24 having those two present in one room, but it -- it
25 did.

**Page 119**

1     Q.  Would an appropriate synonym for your
2 use of aggressive be passionate?
3     A.  Passionate is an interesting word that
4 I would not use to describe Mr. Beckert's behavior,
5 because there were times where it appeared to me
6 that he was just angry, and I don't believe if
7 you're -- if you're passionate that you're angry.
8 And --
9     Q.  Okay.  So your interpretation of --
10     A.  I interpreted his actions as being
11 overly aggressive in trying to present his point of
12 view vigorously, almost as if he felt that
13 everybody in the room was against him.
14     Q.  Uh-huh.  You mentioned that I think
15 you -- I think these are your exact words, that he
16 harassed everybody?
17     A.  Yeah.
18     Q.  Okay.  Do mean that literally?
19     A.  Yeah.  I do mean it literally.  I
20 don't --
21     Q.  Janitorial staff?
22     A.  No.  I don't think janitorial staff.  I
23 mean, basically all my employees on my side.
24     Q.  Uh-huh.  And --
25     A.  And then I -- and I think in the

**Page 120**

1 assessor's office, I also think in the legal
2 division, I think in the tax equalization board, I
3 think all of the treasurer's employees, so there
4 were quite a few.  But in the literal sense, I used
5 the word everybody, but obviously it's not
6 everybody.
7     Q.  Okay.  I'm going to ask -- I'm going to
8 do this annoying thing that I just did with
9 aggressive.  Can you explain to me exactly what you
10 mean by the word harassment or harassed?
11     A.  Well, in his manner of speech towards
12 people, we're having a conversation, we probably
13 are on different sides of the argument, but I'm not
14 angry at you.  But his communication style and how
15 he verbally related items was not a normal
16 conversation that would reflect a mere difference
17 of opinion.
18     Q.  Uh-huh.
19     A.  His method of expression was:  It's my
20 way, and I determine that way, and you have no
21 right to suggest anything different.
22     Q.  Okay.  And is that -- is that your
23 definition of harassment is him being
24 territorial -- I'll use that word --
25     A.  It -- it --

**Page 121**

1     MR. CROSBY:  Object to the form.
2 BY MR. J. ANDERSON:
3     Q.  -- over items?
4     A.  It could be, yes.
5     Q.  Okay.  So --
6     A.  Now, you can ask the female employees
7 directly what they thought.  I wasn't there, and I
8 can't offer an opinion.  But in the --
9     Q.  Sure.  And like --
10     A.  -- time -- in the conversations that I
11 had or in the meetings I attended --
12     Q.  Uh-huh.
13     A.  -- that was my observation, that he was
14 very aggressive, and that aggressive approach can
15 be interpreted as harassment because clearly he
16 didn't want to hear any other point of view.
17     Q.  Okay.  So when you equal his -- so, in
18 an attempt to summarize here:  Him arguing for his
19 points in an aggressive manner is what you're
20 stating harassment to be?
21     MR. CROSBY:  Object to the form.
22 BY MR. J. ANDERSON:
23     Q.  Is -- is that -- I mean --
24     A.  That's --
25     Q.  Correct me if I'm wrong, please.

31 (Pages 118 - 121)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 122

1       A.   That's -- that's part of it.  I
2   observed Mr. -- I -- I was at a meeting -- at a
3   public -- public meeting where Maria was speaking,
4   and, you know, Jim was openly filming her.
5       Q.   Uh-huh.
6       A.   And I thought to myself when I saw
7   that, you know:  What's going on?  So my
8   interpretation of that action was he was trying to
9   intimidate her while she was speaking to the
10  general public.  And he did that on several
11  meetings where I attended, you know.  So I just
12  thought that's not necessary.
13      Q.   Did you -- did you know that he was
14  filming her or was --
15      A.   Yeah.
16      Q.   -- was that your interpretation?
17      A.   No.  Here.
18      Q.   Okay.  All right.  So --
19      A.   Hold up the phone --
20      Q.   He had a phone held up.  Okay.
21      A.   -- directly at her face --
22      Q.   Uh-huh.
23      A.   -- filming.  And I think there are
24  pictures of him doing that.
25      Q.   Uh-huh.  All right.

Page 123

1       A.   So...
2       Q.   Mr. Crosby asked you about -- in
3   Exhibit 1 here, it's the personnel handbook.
4       A.   Yes.
5       Q.   You went to Page 8, and you talked
6   about 1.6, corrective action.
7       A.   Page 8.  Okay.  I'm getting there.  I'm
8   with you.
9       Q.   Now, you two spoke about the last two
10  sentences within that paragraph.  Would you read
11  the first sentence of that --
12      A.   Did you say 1-6?
13      Q.   I did, 1.6.
14      A.   Okay.  The last two sentences?
15      Q.   You two spoke about the last two
16  sentences:  Employees may be disciplined.
17  Non-employees -- him asking a series of questions
18  about what --
19      A.   Okay.
20      Q.   -- non-employees are.
21      A.   In the first paragraph?
22      Q.   Uh-huh.  Yeah.  That's right.  Would
23  you mind reading the first sentence?
24      A.   If management concludes that a
25  complaint of harassment has merit, appropriate

Page 124

1   action is taken.
2       Q.   Okay.  Did management ever conclude
3   that a complaint of harassment has merit against
4   Mr. Beckert during your tenure there?  I
5   understand --
6       A.   Are you indicating that I was the
7   manager of --
8       Q.   I'm not --
9       A.   -- an elected official?
10      Q.   I'm not making a management question at
11  all here, sir.  I'm not indicating that you are the
12  management.  I'm -- I'm asking if this -- in this
13  process -- you know, whatever management is defined
14  as is in this process.
15      A.   Well, I guess my definition of
16  management in this section doesn't apply to county
17  council directors or administrator that I manage an
18  elected official.
19      Q.   Uh-huh.
20      A.   I don't think that was the intent of
21  that.  I think it was the intent of that language
22  that department heads who are in charge of
23  employees are the management that is referred to in
24  that sentence.  And when they see it, they have an
25  avenue to report it.  But I don't think I have the

Page 125

1   management right to offer harassment charges
2   against an elected official.
3       Q.   I -- I understand your position.
4   And -- and while I appreciate it, I think my
5   question was a little bit different.  Whoever the
6   management -- this -- this 1.6 says:  If management
7   concludes -- and we can put aside who management is
8   at this point -- whether it be a -- whether it be a
9   board, whether it be the county council, whoever it
10  could be.  Right?  This is not -- or the
11  administrator, that's not -- but if that management
12  concludes that a complaint of harassment has merit,
13  all right, appropriate action is taken.  Is that
14  not what that says -- I mean, is that what that
15  says?  My apologies.
16      A.   Yes.
17      Q.   Okay.  Did anyone conclude that a
18  complaint of harassment against Mr. Beckert had
19  merit?  Anybody.
20      A.   Well, I didn't come to the conclusion
21  in the legal sense that his actions against a
22  fellow or another employee had merit in the sense
23  that you're referring to it.  But it is my definite
24  opinion predicated on what I witnessed and what I
25  saw in terms of how Mr. Beckert treated others, not

32 (Pages 122 - 125)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 126

1 only his employees, but other employees throughout
2 the county, I would interpret those actions towards
3 those employees that he was harassing them. His
4 anger, his -- the method, the way he talked to them
5 clearly did not comport with what would be
6 considered reasonable and appropriate conduct in a
7 workplace.
8    Q. And you -- but once again, as you
9 stated before, you're not asked to -- to rule on
10 that?
11    A. No.
12    Q. Okay. And would it have been
13 appropriate for you to ever rule on that --
14    A. No.
15    Q. -- in your position as administrator?
16    A. There is no statutory authority that I
17 ever became aware of that gave me that capability.
18    Q. Okay. During -- during your tenure
19 there, did anyone -- are you aware of anyone
20 gossiping about Mr. Beckert?
21    A. Gossiping?
22    Q. Yes, sir.
23    A. I'm not sure what you mean about
24 gossiping. If you're -- if you're meaning were
25 they talking about Mr. Beckert with -- outside of

Page 127

1 his presence?
2    Q. How do you interpret -- I mean, how do
3 you interpret the term gossip?
4    A. I interpret it as two individuals
5 sitting at a bar having a few drinks, discussing
6 how somebody treated somebody else. That's how I
7 interpret gossiping.
8    Q. Okay. So hopefully --
9    A. To me gossip has no meaning whatsoever.
10 People gossip all the time.
11    Q. It's a term used in the county employee
12 handbook, though --
13    A. Okay.
14    Q. -- is it not?
15    A. I don't know. If it is there, it's
16 there. I don't --
17    Q. Okay. So we'll go to 1.3, the
18 anti-harassment policy.
19    A. Okay.
20    Q. I believe it's the second sentence.
21 I'll give you a second to read that. I think it
22 starts with in addition.
23    A. Yes, sir.
24    Q. I'll give you a second to read that.
25    A. Okay.

Page 128

1    Q. How do you interpret gossip in this
2 context?
3    A. How do I interpret gossip in that
4 context? Well, I guess when -- you know, I guess
5 I'll refer -- I'll give you this answer, which may
6 seem kind of odd: There is a movie called -- it's
7 about a Catholic priest, and he in a sermon
8 describes that a woman came to him and she felt she
9 had sinned because she gossiped about another
10 party, and he told her to go on the rooftop with a
11 knife and a pillow and open the pillow. And so she
12 did, and she reported back to the priest: Father,
13 I did what you asked me.
14       And he said, well, now I want you to go
15 and pick up the feathers.
16       And she said, how can I do that?
17 They're everywhere.
18       And he said, that's gossip.
19       Which I found was a pretty profound way
20 of describing what gossip actually is.
21    Q. So releasing things -- releasing
22 statements into the world which you have no ability
23 to capture back?
24    A. Yes.
25    Q. Do you feel like that happened with --

Page 129

1 did anyone ever release statements into the world
2 that they had no ability to capture back about Jim
3 Berkert?
4    A. I'll answer it this way: The Island
5 Packet quoted me several times in meetings that I
6 didn't attend. That's just part of the process.
7 Especially with people in the public, they like
8 what you wear, they don't like what you say. You
9 are open game to anyone if you are a public
10 employee or an elected official.
11    Q. Did any of your employees gossip in the
12 term that you've -- about Mr. Beckert?
13    A. They could have. I don't know.
14    Q. Okay. So you don't -- you don't know
15 if any of your employees did. Did any of your
16 employees use slurs against Mr. Beckert like, I
17 don't know, creepy?
18    A. Yeah. They used word the creepy --
19    Q. Okay.
20    A. -- made me uncomfortable.
21    Q. Okay.
22    A. Yeah. The -- the black employee --
23 female employees who came into my office felt that
24 he was using David Cadd to look over their shoulder
25 to find errors in their performance so that he

33 (Pages 126 - 129)



Deposition of:

# D. Paul Sommerville

*April 8, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

D. Paul Sommerville

April 8, 2021

Holland, Alicia v. Beaufort County et al

Page 6

1    Q.   During your service on County Council,
2  did you become aware by some means of complaints
3  from employees and perhaps others about what they
4  perceived to be harassing or abusive conduct toward
5  them by Jim Beckert?
6    A.   What was the word before "conduct"?  I
7  heard you say harassing and some kind of conduct.
8    Q.   Abusive?
9    A.   Abusive conduct.  Yes.
10   Q.   And tell me how you -- you came to know
11 of those complaints.  And I'll ask you some
12 specifics, but I would just like some generalities
13 to start with.
14   A.   Well, I had -- I have no idea how many
15 conversations with a number of people on that
16 topic.
17   Q.   To the extent you can, when did you
18 first learn about any complaints about Jim
19 Beckert's behavior?
20   A.   I believe Mr. Beckert was first elected
21 -- think about this.  About 9- -- about 2015, I
22 think.  This is his second term, I think.  Towards
23 the end of second term.  So I'm going to say
24 2015 -- that may not be exactly right -- is when he
25 first became auditor, I think, close.

Page 7

1         And I don't remember, to be honest with
2  you, when the first time I heard the complaints
3  about him, so I can't really put a date to it.
4    Q.   Sometime after he took office?
5    A.   Yes, sir.
6    Q.   And what was the nature of the
7  complaints, as best you can recall?
8    A.   Well, they took two forms.  One was --
9  was his job performance and another was the way he
10 treated some individuals that I became aware of.
11   Q.   There were some people that would
12 complain about Mr. Beckert's performance as
13 auditor?
14   A.   Yes, sir, to me.  I don't know, I'm
15 sure they -- well, I'm not sure of anything.  They
16 may have complained to others, but they definitely,
17 some people definitely complained to me.
18   Q.   And then there were complaints about
19 his behavior to -- towards specific others?
20   A.   A lot of the complaints had to do with
21 his job performance, but you're asking me about
22 what?
23   Q.   About his behavior toward people
24 employed -- County employees.
25   A.   Employees.  Yes, several County

Page 8

1  employees complained to me specifically about his
2  behavior towards them.
3    Q.   And can you give me the names of some
4  that you can recall?
5    A.   Yes, sir, I'll give you the ones I can
6  recall.  Alicia Holland, Maria Walls, the CFO of --
7  of the school board, Tanya --
8    Q.   Crosby?
9    A.   -- Crosby.  Thank you.  No, I'm sorry,
10 Tanya Crosby did not complain to me about his
11 treatment of her.  She complained about his job
12 performance.  I want to be clear about that.
13        I recall those two, but I'm not sure
14 beyond that.
15   Q.   Did you ever learn of any complaints by
16 Ebony Sanders?
17        MR. ANDERSON:  Objection.
18        THE WITNESS:  Ebony Sanders, no, sir, I
19 do not.
20 BY MR. CROSBY:
21   Q.   What about Monica Spells?
22        MR. ANDERSON:  Same objection.
23        THE WITNESS:  Am I hearing things?
24        MR. ANDERSON:  No, sir.  I'm objecting,
25 but you can answer the question.

Page 9

1        THE WITNESS:  Oh, okay.  I want to --
2  don't want to dis- -- I don't want to be
3  dismissive.
4        MR. ANDERSON:  No, sir.  It's a
5  speaking objection.  You can answer.
6        THE WITNESS:  I understand.
7        Okay.  You're asking me if I had
8  complaints from Monica Spells --
9  BY MR. CROSBY:
10   Q.   Yes.
11   A.   -- about Beckert directly?
12   Q.   Yes.
13   A.   Directly, no.
14   Q.   How about indirectly?
15   A.   I don't recall specifically.
16   Q.   Did Gary Kubic ever express concerns to
17 you about Beckert's treatment of some of his staff?
18   A.   Yes.
19   Q.   What do you recall was relayed to you
20 by Gary Kubic?
21   A.   Would you repeat the question, please.
22   Q.   What -- do you recall what Gary Kubic
23 told you about that?
24   A.   About?
25   Q.   About his concerns about Beckert's

3 (Pages 6 - 9)

D. Paul Sommerville                                    April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 10

1  treatment of his staff?
2      A.  He -- he complained -- we're not
3  talking about his job performance now.
4      Q.  Right.
5      A.  We're talking about treatment.
6      Q.  Right.
7      A.  Okay.  Gary and I had -- Gary -- Gary
8  told me on several occasions that Jim Beckert
9  was -- I don't want to misquote Gary and it's very
10  difficult to try to remember his exact words, but
11  I'm trying.  I'm going to have to paraphrase
12  because I'm not sure of his exact words, that he
13  was harassing some employees.
14      Q.  Did Gary inform you of any action that
15  he had taken to protect those employees?
16      A.  Yes.  Gary -- I was chairman during
17  some of that -- oh, excuse me, I forgot to turn my
18  phone off.  I'm sorry.  Oh, shoot.  Sorry.  I
19  forgot to turn my phone off.
20      MR. BUYCK:  If you need to get that
21  call you're welcome to.
22      THE WITNESS:  What's that?
23      MR. BUYCK:  If you need to get that
24  call --
25      THE WITNESS:  No, no, no.  I -- it's --

Page 11

1  I'll call them back.
2      Again, would you repeat the question?
3  I'm sorry I was interrupted.
4  BY MR. CROSBY:
5      Q.  I believe the question was did Gary
6  ever tell you or did you learn of any actions that
7  Gary had taken to protect any of the County
8  employees from Jim Beckert's harassment?
9      A.  Yes.
10      Q.  What -- what did you learn?
11      A.  He told me on numerous occasions that
12  he had gone to Beckert's office and talked to him
13  and brought Beckert into his office to talk to him
14  to try to prevent some of that behavior.
15      Q.  Did you ever learn that he had blocked,
16  basically limited Jim Beckert's access to his
17  part -- part of the building?
18      MR. ANDERSON:  Objection.
19      THE WITNESS:  I am not aware that Gary
20  Kubic limited Beckert's access to any part of the
21  building or -- I don't remember that that was
22  discussed.
23  BY MR. CROSBY:
24      Q.  What about, did you become aware that
25  Gary Kubic, in conjunction with the sheriff's

Page 12

1  office, had installed cameras on the County
2  administration building because of Jim Beckert's
3  peering through Maria Walls' windows?
4      A.  Yes.
5      Q.  When did you learn of that?
6      A.  Well, let's see.  Gary left in -- I'm
7  not going to try to pinpoint that date because I
8  don't remember exactly when he left, but sometime
9  prior to Gary leaving he told me that -- he told me
10  he was installing cameras for that purpose.  Among
11  others, there were other -- it wasn't the only
12  purpose, but it was a purpose.
13      Q.  What you learned is that what prompted
14  it was a complaint from Maria Walls about Jim
15  Beckert peering through her window?
16      A.  Yes.
17      MR. ANDERSON:  Object to the form.
18  BY MR. CROSBY:
19      Q.  Did -- did he relay to you that Jim
20  Beckert would peer through his window as well?
21      A.  On numerous occasions, yes.
22      Q.  In your time on County Council, was the
23  issue of Jim Beckert's behavior toward employees
24  and/or Maria Walls ever discussed as an agenda item
25  or in an executive session item where there was

Page 13

1  some effort to determine if anything could be done
2  to stop it?
3      A.  I don't recall.
4      Q.  Did Gary Kubic ever express to you any
5  frustration about his inability to stop Jim
6  Beckert's behavior?
7      A.  Yes.
8      Q.  And -- and tell me -- tell me what you
9  recall about that.
10      A.  I can remember on several occasions
11  Gary being extremely frustrated because he -- he
12  couldn't figure out how to solve that problem, the
13  Beckert problem, in spite of his efforts.
14      Q.  I believe after Maria Walls filed her
15  lawsuit, you were interviewed by the -- the paper
16  and you indicated that -- you acknowledged the
17  complaints that had been received and indicated it
18  had been on an ongoing basis?
19      A.  (Indicating an affirmative response.)
20      Q.  Is that correct?
21      A.  That's correct.
22      Q.  And you're quoted in there as saying,
23  "We concluded that because he's an elected official
24  there wasn't a whole lot we can do."  And it says,
25  "I never felt comfortable with that because I just

4 (Pages 10 - 13)

D. Paul Sommerville
Holland, Alicia v. Beaufort County et al

April 8, 2021

Page 14

1  kept thinking there has to be something we can do
2  to help these poor people."
3       Q.  Do you recall saying that?
4       A.  I do.
5       Q.  When you say we made the decision or we
6  concluded that there wasn't much could be done was
7  that council concluded or are you talking about
8  County government?
9       A.  No, I'm really talking about Gary and
10  myself because my conversations were not with the
11  council itself.  We may have had individual
12  conversations.  I don't recall we had a group
13  conversation, a council conserv- -- conversation.
14  But I had many conversations with Gary about it and
15  so I guess the "we" I'm talking about really is
16  Gary and I.  I think I was probably chairman at
17  that time.
18       Q.  And as chairman you would have had a
19  lot of direct communications with the County
20  administrator?
21       A.  Daily.
22       Q.  Was there ever a -- a legal opinion
23  that was issued where that was looked at to see if
24  there was anything that could be done?
25       A.  I don't have direct knowledge of any

Page 15

1  conversations that may have taken place between
2  Gary and attorneys or Gary and the governor's
3  office or Gary and whoever.  I mean I had second --
4  I have secondhand information that those
5  conversations took place, but no firsthand
6  information.
7       Q.  Did you ever see any -- anything in
8  writing that came to the conclusion that nothing
9  could be done to stop Jim Beckert from harassing
10  employees and others on County property?
11       A.  I don't recall seeing anything like
12  that.
13       Q.  You certainly felt that -- or -- strike
14  that.
15       You certainly would have liked to have
16  been able to do something to protect these
17  employees from harassment?
18       A.  Oh, my gosh, yes.  Absolutely.
19       Q.  And if there would have been anything
20  within the power of the County administrator that
21  could have been done to protect them, that should
22  have been done, correct?
23       MR. BUYCK:  Note my objection.
24       THE WITNESS:  Would you repeat that,
25  please.

Page 16

1  BY MR. CROSBY:
2       Q.  If there was anything that could have
3  been done within the power of the County
4  administrator or department heads to protect from
5  Jim Beckert's harassing behavior, that should have
6  been done?
7       A.  You mean -- I'm still not understanding
8  --
9       Q.  Is it --
10       A.  -- exactly how you're wording the
11  question.
12       Q.  Well, would you agree that if there
13  were actions that could have been done to protect
14  from Jim Beckert's harassing behavior, that any
15  available avenue should have been pursued?
16       MR. ANDERSON:  Object to the form.
17       THE WITNESS:  Oh, absolutely.  Would
18  have been, certainly would have been by Gary and my
19  opinion would have been pursued by Gary Kubic and
20  would have been pursued by me in my role.  We just
21  never could come up with anything that seemed to
22  have any likelihood of success.  It was very
23  frustrating.
24  BY MR. CROSBY:
25       Q.  Did you ever have any conversations

Page 17

1  over the years with Maria Walls about her concerns
2  about Jim Beckert's behavior?
3       A.  Yes.  I can't tell you how many, but it
4  was probably quite a few.
5       Q.  Was that something that was a constant
6  topic between you and Maria where she would bring
7  up her concerns about Jim Beckert?
8       A.  Yes.
9       Q.  In your observations or in what she
10  told you, did you learn as to whether she feared
11  for her physical safety?
12       A.  I can't answer that.  I don't know the
13  answer to that.
14       Q.  But what she would relay to you was
15  that she was being harassed by Jim Beckert?
16       MR. ANDERSON:  Objection.
17       THE WITNESS:  Yes.
18  BY MR. CROSBY:
19       Q.  When --
20       A.  Excuse me, I just remembered I have got
21  another phone to turn off.  That's it.  I promise
22  there are no more.
23       Q.  When -- sometime after Maria Walls
24  filed her lawsuit against the County, did you learn
25  that Jim Beckert's access to the County

5 (Pages 14 - 17)

D. Paul Sommerville                              April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 18

1   Administration Building had been restricted?
2       A.   Yes.
3       Q.   Tell me how you came to learn of that.
4       A.   I believe that the then-County
5   administrator told us that -- told the County
6   Council at an executive session. It wasn't -- it
7   was after Gary. This was Ashley Jacobs.
8       Q.   She told council that she had taken the
9   steps to restrict his access --
10      A.   Correct.
11      Q.   -- and prohibit -- prohibit him from
12  having any contact with County employees?
13      A.   Yeah, let me, if I may, clarify
14  something I said a minute ago that we had no
15  executive sessions to talk about Jim Beckert. That
16  was under Gary Kubic. But I can't recall any, but
17  now we're moving forward to Ashley Jacobs and under
18  Ashley Jacobs we did have, I don't remember, one or
19  two, but we had at least one.
20      Q.   Okay. Well, I was going to ask you
21  about Ashley Jacobs. So did Ashley Jacobs ever
22  relay comp- -- complaints about Jim Beckert's
23  harassment of County employees?
24      A.   Yes.
25      Q.   What do you recall about your

Page 19

1   conversations with Ms. Jacobs?
2       A.   A lot of her complaints about Jim
3   Beckert had to do with his job performance.
4       Q.   Well, would -- I'm talking about
5   specific to his harassment of County employees.
6       A.   Right. I'm trying to recall if she --
7   she very well may have, but I can't -- I can't
8   swear that that happened, that she did, that she
9   talked about his harassment. She very -- I'm sorry
10  to say I just don't specifically remember. I had
11  so many conversations with so many people about his
12  harassment, that I'm not sure if she was one.
13           I had conversations with her about Jim
14  Beckert, but I'm not sure if harassment was part of
15  those con- -- it may -- may well have been, but I'm
16  not sure.
17      Q.   Did she ever relay to you that Jim
18  Beckert exhibited harassing behavior toward her?
19      A.   She never said that directly to me. I
20  think -- I think I may have heard that secondhand,
21  but I'm not sure.
22      Q.   Did -- did -- did you read in any
23  newspaper articles where she was quoted as that, as
24  having been harassed by Jim Beckert?
25      A.   If there was an article, I read it, but

Page 20

1   I just don't recall it. I think I have read every
2   article involving Mr. Beckert that's been written.
3   I may have missed one because I'm out of town quite
4   a bit, but I usually catch up when I come back,
5   so...
6       Q.   Were there any -- ever any discussions
7   in executive session about Jim Beckert's treatment
8   of County employees?
9       A.   Yes.
10      Q.   When -- when would that have occurred?
11      A.   Sometime in the first half of 2020.
12      Q.   And what was -- what -- what brought
13  that to be an item of executive session?
14      A.   Well, my impression was that
15  Ms. Jacobs -- Ms. Jacobs was extremely frustrated
16  dealing with Jim Beckert, as was Gary Kubic, the
17  difference being that I had a lot more daily
18  communication with Gary Kubic than I had with
19  Ms. Jacobs simply because I wasn't the chairman
20  beginning in 2020.
21      Q.   What do you recall about --
22      A.   Or -- or '19, for that matter.
23      Q.   What do you recall about the specifics
24  that she was relaying to council about her
25  frustrations with Jim Beckert?

Page 21

1       A.   I recall that her primary focus was
2   getting the tax bills out and getting the --
3   closing the books, getting the CAFR out and his --
4   his role in those things, particularly the tax
5   bills.
6       Q.   Well, and what about specific to his
7   conduct toward County employees and others on
8   County property?
9       A.   It was discussed, but I can't remember
10  the particulars of it.
11      Q.   Was there any executive action
12  discussed that -- that was proposed to be taken
13  with regard to Jim Beckert's conduct toward County
14  employees?
15      A.   Yes. I don't know who came up with
16  this idea. I may have known at the time, but I
17  don't know now. Somebody came up with the idea
18  that we could exclude him or, I'm sorry, that the
19  administrator had control over the building, the
20  County Office Building and, therefore, had the
21  authority to exclude him from that building and
22  that was going to be the action taken and, in fact,
23  that was the action taken.
24      Q.   Now, that was after the lawsuits were
25  filed?

6 (Pages 18 - 21)

D. Paul Sommerville                                    April 8, 2021
Holland, Aliciav. Beaufort County et al

Page 22

1    A.  I can't -- I don't know what the
2  sequence was.
3    Q.  Other than that, do you recall any
4  action that was discussed with regard to Jim
5  Beckert's conduct toward --
6    A.  Yes, I heard some conversations about
7  going to the governor, but they were -- they were
8  secondhand conversations and so...
9    Q.  That was something that was discussed
10  in executive session or just something that was
11  talked with outside of?
12    A.  No, I don't recall it being discussed
13  in executive session, but I do recall it being
14  discussed between myself and Josh Gruber, Gary
15  Kubic.
16    Q.  With regard to the County administrator
17  having the power or control over access to the
18  buildings, whatever that timing was, was there any
19  vote on that or was it just a discussion that
20  actually, the County administrator, possessed that
21  power?
22    A.  My recollection is that in executive
23  session, Ashley Jacobs proposed that idea.  There
24  was never a vote, to my knowledge, and as a -- as I
25  recall, she proposed it as something within her

Page 23

1  authority to do.  It didn't require a vote.
2    Q.  The -- the County does have control
3  over the County property, correct?
4    A.  Absolutely.
5    Q.  So that's basically what she was
6  suggesting is, as in her role as the highest
7  ranking County employee, she had the authority to
8  make that -- take that type of action?
9    MR. BUYCK:  Note my objection.
10    THE WITNESS:  Correct.
11  BY MR. CROSBY:
12    Q.  You can make a call.
13  to -- or in that meeting to give her special power?
14    A.  No, I only -- I only wish that I had
15  thought of it.  I only wish Gary Kubic had thought
16  of it.  As far as I know, Gary Kubic didn't think
17  of it, Josh Gruber didn't think of it, and I didn't
18  think of it, so, but somebody did at some point and
19  I think it -- so...
20    Q.  Do you re-- did you have more than
21  one conversation with Alicia Holland --
22    A.  Yes.
23    Q.  -- about Beckert's behavior towards
24  her?
25    A.  Yes.

Page 24

1    Q.  Was that something that she complained
2  to you about on multiple occasions?
3    A.  Yes.
4    Q.  Was the -- the complaint typically the
5  same, that Beckert was harassing her?
6    A.  Well, a lot of her complaints had to do
7  with his -- because she was the chief financial
8  officer and responsible for the finance of the --
9  of the County, she -- a lot of her complaints,
10  certainly not all of them, but a lot of them had to
11  do with his job performance.  But yes, she also
12  complained about his harassment.
13    Q.  Did she --
14    A.  To me.
15    Q.  -- complain to you that he was causing
16  her discomfort and stress?
17    A.  I'm struggling to answer that question
18  because I'm not sure if -- if my conversation with
19  her was privileged, so...
20    Q.  I don't -- I don't know how it would
21  be, but as her attorney, it's okay to tell me.
22    A.  Okay.  No, I think there were other
23  things that frustrated her as well, but yes, Jim
24  Beckert was certainly one of them.
25    Q.  Did he relay to you that she was

Page 25

1  stressed about whether that Jim was causing her
2  stress in -- in doing her job?
3    A.  Yes.
4    Q.  Let me give you a couple of documents
5  and I'll let him take a break so you can look at
6  them.
7    MR. CROSBY:  What exhibit numbers are
8  these?
9    MS AVANT:  (Inaudible.)
10    THE WITNESS:  Take a break, like make a
11  call?  Or take a break, like wait for them?
12    MR. BUYCK:  You can make a call.
13    MR. CROSBY:  Let's just go off the
14  record.
15    THE VIDEOGRAPHER:  We are going off
16  record.  The time is 2:42 p.m.
17    (A Recess transpired.)
18    (EXHIBIT 14, Letter, 3-6-18, was marked
19  for identification.)
20    (EXHIBIT 15, E-Mail, 5-21-19, was
21  marked for identification.)
22    (EXHIBIT 16, E-Mail, 8-7-20, was
23  marked for identification.)
24    (EXHIBIT 17, E-Mail, 8-19-20, was
25  marked for identification.)

7 (Pages 22 - 25)

D. Paul Sommerville
Holland, Aliciav. Beaufort County et al

April 8, 2021

Page 26

1    THE VIDEOGRAPHER: We are back on
2  record. The time is 2:55 p.m.
3  BY MR. CROSBY:
4    Q. Mr. Sommerville, can you get the
5  document that's marked as Exhibit 16?
6    A. Yes.
7    Q. Is that an e-mail from Alicia Holland
8  to you?
9    A. Yes.
10   Q. Do you recall why she would have been
11 forwarding you her resignation letter at this point
12 in time?
13   A. I'm sorry?
14   Q. Do you recall why she would have
15 been -- I think she had already left the County's
16 employment by this time. Do you know why she would
17 have been forwarding you her resignation letter?
18   A. I don't recall specifically, no.
19   Q. Did y'all bump into each other or have
20 a conversation whereby that came up and later she
21 sent you this?
22   A. I recall have -- well, I had numerous
23 conversations with her since she left. I recall
24 one conversation that had to do with her
25 resignation and I think I remember saying, "I have

Page 27

1  never seen your resignation" so that may have
2  triggered it.
3    Q. And she later forwarded that to you
4  with her comments about her decision to leave?
5    A. Yes, yes.
6    Q. And then Exhibit No. 17 looks like a
7  reply to an e-mail received from you to Alicia
8  Holland. Is that where she wrote back and said
9  that, "Jim Beckert is a sick and dangerous
10 individual. He has harassed and bullied Maria,
11 myself, and Ebony that I am aware of. There may be
12 others I'm not aware of. Jim is the primary reason
13 I left my employment with Beaufort County."
14      Did you forward to Alicia Holland a
15 copy of the lawsuit that was filed by Maria Walls?
16   A. I may have. I don't -- I don't
17 specifically recall. I -- I'm trying to think if I
18 had it. I'm pretty sure I had it.
19   Q. I mean, it has at the top of it, the
20 subject line in -- in that e-mail, the next e-mail
21 down is from you to Alicia Holland and the subject
22 is "Maria Walls versus Beaufort County."
23   A. I don't doubt that I did. I just don't
24 specifically recall it.
25   Q. Do you know if you forwarded it to

Page 28

1  anyone else?
2    A. I don't recall.
3    Q. It looks like Ashley Jacobs had sent it
4  to yourself and the other members of -- of council.
5    A. That's what it appears to me. It
6  appears that I received it and forwarded it to
7  Alicia.
8    Q. And where she indicates in that first
9  line where she says that, "He," being Jim Beckert,
10 "has harassed and bullied Maria, myself," Maria and
11 herself, you would agree that that's -- Jim
12 Beckert's conduct was, toward Maria Walls and
13 Alicia Holland, was -- would be considered as
14 harassment and bullying in nature?
15   A. Well, I never witnessed any of this
16 firsthand, but this is the way Jim Beckert's
17 actions were characterized to me by Maria and
18 Alicia.
19   Q. All right. When they would talk to you
20 about it, they would relay it in those terms, that
21 he was a bully and that he was harassing them?
22   A. Yes.
23   Q. Did you ever witness Jim Beckert
24 exhibit that type of behavior to anyone?
25   A. The only thing I recall seeing him do

Page 29

1  was he had a phone that he liked to carry out where
2  everybody could see it. At least that was my
3  impression. Maybe some people carry their phone
4  anyway, maybe some people just walk around with it.
5  But I guess it was Maria or Alicia who said that --
6  that he was recording them and as a -- as a method
7  of harassing them.
8    Q. And you -- you had witnessed that
9  yourself?
10   A. Well, I witnessed him -- witnessed him
11 with a phone in his hand, but I don't know. I
12 can't say what he was doing with it. I mean, I --
13   Q. It appeared to you that he could have
14 been recording?
15   A. He certainly could have been.
16      MR. ANDERSON: Object to the form.
17 BY MR. CROSBY:
18   Q. When he would walk around with it, he
19 would have the camera side pointing out?
20   A. I don't recall.
21   Q. On Exhibit 15, it references hiring an
22 outside firm to help determine if the millage had
23 been calculated correctly. Do you recall that?
24   A. Yes.
25   Q. And that the cost was going to be

8 (Pages 26 - 29)

Ex. 3
Beaufort County Adopts Testimony:
Topic 7: Instances of Bullying Involving Beckert



Deposition of:

**Gary T. Kubic**

*April 7, 2021*

In the Matter of:

**Holland, Aliciav. Beaufort County et al**

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

---

Page 34

1 conflicts that were occurring between the auditor
2 and the treasurer at that time.
3     Q.  And in essence SouthData was willing to
4 give up the county's account if they had to have
5 anymore dealings with Jim Beckert?
6     MR. J. ANDERSON:  Object to the form.
7     THE WITNESS:  I'm not sure exactly what
8 SouthData's position was with the overall contract
9 with the county.  But I think they basically had
10 told me, without this letter at the time, that they
11 did not want to take any verbal instructions from
12 Mr. Beckert.
13     And I kept trying to convince them that
14 Maria Walls, Jim Beckert, Gary Kubic, we are trying
15 to work these things out.  But I guess it reached a
16 point where they said, hey, it's not worth the --
17 the business of the county.
18 BY MR. CROSBY:
19     Q.  It says their own Exhibit 9 for
20 SouthData to renew contract IFB 081214, we're
21 requesting the county to include an addendum
22 guaranteeing that SouthData will no longer be
23 required to directly communicate with the Beaufort
24 County Auditor's Office.
25     So it sounds like they were

---

Page 35

1 willing to -- weren't going to renew that contract
2 if they had to deal with Jim Beaufort?
3     A.  I think what they were saying in the
4 letter, my interpretation of the letter, was they
5 were willing to continue their service with
6 Beaufort County, but not take any instruction or
7 changes from Mr. Beckert in that regard; that they
8 would continue to provide a service, but they
9 didn't want to do it with Mr. Beckert.
10     And I know that sounds like
11 gobbledygook, but I guess they were basically
12 saying, look, if it was Maria Walls or Gary Kubic
13 or someone else, we can handle it.  But they didn't
14 want to continue the relationship as it was
15 originally established.
16     Q.  In Exhibit 10 in the forth paragraph,
17 it says:  We produce billing and assessment
18 documents for approximately 140 counties in the
19 southeast and have never experienced a level of
20 frustration nor have we ever requested that any
21 portion of a contract be terminated.
22     Have you ever had in your experience in
23 government ever had a private vendor make such an
24 expression that they would give up a portion of a
25 contract or make a request not to have a particular

---

Page 36

1 individual -- to have to deal with a particular
2 individual?
3     A.  Let me limit my answer to say that
4 during my time with Beaufort County, this is the
5 only case I've ever had where a company that we
6 contracted with would want to withdraw from the
7 contract based on these types of circumstances.  I
8 can't remember all the way back to 1980 and '90
9 and --
10     Q.  And who was Dave Thomas?  Was he
11 someone under your supervision?
12     A.  Dave Thomas was under the chain of
13 command of Alicia Holland.  He was the director of
14 purchasing.  Since I am the county administrator,
15 all those employees are under my chain of command,
16 but he directly reported to Alicia Holland.
17     Q.  And it's my understanding that steps
18 were taken to have Maria Walls be the one that were
19 communicating with SouthData under these contracts?
20     MR. J. ANDERSON:  Object to the form.
21     THE WITNESS:  Yes.  If you understand
22 the significance of this process, all general
23 revenue created by a tax bill, real or personal,
24 came through this printing process.  So the
25 importance from my point of view of getting this

---

Page 37

1 done efficiently and timely was critical.
2     And so my directive to these folks is,
3 look, if you don't want to talk to Jim Beckert and
4 you don't want to take his phone calls, stay with
5 us, you know our system, you've been with us for a
6 while, Maria will do the contacting or I'll do the
7 contacting with you, and we'll be able to continue
8 so that the, quote/unquote, tax bills are available
9 in a timely fashion for the charging and collection
10 of the revenue produced by taxes as directed by
11 Beaufort County Council.
12 BY MR. CROSBY:
13     Q.  In watching Jim Beckert's interaction
14 with county employees and -- as well as Maria Walls
15 over the years, would you describe his behavior or
16 his -- as -- as being of a bullying nature?
17     A.  I would describe Mr. Beckert's actions
18 that if he didn't like you, he was very aggressive
19 in how he conducted himself amongst those
20 individuals.  He was a very aggressive -- he
21 harassed everybody, I mean, to the point where I
22 know a lot of my staff, you know, didn't want to
23 meet.  And I would try to make myself available as
24 a conduit, a mediator so that business could still
25 be conducted without all the friction generated by

---

10 (Pages 34 - 37)

Gary T. Kubic
Holland, Alicia v. Beaufort County et al

April 7, 2021

Page 38

1 Mr. Beckert.

2     Q.  Would his aggressiveness, would you
3 describe it as abusive toward individuals at times?
4     MR. J. ANDERSON: Object to the form.
5     THE WITNESS: Yes.
6 BY MR. CROSBY:
7     Q. And I take it what you did by locking
8 the doors, at least with regard to your staff and
9 his access to them, was an attempt to protect them
10 from what one would describe as a hostile
11 environment?
12     MR. J. ANDERSON: Object to form.
13     THE WITNESS: I would say generally the
14 answer is yes. The idea of separation, obviously,
15 is to keep each side away from each other. And so
16 my intent was to limit, because you cannot be
17 exclusive.
18     In the working conditions and product
19 that we were required to produce for the taxpayer,
20 you have occasions where people doing their
21 functions have to interact with others.
22     So physically putting a lock on the
23 door was one method. The second method would be to
24 try to include or avoid one-on-one situations so
25 that you'd have more people in the meetings, and

Page 39

1 the idea or intent of that was to soften and
2 hopefully modify behavior patterns of individuals
3 because they were in a group setting rather than a
4 one-on-one setting.
5 BY MR. CROSBY:
6     Q. Wouldn't an ordinary functioning of
7 county government with regard to the auditor and
8 treasurer, would there typically just be free
9 access between, for example, the auditor and
10 someone on your staff so that they could -- if they
11 needed something they could reach directly out to
12 them?
13     MR. J. ANDERSON: Object to the form.
14     THE WITNESS: Well, the purpose first
15 and foremost of every elected official in every
16 unit of government is to provide whatever their
17 level of duty and responsibility is to serve the
18 needs of the taxpayer.
19     Whether you like an individual or you
20 don't like an individual, in my world, my
21 authority, is not relevant. I can dislike an
22 employee but not confront them, verbally abuse
23 them. As long as their work product is 100 percent
24 and sufficient, I never thought I would have to
25 like or dislike anyone. I want to see the results

Page 40

1 of their efforts.
2     Given those facts, Mr. Beckert gave
3 several people the impression during meetings
4 and -- and -- that he was just confrontational. I
5 mean, they were always nervous. And that's why I
6 tried to increase my presence at committee meetings
7 if I knew he was going to be there or meetings that
8 involved Alicia or Maria, I tried to be there.
9     The auditor's office and the
10 treasurer's office is hand in glove. They cannot
11 work independently and produce a product that
12 satisfies the needs of the taxpayer. They -- and
13 that's why in my opinion, and I'm going well beyond
14 in my response, is I don't think you need in this
15 day and age of technology two separately elected
16 officials, auditor and treasurer, to generate a tax
17 bill, whether it's personal property or real
18 property. But that's -- that's for another
19 election or referendum.
20 BY MR. CROSBY:
21     Q. In what -- in what you've -- in your
22 response there and your prior responses, because of
23 Mr. Beckert's aggressiveness toward individuals
24 working for the county and in it, he -- you created
25 a system where you served as a conduit and/or, I

Page 41

1 guess, attending more meetings sort of as a
2 protector?
3     MR. BUYCK: Note my objection.
4 BY MR. CROSBY:
5     Q. -- for your employees --
6     MR. J. ANDERSON: Object to the form.
7 BY MR. CROSBY:
8     Q. I mean, the reason you did that was an
9 attempt to protect your employees from
10 Mr. Beckert's --
11     A. There --
12     Q. -- aggressive and abusive behaviors --
13     A. There were two reasons.
14     MR. BUYCK: Same objection.
15     MR. J. ANDERSON: Same objection.
16     THE WITNESS: There were two reasons:
17 One, the primary focus to produce a product that
18 would satisfy the needs of the taxpayer. Two, it
19 was to make sure that those present in the meeting,
20 elected or not elected, understood that we are all
21 together to get that done, that the objective of
22 the meeting was to produce product. And, three, to
23 your point, indirectly to protect or to give
24 comfort from my presence to employees who felt
25 that -- uncomfortable with Mr. Beckert, that they

11 (Pages 38 - 41)

In the Matter of:

# ALICIA HOLLAND

VS.

# BEAUFORT COUNTY, and JAMES BECKERT, Individually, and in his official capacity

**Ebony Sanders**

September 28, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Ebony Sanders - 9/28/2021

## Page 9

1    Q   All right. And do you recall what it was
2  about?
3    A   Not clearly what it was about, but I know
4  it was about a form-- it was about taxation. I
5  can tell you that much from what I can recollect.
6    Q   And when -- when you say conflict, can you
7  help me understand what your definition of conflict
8  with him would be?
9    A   My definition of conflict with -- on
10 the -- when you're defining the word conflict, it's
11 not only -- it's not consideration of a
12 disagreement. We have disagreements with people.
13 That's not what I'm looking at. Conflict to me
14 would be intimidation, retaliation, bullying. Those
15 are the type of things that conflict in my
16 definition would be for Jim Beckert -- with Jim
17 Beckert.
18    Q   Can you give us some examples of times
19 when -- or how Mr. -- Mr. Beckert would intimidate
20 you?
21    A   Yes.
22    Q   Can you please do that?
23    A   There's been occasions when he's come to
24 my office, and he's been -- he's intimidated me on
25 one or two occasions, my staff, and I had to address

## Page 10

1  that matter accordingly.
2    Q   So beyond intimidation of you, he would
3  also intimidate your staff?
4    A   That is correct.
5    Q   What about an example of how he might
6  bully you?
7    A   He's bullied me personally in my office
8  face-to-face, as well as in verbal -- as in written
9  communication against me received. So we've had
10 those instances as well.
11    Q   Can you be more specific about what --
12 what that would look like when he would bully you?
13    A   Yes. Accusations of things that are not
14 true. Accusations against my staff that are not
15 true and the department that is not true.
16    Q   You're not a political figure, are you?
17    A   That is correct.
18    Q   So those weren't political differences
19 between -- that Mr. Beckert was trying to hash out?
20    A   That is correct.
21    Q   What I'm understanding is that he would
22 come in and just falsely accuse you and your staff
23 of not doing your jobs properly?
24      MR. ANDERSON: Object to the form. You
25      can go ahead.

## Page 11

1    A   I'm -- one more time can you ask the
2  question? I got distracted when he objected. But
3  one more time can you ask the question?
4  BY MR. CROSBY:
5    Q   Well, with some of the -- the behaviors
6  that Mr. Beckert would exhibit toward you and your
7  staff, would he falsely accuse you of not doing your
8  jobs properly?
9    A   That is correct. Yes. He has.
10    Q   Can you be more specific? Can you give us
11 some specific examples?
12    A   He -- you know, he has accused me of -- he
13 has accused me of -- falsely accused me of treating
14 him -- being a racist. He has accused me of not
15 having the ability to do my job. He has come to my
16 office and bullied my staff, one particular
17 gentleman who has autism, and I had to defend him.
18    Q   I'm going to give you what's marked as
19 Exhibit 47.
20      (Plaintiff's Deposition Exhibit No.
21      47 was marked for identification.)
22    A   Can you give me a minute?
23 BY MR. CROSBY:
24    Q   Yes, ma'am. And if there's more you want
25 to say here, I don't want to cut you off on your

## Page 12

1  answer.
2    A   I just need a minute.
3    Q   Ma'am?
4    A   I just need a minute.
5      MR. CROSBY: Okay.
6      MR. BUYCK: And what we're going to do is
7  we're going to pass these around. If you'll
8  hand me that exhibit. You're going to keep the
9  one with the yellow, and we're going to keep a
10 circle going around. I'm going to take one,
11 and I'm going to pass one to Mr. Anderson.
12      MR. CROSBY: Thank you, Tom.
13      MR. ANDERSON: You want to explain
14 objections?
15      MR. CROSBY: I thought I did it.
16 BY MR. CROSBY:
17    Q   But, again, there may be a time when they
18 object to a question I ask. And I think it just
19 threw --
20    A   I understood.
21    Q   I figured it just threw you off on what
22 the question was.
23    A   Yes. It did. I understand.
24    Q   And that does -- that happens.
25    A   I do -- I apologize. I do apologize.

3 (Pages 9 to 12)

Ex. 3
Beaufort County Adopts Testimony:
Topic 8: Instances of Inappropriate Behavior Involving
Beckert



Deposition of:
## Suzanne D. Gregory

*April 7, 2021*

In the Matter of:

## Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions
800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Suzanne D. Gregory
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 34

1  with -- I believe it was the deputy county
2  administrator at the time and another person,
3  who I'm not sure what capacity he worked in at the
4  time, where it was very confrontational.
5       Q.  Did any of these ladies indicate to you
6  that Mr. Beckert was partaking in any other
7  behavior that was more than rude, but maybe took it
8  a step further?
9       A.  Not that I can recall, no.
10      Q.  Are you aware that Mr. Beckert would
11  stare into Maria Walls's window outside of her
12  office?
13      A.  I was -- I was told that, yes.
14      Q.  Do you recall who told you that?
15      A.  I believe it was the county
16  administrator.
17      Q.  And who was that at that time?  I know
18  Beaufort County has been through quite a few
19  lately.
20      A.  Gary Kubic.
21      Q.  And was that documented in your
22  department?
23      A.  Not in my department.  I believe Gary
24  Kubic may have documented that.
25      Q.  Why weren't these complaints or these

Page 35

1  comments documented anywhere?
2       A.  Comments weren't documented because it
3  was casual conversation that -- that I wasn't
4  approached in a serious manner.  It was -- it was
5  almost just here's another Jim Beckert situation,
6  you know, here -- and -- and it -- no one walked --
7  no one walked into my office of the list I gave you
8  and said:  I have a problem with Jim Beckert.  It
9  was just we were talking about this, the other, and
10 then his name would come up.
11      Q.  And what was the -- do you remember the
12 context of the other conversation?  Was it other
13 HR-related issues?
14      A.  I don't recall.
15      Q.  I guess I'm trying to figure out your
16 definition of a comment --
17      A.  Uh-huh.
18      Q.  -- to figure out whether it's something
19 that should have been documented, because we looked
20 at the -- the handbook earlier, and it states in
21 there that any complaint should be documented in
22 written form.
23      A.  Uh-huh.
24      Q.  And when you've got multiple, as you've
25 termed them, comments about the same individual,

Page 36

1  I'm trying to figure out why they weren't written
2  down somewhere.  So what is your understanding of
3  comment?
4       A.  A comment is something stated in a
5  conversation that -- I -- I don't know how to
6  answer that.
7       Q.  If someone were to call you about a
8  situation involving employee A and employee B, that
9  they were not involved in, just something that they
10 observed --
11      A.  Uh-huh.
12      Q.  -- would that be documented or would
13 employee A have to come sit down in your office in
14 a serious manner for you to document that?
15      A.  If someone came to me about employee A
16 and B having a conversation or a problem, I would
17 likely contact employee A or B to look into it if
18 it was a serious matter.
19      Q.  And did you ever contact Jim Beckert
20 about the, as you -- as you have termed them,
21 comments against him?  Did you ever contact him to
22 discuss them with him?
23      A.  No.  I -- I made administration aware
24 of anything that went on because they were dealing
25 with him as an elected official at the time the

Page 37

1  best they could.
2       Q.  And what were they dealing with him on?
3  Was there another issue going on that you're aware
4  of?
5       A.  I -- I -- I believe there were several
6  issues going on with him, but one was his behavior.
7       Q.  And when there is an issue with his
8  behavior, he was the director of human resources,
9  you were not involved in that?
10      A.  No, not directly.  Because, there
11 again, he's an elected official, not a county
12 employee, and I had no authority over him.
13      Q.  So, if human resources doesn't have any
14 authority over him as an elected official, why did
15 human resources require him to complete an
16 orientation checklist and sign the Computer and
17 Information Systems Acceptable Use Policy and gave
18 him a handbook?
19      A.  It's my understanding at the time this
20 was done, he was in the transition period.  And
21 before he was sworn in, he was considered a county
22 employee -- a temporary county employee.  That's
23 why he had to complete this paperwork.
24      Q.  Is it your understanding that once he
25 became an elected official, he no longer had to

10 (Pages 34 - 37)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, ET AL

**Thomas J. Keaveny, II**

September 27, 2021



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com

Thomas J. Keaveny, II - 9/27/2021

Page 21

1    tried to do that, but I think there's some
2    case law out there about that.
3    BY MR. CROSBY:
4        Q    There's some case law there that
5    indicates that the county does have discretion in
6    that regard?
7        MR. BUYCK: Note my objection.
8        THE WITNESS: You know, I mean, it's been
9    a while since I've looked at the case, so I'm
10    not really sure, to tell you the truth. I'd
11    have to look at it to discuss it, but we've
12    never gotten involved in a tussle with an
13    elected official about where their office is
14    or should be.
15    BY MR. CROSBY:
16        Q    Until Mr. Beckert?
17        MR. ANDERSON: Objection to form.
18        THE WITNESS: Yeah. Well, like I said, I
19    wasn't involved in that decision, so I really
20    don't know what the dynamics were.
21    BY MR. CROSBY:
22        Q    With regard to the complaints --
23        Let me ask you this: Who have you known
24    to complain about Mr. Beckert's, quote-unquote,
25    abusive behavior?

Page 22

1        A    The reason I'm hesitating to answer is
2    because lots of people have complained about his
3    behavior, but I don't know that a lot of people
4    have complained about his abusive behavior. Not
5    trying to draw too fine a line, but lots of people
6    have complained about his behavior.
7        Maria Walls complained about it. Gary
8    Kubic complained about it. I've complained about
9    it. Josh Gruber's complained about it. Alicia
10    Holland's complained about it. Ebony Sanders has
11    complained about it. Maria -- Alicia Holland, of
12    course, complained about it. I mean, virtually
13    anybody who's dealt with Mr. Beckert has complained
14    about him being difficult.
15        Q    And a number of those people that you
16    complain -- that you listed there complained that
17    he was more than difficult, that he was abusive
18    toward them?
19        MR. BUYCK: Note my objection.
20        MR. ANDERSON: Objection.
21        THE WITNESS: Some. You know, I mean,
22    some did, yeah, sure. Maria did. Alicia did.
23    I mean, Chris Inglese complained about it.
24    He's a former deputy county administrator.
25    John Weaver complained about it. I mean,

Page 23

1    everybody's complained about it.
2    BY MR. CROSBY:
3        Q    Tell me, were you ever asked to look into
4    what could be done to prevent county employees and
5    others on the -- inhabiting the county buildings as
6    to what could be done?
7        MR. BUYCK: Note my objection. If you've
8    been asked anything in your official capacity
9    as an attorney, and there's an attorney-client
10    privilege to be asserted relative to this
11    question, if it was done in your official
12    capacity as providing advice to your clients,
13    which would be the county, then we're going to
14    assert a privilege.
15        THE WITNESS: Anything I would have been
16    asked in that -- in that -- in that manner
17    would have been in my role as one of the
18    county attorneys, so --
19    BY MR. CROSBY:
20        Q    Did you ever research that issue?
21        MR. BUYCK: Same objection.
22        THE WITNESS: It would have been in my
23    role as a county attorney for a client. I
24    have to be careful about the Rules of
25    Professional Conduct, so --

Page 24

1    BY MR. CROSBY:
2        Q    Well, once Beckert was removed, has he
3    taken any action, to your knowledge, to contest the
4    relocation of his office?
5        A    He protested once, to my knowledge, and
6    asked the legal department to provide him with
7    authority that allowed the administration to remove
8    him to the records management.
9        Q    Was that done?
10        A    No, no, we did not.
11        Q    Who made the decision not to respond?
12        A    I did. I advised the county
13    administrator that I believed it was Mr. Beckert's
14    responsibility to provide us authority if he
15    thought there was any that prohibited us -- or
16    prohibited the administration from requiring him to
17    move to the records management office. As far as I
18    know, he never provided any.
19        Q    And that's true up until -- to your
20    knowledge, up until the present?
21        A    As we sit here today, I'm not aware of
22    him ever providing any authority indicating that
23    the county could not do anything.
24        Q    Outside of being asked to officially give
25    legal advice on that, were you aware of, over this

6  (Pages 21 to 24)

Thomas J. Keaveny, II – 9/27/2021

Page 45

1  to him that what he was saying was inaccurate?
2      A  I don't have an independent recollection
3  of having talked to him, but I indicate in my email
4  that we had explained -- we had explained this to
5  him previously.  As I said, we'd explained Item A
6  to Mr. Beckert.  He simply doesn't like the answer,
7  and he won't accept it.
8      Q  And that was -- quite often if you
9  explained something to Mr. Beckert that was
10  contrary to what he was saying, he wouldn't like
11  the answers?
12      MR. ANDERSON:  Objection.
13      THE WITNESS:  There were times when he
14      disagreed with us, yes.
15  BY MR. CROSBY:
16      Q  And you write here:  He would rather
17  continue his personal crusade against the treasurer
18  by alleging she's violating state law?
19      A  Yes.
20      Q  And you believed he had a personal
21  crusade against Maria Walls?
22      MR. ANDERSON:  Objection.
23      THE WITNESS:  He seemed -- he seemed to,
24      yes, by that time.
25  BY MR. CROSBY:

Page 46

1      Q  Did you also observe over time that he
2  had a crusade against Alicia Holland?
3      MR. ANDERSON:  Objection.
4      THE WITNESS:  No, I didn't.  I didn't
5      learn about problems that Alicia and
6      Mr. Beckert had until later on, and my
7      impression was that I learned about them at or
8      about the time they arose.  I don't think that
9      was as early as February in 2018.
10      The problems with Mr. Beckert and
11      Ms. Walls started immediately when they both
12      got sworn in.  I mean, they had disagreements,
13      they weren't necessarily acrimonious, but as
14      the disagreements continued, they got more
15      intense, they got acrimonious, but Ms. Holland
16      was not involved initially.
17  BY MR. CROSBY:
18      Q  And you write here:  Frankly, I believe
19  that is defamatory per se, and what you mean by
20  that is that by accusing her -- falsely accusing
21  Ms. Walls of violating state statutes, that could
22  harm her reputation?
23      MR. ANDERSON:  Objection.
24      MR. BUYCK:  Note my objection.
25      THE WITNESS:  Harm her representation in

Page 47

1  her profession.
2  BY MR. CROSBY:
3      Q  Yeah.
4      A  Right?
5      Q  Then you say you suspect it's only a
6  matter of time before she decides she's had enough
7  and takes some kind of action, which I guess you
8  accurately predicted, it just might have took
9  longer than you thought?
10      A  Yes.
11      Q  And then you say:  If Mr. Kubic were
12  still here, he would have taken action by now.
13      A  Yes.
14      Q  What do you think that Mr. Kubic would
15  have done?
16      A  Well, Mr. Kubic -- so here we're talking
17  in February of 2018.  Mr. Kubic had been gone since
18  September of 2017 and actually really kind of
19  really since the summer of 2017 when his parents --
20  when his mother died first and then his dad died.
21      But Mr. Kubic was a very hands-on guy.
22  He was a -- so I think he would have been much more
23  aggressive in talking to Mr. Beckert, you know,
24  frankly and candidly, and I think that his absence
25  just kind of allowed -- created a bit of a vacuum

Page 48

1  that Mr. Beckert filled.
2      Q  What is -- let me ask, before we move on
3  to that, did Alicia Holland ever discuss with you
4  any issues she was having with Jim Beckert?
5      A  She did, and I believe she did that in a
6  personal -- not as a county attorney, as a just
7  one-on-one personal relationship.
8      Q  And tell me what she relayed to you.
9      A  You know, this is a long time ago, and as
10  you know, a lot has gone on since 2015 here.  We've
11  been through four administrators, interim and not,
12  and it's just kind of hard to keep some of these
13  things straight.
14      But it's my recollection that in -- that
15  a real controversy seemed to arise between Alicia
16  and Jim Beckert in 2019 when he started challenging
17  her calculation of the value of the mill.  And the
18  value of the mill was critical because -- to county
19  government because it is the basis for determining
20  how many mills people will be taxed on their tax
21  bill.
22      And the budgets are done in the spring,
23  and they have to be passed by state law.  County
24  budgets have to be passed by June 30th.  And so in
25  figuring out what your budget is, county council

12  (Pages 45 to 48)

Thomas J. Keaveny, II – 9/27/2021

**Page 49**

1  has to figure out what their expenses are, what
2  they're going to buy, what they're not going to
3  buy, what their personnel costs are going to be,
4  and all of that.
5      So unlike most of us, you know, when
6  we're in private practice, you think, okay, well,
7  what are my revenues, and then I'll kind of figure
8  out what my overhead can be and what my expenses
9  can be. Government is more like, well, what are
10  our expenses, and everybody tries to keep them down
11  as much as they can, and then they say, okay, well,
12  how much money -- how many mills do we have to
13  charge the taxpayers in order to make that
14  expenditure. And in order to do that, you've got
15  to figure out what the value of the mill is because
16  that figure -- that determines how many mills
17  people are charged.
18      So the value of the mill is very
19  important, and when Mr. Kubic was here, Mr. Kubic
20  had a finance background, came here from Ohio and
21  was in some capacity I think in finance. I know
22  that was his background. And he and Alicia worked
23  very well together. And Alicia was our CFO, she's
24  a CPA, and she's an amazingly capable person and
25  professional.

**Page 50**

1      And she had been calculating the value of
2  the mill -- she and her department, the finance
3  department, had been calculating the value of the
4  mill for budget purposes for years and years and
5  years, and Mr. Beckert decided he wanted to get
6  involved in that issue, and he started challenging
7  Alicia's -- the process she used to calculate the
8  value of the mill, and that was the issue that I
9  became aware of.
10      And I remember being in a meeting with
11  her one day and -- one morning over by my office,
12  and she and I and maybe one or two other assistant
13  county administrators, and she was like sitting to
14  my right, and she said, "Tom, I just feel like I'm
15  having heart issues." I told her she needed to
16  call her doctor immediately and get in to her
17  doctor. And she was saying it was because
18  Mr. Beckert was just haranguing her and wouldn't
19  let up on her, and it was having -- taking a
20  physical toll on her.
21      So that's really -- that was the -- that
22  was the -- kind of the summer. It was the summer
23  of 2019 that I recall.
24      Q   And was it just the one occasion that she
25  confided in you?

**Page 51**

1      A   No, no. She confided in me several
2  times, but just on person-to-person, not as a
3  county attorney. She wasn't calling me and asking
4  me for legal advice as a county attorney about how
5  to handle Mr. Beckert.
6      But I remember that she -- we have no
7  control over Mr. Beckert. Everybody knows we have
8  no control over Mr. Beckert, and she knew we didn't
9  because she was a witness to all the stuff that had
10  been going on with Maria, because, obviously, Maria
11  and Alicia work together. It's all finance. It's
12  numbers. Maria collects the revenue, and Alicia
13  accounts for it and all of that, so everybody --
14  you know, everybody works hand in hand and closely
15  on these issues.
16      And so yeah -- so yeah, so she and I
17  talked many times about it.
18      Q   Did you ever -- let me ask you this:
19  What steps, if any, did Ashley Jacobs take to
20  intervene on Ms. Holland's behalf?
21      A   Like I said, Ms. Jacobs and I did not
22  have a good relationship, and we didn't talk. I
23  mean, I think the last time -- we just -- the last
24  time we talked productively was probably early
25  summer/late spring of 2019, so by the time that

**Page 52**

1  Alicia was telling me of these issues, Ms. Jacobs
2  and I had a strained relationship.
3      Q   What was the source of that?
4      A   I really don't know. I mean, I can
5  speculate, but there's no purpose in that.
6      Q   You never learned why y'all -- why your
7  relationship became strained?
8      A   No, no.
9      Q   So you're -- as we sit here, are you
10  aware of anything that Ms. Jacobs did to -- with
11  regard to Ms. Holland's situation with Jim Beckert?
12      A   I don't know what she did or didn't do.
13  Truly, I have no information.
14      Q   In the accusations that Mr. Beckert would
15  make with regard to Ms. Walls violating statutes,
16  did you ever make a determination that she had
17  violated state law?
18      A   Oh, I don't -- I don't think I ever
19  concluded that either one of them violated state
20  law, certainly not intentionally violated state
21  law. I can't sit here and say I remember telling
22  Maria that I disagreed with her interpretation of
23  the statute, but I can imagine that happened. I'm
24  confident that I -- I don't have independent
25  recollection of specific issues with Mr. Beckert,

Thomas J. Keaveny, II - 9/27/2021

Page 89

1  with me actually. But those who did deal with her
2  said you just wouldn't know one day -- from one day
3  to the next which Ashley Jacobs was going to show
4  up to work, Ms. Jekyll or Ms. Hyde, so --
5      Q  Do you think that the -- you stated that
6  the budget process, she touted herself as a budget
7  expert, had a whole bunch of workshops which
8  increased Ms. Holland's stress. Is that --
9      A  Yeah, because Ms. Jacobs didn't -- I
10  mean, it was pretty clear she really didn't have a
11  handle on what she was trying to do, and she was --
12  poor Alicia was chasing her tail.
13      Q  Do you believe she overly involved
14  herself in the CFO's job? And when I say "CFO,"
15  I'm referring to Ms. Holland.
16      A  I think that she -- based on what little
17  information I had with regard to that, my
18  impression is that she did and that she -- Jacobs,
19  too, was probably frustrated by Beckert's
20  involvement injecting himself in the process. She
21  had no control over him, as we've talked about so
22  much, but, you know, she had to deal with that
23  problem too.
24      Q  I note that you mentioned most -- the
25  people that you called out in your -- that you

Page 90

1  identified as within your grievance were all men.
2      A  Well, I didn't identify --
3      Q  Is that correct?
4      A  I didn't identify anybody in here. I
5  didn't -- in this letter, I didn't identify
6  anybody. I just said that there were past and --
7  present and former employees.
8      Q  In your testimony. Thank you.
9      A  Yes.
10      Q  In your testimony, you identified a
11  couple of people?
12      A  Yeah, uh-huh.
13      Q  And they were all -- they were all men.
14  Is that correct?
15      A  Uh-huh.
16      Q  Do you think that Ms. Jacobs fostered an
17  environment of misandry throughout Beaufort County?
18      A  That she did what?
19      Q  Fostered an environment of misandry.
20      A  I don't know what misandry is.
21      Q  It's the opposite of misogyny.
22      A  You know, no. She wasn't hostile to all
23  men.
24      Q  Was she just hostile to successful,
25  self-confident, older men?

Page 91

1      A  Uh-huh. That was my experience. I mean,
2  you could be my age and be diminutive and be a guy,
3  and you'd get along with her.
4      Q  Okay. Would you say that Chris Inglese
5  is someone who is self-confident?
6      A  At times.
7      Q  Okay. Is he a -- does he stand up for
8  himself?
9      A  Well, at times.
10      Q  Okay. You're kind of qualifying that
11  answer. Would you say most of the time or not all
12  the time or --
13      A  Not most of the time.
14      Q  Not most of the time.
15      A  Mostly during reviews, performance
16  reviews.
17      Q  Let me jump off all that.
18          As of now, does the Beaufort
19  County administrator -- does the Beaufort County
20  legal office consider that the employees of elected
21  officials are subject to the grievance process?
22      A  Yes.
23      Q  Okay. So they're grandfathered into the
24  grievance process?
25      A  I don't know what "grandfathered" means.

Page 92

1  What do you mean?
2      Q  I mean, well, they're not employees of
3  the county, right?
4      A  That's right, that's right.
5      Q  But they do follow the grievance process
6  that the county has established. Is that --
7      A  That's because -- that's because the
8  elected official who's in charge of the office has
9  agreed to abide by the rules and regulations set
10  forth in the handbook.
11      Q  And that's what we talked about in, what,
12  Exhibit 18 or Exhibit 19 or something like that?
13      A  Right, right.
14      Q  Okay. If a grievance comes down against
15  the elected official, do they have to abide by it?
16      A  No.
17      Q  We've had a lot of testimony about
18  Mr. Beckert and his mannerisms.
19      A  Mannerisms?
20      Q  Yeah, his mannerisms. Do you find his
21  mannerisms awkward, the way he presents himself to
22  the world?
23      A  No.
24      Q  Have you ever noticed him inappropriately
25  staring somewhere?

23  (Pages 89 to 92)

Thomas J. Keaveny, II - 9/27/2021

Page 93

1    A    Sure.
2    Q    Is that a strange mannerism to you?
3    A    It's inappropriate.  It's intimidating.
4    Q    What else?
5    A    It's unprofessional.  It's demeaning.
6    Q    Is it awkward?
7    A    No.
8    Q    It's not awkward?  You don't -- wouldn't
9    find that awkward at all if someone was just --
10   A    To be staring?
11   Q    -- inappropriately staring at you?
12   A    Well, I don't know.  He hasn't -- he
13   hasn't really glared at me.
14   Q    Well, I didn't say "glare," I said
15   "stare."
16   A    Glare, stare, I think they're the same
17   thing.
18   Q    Well, there's a different connotation,
19   right?
20   A    He's never stared me down.
21   Q    Okay.  Wouldn't it be awkward?
22   A    It would be odd.
23   Q    Fair enough.  All right.  I think that's
24   all I've got, so I'll go ahead and pass right now,
25   but thank you.  I appreciate it.

Page 94

1              EXAMINATION
2    BY MR. BUYCK:
3    Q    Tom, I do have a few quick questions.
4         In the beginning of the deposition, you
5    were asked questions about who has complained about
6    Mr. Beckert's behavior, and you gave five or six
7    names, but was that meant to be an all-inclusive
8    listing of people that have complained about his
9    behavior?
10   A    Oh, no, no, no.
11   Q    For instance, Paul Sommerville and others
12   have already testified in the record about
13   complaining about his behaviors and members of the
14   county council themselves, correct?
15   A    Yes, yes.
16   Q    And that takes me to this next issue of
17   the elected official and the power of the
18   Department of Revenue over the treasurer and the
19   auditor's office, correct?
20   A    Right.
21   Q    These elected officials are elected in
22   the same manner as Beaufort County councilmen,
23   correct?
24   A    Correct.
25   Q    And sometimes there are political

Page 95

1    disputes that are outside the bounds of what the
2    county itself is -- can be involved in, correct?
3    A    Correct.
4    Q    And these political disputes may arise
5    between an auditor and a treasurer, much like that
6    set forth in this May 27th, 2016, letter to the
7    Department of Revenue, correct?
8    A    Right, from the department, yeah.
9    Q    From the department.  But it was -- it
10   was an issue that was identified.  And if two
11   elected officials have a political dispute, such as
12   taking differing positions, can they themselves
13   litigate that in court?
14   A    Sure.
15   Q    And you were asked about the approval
16   process of attorney fees.  Can these political
17   offices, being the treasurer or the auditor, use
18   their own budgeted funds in a manner that they see
19   fit, for instance, to retain -- independently
20   retain counsel for their offices?
21   A    Well, there's a dispute about that,
22   actually.  Some electeds think they can.  The
23   county administrator's position is no.  If you
24   abide by the procurement code, you have to get
25   authorization to do that.  But, you know, if they

Page 96

1    wanted to file a lawsuit, if Maria wanted to file a
2    lawsuit against Jim, Jim wanted to file a lawsuit
3    against Maria, they could include as a cause of
4    action require the county to compensate them for
5    their legal fees.
6    Q    Okay.  But these budgets that are
7    provided to those offices, do the offices have
8    independent duties to spend their funds as they see
9    fit, to some extent?
10   A    Yeah, to some extent, right.
11   Q    In regards to the disputes between
12   Ms. Walls and Mr. Beckert, were these long-standing
13   disputes from when they were both elected to office
14   in, what was that, 2014?
15   A    They were elected in '14, took office in
16   '15.
17   Q    Okay.  And as such, just as you wrote
18   your grievance and complaint in accordance with the
19   county handbook, have you ever seen Ms. Walls
20   having submitted such a grievance and complaint in
21   a written format as this at any time prior to
22   Mr. Beckert's reelection in 2018?
23   A    Well, if I did, that would be in the
24   context of my position as a county attorney, so I
25   don't think I'm really at liberty to talk about

24  (Pages 93 to 96)



Deposition of:

# Gary T. Kubic

*April 7, 2021*

In the Matter of:

# Holland, Aliciav. Beaufort County et al

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Gary T. Kubic                                        April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 6

1 by Beaufort County council in November of 2003. My
2 official start date was January 2004.
3      Q.   Did you also attend law school?
4      A.   Yes.
5      Q.   Did you obtain a law degree?
6      A.   Yes.
7      Q.   Did you ever practice as an --
8      A.   No.
9      Q.   -- attorney?
10     A.   No.
11     Q.   When did you obtain a law degree?
12     A.   1982.
13     Q.   Okay. As you know, we're wanting to
14 talk to you about some of your -- your work while
15 you were at Beaufort -- with Beaufort County. And
16 were you employed as the county administrator
17 for -- starting in 2004 or 2003 up until when?
18     A.   My official start date was January 1,
19 2004. My last day of service was, I believe,
20 September 30th, 2017.
21     Q.   And you retired from --
22     A.   Yes. I retired from service.
23     Q.   In your work as county administrator,
24 was Alicia Holland one of the employees that you
25 had under your supervision?

Page 7

1      A.   Yes.
2      Q.   And what was Alicia Holland's position?
3      A.   She was our chief fiscal officer, our
4 CFO.
5      Q.   And what was -- what does -- what does
6 that mean in lay terms? What was her job?
7      A.   Well, basically Alicia was responsible
8 for recording and maintaining all expenditures,
9 budgetary management, contract management,
10 expenditures on roadways. Anything that involved
11 the financial process through the general fund,
12 through the proprietary funds, through the trust
13 funds, Alicia was responsible for those.
14     Q.   And did you also have interaction with
15 the -- I guess, in the last few years of your
16 employment with Maria Walls?
17     A.   Yes.
18     Q.   And she was the elected treasurer?
19     A.   Yes, she was.
20     Q.   And would you also have interaction
21 with the auditor in those last few years, Jim
22 Beckert?
23     A.   Yes.
24     Q.   How was Alicia Holland as an employee
25 as far as her competence and her willingness --

Page 8

1 ability to do her job?
2      A.   I would rate Alicia as an excellent
3 employee: Professional, intelligent, extremely
4 hard-working, always available to discuss issues
5 and problem-solving, and tireless. Excellent
6 employee. I have -- one of -- one of the best CFOs
7 I've ever had.
8      Q.   And in your -- could you give
9 me those -- oh, you got those -- you got the ones I
10 passed to you? No.
11          So you -- you would have -- let me ask
12 you this: In your time at -- with the county after
13 Jim Beckert was elected as auditor, did you ever
14 become aware of any complaints about Mr. Beckert's
15 behavior toward any of your employees?
16     A.   Yes.
17     Q.   How about expound on that generally,
18 and we'll get into more specifics.
19     A.   Okay. That's a pretty broad question,
20 so I'll -- I'll broadly answer it, and then we can
21 narrow it down to specifics. I'll start with my --
22 my association -- my relationship with -- with
23 Mr. Beckert --
24     Q.   Okay.
25     A.   -- because I think that's a good

Page 9

1 starting point.
2          Mr. Beckert replaced Sharon Burris who,
3 quite frankly, was a terrible manager in the
4 auditor's office, and the expectations of her
5 leaving with -- and having another elected official
6 in the office, at least from my perspective, were
7 quite high.
8          We established a relationship through
9 monthly meetings, trying to also explain various
10 procedures that involved budgetary management, how
11 to prepare a budget, how to submit a budget,
12 employee management.
13          And after a few -- I don't know -- a
14 few monthly meetings, where it became very
15 difficult to work in terms of discussion with
16 Mr. Beckert on procedural matters, relationships
17 with the auditor's office and Beaufort County
18 council, the auditor's office and myself and my
19 various employees, I stopped having those monthly
20 meetings because it was my view that they were not
21 very productive, and all it ended up being was a he
22 said/she said disagreement process where no real
23 progress was being made.
24          And so I shifted my approach in terms
25 of that relationship, auditor to administration, to

3 (Pages 6 - 9)

**Page 10**

1 use basically written documents, letters, and those
2 kinds of things to document my position or document
3 a next step as to how we were to proceed, whether
4 it be budget or employee management or contracts.
5        That's my perspective. And what I
6 found out in terms of staff, generally speaking, my
7 staff did not want to associate with Mr. Beckert.
8 And it got to a point where I had to, based on some
9 of the things that my staff was telling me -- you
10 know, the building was divided into two halves
11 where I had to separate and lock the doorway that
12 would allow entry from his side of the office into
13 my corridor. And that was done primarily because
14 of complaints from the female staff on my side.
15        Q.   And those were staff that work under --
16 under you?
17        A.   Monica Spells, Cheryl Harris, Sue
18 Rainey, members of the HR team primarily.
19        Q.   And what was the nature of the
20 complaints that your staff was relaying to you?
21        A.   They felt uncomfortable having to be
22 with Mr. Beckert. I think they used the word
23 creepy. And so I figured it would be better just
24 to separate the staff and limit the association to
25 those moments when we had to have discussions on a

**Page 11**

1 particular item that involved Mr. Beckert's
2 department and myself. And so we basically kept it
3 on a very -- as professional as we can with noted
4 separation.
5        Q.   And you -- as the highest ranking
6 county employee, you had to have some interaction
7 with -- with the auditor?
8        A.   That's correct.
9        Q.   And when you're telling me is that
10 because of the complaints that you were receiving
11 about -- from your staff about Mr. Beckert's
12 conduct toward them that you took a step of
13 blocking off or cordoning off your employees so
14 that they didn't have access to him?
15        A.   Yes.
16        Q.   How far into Mr. Beckert's term as
17 auditor did this occur?
18        A.   Well, it wasn't right away, and I had
19 been out of the business -- been away from the
20 county for a while. So you're giving me a memory
21 teaser. I'd say three to six months as -- as the
22 initial start. There are documents that show when
23 I stopped having my monthly meetings.
24        These various actions were generated at
25 different times. They did not all occur at once.

**Page 12**

1 And so I did certain steps periodically based on
2 what was brought to me and how I thought I could
3 best resolve them.
4        Q.   Was the nature of the complaints that
5 you were getting such that Mr. -- that what
6 Mr. Beckert's conduct would be deemed
7 unprofessional toward these female employees?
8        A.   Granted that I wasn't present during
9 those moments, but relying upon what my staff told
10 me, my answer would be: Yes, they are -- they --
11 it wasn't a professional discussion.
12        And one of the things that evolved from
13 it was we put hallway cameras in the hallways
14 initially for security purposes to protect the
15 auditor's office because it was an office that
16 invited general public in. Also, security right
17 next door for the treasurer's office where the
18 collection of money would -- would go.
19        And I had access as county
20 administrator because I am in charge of all campus
21 buildings. I had the ability to monitor the
22 cameras in my office at all sites. And I then
23 decided to limit the monitoring of the associated
24 cameras, and I think I restricted one or two in the
25 hallway from Mr. Beckert because I thought that it

**Page 13**

1 was not necessary for him to see hallway activity.
2        And I got some information from staff
3 members that he would appear in the hallway, and
4 they just thought it was kind of ironic, so I
5 restricted that as well.
6        Q.   Would the information you were getting
7 from staff with regard to his use of the cameras,
8 was it such that they believed that he was using
9 the cameras to determine when they would enter the
10 hallway and step out and interact with them?
11        A.   Yes.
12        Q.   Did they complain that his interactions
13 made them feel uncomfortable?
14        A.   Yes.
15        Q.   Did they complain to you that his
16 interactions made them feel threatened?
17        A.   Being threatened in terms of a physical
18 threat, I'm not as certain. Being threatened sort
19 of in an emotional feeling of just generally being
20 uncomfortable, with that qualification, I would say
21 yes. But I'm -- I'm not certain that it rose to a
22 point of physically being threatened.
23        Q.   Well, we're going to talk to each one
24 of them, and we'll -- we'll get their take on that.
25 But obviously you're taking action because of

4 (Pages 10 - 13)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 14

1 Mr. Beckert's actions and what your staff related
2 to you?
3      A.  Yes.
4      Q.  And you as their supervisor and the --
5 in your role as county administrator, you had an
6 obligation to provide a nonhostile, comfortable
7 workplace for your staff --
8           MR. J. ANDERSON:  Object to the form.
9           THE WITNESS:  That's correct.
10 BY MR. CROSBY:
11     Q.  -- correct?
12 I mean, it's important to -- for their
13 productivity and for their -- their well-being to
14 be free from any type of discomfort caused by
15 others in the workplace, correct?
16           MR. J. ANDERSON:  Object to the form.
17           THE WITNESS:  Yes.
18 BY MR. CROSBY:
19     Q.  Did any of the employees at your
20 staff -- let's keep with them right now -- did any
21 of the staff relate to you that Mr. Beckert would
22 from time to time just stare at them?
23     A.  Starting with myself, yes, stare from
24 the sidewalk through my window.  I used to get to
25 work early.  I caught him several times just

Page 15

1 looking through the window standing there.  It was
2 kind of odd.  I even had mentioned it to the
3 sheriff a few times and others.
4           Maria Walls had indicated to me that
5 she felt that Mr. Beckert was staring at her
6 through her office window.  As a result of that, I
7 think I told her to advise the sheriff as well, to
8 notify him that she felt uncomfortable.  And then I
9 also authorized security cameras at that corner to
10 have the ability to video those occurrences, and
11 also for general security of the building itself.
12 I think it -- you know, I'm -- I'm
13 going back.  I hope I get -- Monica Spells, I
14 think, told me a few times that Mr. Beckert
15 demanded access through a card swipe to our side of
16 the building, and I told her that -- you could
17 program the various access points for those cards.
18 And as a result of talking with her, I told her not
19 to program access for Mr. Beckert on -- on that
20 doorway that accessed my office space, that area,
21 that corridor.
22     Q.  Where is your office -- I think the
23 treasurer's office is on the first floor of the
24 county building?
25     A.  Yes.

Page 16

1      Q.  Get my directions, maybe the
2 treasurer's office would be on the south end?
3      A.  Well, I don't have a compass, and I
4 couldn't tell you --
5      Q.  Where --
6      A.  -- which way the sun rose on the
7 buildings.  But basically it's a rectangle building
8 which is divided in half, two corridors.  The front
9 corridor facing Ribaut Road had the treasurer and
10 the auditor, I think a mailroom, planning on that
11 side.  And on the other side was the clerk of
12 council, myself, some of my staff members for --
13 for Monica Spells, Beaufort County channel, and at
14 the end was the HR division.
15           So that was parallel -- there were
16 parallel corridors.  And in between was a central
17 reception area at one time where the general public
18 could come in and access the offices, and that door
19 I restricted coming into my area.  You could buzz
20 and have somebody come in and -- if it was a
21 taxpayer or another official, we would let them
22 through the doorway.
23     Q.  Let's go back to you -- your
24 interaction with Mr. Beckert and his staring in
25 your window.  How many times did that occur?

Page 17

1      A.  Well, I didn't count them, but if
2 you're talking about -- you know, I don't know.  I
3 never really took a count.  It was almost at least
4 once or twice a week.  It would depend on when he
5 arrived at work, and generally I'd get there about
6 7:00, 7:30.  He'd get there early as well.  He
7 parked right across from my window.  And I never
8 really took a count, but it was more than one, and
9 it could be, you know, 20, 30.  I -- I'm not sure.
10     Q.  And he would -- you didn't -- did he
11 ever have a conversation about why it was that he
12 would stand outside your window?
13     A.  No.  I really never talked to him about
14 it.
15     Q.  Did -- it sounds like you got to the
16 point where you were just limiting your interaction
17 with him in professional business settings?
18     A.  You know, looking through my window and
19 being a county administrator, I was going to use a
20 BS kind of language, but quite frankly I had more
21 important things to consider in my duties than to
22 worry about a person and why that person would be
23 staring or looking at me through my window.  I just
24 thought it was unusual, and I treated it that way.
25 You know, I just -- I moved on in my daily

5 (Pages 14 - 17)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

---

**Page 18**

1 activities.
2      Q.   Just -- just to be clear, was -- were
3 there other people who would routinely come to your
4 window and just stare at you?
5      A.   Well, I like to think that I was a
6 popular kind of guy and fairly good-looking, but I
7 lost all my hair, and then that kind of eliminated
8 that possibility pretty much.
9           No, I don't mean to be frivolous.  I
10 know this is an important matter.  But no.  No.
11          And what made it unique from normal
12 traffic on the sidewalk by the public or other
13 elected officials or staff, those occurrences
14 occurred when it was early in the morning with only
15 a few people in the building at that time.  It was
16 at the beginning of the day, and that's what I
17 thought was interesting.
18      Q.   Did you ever get the sense that he was
19 doing it to intimidate you?
20      A.   I don't know.  I -- I have no idea what
21 he was thinking about.  And quite frankly, my
22 personality, I wouldn't have thought that he was
23 doing it to intimidate -- at least I wasn't
24 intimidated by it, per se, because I figured I'm a
25 big boy, and that's kind of incidental.  So not

---

**Page 19**

1 knowing his motives, I really don't know.
2           I guess it was probably to maybe create
3 a signal that he was present.  But I did -- I did
4 go to the sheriff because, you know, at various
5 times I've been required to wear bulletproof vests
6 and different kinds of things on campus in Beaufort
7 County because of threats, and so just to get on
8 record -- and I didn't do it in writing; I just
9 mentioned it to the sheriff -- this is occurring in
10 the morning.  And he said, well, you know, do
11 you -- do you want to continue or do you want to do
12 anything for him?
13          I said, no, I just want you to know.
14 And that was the extent of it.
15      Q.   Just talk about his behavior toward --
16 staring with regard to Maria Walls.  Did she relay
17 that to you?
18      A.   Yes, several times.
19      Q.   And when she relayed it, it was
20 something that she didn't like?
21      A.   Yeah.  That -- you know, that was -- my
22 interpretation of what Maria expressed to me in
23 those moments about Mr. Beckert looking in her
24 window, she was clearly upset, she was clearly
25 worried about physical harm.  I would try to

---

**Page 20**

1 counsel her on visiting and -- and making sure that
2 she related those incidents to the proper
3 authorities, that being the sheriff.  I told her I
4 would introduce a video camera to record those
5 events.  And, yeah, she was visibly upset.  She --
6 it troubled her.
7      Q.   And so while the cameras may have had a
8 secondary function of providing -- serving as
9 security, the -- the -- the initial driver was
10 because of Mr. Beckert's coming and staring
11 at Maria -- through Maria Walls's window?
12          MR. J. ANDERSON:  Object to the form of
13 the question.
14          THE WITNESS:  I would say that's true.
15 I would also say that the camera is in plain view,
16 and the idea was that, you know, generally if you
17 walked in that area and you looked up or you knew
18 that the cameras were rolling as security that it
19 would maybe serve as a deterrent, which was the
20 ultimate intent, to stop that action from
21 happening.
22 BY MR. CROSBY:
23      Q.   Did you ever learn of him staring at
24 any other employees or any employees other than
25 yourself of the county?

---

**Page 21**

1      A.   The only other -- no.  The only other
2 employee that mentioned some occurrences outside
3 the building or along the building was Tony
4 Criscitiello, the planning director.  But, again,
5 Tony didn't think too much of it, but he did
6 mention it to me that he thought Mr. Beckert was --
7 was interested in the planning division.
8           I think maybe at that time Mr. Beckert
9 wanted to get a couple of tables or whatever, but
10 you'd have to check with Tony.  But I think Tony
11 did mention it to me once or twice.
12      Q.   Did Monica Spells ever tell you that
13 Beckert stared at her in the hall and made her feel
14 uncomfortable?
15      A.   Yes.
16      Q.   How about Melissa Beere -- Beere?
17      A.   Who?
18          MR. KEAVENY:  Beere.  Melissa Beere.
19          MR. CROSBY:  Beere.
20          THE WITNESS:  Where does she work at?
21          MR. KEAVENY:  HR.
22 BY MR. CROSBY:
23      Q.   I think she worked in --
24      A.   Oh, Melissa.  No, I don't think I had a
25 conversation with Melissa about that.

6 (Pages 18 - 21)

Gary T. Kubic                                                    April 7, 2021
Holland, Aliciav. Beaufort County et al

**Page 34**

1  conflicts that were occurring between the auditor
2  and the treasurer at that time.
3       Q.   And in essence SouthData was willing to
4  give up the county's account if they had to have
5  anymore dealings with Jim Beckert?
6       MR. J. ANDERSON:  Object to the form.
7       THE WITNESS:  I'm not sure exactly what
8  SouthData's position was with the overall contract
9  with the county.  But I think they basically had
10  told me, without this letter at the time, that they
11  did not want to take any verbal instructions from
12  Mr. Beckert.
13       And I kept trying to convince them that
14  Maria Walls, Jim Beckert, Gary Kubic, we are trying
15  to work these things out.  But I guess it reached a
16  point where they said, hey, it's not worth the --
17  the business of the county.
18  BY MR. CROSBY:
19       Q.   It says their own Exhibit 9 for
20  SouthData to renew contract IFB 081214, we're
21  requesting the county to include an addendum
22  guaranteeing that SouthData will no longer be
23  required to directly communicate with the Beaufort
24  County Auditor's Office.
25       So it sounds like they were

**Page 35**

1  willing to -- weren't going to renew that contract
2  if they had to deal with Jim Beaufort?
3       A.   I think what they were saying in the
4  letter, my interpretation of the letter, was they
5  were willing to continue their service with
6  Beaufort County, but not take any instruction or
7  changes from Mr. Beckert in that regard; that they
8  would continue to provide a service, but they
9  didn't want to do it with Mr. Beckert.
10       And I know that sounds like
11  gobbledygook, but I guess they were basically
12  saying, look, if it was Maria Walls or Gary Kubic
13  or someone else, we can handle it.  But they didn't
14  want to continue the relationship as it was
15  originally established.
16       Q.   In Exhibit 10 in the forth paragraph,
17  it says:  We produce billing and assessment
18  documents for approximately 140 counties in the
19  southeast and have never experienced a level of
20  frustration nor have we ever requested that any
21  portion of a contract be terminated.
22       Have you ever had in your experience in
23  government ever had a private vendor make such an
24  expression that they would give up a portion of a
25  contract or make a request not to have a particular

**Page 36**

1  individual -- to have to deal with a particular
2  individual?
3       A.   Let me limit my answer to say that
4  during my time with Beaufort County, this is the
5  only case I've ever had where a company that we
6  contracted with would want to withdraw from the
7  contract based on these types of circumstances.  I
8  can't remember all the way back to 1980 and '90
9  and --
10       Q.   And who was Dave Thomas?  Was he
11  someone under your supervision?
12       A.   Dave Thomas was under the chain of
13  command of Alicia Holland.  He was the director of
14  purchasing.  Since I am the county administrator,
15  all those employees are under my chain of command,
16  but he directly reported to Alicia Holland.
17       Q.   And it's my understanding that steps
18  were taken to have Maria Walls be the one that were
19  communicating with SouthData under these contracts?
20       MR. J. ANDERSON:  Object to the form.
21       THE WITNESS:  Yes.  If you understand
22  the significance of this process, all general
23  revenue created by a tax bill, real or personal,
24  came through this printing process.  So the
25  importance from my point of view of getting this

**Page 37**

1  done efficiently and timely was critical.
2       And so my directive to these folks is,
3  look, if you don't want to talk to Jim Beckert and
4  you don't want to take his phone calls, stay with
5  us, you know our system, you've been with us for a
6  while, Maria will do the contacting or I'll do the
7  contacting with you, and we'll be able to continue
8  so that the, quote/unquote, tax bills are available
9  in a timely fashion for the charging and collection
10  of the revenue produced by taxes as directed by
11  Beaufort County Council.
12  BY MR. CROSBY:
13       Q.   In watching Jim Beckert's interaction
14  with county employees and -- as well as Maria Walls
15  over the years, would you describe his behavior or
16  his -- as -- as being of a bullying nature?
17       A.   I would describe Mr. Beckert's actions
18  that if he didn't like you, he was very aggressive
19  in how he conducted himself amongst those
20  individuals.  He was a very aggressive -- he
21  harassed everybody, I mean, to the point where I
22  know a lot of my staff, you know, didn't want to
23  meet.  And I would try to make myself available as
24  a conduit, a mediator so that business could still
25  be conducted without all the friction generated by

10 (Pages 34 - 37)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 38

1 Mr. Beckert.
2       Q.  Would his aggressiveness, would you
3 describe it as abusive toward individuals at times?
4       MR. J. ANDERSON:  Object to the form.
5       THE WITNESS:  Yes.
6 BY MR. CROSBY:
7       Q.  And I take it what you did by locking
8 the doors, at least with regard to your staff and
9 his access to them, was an attempt to protect them
10 from what one would describe as a hostile
11 environment?
12       MR. J. ANDERSON:  Object to form.
13       THE WITNESS:  I would say generally the
14 answer is yes.  The idea of separation, obviously,
15 is to keep each side away from each other.  And so
16 my intent was to limit, because you cannot be
17 exclusive.
18       In the working conditions and product
19 that we were required to produce for the taxpayer,
20 you have occasions where people doing their
21 functions have to interact with others.
22       So physically putting a lock on the
23 door was one method.  The second method would be to
24 try to include or avoid one-on-one situations so
25 that you'd have more people in the meetings, and

Page 39

1 the idea or intent of that was to soften and
2 hopefully modify behavior patterns of individuals
3 because they were in a group setting rather than a
4 one-on-one setting.
5 BY MR. CROSBY:
6       Q.  Wouldn't an ordinary functioning of
7 county government with regard to the auditor and
8 treasurer, would there typically just be free
9 access between, for example, the auditor and
10 someone on your staff so that they could -- if they
11 needed something they could reach directly out to
12 them?
13       MR. J. ANDERSON:  Object to the form.
14       THE WITNESS:  Well, the purpose first
15 and foremost of every elected official in every
16 unit of government is to provide whatever their
17 level of duty and responsibility is to serve the
18 needs of the taxpayer.
19       Whether you like an individual or you
20 don't like an individual, in my world, my
21 authority, is not relevant.  I can dislike an
22 employee but not confront them, verbally abuse
23 them.  As long as their work product is 100 percent
24 and sufficient, I never thought I would have to
25 like or dislike anyone.  I want to see the results

Page 40

1 of their efforts.
2       Given those facts, Mr. Beckert gave
3 several people the impression during meetings
4 and -- and -- that he was just confrontational.  I
5 mean, they were always nervous.  And that's why I
6 tried to increase my presence at committee meetings
7 if I knew he was going to be there or meetings that
8 involved Alicia or Maria, I tried to be there.
9       The auditor's office and the
10 treasurer's office is hand in glove.  They cannot
11 work independently and produce a product that
12 satisfies the needs of the taxpayer.  They -- and
13 that's why in my opinion, and I'm going well beyond
14 in my response, is I don't think you need in this
15 day and age of technology two separately elected
16 officials, auditor and treasurer, to generate a tax
17 bill, whether it's personal property or real
18 property.  But that's -- that's for another
19 election or referendum.
20 BY MR. CROSBY:
21       Q.  In what -- in what you've -- in your
22 response there and your prior responses, because of
23 Mr. Beckert's aggressiveness toward individuals
24 working for the county and in it, he -- you created
25 a system where you served as a conduit and/or, I

Page 41

1 guess, attending more meetings sort of as a
2 protector?
3       MR. BUYCK:  Note my objection.
4 BY MR. CROSBY:
5       Q.  -- for your employees --
6       MR. J. ANDERSON:  Object to the form.
7 BY MR. CROSBY:
8       Q.  I mean, the reason you did that was an
9 attempt to protect your employees from
10 Mr. Beckert's --
11       A.  There --
12       Q.  -- aggressive and abusive behaviors --
13       A.  There were two reasons.
14       MR. BUYCK:  Same objection.
15       MR. J. ANDERSON:  Same objection.
16       THE WITNESS:  There were two reasons:
17 One, the primary focus to produce a product that
18 would satisfy the needs of the taxpayer.  Two, it
19 was to make sure that those present in the meeting,
20 elected or not elected, understood that we are all
21 together to get that done, that the objective of
22 the meeting was to produce product.  And, three, to
23 your point, indirectly to protect or to give
24 comfort from my presence to employees who felt
25 that -- uncomfortable with Mr. Beckert, that they

11 (Pages 38 - 41)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 42

1 didn't have to feel that way, that I was there to
2 help all involved, even Mr. Beckert.
3 BY MR. CROSBY:
4      Q.  Employees feeling uncomfortable or
5 nervous in the presence of Mr. Beckert, when
6 they're feeling like that, that interferes with
7 number one, isn't it, and that's producing the
8 product for the public?
9      MR. J. ANDERSON:  Object to the form.
10      THE WITNESS:  I've been a -- I was an
11 administrator for 43 years.  People who can't focus
12 on the mission at hand 100 percent won't produce a
13 product that is 100 percent.
14      So, if you have gaps in the process,
15 whether it be individuals or IT software or
16 whatever, you try to find ways to fill the gaps so
17 that the product is the best it can be.
18      And in this case, those two units, the
19 auditor and treasurer, I cannot express how
20 critical that function was.  And -- and we
21 facilitated -- you know, when you reach a point
22 where you can't produce a tax bill properly, I
23 decided that we would produce a written protocol
24 that the treasurer and the auditor would follow.
25      The protocol was created.  It was

Page 43

1 submitted for review to Mr. Beckert, to Maria
2 Walls, to county council for comment.  Came back
3 in, we refined the product, went back to council
4 and said:  Here's how we're going to produce the
5 tax bill if we follow step one to step two to step
6 three to step four.
7      I don't know if they use that still
8 today or not, but it was an attempt to make sure
9 that everything was able to be completed on a
10 timely basis for the tax bills to go out.
11      MR. CROSBY:  Pass that around.
12      (PLF. EXHIBIT 7, E-mail Chain with the
13 Top Line E-mail from Cynthia Bensch Dated 9/22/16,
14 was marked for identification.)
15      MR. CROSBY:  This is Exhibit Number 7.
16      MR. BUYCK:  You got a Bates number?
17      MR. J. ANDERSON:  No.
18      MR. BUYCK:  Cynthia Bensch.
19      MR. CROSBY:  Ronnie, would you
20 read off the date of the two in the front?
21      MR. CROSBY:  The -- top of it is
22 an -- is an e-mail forwarded September 22nd, 2016,
23 from Cynthia Bensch to Maria Walls.
24      MR. J. ANDERSON:  Thank you.
25      MR. BUYCK:  Chelsi, do you happen to

Page 44

1 know the Bates number of what that would be or how
2 it was identified in your discovery?  It might help
3 me without a copy.
4      MS. AVANT:  I think the e-mail would
5 begin with Bates number 000283.
6      MR. BUYCK:  Okay.  Thank you.  And that
7 was -- is that the Walls?
8      MS. AVANT:  That's in the Walls case.
9      MR. BUYCK:  Okay.
10      MS. AVANT:  And for some reason, that's
11 not -- that's what -- it's on my screen, but if
12 that's not right, let me know.
13      MR. BUYCK:  That's fine.  I'm just
14 trying to pull it up.
15      THE WITNESS:  DOR.  I forgot about
16 this.
17      MR. CROSBY:  Mr. Kubic, while you look
18 at that, let me take a quick break off the record
19 and give you a minute to look that over.  I'm going
20 to --
21      THE VIDEOGRAPHER:  We are going off
22 record.  The time is 2:11 p.m.
23      (A recess transpired.)
24      THE VIDEOGRAPHER:  We are back on
25 record.  The time is 2:21 p.m.

Page 45

1 BY MR. CROSBY:
2      Q.  Before we went off, Mr. Kubic, I passed
3 to you Exhibit 7.  Did you have an opportunity to
4 look that over?
5      A.  Yes.
6      Q.  And this is an e-mail exchange between
7 you and someone named Cynthia Bensch?
8      A.  Councilman Bensch.
9      Q.  She was on council at the time?
10      A.  Yes.
11      Q.  And what -- what was the -- the general
12 nature of what these communications related to?
13      A.  Generally speaking, this is
14 communications that were generated as a result of
15 trying to develop a road map -- a written road map
16 of duties and responsibilities that involved the
17 auditor's office and the treasurer's office, county
18 administration so that each of the areas of
19 responsibility, as this memorandum had indicated,
20 these various steps would be followed, and we would
21 ultimately lead to the generation of a tax bill and
22 the collection of a tax bill.
23      Q.  Was that the beginning efforts of
24 creating that protocol that you were referring to
25 earlier?

12 (Pages 42 - 45)

Gary T. Kubic
April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 50

1 council to come to the same conclusions predicated
2 on what I was telling them or what I was seeing
3 occur.
4     Q.   And she goes on in the next sentence
5 and says:  Harassing another person by walking by
6 their office and standing there and staring at
7 them, then walking backwards to repeat staring is
8 very bizarre behavior.
9     Who -- who was she making reference to?
10     A.   Well, I don't know how she decided to
11 write that. I would probably assume, and it's
12 terrible to do this, that she had conversations
13 with Maria Walls.
14     Q.   And the person that she was talking
15 about doing the harassing by staring was Jim
16 Beckert?
17     A.   Yes.  That's --
18     MR. J. ANDERSON:  Object to the form.
19     THE WITNESS:  -- how I interpret this.
20 BY MR. CROSBY:
21     Q.   And you would concur with her that that
22 type of behaviors, staring and what she's outlining
23 here, is both bizarre and harassing in nature?
24     MR. J. ANDERSON:  Objection.
25     MR. JJ ANDERSON:  Object to the form.

Page 51

1 It's leading.
2     THE WITNESS:  Well, you don't have to
3 lead me to my conclusions. I will tell you that in
4 the normal course of doing business, some of the
5 behaviors of Mr. Beckert were not normal business
6 procedures or strategies or behavior.
7 BY MR. CROSBY:
8     Q.   Do you concur with Ms. --
9     A.   In my opinion.
10     Q.   Okay.  Do you concur with Ms. Bensch's
11 assessment that his interactions, and if it's
12 referring to Ms. Walls, rose to the level of a
13 harassment?
14     A.   Yes.
15     MR. J. ANDERSON:  Objection.
16     MR. BUYCK:  Same objection.
17 BY MR. CROSBY:
18     Q.   And then she goes on, she says:  Is
19 there anyone with authority to speak with him about
20 limits of acceptable behavior?
21     Did you ever respond to her question,
22 either in person or in writing?
23     A.   I don't know if I responded direct -- I
24 think I -- I might have responded to county council
25 collectively. I don't think I responded to Cynthia

Page 52

1 Bennett's directly on point. My position was as
2 county administrator, I served at the pleasure of
3 county council that my duties and responsibilities
4 were defined by county council, that -- I think I
5 told council I have no statutory ability to go to
6 an elected official and instruct an elected
7 official as to how they should conduct their office
8 or level of operation.
9     I basically did have conversations with
10 Mr. Beckert that, you know, arguing and being
11 aggressive with individuals doesn't achieve
12 anything, that normal disagreement is appropriate.
13 Anybody can have an idea about anything. There is
14 differences of opinions almost all the way down the
15 chain of command. But ultimately, you know, you
16 come to some resolution.  And that was very
17 difficult with Mr. Beckert.
18     Q.   Did you ever observe that he made any
19 changes in his behavior toward others as a result
20 of your advice?
21     A.   I don't know if he changed his behavior
22 to become less aggressive. I think he maintained
23 his persona all the way through. I don't -- I
24 don't think he ever changed any -- he -- he just
25 acted that way.  That was his method of operation

Page 53

1 in terms of his personality and being aggressive.
2     Q.   Was this -- Mr. Beckert's harassing
3 nature of his behavior, was that ever brought to
4 the attention of the council?
5     MR. J. ANDERSON:  Object to the form.
6     MR. BUYCK:  Same objection.
7     THE WITNESS:  Are you asking me if I
8 ever brought to the attention of council his
9 aggressive behavior?
10 BY MR. CROSBY:
11     Q.   Yes.
12     A.   I'm not sure I used the word
13 aggressive. I think I told council several times
14 that Mr. Beckert clearly was argumentative,
15 disruptive, unwilling to at least listen to a
16 contrary point of view. And I don't know if I
17 should be -- well, in -- in his -- in this letter,
18 he refers to the department of revenue. I'm going
19 to expand my answer to say that I reached out to
20 the department of revenue to ask them for
21 assistance, and they basically had a difficult time
22 with Mr. Beckert as well, to the point where it's
23 my interpretation that they didn't want to get
24 involved with him either.
25     Q.   And Ms. Bensch goes on to write that

14 (Pages 50 - 53)

Gary T. Kubic
Holland, Aliciav. Beaufort County et al

April 7, 2021

Page 54

1 his obsession with control and authority has to
2 obviously affect office morale and performance in
3 many departments, and says: I know you're very
4 concerned.
5         Was she correct that you were concerned
6 about Mr. Beckert's affect on the morale and
7 performance of the various county departments that
8 were under your control?
9     A. Yes.
10     Q. And that goes back to what you talked
11 about earlier?
12     A. It goes back to Monica Spells, several
13 of my staff members, Dave Thomas in purchasing,
14 Alicia, Maria Walls. You know, it -- it -- it's
15 without question that Mr. Beckert was a disruptive
16 force generally.
17     Q. The -- did Maria Walls relay to you
18 other concerns she had with Mr. Beckert's behavior
19 toward her other than the staring through her
20 window?
21     A. Yes. Maria on several occasions told
22 me that she was afraid. She also shared with me a
23 notebook of various things that Mr. Beckert was
24 doing in terms of affecting her department, tape
25 recording her. And she gave me a copy of that

Page 55

1 notebook I think with the hope that I would be able
2 to somehow correct the situation. The problem for
3 me was I was the county administrator, and I have
4 11 bosses, and besides going to the department of
5 revenue and county council, there is not much else
6 I could possibly do. I couldn't dismiss him or get
7 him out of office. He was an elected official.
8     Q. Did you go to council with the -- those
9 concerns that -- about Ms. Walls's that she had
10 expressed to you?
11     A. Yes. The procedure that I employ with
12 council, because there are 11, is that I first
13 advise, which I did, my concerns to county chairman
14 and the vice chair, and I think it was at the time
15 Paul Sommerville and Jerry Stewart. As a matter of
16 fact, the protocol -- written protocol on how to
17 get a tax bill was an example of that concern. I
18 think I addressed in several of the meetings,
19 particularly I think finance, that we were having
20 difficulties with the auditor in general.
21         And I think there were times where the
22 auditor and treasurer in those meetings were
23 present, and they both spoke to it, and it was
24 clear from their comments that -- that it was very
25 difficult for them to cooperate with each other.

Page 56

1     Q. Did -- after you carried the concerns
2 Ms. Walls raised to council, were there ever any
3 solutions proposed by council on how to alleviate
4 these concerns that she had raised to you?
5     A. It was my impression that council felt
6 that having them both present at their committee
7 meetings or allowing each of them separately or
8 collectively to address council from the podium
9 about their concerns on a matter in dispute, which
10 they permitted.
11         I do believe that I advised
12 Mr. Sommerville and Mr. Stewart of my concerns
13 regarding the inability of both parties to resolve
14 their differences so that there could be a
15 collective positive outcome in the responsibilities
16 of each at the department, because what's unique
17 about these two departments is they're independent,
18 but their product is -- is a combination of --
19 of -- of both efforts.
20         And then the third component is the IT,
21 which is the software processing to actually create
22 the tax rolls which then go towards the final
23 product in printing the bills.
24         So, yeah, they were aware, and I think
25 the heightened awareness of it was the tax bills.

Page 57

1 I mean, there were disputes on language, there were
2 disputes on timeliness. And I wasn't the only one
3 that called the department of revenue. Mr. Beckert
4 called them countless times trying to get them to
5 see his way.
6     Q. And what you learned from your
7 conversations with the department of revenue was
8 that Mr. Beckert's interpretation of the laws was
9 inaccurate?
10     A. Yes. And I think a few times with the
11 extensions -- you know, they were -- they were
12 granting us extensions to push the date to produce
13 the bills back a month or so. But they were keenly
14 aware of Mr. Beckert.
15     Q. And when you were talking -- mentioned
16 earlier about Ms. Walls's concerns for her safety,
17 you were talking about her physical safety?
18     A. Yes.
19         MR. J. ANDERSON: Object to the form.
20 BY MR. CROSBY:
21     Q. And she expressed that to you?
22     A. Yes. More than one occasion.
23     Q. Was council aware that you had locked
24 Mr. Beckert out of your end of the building?
25     A. I'm not sure. I'm certain that

15 (Pages 54 - 57)

Gary T. Kubic                                        April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 62

1  elected officials, it's also for the new hires to
2  understand what their responsibilities are to the
3  taxpayer of Beaufort County.
4      Q.  Right.  This is the exact same handbook
5  that your staff would sign?
6      A.  Yes.
7      Q.  And it sets forth the expectations with
8  regard to the -- how you expect county employees
9  and those that sign off on this to act in the
10  workplace?  It has --
11        MR. J. ANDERSON:  Objection.
12        MR. BUYCK:  Note my objection.
13  BY MR. CROSBY:
14      Q.  -- certain -- certain forbidden --
15  or behaviors that are set forth in this?
16        MR. BUYCK:  Same objection.
17        MR. J. ANDERSON:  Me too.
18        THE WITNESS:  It -- it's a -- it's a
19  personnel handbook that offers the elected official
20  the hiring authority and the employee hired by the
21  hiring authority to know in writing what the
22  expectations would be for each side.  And so for
23  clarity, and also I think to protect the county
24  overall from random or haphazard claims by
25  employees against the county, if they did not

Page 63

1  follow the handbook, then they have no real
2  position to argue.
3  BY MR. CROSBY:
4      Q.  And --
5      A.  So, if they violated procedure, we had
6  the ability to process them through the conditions
7  and the grievance procedures defined in this book.
8      Q.  And one of the purposes of the -- some
9  of the language in the handbook is to provide a
10  good working environment by prohibiting such things
11  as sexual harassment?
12      A.  Yes.
13      Q.  That's something that was strictly
14  forbidden by the county?
15      A.  Appropriate behavior.
16      Q.  If we look at Page 6 at Paragraph 1.3,
17  it has an anti-harassment policy set forth there.
18      A.  Page 6, 1.3, yes.
19      Q.  And in the second sentence, it says:
20  In addition to county endeavors to provide a
21  working environment in which employees are free
22  from discomfort or pressure resulting from jokes,
23  ridicule, slurs, gossip, threats, bullying,
24  harassment whether relating to such distinctions or
25  simply resulting from a lack of consideration for a

Page 64

1  fellow human being.
2        And then it says:  The county does not
3  tolerate harassment of any kind and strictly
4  forbids retaliation against anyone who has reported
5  harassment in good faith.
6      A.  Yes.  That's what it says.
7      Q.  And basically it's -- what we've talked
8  about earlier, your efforts that we've talked about
9  to protect your staff and your employees from some
10  of Mr. Beckert's conduct were in effort to provide
11  the working anti -- harassment-free environment to
12  your employees?
13      A.  That's correct.  That's just sound --
14  sound management.
15      Q.  Because what -- what Mr. Beckert's
16  conduct, as you observed, would -- rose to the
17  level of what one would describe as harassment
18  within this definition?
19        MR. J. ANDERSON:  Objection.
20        THE WITNESS:  Are you asking me whether
21  or not Mr. Beckert violated this provision as
22  written in the employee handbook?
23  BY MR. CROSBY:
24      Q.  That's another way of saying it.
25      A.  I would have to say I agree with that

Page 65

1  assessment.
2      Q.  And what you did to the best of your
3  ability was try to protect the county's employees
4  from that type of environment?
5      A.  Yes.
6      Q.  And you actually tried to -- in some
7  respects -- to help protect Maria Walls from
8  that conduct by putting up the cameras and taking
9  the concerns to county council?
10      A.  Yes.
11        MR. J. ANDERSON:  Objection.
12  BY MR. CROSBY:
13      Q.  Go over to page -- let me -- let me ask
14  something before this.  There is always this issue
15  about Jim Beckert that seems to permeate, and that
16  is that no one could do anything about him because
17  he was an elected official.  That was -- and you
18  and I have talked about that, that you didn't have
19  statutory authority to control an elected official,
20  correct?
21      A.  Yes.
22      Q.  The office of the auditor and the
23  treasurer are in county-owned property?
24      A.  Beg your pardon?
25      Q.  The offices of both the treasurer and

17 (Pages 62 - 65)

Gary T. Kubic                                              April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 118

1  Could you -- could you be a little more clear on --
2  on what you meant by aggressive?
3       A.   Manner of speech, his countenance in
4  terms of sitting in a meeting and having
5  Mr. Beckert stare at you with intensity, those
6  types of observations is what I meant by a
7  nontypical office type behavior.
8       Q.   Okay.  So staring at you -- and I don't
9  want to put words in your mouth, but I don't -- you
10 know, we're trying -- is it -- would he be more
11 curt?  Would he be -- would he scream at you?  I
12 mean, what -- what's -- what does aggressive mean
13 when you say manner of speech?
14      A.   You can take a look at the -- all the
15 committee meetings are on videotape.
16      Q.   Uh-huh.
17      A.   There were occasions where Mr. Beckert
18 would get aggressive and argumentative.  So I can
19 recall distinctly a meeting that I tried to
20 create -- I think David Cadd, his assistant,
21 Mr. Beckert, Maria, myself, and maybe a couple of
22 other people -- to try to resolve issues, and I
23 didn't anticipate that it would generate anger by
24 having those two present in one room, but it -- it
25 did.

Page 119

1       Q.   Would an appropriate synonym for your
2  use of aggressive be passionate?
3       A.   Passionate is an interesting word that
4  I would not use to describe Mr. Beckert's behavior,
5  because there were times where it appeared to me
6  that he was just angry, and I don't believe if
7  you're -- if you're passionate that you're angry.
8  And --
9       Q.   Okay.  So your interpretation of --
10      A.   I interpreted his actions as being
11 overly aggressive in trying to present his point of
12 view vigorously, almost as if he felt that
13 everybody in the room was against him.
14      Q.   Uh-huh.  You mentioned that I think
15 you -- I think these are your exact words, that he
16 harassed everybody?
17      A.   Yeah.
18      Q.   Okay.  Do mean that literally?
19      A.   Yeah.  I do mean it literally.  I
20 don't --
21      Q.   Janitorial staff?
22      A.   No.  I don't think janitorial staff.  I
23 mean, basically all my employees on my side.
24      Q.   Uh-huh.  And --
25      A.   And then I -- and I think in the

Page 120

1  assessor's office, I also think in the legal
2  division, I think in the tax equalization board, I
3  think all of the treasurer's employees, so there
4  were quite a few.  But in the literal sense, I used
5  the word everybody, but obviously it's not
6  everybody.
7       Q.   Okay.  I'm going to ask -- I'm going to
8  do this annoying thing that I just did with
9  aggressive.  Can you explain to me exactly what you
10 mean by the word harassment or harassed?
11      A.   Well, in his manner of speech towards
12 people, we're having a conversation, we probably
13 are on different sides of the argument, but I'm not
14 angry at you.  But his communication style and how
15 he verbally related items was not a normal
16 conversation that would reflect a mere difference
17 of opinion.
18      Q.   Uh-huh.
19      A.   His method of expression was: It's my
20 way, and I determine that way, and you have no
21 right to suggest anything different.
22      Q.   Okay.  And is that -- is that your
23 definition of harassment is him being
24 territorial -- I'll use that word --
25      A.   It -- it --

Page 121

1            MR. CROSBY:  Object to the form.
2  BY MR. J. ANDERSON:
3       Q.   -- over items?
4       A.   It could be, yes.
5       Q.   Okay.  So --
6       A.   Now, you can ask the female employees
7  directly what they thought.  I wasn't there, and I
8  can't offer an opinion.  But in the --
9       Q.   Sure.  And like --
10      A.   -- time -- in the conversations that I
11 had or in the meetings I attended --
12      Q.   Uh-huh.
13      A.   -- that was my observation, that he was
14 very aggressive, and that aggressive approach can
15 be interpreted as harassment because clearly he
16 didn't want to hear any other point of view.
17      Q.   Okay.  So when you equal his -- so, in
18 an attempt to summarize here:  Him arguing for his
19 points in an aggressive manner is what you're
20 stating harassment to be?
21            MR. CROSBY:  Object to the form.
22 BY MR. J. ANDERSON:
23      Q.   Is -- is that -- I mean --
24      A.   That's --
25      Q.   Correct me if I'm wrong, please.

31 (Pages 118 - 121)

Gary T. Kubic                                                          April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 122

1      A.   That's -- that's part of it.  I
2  observed Mr. -- I -- I was at a meeting -- at a
3  public -- public meeting where Maria was speaking,
4  and, you know, Jim was openly filming her.
5      Q.   Uh-huh.
6      A.   And I thought to myself when I saw
7  that, you know:  What's going on?  So my
8  interpretation of that action was he was trying to
9  intimidate her while she was speaking to the
10  general public.  And he did that on several
11  meetings where I attended, you know.  So I just
12  thought that's not necessary.
13      Q.   Did you -- did you know that he was
14  filming her or was --
15      A.   Yeah.
16      Q.   -- was that your interpretation?
17      A.   No.  Here.
18      Q.   Okay.  All right.  So --
19      A.   Hold up the phone --
20      Q.   He had a phone held up.  Okay.
21      A.   -- directly at her face --
22      Q.   Uh-huh.
23      A.   -- filming.  And I think there are
24  pictures of him doing that.
25      Q.   Uh-huh.  All right.

Page 123

1      A.   So...
2      Q.   Mr. Crosby asked you about -- in
3  Exhibit 1 here, it's the personnel handbook.
4      A.   Yes.
5      Q.   You went to Page 8, and you talked
6  about 1.6, corrective action.
7      A.   Page 8.  Okay.  I'm getting there.  I'm
8  with you.
9      Q.   Now, you two spoke about the last two
10  sentences within that paragraph.  Would you read
11  the first sentence of that --
12      A.   Did you say 1-6?
13      Q.   I did, 1.6.
14      A.   Okay.  The last two sentences?
15      Q.   You two spoke about the last two
16  sentences:  Employees may be disciplined.
17  Non-employees -- him asking a series of questions
18  about what --
19      A.   Okay.
20      Q.   -- non-employees are.
21      A.   In the first paragraph?
22      Q.   Uh-huh.  Yeah.  That's right.  Would
23  you mind reading the first sentence?
24      A.   If management concludes that a
25  complaint of harassment has merit, appropriate

Page 124

1  action is taken.
2      Q.   Okay.  Did management ever conclude
3  that a complaint of harassment has merit against
4  Mr. Beckert during your tenure there?  I
5  understand --
6      A.   Are you indicating that I was the
7  manager of --
8      Q.   I'm not --
9      A.   -- an elected official?
10      Q.   I'm not making a management question at
11  all here, sir.  I'm not indicating that you are the
12  management.  I'm -- I'm asking if this -- in this
13  process -- you know, whatever management is defined
14  as is in this process.
15      A.   Well, I guess my definition of
16  management in this section doesn't apply to county
17  council directors or administrator that I manage an
18  elected official.
19      Q.   Uh-huh.
20      A.   I don't think that was the intent of
21  that.  I think it was the intent of that language
22  that department heads who are in charge of
23  employees are the management that is referred to in
24  that sentence.  And when they see it, they have an
25  avenue to report it.  But I don't think I have the

Page 125

1  management right to offer harassment charges
2  against an elected official.
3      Q.   I -- I understand your position.
4  And -- and while I appreciate it, I think my
5  question was a little bit different.  Whoever the
6  management -- this -- this 1.6 says:  If management
7  concludes -- and we can put aside who management is
8  at this point -- whether it be a -- whether it be a
9  board, whether it be the county council, whoever it
10  could be.  Right?  This is not -- or the
11  administrator, that's not -- but if that management
12  concludes that a complaint of harassment has merit,
13  all right, appropriate action is taken.  Is that
14  not what that says -- I mean, is that what that
15  says?  My apologies.
16      A.   Yes.
17      Q.   Okay.  Did anyone conclude that a
18  complaint of harassment against Mr. Beckert had
19  merit?  Anybody?
20      A.   Well, I didn't come to the conclusion
21  in the legal sense that his actions against a
22  fellow or another employee had merit in the sense
23  that you're referring to it.  But it is my definite
24  opinion predicated on what I witnessed and what I
25  saw in terms of how Mr. Beckert treated others, not

32 (Pages 122 - 125)

Gary T. Kubic                                April 7, 2021
Holland, Aliciav. Beaufort County et al

Page 126

1 only his employees, but other employees throughout
2 the county, I would interpret those actions towards
3 those employees that he was harassing them. His
4 anger, his -- the method, the way he talked to them
5 clearly did not comport with what would be
6 considered reasonable and appropriate conduct in a
7 workplace.
8     Q.  And you -- but once again, as you
9 stated before, you're not asked to -- to rule on
10 that?
11    A.  No.
12    Q.  Okay.  And would it have been
13 appropriate for you to ever rule on that --
14    A.  No.
15    Q.  -- in your position as administrator?
16    A.  There is no statutory authority that I
17 ever became aware of that gave me that capability.
18    Q.  Okay.  During -- during your tenure
19 there, did anyone -- are you aware of anyone
20 gossiping about Mr. Beckert?
21    A.  Gossiping?
22    Q.  Yes, sir.
23    A.  I'm not sure what you mean about
24 gossiping.  If you're -- if you're meaning were
25 they talking about Mr. Beckert with -- outside of

Page 127

1 his presence?
2     Q.  How do you interpret -- I mean, how do
3 you interpret the term gossip?
4     A.  I interpret it as two individuals
5 sitting at a bar having a few drinks, discussing
6 how somebody treated somebody else.  That's how I
7 interpret gossiping.
8     Q.  Okay.  So hopefully --
9     A.  To me gossip has no meaning whatsoever.
10 People gossip all the time.
11    Q.  It's a term used in the county employee
12 handbook, though --
13    A.  Okay.
14    Q.  -- is it not?
15    A.  I don't know.  If it is there, it's
16 there.  I don't --
17    Q.  Okay.  So we'll go to 1.3, the
18 anti-harassment policy.
19    A.  Okay.
20    Q.  I believe it's the second sentence.
21 I'll give you a second to read that.  I think it
22 starts with in addition.
23    A.  Yes, sir.
24    Q.  I'll give you a second to read that.
25    A.  Okay.

Page 128

1     Q.  How do you interpret gossip in this
2 context?
3     A.  How do I interpret gossip in that
4 context?  Well, I guess when -- you know, I guess
5 I'll refer -- I'll give you this answer, which may
6 seem kind of odd:  There is a movie called -- it's
7 about a Catholic priest, and he in a sermon
8 describes that a woman came to him and she felt she
9 had sinned because she gossiped about another
10 party, and he told her to go on the rooftop with a
11 knife and a pillow and open the pillow.  And so she
12 did, and she reported back to the priest:  Father,
13 I did what you asked me.
14        And he said, well, now I want you to go
15 and pick up the feathers.
16        And she said, how can I do that?
17 They're everywhere.
18        And he said, that's gossip.
19        Which I found was a pretty profound way
20 of describing what gossip actually is.
21    Q.  So releasing things -- releasing
22 statements into the world which you have no ability
23 to capture back?
24    A.  Yes.
25    Q.  Do you feel like that happened with --

Page 129

1 did anyone ever release statements into the world
2 that they had no ability to capture back about Jim
3 Berkert?
4     A.  I'll answer it this way:  The Island
5 Packet quoted me several times in meetings that I
6 didn't attend.  That's just part of the process.
7 Especially with people in the public, they like
8 what you wear, they don't like what you say.  You
9 are open game to anyone if you are a public
10 employee or an elected official.
11    Q.  Did any of your employees gossip in the
12 term that you've -- about Mr. Beckert?
13    A.  They could have.  I don't know.
14    Q.  Okay.  So you don't -- you don't know
15 if any of your employees did.  Did any of your
16 employees use slurs against Mr. Beckert like, I
17 don't know, creepy?
18    A.  Yeah.  They used word the creepy --
19    Q.  Okay.
20    A.  -- made me uncomfortable.
21    Q.  Okay.
22    A.  Yeah.  The -- the black employee --
23 female employees who came into my office felt that
24 he was using David Cadd to look over their shoulder
25 to find errors in their performance so that he

33 (Pages 126 - 129)

In the Matter of:

# ALICIA HOLLAND

vs.

# BEAUFORT COUNTY, and JAMES BECKERT, Individually, and in his official capacity

---

## Ebony Sanders

September 28, 2021

---



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC  29465
843-849-0133
Spectrumaaa@gmail.com